IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MILTON AL STEWART, Acting Secretary of Labor, United States Department of Labor, | ) ) ) | CIVIL NO. 18-00155 SOM-WRP ORDER GRANTING IN PART AND |
| Plaintiff, | ) ) ) | DENYING IN PART GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING BOWERS AND |
| vs. | ) ) | KUBOTA'S MOTION FOR SUMMARY JUDGMENT AND JOINDER THEREIN |
| NICHOLAS L. SAAKVITNE, an individual; NICHOLAS L. SAAVITNE, A LAW CORPORATION, a California Corporation; BRIAN BOWERS, an individual; DEXTER C. KUBOTA, an individual; BOWERS + KUBOTA CONSULTING, INC., a corporation; BOWERS + KUBOTA CONSULTING, INC. EMPLOYEE STOCK OWNERSHIP PLAN, | ) ) ) ) ) ) ) ) ) ) ) ) | BUT DISMISSING THE PORTION OF COUNT IX CHALLENGING THE VALIDITY OF LANGUAGE IN THE ESOP STOCK PURCHASE AGREEMENT |
| Defendants. | ) ) ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S
MOTION FOR SUMMARY JUDGMENT; ORDER DENYING BOWERS
AND KUBOTA'S MOTION FOR SUMMARY JUDGMENT AND JOINDER THEREIN
BUT DISMISSING THE PORTION OF COUNT IX CHALLENGING
THE VALIDITY OF LANGUAGE IN THE ESOP STOCK PURCHASE AGREEMENT**

I.      INTRODUCTION.

Brian Bowers and Dexter C. Kubota operated Bowers + Kubota Consulting, Inc. (the "Company"), through which they provided consulting, architectural, and engineering services. Bowers and Kubota had separate trusts that owned the Company. The two men created an Employee Stock Ownership Plan called Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan (the "ESOP"), and had their trusts sell their 100 percent ownership interest in the Company to the ESOP.  The consulting

company was allegedly overvalued based on faulty data, meaning that the ESOP allegedly agreed to pay more money than the Company was worth.  The Secretary of Labor (the "Government"), proceeding under the Employee Retirement Income Security Act of 1974 ("ERISA"), is suing the two individuals, the Company, the ESOP, Nicholas L. Saakvitne (the first trustee of the ESOP), and the first trustee's law firm, alleging that the sale to the ESOP improperly benefitted Bowers and Kubota to the detriment of the ESOP.  The Government also claims that Saakvitne breached his duties as the ESOP's trustee and that Bowers and Kubota breached their fiduciary duties to monitor Saakvitne and to sell the Company for no more than fair market value.

Before the court are two motions for summary judgment. The court grants in part the Government's motion for partial summary judgment, which seeks to set the dates when Bowers and Kubota were acting as fiduciaries.  This court rules that Bowers and Kubota acted as fiduciaries to the ESOP no later than December 3, 2012, when they adopted the ESOP and appointed Saakvitne as an independent fiduciary and the sole ESOP trustee, with a retroactive date of January 1, 2012.  Questions of fact preclude this court from determining on the present record whether Bowers and Kubota acted as fiduciaries before December 3, 2012.  The Government's motion is therefore denied in all other respects.

2

The court denies Bowers and Kubota's motion for summary judgment, as well as the Company's joinder therein.  However, the court dismisses the portion of Count IX challenging the validity of the indemnification language in the ESOP Stock Purchase Agreement, as there is no actual case or controversy with respect to that language.

**II.      BACKGROUND.**

**A.    The Sale of ESOP Stock.**

Bowers and Kubota's respective trusts owned the Company, which performed consulting, architectural, and engineering work.  *See* Answer, ECF No. 67, PageID # 588; Responsive Concise Statement, ECF No. 383, PageID # 8156.  Bowers and Kubota as individuals indisputably controlled the Company.

In December 2011, URS Corporation sent the Company a nonbinding indication of interest in purchasing the Company for $15,000,000, plus or minus "cash and debt on the Company's balance sheet."  *See* ECF No. 386-6, PageID #s 8478-80 ("URS has estimated a preliminary purchase price of $15,000,000 in cash, not including any cash and debt on the Company's balance sheet . . . .").  Taking that "cash and debt on the Company's balance sheet" into account, Bowers and Kubota say the offer was closer to between $20,000,000 and $30,000,000.  *See* Depo. of Greg Kniesel, ECF No. 388-5, PageID # 8734 (indicating that the URS letter of interest, with adjustments, meant a preliminary

3

purchase price "in the neighborhood of $20 to $30 million total").

In January 2012, Bowers, Kubota, and Tom Nishihara, the Company's outside certified public accountant, met with Gary Kuba of GMK Consulting, Inc.  *See* Depo. of Dexter Kubota, ECF No. 363-9, PageID # 6962.  The Company hired GMK to determine what the Company was worth for the purpose of evaluating the URS offer.  *See* Depo. of Brian Bowers, ECF No. 355-7, PageID # 6595.  On May 9, 2012, GMK valued the Company at between $31.2 and $46.8 million, *see* ECF No. 355-5, PageID #s 6576-87, relying on information provided by Bowers, Kubota, and Nishihara, *see* Bowers Depo., ECF No. 355-7, PageID # 6598.  The Company sent a copy of the GMK report to URS, which then abandoned discussions about acquiring the Company.  *See* Bowers Depo., ECF No. 355-7, PageID #s 6597, 6600; ECF No. 355-6, PageID # 6588 (May 9, 2012, e-mail from Bowers to Paul Vallone, of URS, attaching GMK valuation report).

In June 2012, Bowers and Kubota started "moving in the ESOP direction."  ECF No. 355-8, PageID # 6607 (June 19, 2012, e-mail from Bowers to Kuba and Kubota).

On July 26, 2012, Kuba of GMK told Bowers that GMK was interested in assisting the Company with its transition to an ESOP, if that was the direction the Company chose.  Kuba also recommended Greg Hansen, of the Honolulu law firm of Case

4

Lombardi & Pettit, as a possible attorney. *See* ECF No. 355-9, PageID # 6609.

On September 2, 2012, the Company hired Hansen to provide legal advice with respect to the Company's possible sale to the ESOP. *See* ECF No., 355-10, PageID #s 6510-13. That same day, the Company asked Kuba to "pick[] up where you left off" and complete a formal valuation appraisal for the Company. *See* ECF No. 355-8, PageID # 6607.

The following month, October 2012, Kuba indicated to the Company that he felt "uncomfortable with . . . the structure of the transaction" and did not want to complete a valuation for ESOP purposes. *See* Depo. of Gary Kuba, ECF No. 388-9, PageID #s 8768-69; ECF No. 356-1, PageID # 6618 (October 19, 2012, e-mail from Bowers to Hansen, explaining that "Kub[a] felt uncomfortable completing our valuation" and quit on October 17, 2012).

Hansen then recommended that Bowers and Kubota meet Greg Kniesel of Libra Valuation Advisors ("LVA") when Bowers and Kubota were on a business trip to Chicago. *See* ECF No. 356-2, PageID #s 6621, 6623. On October 18, 2012, Bowers sent Kniesel a copy of Kuba's May report valuing the Company at between $31.2 and $46.8 million. *See* ECF No. 355-5, PageID # 6559 (Oct. 18, 2012, e-mail from Bowers to Kniesel attaching Kuba's May report); Bowers Depo., ECF No. 355-7, PageID #s 6597.

On October 20, 2012, LVA sent an engagement letter to the Company and "Brian Bowers, Trustee . . . of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust," in which LVA agreed to determine the fair market value of the ESOP stock. *See* ECF No. 356-3, PageID # 6627.

Bowers, Kubota, and Kniesel met on October 22, 2012. *See* ECF No. 356-2, PageID # 6620 (October 12, 2012, e-mail indicating that the meeting occurred that day); Depo. of Greg Kniesel, ECF No. 388-5, PageID #s 8729-30 (indicating that the meeting between himself and Bowers and Kubota occurred at a private meeting room in a hotel and likely lasted several hours).

At some point, LVA was hired and then produced a report dated November 21, 2012. *See* ECF No. 356-3, PageID # 6627; ECF No. 356-6, PageID #s 6637-40. The report stated that the fair market value of the Company was "in the range of **$37,090,000 to $41,620,000.**" *Id.*, PageID # 6638. According to Kniesel, this value range was based in part on income statements and cash flow information provided to LVA by the Company. *See* Kniesel Depo., ECF No. 388-5, PageID # 8745.

