UNITED STATES DEPARTMENT OF LABOR

EMPLOYEE BENEFITS SECURITY ADMINISTRATION

|  |  |
|---|---|
| In the Matter of the Investigation of the Bowers + Kubota Consulting, Inc., Employee Stock Ownership Plan. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF GREGORY M. HANSEN

Taken on behalf of the United States Department of Labor pursuant to Subpoena, on Friday, February 23, 2018, commencing at 8:31 a.m., at the Prince Kuhio Federal Building, of 300 Ala Moana Boulevard, Conference Room 5-135, Honolulu, Hawaii 96850.

Ali'i Court Reporting
956 Uwao Street
Honolulu, Hawaii   96825
(808) 394-Alii

```
 1   APPEARANCES:

 2   For Bowers + Kubota Consulting, Inc., Gregory E.
     Kniesel, ASA, and Libra Valuation Advisors:
 3
     DAVID JOHANSON, ESQ.
 4   Hawkins Parnell Thackston & Young LLP
     1776 Second Street
 5   Napa, California  94559
     (707) 226-8997
 6

 7   For Secretary of Labor:          (via telephone)

 8   ELIZABETH HOPKINS, ESQ.
     IAN ELIASOPH, SOL.
 9   DORIAN HANZICH, Senior Investigator
     MICHAEL WEN, Investigator
10   JEROME RAGUERO, Investigator
     U.S. Department of Labor
11   35 North Lake Avenue, Suite 300
     Pasadena, California  91101
12   (626) 229-1000

13   For Deponent:

14   JEFFREY HARRIS, ESQ.
     Torkildson, Katz, Hetherington, Harris & Knorek
15   Topa Financial Center, Bishop Tower
     700 Bishop Street, Floor 15
16   Honolulu, Hawaii  96813
     (808) 523-5393
17

18   Also Present:

19   Eric Daido

20

21

22   REPORTED BY:   Laura Savo, CSR No. 347
                    State of Hawaii
23

24

25
```

```
 1    (Pursuant to Rule 14 of the Rules Governing Court

 2    Reporting in Hawaii, the reporter's disclosure is

 3    available.)

 4                 GREGORY M. HANSEN,

 5          having been called as a witness and being first

 6    duly sworn to tell the truth, the whole truth and

 7    nothing but the truth, was examined and testified as

 8    follows:

 9                      EXAMINATION

10    BY MS. HOPKINS:

11    Q.       This sworn testimony is being taken in the matter

12    of Bowers and Kubota Consulting, Inc., Employee Stock

13    Ownership Plan, ESOP, involving an investigation pursuant

14    to Section 504 of the Employee Retirement Income Security

15    Act of 1974, ERISA, 29 USC, Section 1134, to determine

16    whether any person has violated or is about to violate

17    any provision of Title I of ERISA or any regulation or

18    order issued thereunder.

19          The witness is appearing here today in response

20    to a subpoena issued pursuant to ERISA, Section 504, 29

21    USC, Section 1134, which expressly incorporates Sections

22    9 and 10 of the Federal Trade Commission Act, 15 USC,

23    Sections 49 and 50.

24          Would the witness please state and spell his full

25    name for the record?
```

```
 1   communications that might be covered by a common
 2   interest agreement that you have entered into.  Okay?
 3   Thank you.
 4           THE WITNESS:  (Witness nods.)
 5   BY MS. HOPKINS:
 6   Q.      Okay.  Please state your home address and
 7   telephone number.
 8   A.      134 Meleana, M-e-l-e-a-n-a, Place, Honolulu,
 9   96817.  And my phone number is (808) 547-5400.
10   Q.      Thank you.  How long have you lived at this
11   address?
12   A.      16 years.
13   Q.      Do you have any current plans to move?
14   A.      No.
15   Q.      What's your highest level of education?
16   A.      Law degree.
17   Q.      From where?
18   A.      University of California, Los Angeles.
19   Q.      And when was that that you -- that you got your
20   degree?
21   A.      1973.
22   Q.      Do you have any other licenses or certifications?
23   A.      I have a driver's license.  What type of licenses
24   are you asking me about?
25   Q.      Professional licenses or certifications.
```

1    A.        I'm a member of the Hawaii State Bar Association

2    and an inactive member of the California Bar and the Utah

3    Bar associations.

4    Q.        What's your current job?

5    A.        I am an attorney with the law firm of Case

6    Lombardi and Pettit.

7    Q.        Are you a partner?

8    A.        I'm of counsel.

9    Q.        And how long have you had this job?

10   A.        You mean the current position or my job with Case

11   Lombardi?

12   Q.        If you could tell me sort of about your job --

13   your jobs at Case Lombardi.