On November 21, 2012, Bowers and Kubota met with the Company's attorney, Hansen. Hansen's agenda for the meeting included a line item for "Trustee appointment--independent highly recommended." ECF No. 356-8, PageID # 6656. Hansen strongly recommended that Saakvitne be the ESOP trustee, as Hansen had

known Saakvitne for many years and Saakvitne had experience practicing law, dealing with business matters, and working with ESOPs. *See* Bowers Depo., ECF No. 355-7, PageID # 6602. That same day, Hansen sent Saakvitne an e-mail stating, "They agreed to hire you on my advice." ECF No. 356-9, PageID # 6657. The e-mail further stated, "This is looking like a $12 million preferred stock transaction. There is a slight possibility they will change their mind and do a 100% transaction for 40 million . . . ." *Id.* The e-mail also noted, "Greg Kniesel [j]ust finished the draft evaluation today." *Id.* Finally, Hansen told Saakvitne that Hansen was leaving town on December 19, 2012, and that any deal would need to be completed by then. *Id.*

On November 22, 2012, Bowers forwarded the LVA report to the Company's CPA, Tom Nishihara, stating, "Range is tighter and falls within Gary[ Kuba]'s previous range which is good." ECF No. 356-7, PageID # 6654.

On November 24, 2012, Hansen asked Saakvitne to send LVA his exact title so that LVA's engagement letter would "run directly to the Trustee" of the ESOP, rather than to the Company and "Brian Bowers, Trustee . . . of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust," as set forth in the previous engagement letter. *See* ECF No. 356-3, PageID # 6627; ECF No. 357-1, PagID # 6661.

On November 26, 2012, the Company formally agreed with
Saakvitne that he would be the Company's ESOP trustee.  *See* ECF
No. 358, PageID #s 6696-99 (Employee Stock Ownership Plan
Fiduciary Agreement Between Bowers + Kubota Consulting, Inc. and
Nicholas L. Saakvitne).

On December 3, 2012, Bowers and Kubota, as the only
members of the Company's board of directors, signed a resolution
adopting the ESOP and appointing Saakvitne as an independent
fiduciary and the sole ESOP trustee, retroactively effective as
of January 1, 2012.  *See* ECF No. 357-3, PageID #s 6667-68.

On December 7, 2012, Saakvitne, as "Trustee of the
Proposed Bowers + Kubota Employee Stock Ownership Plan and
Trust," executed a second LVA engagement letter.  *See* ECF No.
357-2, PageID #s 6662-67.  Before hiring Saakvitne, Bowers and
Kubota had had only one telephone discussion with him that may
have lasted from four to six hours.  *See* Bowers Depo., ECF No.
355-7, PageID # 6602-03.  However, Saakvitne billed a total of
only 1.2 hours for "11/23/12 CORRESPONDENCE WITH GREG HANSEN;
TELEPHONE CONFERENCE WITH MESSRS BOWERS, KUBOTA AND HANSEN
REGARDING ESOP TRANSACTION."  ECF No. 357-7, PageID # 6691.
Possibly, Saakvitne wrote off some of his time in billing for the
meeting.  Given challenges by Bowers and Kubota to the
authenticity of Saakvitne's bill, *see* ECF No. 382, PageID # 8142,

the court assumes that the telephone discussion lasted four to six hours.

On December 10, 2012, Bowers sent Saakvitne an e-mail indicating that he and Kubota ("the sellers," according to Bowers) were offering to sell the ESOP 100 percent of the Company's common stock for $41 million.  Bowers did not refer to his and Kubota's trusts, which actually owned the stock.  On December 11, 2012, Saakvitne countered at $39 million.  Later that day, Bowers sent an e-mail countering at $40 million, which Saakvitne agreed to.  *See* ECF No. 357-4, PageID #s 6669-72.

On December 11, 2012, Bowers and Kubota, in their capacities as the Company's officers, adopted the Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan (Effective As Of January 1, 2012).  *See* ECF No. 357-5, PageID #s 6674-85.  The Plan states, "The Company shall be the named fiduciary with authority to control and manage the administration of the Plan, except where the Plan otherwise delegates such responsibility to the Board of Trustees."  *Id.*, PageID # 6679.  The Plan further states, "The Plan will be administered by the Company and a Board of Trustees composed of one or more individuals appointed by the Board of Directors to serve at its pleasure and without compensation."  *Id.*

The Plan provides:

The Company shall have all powers necessary
to enable it to administer the Plan and the

> Trust Agreement in accordance with their
> provisions, including without limitation the
> following: . . . (9) reviewing the
> performance of the Trustee with respect to
> the Trustee's administrative duties,
> responsibilities and obligations under the
> Plan and Trust Agreement.

*Id.*, PageID # 6680.  The Plan also states:

> The Trustee shall have all powers necessary
> to administer the Plan and the Trust
> Agreement in accordance with their
> provisions, including without limitation the
> following:
>
> (1) establishing a funding policy and method
> for acquiring Company Stock and for otherwise
> investing the Trust Assets in a manner that
> is consistent with the objectives of the Plan
> and the requirements of ERISA; and
>
> (2) selecting an independent appraiser and
> determining the Fair Market Value of Company
> Stock as of such dates as it determines to be
> necessary or appropriate.

*Id.*, PageID #s 6680-81.

On December 14, 2012, LVA sent Saakvitne and Bowers a valuation of the Company's stock as of that date.  LVA noted its understanding that the ESOP was going to purchase all 1,000,000 shares of the Company's stock for $40,000,000, with the Brian J. Bowers Trust, dated December 22, 2010, selling 510,000 shares and the Dexter C. Kubota Trust, dated March 17, 2006, selling 490,000 shares.  This meant the purchase price per share was $40.00.  LVA determined that the fair market price of each share was $40.15. Accordingly, LVA determined that the price the ESOP was paying to acquire the stock did not exceed its fair market value.  *See* ECF

No. 357-6, PageID #s 6686-90.  Also on December 14, 2012, Bowers
and Kubota's respective trusts sold all of their 1,000,000 shares
to the Company's ESOP for $40,000,000.  *See* ESOP Stock Purchase
Agreement, ECF No. 368-1, PageID #s 7680-96.  The sale was
financed by a loan by Bowers and Kubota to the ESOP, with the
ESOP giving Bowers and Kubota promissory notes for the money
owed.  The shares were the collateral for the loan.  *Id.*, PageID
# 7680.

On or about October 15, 2013, the ESOP filed Form 5500,
its Annual Return/Report of Employee Benefit Plan, with the
Internal Revenue Service.  *See* ECF No. 364-6, PageID # 7285.
Apparently, the form was also submitted to the Department of
Labor via EFAST2, an electronic filing system discussed in BK
Exhibit 280.  *See* ECF No. 365-4.  According to Jerome Raguero of
the Department of Labor, EFAST2 is an automated system in which,
when a form is submitted, "there isn't someone who is receiving
it, a person receiving it when it's filed, that a person doesn't
necessarily look [at] it at the time that it's filed."  30(b)(6)
Depo. of Jerome Raguero, ECF No. 363-1, PageID # 6783.  Bowers
and Kubota have asserted that Form 5500 was indeed read by an
EFAST2 contractor when received.  *See* ECF No. 373, PageID
#s 7709-10.  However, at the hearing on the motions addressed in
the present order, they were unable to identify admissible
evidence supporting this contention.  Instead, they are drawing

11

an inference that they say flows from the absence of a rejection of the form by the EFAST2 system.

The supplemental attachments to Form 5500 explain the transaction:

> Closing on December 14, 2012, the Plan purchased all of the issued and outstanding shares (Shares) of common stock of the Company and financed the purchase with two loans (ESOP Loans) from the Sellers that are evidenced by two executed Promissory Notes, and pledged the Shares to the Sellers to secure payment of the Notes.  The Company common stock is held in a trust (Trust) established under the Plan.  The loans are to be repaid over a period of twenty five years by Company contributions and/or distributed dividends and/or earnings to the Plan.  As the Plan makes each payment of principal, an appropriate percentage of stock will be allocated to eligible employees' accounts in accordance with applicable regulations under the Code.  Shares vest fully upon allocation. The loans are collateralized by the unallocated shares of common stock and are guaranteed by the Company.  The lenders have no rights against shares of common stock once they are allocated under the ESOP. Accordingly, the financial statements of the Plan as of December 31, 2012, and for the year ended December 31, 2012, present separately the assets and liabilities and changes therein pertaining to:
>
> ◦ The accounts of employees with vested rights in allocated common stock (Allocated) and
>
> ◦ Common stock not yet allocated to employees (Unallocated).

ECF No. 364-6, PageID # 7301.

Attached to Form 5500 is the Independent Auditors'
Report and Financial Statements as of December 31, 2012, prepared
by Robert H.Y. Leong & Company.  *See* ECF No. 364-6, PageID
#s 7296-7300.  This report concluded that each company share, as
of December 31, 2012, had a fair market value of about $6.53 per
share, giving the 1,000,000 shares a total value of $6,530,000.[1]
*See id.*, PageID #s 7309, 7313.  At the hearing, Bowers and Kubota
explained that the apparent drop in price was not a drop at all.
Instead, they say the Independent Auditors' Report's $6.53 per
share valuation reflects the value of the company offset by the
ESOP's debt relating to the purchase of the stock.  This
explanation is consistent with the Independent Auditors' Report's
statement that "[t]he carrying value of the notes payable as of
December 31, 2012, was approximately $39,092,055, which
approximated fair value."  *See id.*, PageID # 7310.