14   A.        I joined the law firm in 1983, and I've been in

15   the same firm since that time, and I was a partner for

16   most of that time, and I converted from partner status to

17   of counsel status about four years ago.

18   Q.        And prior to working at Case Lombardi, what was

19   your previous employment?

20   A.        I was in private practice as an attorney in

21   Salt Lake City, Utah, from 1977 to 1983.  And prior to

22   that, from 1974 to 1976, I believe, I was an attorney for

23   the Internal Revenue Service.

24   Q.        Okay.  Now, going back to your current job, what

25   are your -- could you describe your job duties,

```
 1    generally?
 2    A.      My practice focus is in the area of ERISA
 3    matters.
 4    Q.      And what do you do in that capacity for your
 5    clients in a general sense, if you can tell me?
 6    A.      I help companies maintain qualified plans and
 7    keep them current with regulations that are passed from
 8    time to time, and I often advise companies in connection
 9    with establishing Employee Stock Ownership Plans.
10    Q.      How do you attract clients?
11    A.      Well, in the past, I've done a lot of speaking
12    engagements and --
13            MR. HARRIS:  Objection.  Time frame.
14            THE WITNESS:  Excuse me?
15            MR. HARRIS:  Time frame.
16            THE WITNESS:  Yeah.  What time frame are you
17    referring to?
18            MR. HARRIS:  Vague.
19    BY MS. HOPKINS:
20    Q.      I'm talking about in the last several years, how
21    you attract clients.  Say, go back three years --
22    A.      Pretty much word of mouth.  It's a small market
23    here.  I don't --
24    Q.      Are most of your -- I'm sorry?
25    A.      I do not advertise.
```

```
 1   quite a few in the field that I've worked with in the
 2   past.  Are you talking about --
 3   Q.      Okay.  Let's go through -- let's do appraisers
 4   first.  Do you have a roster of people that you use?
 5           MR. JOHANSON:  Objection as to form.
 6           MR. HARRIS:  Yeah.
 7           MR. JOHANSON:  Go ahead and answer if you can.
 8           THE WITNESS:  I don't really know what you mean
 9   by "roster."
10   BY MS. HOPKINS:
11   Q.      Do you have a list of people that you use?
12   A.      Not --
13           MR. JOHANSON:  Same objection.
14           THE WITNESS:  Not written down.
15   BY MS. HOPKINS:
16   Q.      Can you tell me who you regularly use as
17   appraisers?
18           MR. JOHANSON:  Objection as to form.  Go ahead
19   and answer.
20           THE WITNESS:  Yeah.  I wouldn't say regularly,
21   but in the past, I have worked with -- I could not tell
22   you -- I could not remember all the names.  I'll just
23   think out loud a few names.  I've worked with Mr. Chris
24   Kramer from Strategic Equity Group.  I have worked with
25   Gregory Kniesel from Libra Valuation Advisors.  I've
```

1    worked with Dennis Locke from Moss Adams, CPA firm.

2    Other than that, I'd have to think about it a little bit

3    longer on the appraisal side.

4    BY MS. HOPKINS:

5    Q.      Okay.  And what about professional trustees?  Can

6    you name who you work with as professional trustees for

7    ESOP transactions?

8           MR. JOHANSON:  Objection as to form.

9           MS. HOPKINS:  Is that Mr. Johanson or is that --

10          MR. JOHANSON:  It is, Liz.  How are you doing

11   today?

12          MS. HOPKINS:  I'm fine.  Why are you objecting?

13   This doesn't seem to be attorney-client privilege.

14          MR. JOHANSON:  Liz, I'm going to object as

15   appropriate, and, you know, I think, basically, I'm

16   probably going to, for the most part, join in any

17   objection that Mr. Harris makes, and that's how I'm

18   going to do it today.  Thank you.