From his appointment as the ESOP trustee through the
sale of the stock on December 14, 2012, Saakvitne billed for 30.1
hours of work.  *See* ECF No. 357-7, PageID #s 6691-6693.  Although

---

[1] As of December 31, 2012, 44,611 shares had been allocated
to the Company's employees, leaving 955,389 of the 1,000,000
shares unallocated.  *See id.*, PageID # 7306.  The report noted
that the employer had contributed $2,459,873 to the plan, giving
the plan assets of $8,989,873, calculated by adding the value of
the shares ($6,530,000) and the employer contributions
($2,459,873).  The report then subtracted the value of the notes
payable for the purchase of the stocks and interest on the notes
($39,129,540), giving the ESOP a deficit of $30,139,667.  *See
id.*, PageID # 7299.

Bowers and Kubota challenge the authenticity of this bill, this court need not rely on it in addressing the present motions. Instead, the number of hours worked by Saakvitne goes to the issue of whether he properly represented and evaluated the value of the ESOP or whether he was improperly swayed by what he may have been told by the Company, matters not before the court on the present motions.

### B.   The Government's Enforcement Action.

In December 2014, Michael Wen of the Department of Labor was told by his supervisor to "find some ESOP cases in Hawaii." Depo. of Michael Wen, ECF No. 388-1, PageID # 8585. Wen then used the Government's ERISA data system, asking it to locate leveraged ESOPs with an asset value over $1 or $5 million. The ERISA data system identified the Company's ESOP. *Id.* Wen says he then printed out the ESOP's Form 5500 and the auditors' notes for 2012 and 2013 and sent a document request to the ESOP. *Id.*, PageID #s 8586, 8587, 8592-92.

The Department of Labor had previously investigated other ESOPs involving Saakvitne. For example, beginning on November 5, 2013, it had investigated the Kennedy Fabricating, Inc. Employee Stock Ownership Plan. *See* Depo. of Harold W. LeBrocq, III, ECF No. 363-6, PageID # 6937. The October 2015 Investigative Plan for Major Case with respect to the Kennedy Fabricating ESOP indicates that the Department of Labor sought to

14

"[d]etermine if the named Trustee, Nicholas L. Saakvitne[,]
performed his due diligence with regards to the valuation
performed by Vantage Point Advisors.  Documents to be subpoenaed
by 11/20/15.  To be interviewed by 11/30/15."  ECF No. 364-3,
PageID # 7230.

According to Jerome Raguero of the Department of Labor,
although an investigator is not prohibited from inquiring about
other ESOPs a service provider may have been involved with,
Department of Labor investigators do not generally make such
inquiries.  *See* Depo. of Jerome Raguero, ECF No. 363-1, PageID
# 6800; *see also* Johnson Depo., ECF No. 363-3, PageID #s 6840-41
(stating that, although investigators have the power to ask about
other ESOPs, "I don't know . . . why we would," and noting that
an investigator focuses on trying to resolve the case before the
investigator); Depo. of Robert Prunty, ECF No. 363-5, PageID
#s 6895, 6908 (testifying that investigators do not typically ask
about other ESOPs when conducting an investigation into an ESOP
and that he has not done so).

Harold LeBrocq investigated the Kennedy Fabricating
ESOP without asking Saakvitne about other ESOPs Saakvitne was
involved with.  *See* LeBrocq Depo., ECF No. 363-6, PageID # 6933.
Similarly, while investigating the ESOP at issue in this case,
Wen did not ask Saakvitne about other ESOPs Saakvitne was
involved with.  Wen explained that he was focused only on the

15

ESOP transaction before him.  *See* Wen Depo., ECF No. 363-2,
PageID #s 6824-25.

The Department of Labor had also investigated the Hot
Dog on a Stick Employee Stock Ownership Plan.  Robert Prunty, the
senior investigator assigned to that investigation, said that the
Department of Labor began that investigation when a service
provider gave them a lead around July 14, 2014.  *See* Prunty
Depo., ECF No. 363-5, PageID #s 6898-6900, 6906.  The Government
interviewed Saakvitne in July 2014 about the matter.  *See* Depo.
of Crisanta Johnson, ECF No. 363-3, PageID # 6850.  A Report of
Investigation dated September 19, 2017, indicates that the
investigation was opened because the plan sponsor and trustee
agreed to sell the company for $12 million after having earlier
agreed to sell it for $16 million.  *See* ECF No. 364-4, PageID
# 7239.  According to the report, "Saakvitne was the designated
fiduciary to more than 100 plans."  *Id.*, PageID # 7248.  The
report notes that, on June 8, 2015, the "LARO [the Department of
Labor's Los Angeles Regional Office] opened a spin-off service
provider investigation of Saakvitne."  *Id.*; Investigative Plan-
Major Case (Subject: Nicholas L. Saakvitne) dated October 7,
2016, ECF No. 364-5, PageID # 7253.

Miguel Paredes, a former Department of Labor
supervisory investigator, said, "I would expect that if an
investigator has uncovered what they think is a fiduciary breach

by a fiduciary, they would want to know whether or not that fiduciary is a fiduciary of other plans because they would be concerned that this provider is breaching a fiduciary duty in other--in other--in the provision of services to other plans." Depo. of Miguel Paredes, ECF No. 363-4, PageID # 6889.

On or about June 15, 2016, Wen prepared a Major Case Submission for the ESOP at issue in this case. *See* Wen Depo., ECF No. 388-1, PageID # 8595. That document explains, "The case was opened due to more than $30 million decrease in the Company stock valuation after the ESOP purchased 100% of the Company stock in 2012." ECF No. 364-10, PageID # 7329.

In October 2016, the Government, the Company, and Bowers and Kubota in their individual capacities, agreed to toll the statute of limitations under ERISA effective October 16, 2017, to April 30, 2018. *See* ECF No. 367-2, PageID #s 7607-12.

On April 27, 2018, the Government filed the Complaint in this matter. *See* ECF No. 1.

**III.      STANDARD OF REVIEW.**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment movants must support their

17

position concerning whether a material fact is genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

*Ass'n*, 809 F.2d 626, 630 (9ᵗʰ Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial.  *T.W. Elec. Serv.*, 809 F.2d at 630.  At least some "'significant probative evidence tending to support the complaint'" must be produced.  *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)); *see also Addisu*, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").  "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial."  *Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9ᵗʰ Cir. 1987) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).  *Accord Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

19

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party.  *T.W. Elec. Serv.*, 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  *Id.*  When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  *Id.*

IV.    **ANALYSIS.**

   A.    **The Government's Motion for Summary Judgment Is Granted in Part and Denied in Part.**

The Government's motion seeks partial summary judgment in the form of an order declaring that Bowers and Kubota were fiduciaries with respect to the Company's ESOP from January 1, 2012, the date the ESOP was retroactive to, through December 14, 2012, when the ESOP purchased the Company's stock.  This court therefore examines whether and to what extent Bowers and Kubota exercised "discretionary authority or discretionary control respecting management of such plan or exercise[d] any authority or control respecting management or disposition of its assets.'" *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 1997) (quoting 29 U.S.C. § 1002(21)(A)(i)).

20

Congress enacted ERISA to establish "minimum standards . . . assuring the equitable character of [employee benefit] plans and their financial soundness."  29 U.S.C. § 1001(a). ERISA requires that "authority to control and manage the operation and administration of the plan" be vested in one or more named fiduciaries, and that these fiduciaries abide by "standards of conduct, responsibility, and obligation" to protect the plan's participants and beneficiaries.  *Id.* §§ 1001(b), 1102(a)(1).  These standards include the duties of loyalty and care and a prohibition against self-dealing.  In other words, employee plan fiduciaries must discharge plan duties "solely in the interest of the participants and beneficiaries.  *Id.* §§ 1104(a)(1), 1106(b)(1).  Fiduciaries are required to discharge their duties with respect to a plan:

> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

21

> (D) in accordance with the documents and
> instruments governing the plan insofar as
> such documents and instruments are consistent
> with the provisions of this subchapter and
> subchapter III.