19          MR. HARRIS:  Please go ahead.

20          THE WITNESS:  Would you repeat --

21          MR. ELIASOPH:  Mr. Johanson, this is Ian

22   Eliasoph.  You asked to participate in this

23   deposition --

24          MR. HARRIS:  Hold on.  Hold on.  We're going to

25   terminate this deposition if more than one attorney gets

1   with."

2           THE WITNESS:  Yeah.  I often have the

3   opportunity to refer my corporate clients to trustees

4   that they may want to consider in an ESOP transaction.

5   Is that the question you're asking me?

6   BY MS. HOPKINS:

7   Q.      I'm asking you to describe professional trustees

8   that you work with in doing ESOPs.  Who are some of those

9   trustees that you refer your corporate clients to?

10          MR. HARRIS:  Same objection.

11          THE WITNESS:  Yeah.  There's several of them,

12  but the ones that just come to mind, of course, is

13  Mr. Saakvitne, the one in this case, Dan Reser of

14  Fiduciary Services.  I've referred corporate clients to

15  him before.  Mr. Neil Brozen.  I think his company is

16  called Ventura Fiduciary Services now.  And GreatBanc

17  Trust Company, various professionals at GreatBanc Trust

18  Company.  And there's been others, but I don't recall

19  off the top of head.  It's been, you know, decades of

20  time that I've worked in this area.  So there may be

21  others that I have referred my corporate clients to.

22  BY MS. HOPKINS:

23  Q.      Okay.  How do you find these other professionals

24  to work with or to refer to your clients on ESOP

25  transactions?

```
 1          MR. HARRIS:  Objection.  Time frame.
 2          THE WITNESS:  I would say that the -- from
 3   attending conferences and from speaking with other
 4   professionals in the field, it's a fairly finite list of
 5   professionals that have a good reputation out there to
 6   use, and anybody I would refer to would be somebody that
 7   I have met at a conference and spent time to get to know
 8   and know their reputation.
 9   BY MS. HOPKINS:
10   Q.     What kinds of traits or qualities are you looking
11   for in an appraiser that you want to use or recommend
12   that your corporate clients use on an ESOP transaction?
13   A.     What type of traits, did you say?
14   Q.     Yes.
15   A.     I'm assuming you mean professional traits?
16   Related to their profession, you mean?
17   Q.     Well, when you use somebody or recommend them,
18   what is it you're looking for?  It might be personal
19   traits for all I know --
20          MR. HARRIS:  Compound.  Form.
21          THE WITNESS:  Once again, it's oftentimes a
22   professional that I would meet at a professional
23   conference, and I have observed them speaking.  I have
24   observed them in committee meetings.  I pull them aside
25   and speak with them and have coffee and share my issues
```

```
 1    and problems with them, and I gauge whether I think

 2    they're a knowledgeable, experienced professional and

 3    somebody that I'm willing to refer my corporate clients

 4    to.  And they're -- they often will have published

 5    articles that I've reviewed that are helpful.

 6    BY MS. HOPKINS:

 7    Q.      Okay.  What are your current fees in doing ESOP

 8    transactions?

 9            MR. HARRIS:  Objection.  Form.

10            THE WITNESS:  I'm not sure this answers your

11    question, but the most common method is I would just

12    charge an hourly rate, which is currently $400 per hour.

13    BY MS. HOPKINS:

14    Q.      Are there times when you do it on a transactional

15    basis and then do a flat fee?

16    A.      There's been times where we give estimates.

17    Usually it's a range.

18    Q.      Who generally pays your fees in an ESOP

19    transaction?

20            MR. HARRIS:  Objection.  Form.

21            THE WITNESS:  I didn't hear -- we couldn't hear

22    the question.

23    BY MS. HOPKINS:

24    Q.      Sorry.  Who generally pays your fees in an ESOP

25    transaction?
```

1    A.     My corporate client.

2           MR. JOHANSON:   Objection as to form too.

3           MR. HARRIS:   Yeah.

4    BY MS. HOPKINS:

5    Q.     Who's your client generally in such transactions?

6           MR. HARRIS:   Excuse me.   Let me clarify my

7    objection to form.   Are you referring to Mr. Hansen's

8    firm or Mr. Hansen when you say "your"?