29 U.S.C. § 1104(a)(1).

ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Couturier*, 572 F.3d at 1076 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)).  The Ninth Circuit "construe[s] ERISA fiduciary status 'liberally, consistent with ERISA's policies and objectives.'"  *Id.* (quoting *Ariz. State Carpenters Pension Tr. Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997)); *see also LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015) ("we have repeatedly stated that ERISA is remedial legislation that should be construed liberally to protect participants in employee benefits plans." (alteration signals, quotation marks, and citation omitted)); *Batchelor v. Oak Hill Med. Grp.*, 870 F.2d 1446, 1449 (9th Cir. 1989) ("ERISA is remedial legislation which should be liberally construed in favor of protecting participants in employee benefit plans.").  ESOP fiduciaries therefore include "not only those specifically named in the employee benefit plan, 29 U.S.C. § 1102(a), but also any individual who 'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or

22

disposition of its assets.'"  *Couturier*, 572 F.3d at 1076
(quoting 29 U.S.C. § 1002(21)(A)(i)).

Members of an employer's board of directors have ERISA
fiduciary obligations to the extent they have responsibility over
the ESOP and over the management or disposition of its assets.
*See Couturier*, 572 F.3d at 1076 ("We have accordingly recognized
that where members of an employer's board of directors have
responsibility for the appointment and removal of ERISA trustees,
those directors are themselves subject to ERISA fiduciary duties,
albeit only with respect to trustee selection and retention.").
The Department of Labor has provided guidance for fiduciaries on
a board of directors:

> Members of the board of directors of an
> employer which maintains an employee benefit
> plan will be fiduciaries only to the extent
> that they have responsibility for the
> functions described in section 3(21)(A) of
> the [ERISA, 29 U.S.C. § 1002(21)(a)].  For
> example, the board of directors may be
> responsible for the selection and retention
> of plan fiduciaries.  In such a case, members
> of the board of directors exercise
> "discretionary authority or discretionary
> control respecting management of such plan"
> and are, therefore, fiduciaries with respect
> to the plan.  However, their responsibility,
> and, consequently, their liability, is
> limited to the selection and retention of
> fiduciaries (apart from co-fiduciary
> liability arising under circumstances
> described in section 405(a) of the Act[, 29
> U.S.C. § 1105(a)]).

29 C.F.R. § 2509.75-8(D-4).

23

As this court previously recognized, fiduciary duties may extend to the creation of an employee benefit plan.  *See* ECF No. 47, PageID #s 470-71.  To determine whether Bowers and Kubota were fiduciaries for purposes of ERISA, this court looks at whether they functionally exercised control and authority over the ESOP's management.  This court construes ERISA fiduciary status liberally, consistent with ERISA's policies and objectives.  *Couturier*, 572 F.3d at 1076; *see also LeGras*, 786 F.3d at 1236; *Batchelor*, 870 F.2d at 1449.  ERISA seeks to ensure that fiduciaries who fund an ESOP acquire employer securities for "adequate consideration."  29 U.S.C. § 1108(e)(1).  Courts recognize that "an ERISA plan and ERISA fiduciary responsibilities thereunder, can exist even where a formal employee benefit plan had not been adopted."  *Solis v. Webb*, 931 F. Supp. 2d 936, 945 (N.D. Cal. 2012).  As the Ninth Circuit has recognized, "A person's actions, not the official designation of his role, determines whether he enjoys fiduciary status, regardless of what his agreed-upon contractual responsibilities may be."  *CSA 401(K) Plan v. Pension Pros., Inc.*, 195 F.3d 1135, 1138 (9th Cir. 1999) (quotation marks and citation omitted).

In December 2011, when URS submitted a nonbinding indication of interest in purchasing the Company for $15,000,000, *see* ECF No. 386-6, PageID #s 8478-80, Bowers and Kubota tried to figure out what the Company was worth, asking GMK to value it.

24

*See* Depo. of Dexter Kubota, ECF No. 363-9, PageID # 6962; Depo. of Brian Bowers, ECF No. 355-7, PageID # 6595; ECF No. 355-4, PageID #s 6555-58.  In May 2012, GMK valued the Company at between $31.2 and $46.8 million based on information provided by Bowers and Kubota.  *See* ECF No. 355-5, PageID #s 6576-87.  URS ultimately decided not to pursue the purchase of the Company. *See* Bowers Depo., ECF No. 355-7, PageID #s 6597, 6600; ECF No. 355-6, PageID # 6588 (May 9, 2012, e-mail from Bowers to Paul Vallone, of URS, attaching GMK valuation report).

In June 2012, Bowers and Kubota started "moving in the ESOP direction."  ECF No. 355-8, PageID # 6607 (June 19, 2012, e-mail from Bowers to Kuba and Kubota).  There is no evidence in the record demonstrating that Bowers and Kubota exercised discretionary authority, management, or control with respect to the ESOP at or before that time, as the record does not show that Bowers and Kubota had by then decided to form an ESOP.

On September 2, 2012, the Company hired Hansen to provide legal advice with respect to the Company's possible sale to the ESOP.  *See* ECF No., 355-10, PageID #s 6510-13.  The Company also asked Kuba to "pick[] up where you left off" and complete a formal valuation appraisal for the Company.  *See* ECF No. 355-8, PageID # 6607.  Kuba later bowed out, and Kniesel of LVA stepped in.  *See* ECF No. 356-2, PageID # 6620; Depo. of Greg Kniesel, ECF No. 388-5, PageID #s 8729-30.  On October 18, 2012,

Bowers sent Kniesel a copy of Kuba's May 2012 report valuing the Company at between $31.2 and $46.8 million.  *See* ECF No. 355-5, PageID # 6559; Bowers Depo., ECF No. 355-7, PageID # 6597.  Based on information Bowers and Kubota had provided to LVA, LVA valued the company in the range of $37,090,000 to $41,620,000.  *See* ECF No. 356-6, PageID # 6638.

On November 21, 2012, Bowers and Kubota met with the Company's attorney, Hansen, who recommended that Saakvitne be selected as the ESOP's trustee.  *See* Bowers Depo., ECF No. 355-7, PageID # 6602.  ECF No. 356-9, PageID # 6657.  A few days later, on November 26, 2012, the Company agreed to retain Saakvitne as the ESOP trustee.  *See* ECF No. 358, PageID #s 6696-99 (Employee Stock Ownership Plan Fiduciary Agreement Between Bowers + Kubota Consulting, Inc. and Nicholas L. Saakvitne).  On December 3, 2012, Bowers and Kubota, the only members of the Company's board of directors, signed a resolution adopting the ESOP and appointing Saakvitne as an independent fiduciary and the sole ESOP trustee, retroactively effective as of January 1, 2012.  *See* ECF No. 357-3, PageID #s 6667-68.  On December 11, 2012, Bowers and Kubota, in their capacities as the Company's officers, adopted the Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan (Effective As Of January 1, 2012).  *See* ECF No. 357-5, PageID #s 6674-85.

26

The above background establishes that Bowers and Kubota did exercise discretionary management authority at some point with respect to the formation of the ESOP and the selection of Saakvitne as its trustee.  The question for this court is when that could be said to have begun.  This court rules that Bowers and Kubota had fiduciary obligations no later than December 3, 2012, the date on which, as the only members of the Company's board of directors, they signed a resolution adopting the ESOP and appointing Saakvitne as an independent fiduciary and the sole ESOP trustee, retroactively effective as of January 1, 2012.  *See* ECF No. 357-3, PageID #s 6667-68.  But this court cannot tell on the present record whether Bowers and Kubota exercised "discretionary authority or discretionary control respecting management of such plan or exercise[d] any authority or control respecting management or disposition of its assets'" before December 3, 2012.  *Couturier*, 572 F.3d at 1076.

It may be that Bowers and Kubota were exercising such discretionary authority on, for example, November 26, 2012, when the Company agreed that Saakvitne would be the ESOP trustee.  *See* ECF No. 358, PageID #s 6696-99 (Employee Stock Ownership Plan Fiduciary Agreement Between Bowers + Kubota Consulting, Inc. and Nicholas L. Saakvitne).  It may also be that Bowers and Kubota were exercising discretionary authority, management, and control with respect to the ESOP when they sent LVA a copy of Kuba's May

2012 report valuing the Company at between $31.2 and $46.8 million, as well as other financial data, which LVA may have relied on in valuing the company in the range of $37,090,000 to $41,620,000.  *See* ECF No. 356-6, PageID # 6638.  Saakvitne had to evaluate the value of the Company in a very short time and may have relied on the LVA valuation in determining that the Company's stock was being sold for fair market value.  But this court cannot say on the present record that Bowers and Kubota's actions in that regard were necessarily fiduciary in nature.

In seeking to impose fiduciary status dating back to January 1, 2012, the Government points to the backdating of the ESOP to be effective as of that date.  As the party seeking summary judgment, the Government has the burden of establishing that Bowers and Kubota functioned as fiduciaries going back to that date.  It is not clear how Bowers and Kubota exercised discretionary authority or discretionary control respecting management of a plan that was not even being considered at the time.  Under the Ninth Circuit's "functional" test, Bowers and Kubota cannot be said to have functioned as fiduciaries as of January 1, 2012.  The mere backdating of an employee benefit plan does not, without more, mean that Bowers and Kubota exercised "functional" control starting on that backdated date.  In fact, the record does not demonstrate that Bowers and Kubota did anything at all with respect to the ESOP on January 1, 2012.  To

28

the contrary, the record reflects that, on January 1, 2012, Bowers and Kubota were evaluating the letter of interest from URS.  Nothing in the record demonstrates that they were even considering forming an ESOP at the time.  The backdating of the ESOP instead appears to have been intended to benefit Company employees, by making them eligible to receive Company shares as of the backdated date of January 1, 2012.