9           MS. HOPKINS:   I'm referring to Mr. Hansen.

10          MR. HARRIS:   Okay.

11          THE WITNESS:   Well, let me clarify that all the

12   work -- all the legal work that I perform is in the name

13   of my law firm, Case Lombardi & Pettit.   I don't have

14   any independent sole proprietorship going on as an

15   attorney.

16   BY MS. HOPKINS:

17   Q.     All right.

18   A.     So all correspondence and all billing is in the

19   name of my law firm.

20   Q.     Okay.   So then who is your law firm's client

21   generally when you do work on ESOP transactions?

22   A.     Generally, it is the corporation that is

23   considering the establishment of an Employee Stock

24   Ownership Plan.

25   Q.     And in general, how do you communicate with your

1  A.       No.

2  Q.       Do you know what it is for paper files and

3  documents?

4  A.       No.

5  Q.       What was your role with respect to the Bowers and

6  Kubota ESOP formation?

7  A.       I was hired as counsel to the corporation.

8  Q.       And what was your role?

9  A.       To advise the company regarding the possible

10  feasibility and possible implementation of an ESOP

11  transaction.

12  Q.       Anything else?

13  A.       No.

14  Q.       And who hired you, specifically?

15  A.       Bowers and Kubota Consulting, Inc.   And they

16  hired my law firm, not me personally.

17  Q.       How much were you or your law firm paid for your

18  work on the ESOP transaction?  And I'm not necessarily

19  talking about work you may have done since that time, but

20  I mean the work leading up to the ESOP transaction in

21  late 2012.

22       MR. HARRIS:  Can you give a time frame, a more

23  definite time frame, please?  Objection as to form.

24       MS. HOPKINS:  I'm talking in 2012 for work on

25  the ESOP transaction.

1    THE WITNESS:  I don't recall.

2  BY MS. HOPKINS:

3  Q.    Do you have any estimate?

4  A.    Do you want me to guess?

5  Q.    No.

6  A.    Then I don't recall.

7  Q.    Do you still do work with respect to the Bowers

8  and Kubota ESOPs?

9  A.    Yes.  When the company calls me and asks for

10  advice, I would respond.  So currently at the moment, no.

11  Q.    And how often in the time frame since the ESOP

12  transaction in 2012, so post-ESOP transaction, has the

13  company called you and asked for advice?

14  A.    I don't recall.  That would be a guess.

15  Q.    Is it more than one?

16  A.    Let me offer one piece of information.  As you

17  may be aware, every approximately five years, ERISA

18  requires -- well, the Internal Revenue Service requires

19  the restatement and updating of these retirement plan

20  documents, and that time frame would trigger

21  communication between us and our corporate clients for

22  all of them to get in touch and update their documents to

23  keep them in compliance with all current laws.

24  Q.    So do I take it from this piece of information

25  that this means that you were involved in drafting the

```
 1    documents for the ESOP?
 2    A.       Yes.
 3             MR. HARRIS:  Objection.  Objection as to form.
 4    Confusing.
 5             THE WITNESS:  Yeah.  What -- I'm not exactly
 6    sure which documents you're referring to.  Could you be
 7    more specific?
 8    BY MS. HOPKINS:
 9    Q.       Did you draft documents for -- as part of the
10    ESOP transaction in 2012?
11             MR. JOHANSON:  Objection as to form.
12    BY MS. HOPKINS:
13    Q.       Did you draft the trust agreements?
14    A.       We drafted an Employee Stock Ownership Plan and
15    related trust agreement for the plan.
16    Q.       Okay.  So it sounds like when I asked what your
17    role was, you said you hired -- you were hired to advise
18    the company of the possibility and foreseeability of
19    doing the ESOP transaction or possible ESOP transaction,
20    and you drafted -- you drafted the Employee Stock
21    Ownership Plan.  I don't know what you just said, but
22    documents -- trust agreement documents.  Is there
23    anything else that you did in -- leading up to the ESOP
24    transaction in 2012?
25             MR. HARRIS:  Objection.  Vague, overbroad.
```

1    Form.  Calls for a narrative.

2    BY MS. HOPKINS:

3    Q.      Well, a narrative is called for here.

4    A.      Let me just answer by saying there were a few

5    other documents related to the ESOP transaction that we

6    would have had involvement with.