Whether Bowers and Kubota had a fiduciary duty as of January 1, 2012, may not ultimately affect any issue in this case, as the Government has not indicated how Bowers or Kubota breached fiduciary obligations with respect to actions taken before the ESOP was being formed.

The earliest Bowers and Kubota could have had fiduciary responsibilities was when they began the process of forming the ESOP, a date that has not been definitively established on the present record but must have been on or before December 3, 2012, the date Bowers and Kubota signed a Company resolution adopting the ESOP and appointing Saakvitne as an independent fiduciary and the sole ESOP trustee.[2]  *See* ECF No. 357-3, PageID #s 6667-68.

_____

[2] This court is not ruling that Bowers and/or Kubota breached any such fiduciary duty, as no such ruling is being sought by the Government on this motion. *See* Reply, ECF No. 390, PageID # 8789 ("The Secretary's motion for partial summary judgment does not seek a ruling from the Court that Defendants breached their fiduciary duties or engaged in a prohibited transaction.").

This court is not persuaded by the Government's argument that, because § 1102(a)(1) requires that one or more named fiduciaries have the "authority to control and manage the operation and administration of the plan," Bowers and Kubota must have had fiduciary status from the date the ESOP was backdated to. Even construing fiduciary status liberally to benefit the ESOP and its participants, the Government has not shown how beginning fiduciary status before Bowers and Kubota had taken any action to form the ESOP makes any sense.

While rejecting the Government's argument, this court is not adopting Bowers and Kubota's contention that there is already a ruling that they were not acting as fiduciaries. Bowers and Kubota cite a discovery order by the Magistrate Judge assigned to this case for that proposition. However, that order is actually consistent with this court's present ruling and only determines that certain documents sought via discovery were not subject to the fiduciary exception to the attorney-client privilege, not that Bowers and Kubota lacked fiduciary obligations. *See* ECF No. 281, PageID # 6085.

While Bowers and Kubota clearly had discretionary authority with respect to the formation of the ESOP and the selection of its trustee, there is a question of fact with respect to whether such discretionary authority extended to the sale of the stock to the ESOP. According to the ESOP's formation

30

document, the ESOP's board of directors was to appoint the ESOP's trustee to "serve at its pleasure."  *Id.*, PageID # 6679.

The Plan states, "The Company shall be the named fiduciary with authority to control and manage the administration of the Plan, except where the Plan otherwise delegates such responsibility to the Board of Trustees."  *Id.*  It further states, "The Plan will be administered by the Company and a Board of Trustees composed of one or more individuals appointed by the Board of Directors to serve at its pleasure and without compensation."  *Id.*

According to the Resolution of Board of Directors by Unanimous Written Consent Without a Meeting, dated December 3, 2012, Saakvitne was appointed "as Independent Fiduciary and sole member of the Board of Trustees under the Plan."  ECF No. 386-3, PageID # 8370.

The Plan states:

The Trustee shall have all powers necessary to administer the Plan and the Trust Agreement in accordance with their provisions, including without limitation the following:

(1) establishing a funding policy and method for acquiring Company Stock and for otherwise investing the Trust Assets in a manner that is consistent with the objectives of the Plan and the requirements of ERISA; and

(2) selecting an independent appraiser and determining the Fair Market Value of Company Stock as of such dates as it determines to be necessary or appropriate.

31

*Id.*, PageID #s 6680-81.  In keeping with those powers, Saakvitne, after receiving the LVA report, negotiated the price of the stock down from $41 million to $40 million.  *See* ECF No. 357-4, PageID #s 6669-72.  This was the price that Hansen had told Saakvitne 100 percent of the shares might be sold for.  *See* ECF No. 356-9, PageID # 6657 (Nov. 21, 2012, e-mail from Hansen to Saakvitne).

Whether Bowers and Kubota influenced the purchase price via documents they selectively provided to Saakvitne and whether Saakvitne exercised his independent judgment in determining the fair market value of the Company are matters this court need not address here.  In any event, those issues present questions of fact.

The Government also argues that Bowers and Kubota had a fiduciary duty to monitor Saakvitne's actions from his appointment on November 26, 2012, through the sale of the stock on December 14, 2012.  According to the Plan,

> [t]he Company shall have all powers necessary
> to enable it to administer the Plan and the
> Trust Agreement in accordance with their
> provisions, including without limitation the
> following: . . . (9) reviewing the
> performance of the Trustee with respect to
> the Trustee's administrative duties,
> responsibilities and obligations under the
> Plan and Trust Agreement.

ECF No. 357-5, PageID # 6680.

The Department of Labor's published guidance discusses the fiduciary duty to monitor a trustee:

> At reasonable intervals the performance of
> trustees and other fiduciaries should be
> reviewed by the appointing fiduciary in such
> manner as may be reasonably expected to
> ensure that their performance has been in
> compliance with the terms of the plan and
> statutory standards, and satisfies the needs
> of the plan.  No single procedure will be
> appropriate in all cases; the procedure
> adopted may vary in accordance with the
> nature of the plan and other facts and
> circumstances relevant to the choice of the
> procedure.

29 C.F.R. § 2509.75-8(FR-17).  This court has already ruled in this case that the power to appoint and remove a trustee gives rise to a duty to monitor the trustee's performance.  *See* ECF No. 47, PageID # 472 (citing *Webb*, 931 F. Supp. 2d at 953; *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1090 (D. Nev. 2011)).  As the district court noted in *In re Calpine Corporation ERISA Litigation*, 2005 WL 1431506, at *3 (N.D. Cal. Mar. 31, 2005), the duty arising from § 2509.75-8(FR-17) is "limited."  Remaining for trial is the issue of whether Bowers and Kubota actually breached this limited fiduciary duty to monitor Saakvitne with respect to the purchase of the Company's stock.

B. **Bowers and Kubota's Motion for Summary Judgment is Denied.**

Bowers and Kubota seek summary judgment on several grounds, each of which this court is unpersuaded by.

1. **Questions of Fact Preclude Summary Judgment Based on the Applicable Statutes of Limitations.**

Bowers and Kubota argue that the Government's claims are untimely. Under section 413 of ERISA:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

With respect to the three-year limitations period set forth in § 1113(2), the Supreme Court last year, in *Intel Corporation Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 776 (2020), discussed when a plaintiff can be said to have

had "actual knowledge" of a breach or violation such that the limitation period began running. "Actual knowledge" requires more than "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal" knowledge. *Id.* Section 1113(2) "requires more than evidence of disclosure alone. That all relevant information was disclosed to the plaintiff is no doubt relevant in judging whether he gained knowledge of that information. . . . To meet § 1113(2)'s 'actual knowledge' requirement, however, the plaintiff must in fact have become aware of that information." *Id.* at 777.

In *Sulyma*, the Court noted that actual knowledge could be proven in the usual way, such as through testimony and inferences from circumstantial evidence. *Id.* at 779. The Court also noted that its decision did "not preclude defendants from contending that evidence of 'willful blindness' supports a finding of 'actual knowledge.'" *Id.* (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

In *Global-Tech*, the Court saw "willful blindness" as occurring when a person subjectively believed there was a high probability that a fact existed but deliberately avoided learning about that existence. 563 U.S. at 769. *Sulyma* recognizes that willful blindness can support a finding of actual knowledge. 140 S. Ct. at 779.

The Government, the Company, and Bowers and Kubota in their individual capacities agreed to toll the statute of limitations under ERISA effective October 16, 2017, to April 30, 2018. *See* ECF No. 367-2, PageID #s 7607-12. The present Complaint was filed on April 27, 2018. *See* ECF No. 1. Bowers and Kubota argue that the statute of limitation set forth in § 1113(2) bars claims of ERISA violations that the Government had actual knowledge of three years before October 16, 2017 (*i.e.*, on or before October 16, 2014).

Bowers and Kubota argue that the Government gained actual knowledge of the alleged violations from Form 5500 (the Annual Return/Report of Employee Benefit Plan) filed with the Internal Revenue Service and submitted to the Department of Labor via EFAST2 on October 15, 2013. However, *Sulyma* states that "§ 1113(2) requires more than evidence of disclosure alone." 140 S. Ct. at 777. Jerome Raguero of the Department of Labor explains that EFAST2 is an automated system in which officials do not automatically read submissions upon receipt. 30(b)(6) Depo. of Jerome Raguero, ECF No. 363-1, PageID # 6783. This raises a question of fact as to whether the Government had actual knowledge of the contents of Form 5500 or whether the EFAST2 submission amounted to only a disclosure.