7    Q.      And what were those documents?

8    A.      Corporate documents.  I wouldn't recall the

9    specific names, but there would always be a stock

10   purchase agreement in an ESOP transaction.

11   Q.      Okay.  Can you recall anything else?  Any other

12   documents?

13   A.      There may well have been an amendment to the

14   articles of the incorporation of the company related to

15   the ESOP transaction.  I don't recall specifically, but

16   that's a common event.  There may have been some

17   director's actions of the corporation approving the

18   transaction.  There probably were.  There may have been

19   employment agreements for the corporation.  Off the top

20   of my head, that's all I can recall without starting to

21   speculate.

22   Q.      Okay.  Thank you.  Do you do other legal work for

23   Bowers and Kubota?

24   A.      No.

25   Q.      Did you do legal work for Bowers and Kubota prior

```
 1    to the ESOP transaction?
 2    A.        No.
 3    Q.        How did you first get involved with Bowers and
 4    Kubota?
 5    A.        He called me on the telephone.
 6    Q.        Who is "he"?
 7    A.        Oh, excuse me.  Brian Bowers, the president of
 8    the company, called me on the telephone.
 9              MR. JOHANSON:  And I just remind you,
10    Mr. Hansen, it's all right to reveal that a conversation
11    occurred, but not the --
12              MR. HARRIS:  Substance.
13              MR. JOHANSON:  -- substance of the conversation
14    with Mr. Bowers in his capacity as corporate officer and
15    director of Bowers + Kubota Consulting.  Thank you.
16    I'll instruct you accordingly.
17    BY MS. HOPKINS:
18    Q.        Okay.  And when was that that Mr. Bowers called
19    you on the telephone?
20    A.        I believe it was early 2012 or mid 2012.
21    Q.        Do you know if you can answer why he called you?
22              MR. HARRIS:  Objection.  Instruct --
23    attorney-client privilege.  Instruct you not to answer.
24              THE WITNESS:  I cannot answer due to --
25    BY MS. HOPKINS:
```

```
 1   Q.      Okay.  Thank you.  I'm going to move on.

 2           Who else was involved with you in the ESOP

 3   transaction?

 4           MR. JOHANSON:  Form.

 5           MR. HARRIS:  Objection as to form.  Who else?

 6           THE WITNESS:  Could you be more specific in your

 7   question?

 8   BY MS. HOPKINS:

 9   Q.      What was the role of each person who you worked

10   with on the ESOP transaction in -- for Bowers and Kubota

11   in 2012?

12   A.      The role of each person?  We don't even know

13   which persons we're referring to now.

14   Q.      Well, can you tell me who you worked with?

15   That's a good place to start.

16           MR. JOHANSON:  I --

17   A.      Mr. Bowers, for one.

18           MR. JOHANSON:  Go ahead.

19   BY MS. HOPKINS:

20   Q.      Okay.

21   A.      Mr. Bowers.

22   Q.      Anyone else?

23   A.      I don't recall.  You're asking about individuals

24   at the company?

25   Q.      I'm asking for anybody who was involved in the
```

```
 1   ESOP transaction.   What about Nick Saakvitne?

 2   A.       Could you be more specific in your question?

 3   Q.       What was the role of Nick Saakvitne in the ESOP

 4   transaction?

 5   A.       The corporation hired him as an independent

 6   trustee.

 7   Q.       How did he become involved or how was he hired by

 8   the company?

 9            MR. HARRIS:  Objection.  Instruct you not to

10   answer -- objection to attorney-client privilege.

11            MR. JOHANSON:  Could we read --

12            MR. HARRIS:  Yeah.

13            MR. JOHANSON:  -- that question back --

14            MR. HARRIS:  Yeah.

15            MR. JOHANSON:  -- please?

16            (The following question was read:

17            "Question:  How did he become involved or how

18            was he hired by the company?")

19            MR. JOHANSON:  Who is "he," Liz?

20            MS. HOPKINS:  That's Mr. Saakvitne.

21            MR. JOHANSON:  Okay.  If we could have just two

22   minutes.  We'd like to confer about that as it relates

23   to the attorney-client privilege, attorney work product,

24   and there may be a limited offer of waiver here, but I

25   need to speak with Mr. Harris and Mr. Hansen.  Thank
```

```
 1   questioning that you're making about the selection of a
 2   trustee.
 3        Mr. Harris, do you have anything to add?
 4        MR. HARRIS:  No.
 5        MS. HOPKINS:  Okay.  I can agree that it's a
 6   limited waiver and not a general waiver and --
 7        MR. HARRIS:  And the subject is the selection of
 8   Mr. Saakvitne --
 9        MS. HOPKINS:  That's correct.
10        MR. HARRIS:  -- by the company.
11        MR. JOHANSON:  Great.  Thank you, Liz, for
12   reaching the same agreement today as we did yesterday.
13   I appreciate it.
14        THE WITNESS:  Could you repeat the question?
15   BY MS. HOPKINS:
16   Q.   Yeah.  Do you know how Mr. Saakvitne came to be
17   hired as independent trustee for the ESOP?
18   A.   Well, it's my customary practice, when I
19   represent a company considering an ESOP, to advise them
20   early on to engage an independent trustee, and then if
21   they asked me -- sometimes they do.  Sometimes they
22   don't.  If they ask for my advice as to who to consider,
23   I give them two, three, four names of independent
24   trustees that I might know or have worked with or think
25   might be appropriate for the particular transaction.
```