Additionally, the court notes that Form 5500 shows only a possible decrease in the value of the Company stock, rather

36

than establishing on its own an actual ERISA violation in the form of a sale of stock for more than fair market value.  At the hearing, Bowers and Kubota explained that what appears to be a decrease in the value of the Company stock was actually an accounting of the debt related to the loan taken out to purchase the stock.  Whatever the explanation, this court cannot conclude that Form 5500, without more, provides actual notice of a possible ERISA violation.  Bowers and Kubota fail to show on the present record that the Government had actual knowledge of the alleged ERISA violations in this case from the Form 5500 submitted via the EFAST2 system.

A question of fact similarly precludes summary judgment with respect to Bowers and Kubota's argument that the Government's alleged willful blindness counts as actual knowledge of the alleged ERISA violations.  Bowers and Kubota argue that the Government willfully ignored Saakvitne's conduct, having received a tip in July 2014 that Saakvitne may have done something improper with respect to the Hot Dog on a Stick ESOP. *See* Depo. of Robert Prunty, ECF No. 363-5, PageID #s 6898-6900, 6906; Depo. of Crisanta Johnson, ECF No. 363-3, PageID # 6850. Bowers and Kubota also argue willful blindness based on the Kennedy Fabricating investigation, which began in November 2013, and led to a November 2015 investigation into Saakvitne.  *See* Depo. of Harold W. LeBrocq, III, ECF No. 363-6, PageID # 6937;

ECF No. 364-3, PageID # 7230.  Citing Miguel Paredes, a former
Department of Labor supervisory investigator, Bowers and Kubota
argue that the Government should have investigated Saakvitne's
conduct in other cases, including this one.  Paredes testified,
"I would expect that if an investigator has uncovered what they
think is a fiduciary breach by a fiduciary, they would want to
know whether or not that fiduciary is a fiduciary of other plans
because they would be concerned that this provider is breaching a
fiduciary duty in other--in other--in the provision of services
to other plans."  Depo. of Miguel Paredes, ECF No. 363-4, PageID
# 6889.  What an investigator might want to know about other
ESOPs is not actual knowledge for purposes of § 1113(2).

There are questions of fact as to whether the Hot Dog
on a Stick and Kennedy Fabricating investigations show willful
blindness on the Government's part.  Raguero of the Department of
Labor testified that, although an investigator may inquire about
other ESOPs that a particular service provider may be involved
with, Department of Labor investigators do not generally make
such inquiries.  *See* Depo. of Jerome Raguero, ECF No. 363-1,
PageID # 6800; *see also* Johnson Depo., ECF No. 363-3, PageID
#s 6840-41; Prunty Depo., ECF No. 363-5, PageID #s 6895, 6908.
For example, with respect to the Kennedy Fabricating
investigation, LeBrocq testified that, when he was investigating
the Kennedy Fabricating ESOP, he did not ask Saakvitne about

38

other ESOPs Saakvitne was involved with.  *See* LeBrocq Depo., ECF
No. 363-6, PageID # 6933.  Similarly, Wen testified that, when he
was investigating the ESOP at issue in this case, he did not ask
Saakvitne about other ESOPs Saakvitne was involved with.  Wen
explained that he focused only on the ESOP transaction he was
working on.  *See* Wen Depo., ECF No. 363-2, PageID #s 6824-25.

On this motion, Bowers and Kubota fail to establish
that other investigations were red flags to which the Government
was willfully blind.  It might be that it would have been a good
practice for individuals to have considered Saakvitne's
involvement with other ESOPs, but willful blindness requires more
than a failure to do what is best.  At a minimum, there is a
question of fact as to whether the Government investigators were
deliberately ignoring those alleged red flags or were instead
reasonably focusing on the potential ERISA violations they were
investigating.

**2.    There is a Question of Fact as to Whether
       Bowers and Kubota Breached Their Duty to
       Monitor Saakvitne.**

Bowers and Kubota's summary judgment motion argues
that, as the Company's board members, they prudently appointed
Saakvitne as the ESOP's trustee and that there is no evidence
supporting the Government's contention that Bowers and Kubota
breached their fiduciary duty to monitor Saakvitne, who had the

39

sole discretion to purchase the Company's stock.[3]  In other words, they argue that they cannot be liable for having breached a fiduciary duty to monitor Saakvitne because there is no evidence that they "knew or should have known" about any trustee misconduct, yet failed to take steps to remedy the situation. That argument raises factual issues that need to be resolved at trial.

In denying Bowers and Kubota's earlier motion to dismiss, this court ruled,

> "A fiduciary with a duty to monitor a trustee is liable for the trustee's fiduciary breach if he 'knew or should have known' about the trustee's misconduct and failed to take steps to remedy the situation." *Solis v. Couturier*, No. 2:08-cv-02732-RRB-GGH, 2009 WL 1748724, at *7 (E.D. Cal. June 19, 2009) (quoting *Henry v. Frontier Indus., Inc.*, 863 F.2d 886, 1988 WL 132577, at *4 (9th Cir. 1988) (unpublished decision)).

ECF No. 47, PageID # 474.

In October 2012, LVA sent an engagement letter to the Company and "Brian Bowers, Trustee . . . of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust," stating that LVA would determine the fair market value of the ESOP stock.  *See* ECF

---

[3] Whether Saakvitne's appointment was prudent is not a matter that generally lends itself to a summary judgment ruling. This court has ruled that Bowers and Kubota acted as fiduciaries in appointing Saakvitne.  Whether Bowers and Kubota breached that duty is similar to whether they acted prudently in appointing him.  There is a question of fact as to whether, in hiring Saakvitne just a few weeks before the sale of stock closed, they breached their fiduciary duty.

No. 356-3, PageID # 6627.  On November 21, 2012, LVA completed its report, valuing the Company "in the range of **$37,090,000 to $41,620,000**."  *See* ECF No. 356-6, PageID #s 6637-40.  LVA reached this conclusion based in part on income statements and cash flow information provided to LVA by the Company (which was controlled by Bowers and Kubota).  *See* Kniesel Depo., ECF No. 388-5, PageID # 8745.

On November 21, 2012, following a meeting in which Hansen recommended that Bowers and Kubota hire Saakvitne, Hansen sent Saakvitne an e-mail stating, "They agreed to hire you on my advice."  ECF No. 356-9, PageID # 6657.  The e-mail further stated, "This is looking like a $12 million preferred stock transaction.  There is a slight possibility they will change their mind and do a 100% transaction for 40 million . . ."  *Id.* The e-mail also noted that LVA had just finished a draft valuation.  *Id.*

Three days later, on November 24, 2012, Hansen asked Saakvitne to send LVA his exact title so that LVA's engagement letter would "run directly to the Trustee."  ECF No. 357-1, PageID # 6661.  Before hiring Saakvitne, Bowers and Kubota had a single telephone discussion with him that may have been lengthy. *See* Bowers Depo., ECF No. 355-7, PageID # 6602-03.

On November 26, 2012, the Company and Saakvitne agreed that he would be the Company's ESOP trustee.  *See* ECF No. 358,

PageID #s 6696-99 (Employee Stock Ownership Plan Fiduciary Agreement Between Bowers + Kubota Consulting, Inc. and Nicholas L. Saakvitne).  Then, on December 3, 2012, Bowers and Kubota, the only members of the Company's board of directors, signed a resolution adopting the ESOP and appointing Saakvitne as an independent fiduciary and as the sole ESOP trustee, retroactively effective as of January 1, 2012.  *See* ECF No. 357-3, PageID #s 6667-68.

On December 10, 2012, Bowers sent Saakvitne an e-mail indicating that he and Kubota, as "the sellers," were offering to sell the ESOP all of the common stock of the Company for $41 million.  Saakvitne countered at $39 million.  Ultimately, Bowers, Kubota, and Saakvitne agreed to a price of $40 million. *See* ECF No. 357-4, PageID #s 6669-72.

The Government argues that Saakvitne failed to adequately investigate the value of the Company and instead accepted the value given to him by the Company, Bowers, and Kubota, going so far as to change the LVA report recipient and proceeding with a $40,000,000 sale in less than a month.  Bowers and Kubota contend that Saakvitne had unfettered discretion to hire LVA.  But Saakvitne may have had in mind Hansen's statement of November 21, 2012, indicating that any deal had to be completed by December 19, 2012, leaving little time to get another opinion other than LVA's.  ECF No. 356-9, PageID # 6657.

42

This court is left with a question of fact as to whether Bowers and Kubota knew or should have known whether Saakvitne was relying heavily on the LVA report, which was based on figures they themselves had given LVA.  In other words, it is not clear from the record that Saakvitne properly and independently determined that the Company stock was worth $40,000,000, or that Bowers and Kubota knew of any alleged deficiency in that determination.