1    Q.      And is that what happened here?  Did you give

2    more than one name to Bowers and Kubota or to Mr. Bowers?

3    A.      It's my customary practice to give at least three

4    names to consider for independent trustee.  I don't

5    recall in this particular situation whether it was two,

6    three or four.

7    Q.      And was Mr. Saakvitne one of the three names --

8    A.      Yes.

9    Q.      -- you recall?

10        And what was the role of Greg Kniesel in the

11   transaction?

12   A.      Greg Kniesel is a professional independent

13   appraiser that was engaged by the independent trustee to

14   determine the value of the corporation stock.

15   Q.      And do you know how he came to be hired as the --

16   as the appraiser?

17        MR. JOHANSON:  Mr. Hansen, I am concerned that

18   your answer may reveal attorney-client privileged

19   communications and/or attorney work product.  So I would

20   instruct you not to answer to the extent that it -- your

21   answer will reveal that privileged information.

22        THE WITNESS:  On that basis, I am not going to

23   answer.

24        MS. HOPKINS:  Okay.

25        MR. HARRIS:  Same --

```
 1  BY MS. HOPKINS:

 2  Q.      No.  How long have you known Mr. Kniesel?

 3  A.      Approximately 20 years.

 4  Q.      And could you describe your working relationship

 5  with Mr. Kniesel?

 6          MR. HARRIS:  Objection as to form.

 7          THE WITNESS:  Mr. Kniesel is a professional

 8  appraiser that I refer to independent trustees.

 9  BY MS. HOPKINS:

10  Q.      And have you worked with Mr. Saakvitne before the

11  transaction in 2012 for Bowers and Kubota?

12          MR. HARRIS:  Objection as to form, "worked

13  with."

14          THE WITNESS:  Yeah.  I don't personally work

15  with Mr. Saakvitne, but from time to time, I have

16  referred Mr. Saakvitne to my corporate clients as an

17  independent trustee that they might want to consider

18  engaging.

19  BY MS. HOPKINS:

20  Q.      Do you know how many times or approximately how

21  many times?

22  A.      I would say more than once and less than 10

23  times.

24  Q.      Do you recall any other transactions where you

25  referred Mr. Saakvitne to your corporate clients as an
```

```
 1              (Exhibit 1 is marked for identification.)

 2    BY MS. HOPKINS:

 3    Q.       Okay.  Mr. Hansen, if you can let me know when

 4    you've had a chance to look at this.

 5    A.       I've looked at it.  What is your question?

 6    Q.       Do you recognize this document?

 7    A.       It appears to be an email that I sent November 21

 8    of 2012.

 9    Q.       And you sent it to whom?

10    A.       To Mr. Saakvitne.

11    Q.       Can you describe what's going on in this email?

12              MR. JOHANSON:  Form.

13              MR. HARRIS:  Yeah.  Objection as to form and

14    vagueness.

15              THE WITNESS:  Yeah.  Could you give me a

16    specific question?

17    BY MS. HOPKINS:

18    Q.       What are you talking about in this email with

19    Mr. Saakvitne?

20              MR. HARRIS:  Objection.  Form.  The document --

21    we're all looking at the document.  Do you have a

22    question about the document?

23              MS. HOPKINS:  Yes.  I'm asking --

24              MR. HARRIS:  He's --

25              MS. HOPKINS:  -- what's going on in this
```