To be more specific, this court notes that it is unclear from the record whether the LVA report given to Saakvitne was based on faulty data, whether the sale price was too high, whether Bowers and Kubota knew or should have known that, and whether they failed to take steps to remedy the situation.  While the Government could certainly have provided more detail regarding its claim in this regard, Bowers and Kubota have the burden on their own motion of showing entitlement to summary judgment.  Bowers and Kubota may indeed be correct that the valuation report attached to Form 5500 showed a decrease in value only because the ESOP had acquired substantial debt in purchasing the stock.  However, questions of fact exist on the current record that preclude summary judgment with respect to their duty to monitor Saakvitne.

3.   **ERISA § 502(a)(5) Claims (29 U.S.C. § 1132(a)(5)).**

Bowers and Kubota argue that, to the extent the Government seeks to hold them liable under ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5), the Government may only recover funds from them that are attributable to the direct payments to their revocable trusts by the ESOP.  *See* ECF No. 360, PageID # 6733. That section provides that a civil action may be brought "except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter."  29 U.S.C. § 1132(a)(5).[4]  Bowers and Kubota

---

[4] ERISA § 409 provides for personal liability for breaches of fiduciary duties:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.  A fiduciary may also be removed for a violation of section 1111 of this title.

(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

29 U.S.C. § 1109.

argue that, under *Montanile v. Board of Trustees of the National Elevator Industry Health Benefit Plan*, 577 U.S. 136 (2016), the Government may only recover funds from them pursuant to § 1132(a)(5) that they directly received from the ESOP, or $3,226,013.84. *See* ECF No. 360, PageID # 6733. They say that any equitable remedy is limited to those funds because, on March 1, 2013, the Company agreed to assume the ESOP's obligations to pay the respective Bowers and Kubota trusts for the Company's stock in exchange for the ESOP's agreement to pay the Company $37,313,352.88 though a loan financed by the Company. *See* ECF No. 381-9, PageID #s 8080-89 (executed by Saakvitne as the ESOP trustee and Bowers as the Company's president). In other words, they say that no equitable remedy is available under ERISA for funds paid after March 1, 2013, because any money paid after that date was paid by the Company, not the ESOP. Bowers and Kubota are stretching the holding of *Montanile*.

Montanile was injured by a drunk driver and incurred more than $120,000 in medical expenses, which his ERISA plan paid. Montanile sued the drunk driver and obtained a $500,000 settlement, which was used to pay his attorney $260,000 for fees and expenses. Because his ERISA plan contained a subrogation clause, his plan administrator sought reimbursement of the medical bills the plan had paid. Montanile attempted to settle the dispute with the plan. When settlement negotiations broke

45

down, Montanile's attorney notified the plan's board of trustees
that the $240,000 remaining in the attorney's client trust
account would be distributed to Montanile in 14 days unless the
attorney received an objection.  When no such objection was
received, the attorney turned over the $240,000 to Montanile.
The plan's board sued Montanile six months later, asking for an
equitable lien on the settlement funds and an order enjoining
Montanile from dissipating such funds, some of which Montanile
conceded he still had.  577 U.S. at 140-41.

ERISA § 502(a)(3), at issue in *Montanile*, authorizes
plan fiduciaries like the a plan's board of trustees to bring
civil suits "to obtain other appropriate equitable relief . . .
to enforce . . . the terms of the plan."  29 U.S.C. § 1132(a)(3).
This language is the same as that used in ERISA § 502(a)(5), at
issue in this case, which authorizes the Government to do the
same.  29 U.S.C. § 1132(a)(5).  *Montanile* recognized that the
basis of the board's claim was equitable and gave rise to an
equitable lien attaching to the settlement funds.  577 U.S. at
144.  The Supreme Court examined whether the board would still be
seeking an equitable remedy if Montanile had spent all of the
funds and the board then sought recovery from his general assets.

The Supreme Court noted that, ordinarily, equitable
liens may only be placed on "specifically identified funds that
remain in the defendant's possession or against traceable items

46

that the defendant purchased with the funds (e.g., identifiable property like a car)." The Court said that, when a person spends the entire identifiable fund on nontraceable items such as food or travel, there can be no equitable lien, and a plaintiff like the board has only a legal remedy to recover on a personal claim against a defendant like Montanile. *Id.* at 144-45. However, if the person comingles the identifiable funds with another pot of funds, such as by putting it into a bank account, a plaintiff like the board can recover the amount of the lien from the pot via an equitable lien. *Id.* at 144-45. The Supreme Court remanded the case for the district court to determine how much money had been dissipated by Montanile. *Id.* at 151.

Relying on *Montanile*, Bowers and Kubota argue that only the funds directly paid by the ESOP to Bowers and Kubota's trusts are subject to an equitable lien. They say that any money being paid to the trusts by the Company (which assumed the ESOP's liability in exchange for a note from the ESOP to the Company) is not subject to an equitable lien. *Montanile* does not go that far.

*Montanile* applies to identifiable money on which an equitable lien can be placed. The case does not focus on the source of that money. Here, the Government is arguing that the ESOP agreed to pay Bowers and Kubota's trusts too much money for the stock purchased. The Government therefore seeks either an

47

equitable lien on money in excess of what it says should have been paid, or rescission of the stock sale.  Nothing before this court indicates that Bowers and Kubota spent all of the money received from the stock sale on consumable items such as food or travel.  The Company agreed to assume the liabilities of the ESOP, and Bowers and Kubota control the Company.  Under those circumstances, money paid to Bowers and Kubota's trusts arising out of the stock sale might be part of identifiable funds from an allegedly impermissible transaction for which an equitable lien might still attach.

This court has wide latitude in crafting equitable remedies.  Bowers and Kubota do not, on the present record, demonstrate that the Government is barred from obtaining disgorgement of allegedly improper profits.  *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (recognizing in the ERISA § 502(a)(3) context that disgorgement of proceeds is available when restitution of property is not).  It may well be possible to determine whether and to what extent Bowers and Kubota have allegedly been unjustly enriched.  They do not show that their liability is necessarily limited to the $3,226,013.84 they say they received directly from the ESOP.

### 4.    Indemnification.

Bowers and Kubota seek summary judgment with respect to indemnification provisions in three of the ESOP's documents,

arguing that Count IX of the Complaint seeks a determination that they have been improperly indemnified.  *See* ECF No. 360, PageID # 6735 ("Section IX of the Complaint alleges that Bowers and Kubota have been improperly indemnified in violation of ERISA."). However, the relief sought in the Complaint is not a ruling that Bowers and Kubota have been improperly indemnified.  Instead, Count IX of the Complaint seeks a ruling that certain provisions in the ESOP documents are void as against public policy under ERISA § 410, 29 U.S.C. § 1110.  ERISA § 410 states that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."[5]  Nothing in the record indicates that either Bowers or Kubota has been improperly indemnified under any of the three ESOP documents, and Count IX does not appear to so allege.  Because Count IX does not appear to assert a claim against Bowers or Kubota, it makes no sense to award summary judgment to Bowers and Kubota on that claim.  The court therefore

---

[5] Bowers and Kubota have sought indemnification from the Company pursuant to its Amended and Restated Articles of Incorporation.  *See* ECF No. 367-5, PageID # 7621.  The Company agreed to provide such indemnification with respect to the advancement of defense fees and expenses pursuant to those articles of incorporation.  *See* ECF No. 367-7. PageID # 7632. The indemnification provision in the Company's Amended and Restated Articles of Incorporation is not at issue in this case, as the Complaint does not seek to have it declared void.  *See* ECF No. 1, PageID #s 21-22.

denies Bowers and Kubota's motion to the extent they seek summary judgment with respect to Count IX.

However, with respect to the portion of Count IX challenging the indemnification language in one of the documents--the ESOP Stock Purchase Agreement, the court cannot identify any actual case or controversy.  Bowers and Kubota say they have never sought indemnification under that document, and the language in that document has expired by its terms.  The portion of Count IX challenging that language is dismissed.

Whether the other indemnity provisions in the Bowers + Kubota Consulting, Inc., Employee Stock Ownership Trust Agreement or the ESOP are or are not void remains for adjudication, and that adjudication may affect other parties like Saakvitne.  The court nevertheless discusses those provisions here in aid of avoiding misunderstandings in future proceedings.

> ### a. Bowers + Kubota Consulting, Inc., Employee Stock Ownership Trust Agreement.