1    about that it will possibly be 100 percent transaction

2    for 40 million.  What is that 40 million based on?

3            MR. HARRIS:  Objection.  Attorney-client

4    privilege.  Instruct the witness not to answer.

5            THE WITNESS:  I refuse --

6    BY MS. HOPKINS:

7    Q.      Okay.  I'm going to ask another question then.

8    Are you going to follow your attorney's advice?

9    A.      Yes.

10   Q.      I'm going to ask another question then.  Is it

11   your normal practice to give numbers like this to a

12   trustee, such as Mr. Saakvitne, who's just being hired to

13   be trustee?

14   A.      It's my normal practice when I speak -- when I

15   refer an independent trustee to my corporate clients, the

16   trustees might call me and say, "What does this

17   transaction look like?  How complicated is it?  How much

18   time is it going to take," and they have to decide

19   whether they can take on the engagement or not.  So there

20   might be some minimal discussion about the potential

21   parameters of the transaction being structured as A, B or

22   C or, you know, alternative structure of the transaction

23   to help the independent trustee decide if he's willing to

24   take on the engagement or not.

25   Q.      Including mentioning the price that you believe

1    employees in the hallways, gone over financial documents

2    with the company.

3    Q.      Did you specifically have any conversations with

4    Mr. Saakvitne at this meeting?

5    A.      I assume I did.  There would have been

6    pleasantries and, you know, "How are you doing" and "When

7    can this transaction close" and things like that, but it

8    wasn't my function to provide any of the information to

9    him that he was looking for.  He was getting all that

10   information from the -- from his client, the company.

11   Q.      Just one second.  Do you recall if you discussed

12   anything about how the transaction was going to be

13   structured at this due diligence meeting that you

14   remember in early December with Mr. Saakvitne?

15   A.      Not specifically, no, beyond the fact that there

16   was an ongoing debate as to whether it would be a partial

17   transaction or 100 percent transaction.  It was a big

18   decision that had to be made.

19           MR. JOHANSON:  Again, Mr. Hansen, I just want to

20   caution you to the extent you're revealing or you feel

21   like you're revealing privileged and confidential

22   communications with Brian Bowers in his capacity as an

23   officer of the company, be careful there.  Thank you.

24   I'll instruct you not to --

25   BY MS. HOPKINS:

```
 1   BY MS. HOPKINS:

 2   Q.      Are you ready?

 3   A.      Yes.

 4   Q.      Okay.  Are these emails exchanged between

 5   Mr. Saakvitne and Brian Bowers discussing offers and

 6   counteroffers, ESOP purchase?

 7   A.      Are they -- the emails speak --

 8   Q.      I should say "transaction."

 9   A.      They speak for themselves.

10   Q.      What is that?

11   A.      I believe the emails will speak for themselves.

12   There's an offer and a counteroffer.

13           MR. JOHANSON:  It's the witness, Liz.

14   BY MS. HOPKINS:

15   Q.      Are you on these emails?

16   A.      Well, let's see.  There's several of them.

17   There's one on December 11th, and, yes, I am copied on

18   that one.

19   Q.      What was your role with regard to these offers

20   and counteroffers?

21   A.      I am the attorney for the corporation charged

22   with the responsibility of drafting documents to

23   implement the ESOP if the company decided to go forward.

24           I would have blanks in my documents that would

25   need to be filled in once the parties determined how the
```

```
 1    transaction would be structured.
 2    Q.      Were you involved with the negotiations about how
 3    the transaction would be structured?
 4    A.      When you say "involved," I was the attorney that
 5    was responsible for drafting documents for the
 6    corporation.  I guess that's involvement.  I was not
 7    party to negotiations, no.  It's not my role.
 8            MR. JOHANSON:  And just --
 9    BY MS. HOPKINS:
10    Q.      Are you normally on emails with the negotiations
11    before the terms have been reached that need to be filled
12    in in the document?
13            MR. JOHANSON:  Just a reminder, again, when
14    you're answering these questions, please be careful not
15    to reveal any attorney-client privileged communications
16    and attorney work.  Thank you.  I'll instruct you
17    accordingly.
18            THE WITNESS:  Your question is am I normally
19    involved in emails with clients about ESOP negotiations?
20    That's a general question about my entire ESOP practice?
21    BY MS. HOPKINS:
22    Q.      I'm just asking, yes, what your general practice
23    is.  Is this unusual?
24    A.      I don't know.  I've been in this business for 20,
25    30 years.  I don't really know what's usual.  Depends on
```