The Bowers + Kubota Consulting, Inc., Employee Stock Ownership Trust Agreement provides:

> Subject to the applicable provisions of ERISA, the Company shall indemnify the Trustee and its officers, directors, employees and agents ("Indemnitees") for any loss, cost, expense or other damage, including attorney's fees, suffered by any of the Indemnit[e]es and resulting from or incurred with respect to any legal proceedings related in any way to the performance of services by any one or more of

the Indemnit[e]es pursuant to this Trust
Agreement.  The indemnification provided for
in this Paragraph shall include, but not be
limited to: (a) any action taken or not taken
by any of the Indemnitees at the direction or
request of the Company, any agent of the
Company, or any committee or fiduciary under
the Plan or Trust; and (b) all costs and
expenses incurred by the Indemnitees in
enforcing the indemnification provisions of
this Paragraph, including attorney's fees and
court costs.  However, this indemnification
provision shall not apply to the extent that
any loss, cost[,] expense, or damage with
respect to which any of the Indemnit[e]es
shall seek indemnification is held by a court
of competent jurisdiction, [i]n a final
judgment from which no appeal can be taken,
to have resulted either from the gross
negligence, or willful misconduct of one or
more of the Indemnitees, or from the
violation or breach of any fiduciary duty
imposed under ERISA on any one or more of the
Indemnitees.  An Indemnitee who receives an
advancement of fees or expenses from the
Company pursuant to this paragraph shall make
arrangements reasonably satisfactory to the
Company to ensure that such Indemnitee will
reimburse the Company for such advancements
in the event it is determined the Indemnitee
is not entitled to retain such amounts
hereunder.

ECF No. 367-8, PageID #s 7639-40.

Bowers and Kubota point out, and the Government agrees,
that this indemnity provision does not actually benefit Bowers or
Kubota.  They have not been indemnified under it.  *See* ECF No.
360, PageID # 6735; ECF No. 378 n.5, PageID # 7827.  Instead,
this provision appears to apply to indemnification of Saakvitne.
This, of course, does not establish whether the provision is or
is not void under 29 U.S.C. § 1110.  To the extent Bowers and

Kubota seek summary judgment with respect to the indemnification language of the ESOP stock trust agreement, they do not establish entitlement to summary judgment because any claim relating to that language is not asserted against them.  However, the court will hold the Government to its position that it is not challenging this provision in aid of seeking any recovery from Bowers and Kubota.

### b.  ESOP Stock Purchase Agreement.

In relevant part, the ESOP Stock Purchase Agreement provides:

> 11.2 Except for claims relating to matters known prior to the Closing by the potentially indemnified party, the Company shall indemnify, hold harmless, reimburse and, if requested by the Sellers [the respective trusts of Bowers and Kubota], defend the Sellers (the "Indemnified Person") for, and will pay to the Indemnified Person the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including reasonable costs of investigation and defense and reasonable attorneys' fees), or diminution of value, whether or not involving a third party claim, arising, directly or indirectly, from or in connection with any breach or any representation, warranty, covenant or other agreement of the ESOP or the Company herein contained.

> 11.3 The indemnity obligations of the Sellers and the Company under this Agreement shall survive the Closing and for a period of two (2) years thereafter, provided that indemnity obligations as to specific claims for which

> notice is given under Section 12.6 below
> within such period shall survive until
> resolved.

ECF No. 368-1, PageID # 7691.

Bowers and Kubota argue that they did not seek indemnification within two years of the closing of the sale and thus the indemnification provision in the ESOP stock purchase agreement expired. *See* ECF No. 360, PageID # 6736. The Government notes that this indemnification agreement does not run in favor of Bowers or Kubota individually. *See* ECF No. 378 n.5, PageID # 7827. Instead, this indemnification provision runs in favor of Bowers and Kubota's respective trusts, as the sellers of the stock. The trusts have not been named as Defendants, but Bowers and Kubota control the trusts and have treated them as themselves. *See* ECF No. 357-4, PageID #s 6669-72 (negotiating the sale of the Company in their names, rather than the trusts that owned it). This court assumes that, when Bowers and Kubota say that they have not sought indemnification under the ESOP Stock Purchase Agreement, that representation means that their trusts have also not sought such indemnification. If this assumption is unwarranted, Bowers and Kubota are ordered to explain why in a filing no later than March 31, 2021.

The Company's indemnification obligation under the ESOP Stock Purchase Agreement expired two years from the closing of the sale, unless the "savings clause" (under which the

53

obligations survive even after two years) is in effect.  There is no evidence in the record indicating that the "savings clause" has been implicated.  While the Government argues that Bowers and Kubota may be receiving an advancement for or reimbursement of attorneys' fees pursuant to the indemnification provision in the ESOP stock purchase agreement, it submits no evidence demonstrating that Bowers and Kubota could possibly be or are now being indemnified pursuant to the indemnity provision in the ESOP stock purchase agreement.  Because there is no evidence in the record demonstrating that the indemnification provision in the ESOP Stock Purchase Agreement is or could be in issue, this court dismisses Count IX to the extent it seeks a determination that the indemnification language in the ESOP Stock Purchase Agreement is void.  Absent an actual case or controversy relating to the document, this court lacks jurisdiction over the challenge.

### c.   ESOP.

The ESOP provides:

> The Company hereby agrees to indemnify each member of the Board of Trustees (to the extent permitted by law) against any personal liability or expense, including reasonable attorney's fees, resulting from his service on the Board of Trustees, except such liability or expense as may result from his own willful misconduct.

ECF No. 366-1, PageID # 7500.

Bowers and Kubota seek a determination that the indemnification provision in the ESOP does not apply to them, as

54

they were not members of the ESOP's board of trustees.  *See* ECF
No. 360, PageID # 6735.  Of course, such a determination would
not establish whether the ESOP's indemnification provision is or
is not void under 29 U.S.C. § 1110, the relief sought in Count IX
of the Complaint.  *See* ECF No. 1, PageID #s 21-22.  Accordingly,
Bowers and Kubota's motion is denied to the extent they seek
summary judgement with respect to the indemnification provision
in the ESOP.  However, again, this court will hold the Government
to its position that it is seeking a declaration about the
language in the provision, not a judgment in this regard against
Bowers and Kubota individually.

**V.         CONCLUSION.**

          The court grants the Government's motion to the extent
it seeks a determination that Bowers and Kubota were exercising
fiduciary obligations to the ESOP no later than December 3, 2012,
when they adopted the ESOP and appointed Saakvitne as an
independent fiduciary and the sole ESOP trustee, retroactively
effective as of January 1, 2012.  In all other respects, the
Government's motion is denied.

          The court also denies the motion for summary judgment
filed by Bowers and Kubota as well as the Company's joinder in
it.  However, this court dismisses the portion of Count IX
challenging the indemnity provision in the ESOP Stock Purchase

Agreement, as there is no actual case or controversy with respect to that language.

In preparing for trial, the parties should review and follow this court's Procedures for Trials Before Judge Susan Oki Mollway (Revised 2/04/21),

https://www.hid.uscourts.gov/reqrmts/SOM/SOM_trial_procedures.pdf ?pid=19&mid=61, paying particular attention to the additional instructions for civil nonjury trials.

Additionally, given the complexity of and expected number of exhibits in this case, the parties are ordered to meet and confer before submitting trial exhibits to see whether they can stipulate to the authenticity and/or admissibility of certain exhibits and to the filing of those documents with joint exhibit numbers. This will avoid submission of the same documents under multiple exhibit numbers.

The parties may, of course, offer exhibits other than those agreed upon, labeling the exhibits as such. For example, the parties may have Joint Exhibits 1 through 100, Government's Exhibits 101 through 300, and Defendants' Exhibits 301 through 500. Using different number series for each party's separate exhibits will make it easier to refer to and locate exhibits. The parties should keep in mind that, in any submission of proposed findings of fact and conclusions of law, they must refer

to specific pages of these trial exhibit numbers, not exhibit numbers used in discovery.

The parties are further reminded that trial exhibits must be appropriately tabbed and three copies (labeled "witness," "judge," and "law clerk") must be submitted to the court in three-ring binders (not D-ring binders).  At the time the binders are provided to the court, the parties must also submit a flash drive containing .pdf copies of the exhibits, preferably in a searchable format in which the file is named in a manner describing the exhibit number and exhibit, such as "Exhibit __ (description of exhibit)."

No later than May 3, 2021, each party proceeding to trial should submit a statement discussing what, if any, testimony must be in person (as opposed to by live video) and how many hours each side should be limited to if this court imposes time limits (such as, for example, 12 hours for cross- and redirect examinations, including rebuttal for the Government, and 12 hours for cross- and redirect examinations for all Defendants combined, keeping in mind this court's practice of receiving direct examinations in writing).

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 12, 2021.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*Stewart v. Heritage, et al.*, Civ. No. 18-00155 SOM-WRP; ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING BOWERS AND KUBOTA'S MOTION FOR SUMMARY JUDGMENT AND JOINDER THEREIN BUT DISMISSING THE PORTION OF COUNT IX CHALLENGING THE VALIDITY OF LANGUAGE IN THE ESOP STOCK PURCHASE AGREEMENT