1    the parties.

2    Q.        Okay.  I'd like to move on to Exhibit 5.

3              (Exhibit 5 is marked for identification.)

4              THE WITNESS:  Yes?

5    BY MS. HOPKINS:

6    Q.        Do you recognize this document?

7    A.        Yes.

8    Q.        What is it?

9    A.        The Bowers and Kubota Consulting, Inc., Employee

10   Stock Ownership Trust Agreement dated effective

11   January 1, 2012.

12   Q.        And who drafted it?

13   A.        Probably my paralegal.

14   Q.        Did you review it?

15   A.        I don't remember specifically.  In the normal

16   course, I would review the ESOP and the trust agreement.

17   Normally, the ESOP plan document is where a lot of the

18   detail and the specifics are involved, and the trust

19   agreement is often fairly boilerplate, but it varies in

20   case to case.  I don't recall in this specific case.

21   Q.        Are you saying you don't always review the trust

22   agreement?

23   A.        Could you rephrase that?  Are you asking if I

24   never review?

25   Q.        No.  I'm asking you if you don't always review

1          I, the undersigned, GREGORY M. HANSEN, being

2     first duly sworn, say:

3          I have read and/or had translated the foregoing

4     deposition, pages 1 to 75, inclusive, and corrections,

5     if any, were noted by me, and I declare under penalty of

6     perjury that the foregoing, with corrections, if any, is

7     true and correct.

8

9          Executed on _____March 15_____, 2018, at

10    _Honolulu, Hawaii_____,

11    _____.

12

13                    _____

14                    GREGORY M. HANSEN

15

16

17

18

19

20

21

22

23    In the Matter of the Investigation of the
      Bowers + Kubota Consulting, Inc., Employee Stock
24    Ownership Plan; February 23, 2018
      By Laura Savo, RPR, CSR

25

```
 1                        C E R T I F I C A T E

 2
       STATE OF HAWAII                    )
 3                                        )  ss.
       CITY AND COUNTY OF HONOLULU        )
 4

 5            I, LAURA SAVO, a Court Reporter in and for the
       State of Hawaii, do hereby certify:
 6
              That on Friday, February 23, 2018, at
 7     8:31 a.m., appeared before me GREGORY M. HANSEN, the
       deponent whose testimony is contained herein; that prior
 8     to being examined, the deponent was by me duly sworn or
       affirmed; that the proceedings were taken in machine
 9     shorthand by me and was thereafter reduced to
       typewriting under my supervision; that the foregoing
10     represents, to the best of my ability, a correct
       transcript of the proceedings had at that time;
11
              That pursuant to Rule 30(e) of the Hawaii Rules
12     of Civil Procedure, a request for an opportunity to
       review and make changes to the transcript:
13
              X      Was made by the deponent or a party
14                   (and/or their attorney) prior to the
                     completion of the deposition.
15
              _____  Was not made by the deponent or a party
16                   (and/or their attorney) prior to the
                     completion of the deposition.
17
              _____  Was waived.
18

19            I further certify that I am not of counsel or
       attorney for any of the parties to this case, nor in any
20     way interested in the outcome hereof, and that I am not
       related to any of the parties hereto.
21
              Dated this 7th day of March 2018 in Honolulu,
22     Hawaii.

23

24                   LAURA SAVO, RPR, CSR NO. 347
                     STATE OF HAWAII
25
```