1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF HAWAII

3

4        ----------------------------------
         EUGENE SCALIA, Secretary of     )
5        Labor, United States           )   CASE NO. 1:18-cv-155-SOM-WRP
         Department of Labor,           )
6                                       )
                   Plaintiff,           )
7                                       )
             vs.                        )
8                                       )
         SHARON L. HERITAGE; NICHOLAS   )
9        L. SAAKVITNE, A LAW            )
         CORPORATION; BRIAN J. BOWERS;  )
10       DEXTER C. KUBOTA; BOWERS +     )
         KUBOTA CONSULTING, INC.;       )
11       BOWERS + KUBOTA CONSULTING,    )
         INC. EMPLOYEE STOCK OWNERSHIP  )
12       PLAN,                          )
                                        )
13                 Defendants.          )
         ----------------------------------

14

15                   DEPOSITION OF GREG HANSEN

16             Taken on behalf of the Plaintiff Eugene Scalia,

17       Secretary of Labor, United States Department of Labor, via

18       Zoom video conference, commencing at 9:02 a.m., on

19       November 23, 2020, pursuant to Notice.

20

         BEFORE:   SANDRA J. GRAN, CSR NO. 424
21                 Registered Professional Reporter

22

23

24

25

Greg Hansen - Confidential                                                    2

APPEARANCES:

For the Plaintiff Eugene Scalia, Secretary of Labor, United
        States Department of Labor:

        RUBEN P. CHAPA, ESQ.
        Office of the Solicitor
        U.S. Department of Labor
        230 S. Dearborn, Room 844
        Chicago, Illinois 60604
        Email chapa.ruben@dol.gov


For the Defendants Nicholas L. Saakvitne, A Law Corporation
        and Sharon L. Heritage, as successor to Nicholas L.
        Saakvitne, Deceased:

        JEFFREY S. PORTNOY, ESQ.
        Cades Schutte LLP
        1000 Bishop Street, Suite 1200
        Honolulu, Hawaii 96813
        Telephone 808-521-9200
        Email jportnoy@cades.com

        And

        OLUWASEUN O. FAMILONI, ESQ.
        Morgan Lewis & Bockius LLP
        1111 Pennsylvania Avenue, NW
        Washington, DC 20004
        Telephone 202-739-5520
        Email sean.mcmahan@morganlewis.com


For the Defendants Brian J. Bowers and Dexter C. Kubota:

        DAVID R. JOHANSON, ESQ.
        ROBERT THOMPSON, ESQ.
        Hawkins, Parnell & Young, LLP
        1776 Second Street
        Napa, California 94559
        Telephone 707-299-2470
        Email djohanson@hpylaw.com
        Email drubel@hpylaw.com

Greg Hansen - Confidential

1    For the Defendant Bowers + Kubota Consulting, Inc.:

2        SCOTT I. BATTERMAN, ESQ.
         Clay Chapman Iwamura Pulice & Nervell, AAL, ALC
3        700 Bishop Street, Suite 2100
         Honolulu, Hawaii 96813
4        Telephone 808-535-8400
         Email sib@paclawteam.com
5

6    For the Witness:

7        DAVID J. MINKIN, ESQ.
         McCorriston Miller Mukai MacKinnon LLP
8        Five Waterfront Plaza, 4th Floor
         500 Ala Moana Boulevard
9        Honolulu, Hawaii 96813
         PO Box 2800
10       Honolulu, Hawaii 96803
         Telephone 808-529-7300
11       Email minkin@m4law.com

12

     Also Present:  Michael Wen and Heather Dakins
13

14

15

16

17

18

19

20

21

22

23

24

25

Greg Hansen - Confidential                                    6

```
 1                      P R O C E E D I N G S:

 2            (Reporter's Disclosure available to counsel.)

 3                           GREG HANSEN

 4            Having been first duly sworn, testified as follows:

 5            MR. CHAPA:  Thank you.  Can we all make our

 6    appearances on the record?  My name is Ruben Chapa.  I'm an

 7    attorney with the Secretary of Labor, U.S. Department of

 8    Labor.

 9            MR. JOHANSON:  David Johanson with Hawkins Parnell &

10    Young, senior partner.  I think Rob Thompson may be joining us

11    as well.  We represent Mr. Brian J. Bowers and Mr. Dexter C.

12    Kubota.

13            MR. BATTERMAN:  Scott Batterman here, from the firm

14    of Clay Chapman Iwamura Pulice & Nervell, representing nominal

15    defendant Bowers + Kubota Consulting, Inc.

16            MR. PORTNOY:  Jeff Portnoy, local counsel for the

17    Saakvitne defendants.

18            MR. MINKIN:  David Minkin representing the deponent,

19    Greg Hansen.

20            MS. FAMILONI:  Shay Familoni, I'm from Morgan Lewis,

21    representing the Saakvitne defendants as well.

22            MR. WEN:  Michael Wen with EBSA, Department of

23    Labor.

24            MS. DAKINS:  Heather Dakins with the U.S. Department

25    of Labor.
```

1    rules today.  I'll be asking you questions, my questions and

2    your answers will be recorded by the court reporter.  Please

3    make certain you give verbal answers to the questions I ask.

4    Your attorney may have an objection.  If he has an objection,

5    please let him make the objection and please provide a

6    response to the question posed.  Please understand this is not

7    like a courtroom setting where a response is not expected

8    until a judge issues a decision.  Pursuant to the rules, you

9    are to answer all questions posed to you.  If you're unclear

10   about anything I'm asking, please ask.  You're not to confer

11   with your attorney while a question is posed, specifically

12   you're not to confer with your attorney for any type of

13   response.  If you don't understand a question -- strike that.

14   We'll take breaks periodically.  Do you understand the rules

15   I've set forth?

16        A.   Yes.

17        Q.   Is there any reason why you cannot truthfully and

18   accurately testify today?

19        A.   No.

20        Q.   Mr. Hansen, what is your current occupation?

21        A.   I'm an attorney.

22        Q.   And for whom do you work?

23        A.   Case Lombardi & Pettit.

24        Q.   Is that a law firm?

25        A.   Yes.

1    Q.   How long have you worked there?

2    A.   Thirty-eight years.   Thirty-seven years.

3    Q.   Did you say 37 years?

4    A.   Yeah, 37.

5    Q.   Does it have more than one office location?

6    A.   No.

7    Q.   And where is its office -- where are its offices

8  located?

9    A.   737 Bishop Street in Honolulu.

10   Q.   What is your job title?

11   A.   Attorney.

12   Q.   Are you in -- strike that.   Does the firm have

13 various practice settings or how does it work?

14   A.   I don't understand your questions.

15   Q.   Okay.   Is the -- is the firm divided into different

16 practice areas?

17   A.   The attorneys all have different specialties.   The

18 others are a real estate group, a corporate group, a

19 litigation group.

20   Q.   Has your position at that firm changed over the 37

21 years you've been there?

22   A.   Yes.

23   Q.   In what respect?

24   A.   About five years ago I switched from being a partner

25 to being of counsel.

1        Q.   Any other way it's changed?

2        A.   I got older.

3        Q.   Okay.  In two thousand -- in the calendar year 2012,

4   was your job title at the firm still just as attorney or a

5   partner in the firm or what?

6        A.   I don't recall when I converted to of counsel.

7        Q.   Have your duties and responsibilities changed in any

8   way when you converted to of counsel?

9        A.   No.

10       Q.   What's the highest level of education you've

11  obtained?

12       A.   A law degree.

13       Q.   Where did you obtain your law degree from?

14       A.   University of California out of Los Angeles.

15       Q.   And when did you obtain that?

16       A.   1973.

17       Q.   And in calendar year 2012, what percentage of your

18  work constituted ESOP work?

19       A.   More than 50 percent.

20       Q.   Was it more than 80 percent?

21       A.   I couldn't say for sure.

22       Q.   And in 2012 -- well, strike that.  Do you currently

23  have any licenses or certificates in accounting?

24       A.   Licenses or certificates.  No.

25       Q.   And do you have any certifications in -- with

1    respect to ESOPs?

2          A.    No.

3          Q.    Have you ever taught any courses with respect to

4    ERISA matters?

5          A.    I've given lectures, I don't know if they would be

6    considered courses.

7          Q.    Did you ever give any lectures regarding ESOPs?

8          A.    Yes.

9          Q.    What audiences?

10         A.    Please repeat that.

11         Q.    When you gave those lectures, what was the audience

12   or what was the forum it was in?

13         A.    I assume you're asking about what the location was.

14         Q.    Well, I'm asking, basically, was it a particular

15   association or what type of entity was sponsoring that

16   lecture?

17         A.    There is a Hawaii Chapter of the ESOP Association

18   that meets several times a year that I have spoken to on

19   occasion.

20         Q.    Any other organizations that have asked you to speak

21   or lecture?

22         A.    There is the National ESOP Association that meets a

23   few times a year, I've spoken a few times.

24         Q.    Any others?

25         A.    Not that I recall.

1          Q.   In any of those instances that you lectured for the

2    National ESOP Association, did it relate to ESOP transactions?

3          A.   Yes.

4          Q.   Do you currently hold any position with the National

5    ESOP Association?

6          A.   No.

7          Q.   Have you ever been a treasurer for the National ESOP

8    Association?

9          A.   No.

10         Q.   Do you hold any positions for the Hawaii Chapter of

11   the ESOP Association?

12         A.   We have, I think, a board of directors or the

13   chapter -- I think it's called board of directors.  I'm a

14   member of that.  It might -- I believe it's board of

15   directors, yes.

16         Q.   Did you say you're a board of director on the Hawaii

17   Chapter?  I didn't understand that.

18         A.   The Hawaii Chapter has -- I forget whether it's a

19   board or a committee that runs our local chapter.  I'm a

20   member of whatever the local body is.

21         Q.   Do you hold any officer positions with the Hawaii

22   Chapter?

23         A.   I don't recall.

24         Q.   Have you ever been the treasurer of the Hawaii

25   Chapter?

 1        A.   No.

 2        Q.   And from when to when did you serve on the board of

 3   the Hawaii Chapter?

 4             MR. MINKIN:  Objection; misstates the testimony.

 5             But you can answer.

 6             THE WITNESS:  I didn't understand the question.

 7   MR. CHAPA:

 8        Q.   You mentioned that you either -- you served in some

 9   capacity on the Hawaii Chapter ESOP Association; is that

10   accurate?

11        A.   Yes.

12        Q.   Okay.  From when to when did you serve in that

13   capacity?

14        A.   On and off over the last 20 years.

15        Q.   How many other board -- how many other members also

16   serve in that capacity?

17        A.   Between five and ten, I would guess.

18        Q.   Have you published any articles regarding ESOPs?

19        A.   Can you define "publish"?

20        Q.   Have you ever used the word published?

21        A.   I'm sorry.

22        Q.   Have you ever used the word published?

23        A.   I just did in the question I asked.

24        Q.   Okay.  And prior to that, had you ever used the word

25   published?

Gregersen - Confidential                                                17

1      A.   I'm sure I have, yes.

2      Q.   When you used the word, what did you mean by that?

3      A.   I don't recall.

4      Q.   Okay.  Have you ever written any articles for any

5    entity?

6      A.   When I have given talks at the local ESOP chapter,

7    there's normally a requirement to provide an outline and some

8    people might consider that publishing, but I don't know if you

9    would.

10      Q.   Okay.  Thank you.  Besides those outlines, have you

11    ever written any articles or any other -- have you ever

12    written any articles for any entities?

13      A.   I don't recall.

14      Q.   Have you ever been interviewed by the media

15    regarding -- related to ESOPs?

16      A.   Probably.  I don't recall when.

17      Q.   Approximately how many times has that happened?

18      A.   I don't recall.

19      Q.   Would you say more than ten?

20      A.   No.

21      Q.   Have you ever been interviewed by Pacific Business

22    News?

23      A.   I don't recall.

24      Q.   By a reporter named Kristi L. Cane, do you recall

25    that?

```
1           A.   Let me do the math.

2           Q.   Okay.

3           A.   I believe it's 47 years.

4           Q.   And before you came to the current firm you practice

5      at, where did you practice?

6           A.    In Utah and before that in Oregon.

7           Q.   When you were in Utah, where did you practice?

8           A.   At a law firm.

9           Q.   What was the name of the firm?

10          A.   Kruse Landa Hansen & Maycock.

11          Q.   And what areas of law did you practice in?

12          A.   Tax law.

13          Q.   And in Oregon, what was the practice that you were

14     at?

15          A.   I worked for your employer.

16          Q.   The U.S. government?

17          A.   Yes.

18          Q.   What entity in the U.S. government, what agency?

19          A.   The Treasury Department.

20          Q.   What were your duties and -- what was your title in

21     the Treasury Department?

22          A.   Attorney.

23          Q.   What were your duties and responsibilities?

24          A.   With respect to the IRS, I handled tax court cases,

25     disputes, criminal tax case referrals.
```

1      Q.   At that setting did you ever deal with any ESOPs?

2      A.   Can you repeat that.

3      Q.   When you were with the U.S. government, the Treasury

4  Department, did you ever deal with any ESOPs?

5      A.   No.

6      Q.   And what about when you were with the firm Kruse in

7  Utah, did you deal with any ESOPs there?

8      A.   I believe I dealt with one ESOP when I was there.

9      Q.   Was it related to an ESOP transaction?

10     A.   No.

11     Q.   All right.  In the 47 years you've been practicing

12  law, how many ESOP transactions have you been involved in?

13     A.   I don't recall.

14     Q.   Is it more than 50?

15     A.   Probably.

16     Q.   More than a hundred?

17     A.   I would be guessing if I answered that.

18     Q.   Of the ESOP transactions that you've been involved

19  in, besides the Bowers + Kubota matter, was Mr. Saakvitne part

20  of any of those other transactions?

21     A.   I don't understand your question.  It sounded like

22  two questions.

23     Q.   Okay.  Have you ever worked with Nicholas Saakvitne?

24     A.   Yes.

25     Q.   How many times?

1     A.   I don't recall.

2     Q.   Do you recall working with him on the Bowers +

3 Kubota ESOP transaction?

4     A.   Yes.

5     Q.   Do you recall working with him on any other

6 transaction?

7     A.   Not specifically, but I know I have.

8     Q.   Have you worked with Mr. Saakvitne more than ten

9 times?

10    A.   I don't recall.

11    Q.   In the times you have worked with Mr. Saakvitne on

12 ESOP transactions, what was his role?

13          MR. MINKIN:   Objection; vague and ambiguous.

14          If you can answer.

15          MR. BATTERMAN:   Objection; compound, complex.

16          THE WITNESS:   Would you repeat the question.

17          MR. CHAPA:   Madam Court Reporter, can you repeat the

18 question, please.

19       (Reporter read as requested.)

20          To begin with, my client would be --

21          MR. MINKIN:   Same objections.

22          Go ahead, the best of your recollection.

23          THE WITNESS:   My client would be the corporation, so

24 I wouldn't work directly with Mr. Saakvitne.   Most commonly,

25 the corporation would sponsor an ESOP and they would engage

Greg Kasen - Confidential                                    22

1    Mr. Saakvitne as the trustee.

2    MR. CHAPA:

3        Q.   When you say "trustee," was he engaged as the

4    discretionary trustee?

5            MR. MINKIN:   Objection; vague and ambiguous.

6            THE WITNESS:   Trustee.

7    MR. CHAPA:

8        Q.   Are you familiar -- are you familiar with

9    discretionary trustees as opposed to directed trustees?

10       A.   Yes.

11       Q.   Okay.   In the instances that you dealt with

12   Mr. Saakvitne on those ESOP transactions, was he a directed

13   trustee?

14       A.   I don't recall specifically, but I -- I think in

15   some transactions, he was directed.

16       Q.   In the instances you dealt with Mr. Saakvitne, were

17   they -- were they all ESOPs of companies located in Hawaii?

18       A.   No.

19       Q.   What other locations would they have been in?

20       A.   I don't recall.

21       Q.   Would any have been in California?

22       A.   I remember one in Texas.   I don't remember one in

23   California at the moment.

24       Q.   Do you remember any in Hawaii besides the Bowers +

25   Kubota matter?

```
 1          Q.    Where the company hired the appraiser or the -- or
 2    if they appointed an independent fiduciary, the independent
 3    fiduciary hired the appraiser.
 4          A.    I do not hire the appraiser.  It would be --
 5          Q.    Correct.
 6          A.    If you're asking me if I worked on transactions
 7    where other appraisers have been involved in Hawaii -- is that
 8    your question?
 9          Q.    Correct.
10          A.    I remember Strategic Equity Group is another
11    valuation firm that has been involved in transactions in
12    Hawaii.
13          Q.    Do you know where Strategic Equity Group is based?
14          A.    California.
15          Q.    What about, were you ever involved in an ESOP
16    transaction where Mr. Kuba was involved?  I think his firm is
17    GMK.
18          A.    I have worked with Mr. Kuba on various transactions.
19    I don't recall whether they were ESOP transactions or not off
20    the top of my head.  I think he also does divorce
21    transactions, estate planning, and various transactions.
22          Q.    Just to make certain that we're on the same page,
23    I'm going to try to use certain terms to make it more
24    efficient, our discussion.  When I refer to BK, I mean
25    Bowers + Kubota Consulting, Inc.  Are you -- is that okay?
```

Greg Hansen - Confidential                                35

1    of the type of ESOP or type of ERISA plan was being -- was

2    being constructed?

3         A.   An ESOP is an ERISA plan.

4         Q.   Correct.

5         A.   That is the type of plan I would have worked on.

6    I've also helped several companies establish and maintain 401K

7    plans and often a client of mine might maintain both an ESOP

8    and a 401K plan.

9         Q.   All right.  Focusing on ESOP plans, would you also

10   provide guidance or counsel with respect to fiduciary

11   functions?

12             MR. MINKIN:   Vague and ambiguous.

13             THE WITNESS:   Yeah.

14             MR. MINKIN:   If you can answer.

15             THE WITNESS:   Could you ask it again, please.

16             MR. CHAPA:   Certainly.

17             Madam Court Reporter, if you could reask the

18   question, please.

19        (Reporter read as requested.)

20             THE WITNESS:   If I was representing the company, I

21   would primarily advise them on how to structure the plan, the

22   related tax issues, and the players that would be involved.

23   And I would have a discussion with the company that there are

24   fiduciary issues involved, if the -- if the -- the trustee of

25   the ESOP would have fiduciary issues that they have to deal

 1    with.

 2    MR. CHAPA:

 3          Q.    Would you also provide counsel on plan

 4    administration type of issues?

 5          A.    Yes, but that would normally by way of -- I would

 6    advise them, much like for a 401K plan, that they would want

 7    to hire an outside administrator to handle those compliance

 8    functions for them.

 9          Q.    Would you provide them any -- any names of

10    individuals that might serve in that capacity?

11          A.    Which capacity?

12          Q.    You said outside -- I don't know if you said service

13    providers or outside consultants.

14          A.    Yes, I will use -- I will use a -- I think the term

15    of art is third-party administrator, TPA, yes.  And they would

16    usually ask me who to use and this is a very specialized field

17    and we would usually give a company at least a couple of names

18    to contact, because it makes our job a lot easier if they have

19    a top-flight professional doing the administration of their

20    plan.

21          Q.    And when you say "some," would it be three names,

22    four names, how many names would you give them?

23          A.    Probably usually two or three names.

24          Q.    And would you usually give them that information in

25    an email or verbally or how?

1    amount the transaction will close at, the value -- the dollar

2    amount the transaction will close at?

3         A.   No.

4         Q.   So a transaction that closed at $1 million may be

5    the same price as -- may incur the same amount of fees on your

6    part as a transaction that closes at 25 million?

7         A.   Practically speaking, no, because -- well, first of

8    all, we don't do a $1 million transaction, it's not pragmatic,

9    but great effort -- on a small transaction, great effort is

10   engaged in to convince the client to stick with the simpler --

11   simplest possible structure to keep things less expensive and

12   more streamlined.

13        Q.   Would the simple structure include not having an

14   independent fiduciary?

15        A.   That's up to the client, because the -- we will

16   usually have the discussion with the client, because the law

17   does not dictate who has to serve as the trustee of the ESOP.

18        Q.   What did you mean by the simplest structure?  What

19   would you consider the simplest structure?

20        A.   Well, that's -- how much time do you have?

21        Q.   Can you give me a summary of what you mean by that?

22        A.   Every ESOP transaction I've ever worked on is

23   different from other ones.  They all vary.  It depends on

24   exactly what the -- the seller's motivation is, the company's

25   motivation is, what their liquidity situation is, how old they

1    are, how they help.  Every transaction is different.  In a

2    smaller transaction, we do our best to advise the company of

3    ways to economize and simplify the transaction.

4         Q.   And what are some of those ways to economize and

5    simplify?

6         A.   Well, one example might be frequently a transaction

7    might have what are called stock appreciation rights or

8    warrants or earn out provisions or 1042 transactions, 1042

9    rollover transactions, mergers, all kinds of features that

10   might come up in a 20 or 30 million dollar transaction that

11   would be economically very burdensome in a small transaction.

12   It's up to the client to decide which way to go.  Sometimes a

13   client wants to sell 30 percent or 50 percent or 70 percent or

14   a hundred percent of the stock, those all involve different

15   levels of structure and complexity.

16        Q.   Just to be clear, so when the transaction includes

17   stock appreciation rights or warrants, it's more complicated

18   than if it doesn't; correct?

19        A.   It's an additional feature to your basic ESOP stock

20   purchase.

21        Q.   And as you see it, when you're retained to help

22   create the ESOP, what are your duties and responsibilities to

23   the client?

24        A.   Well, when I'm retained by a corporation, my duty is

25   to guide them, to educate them on how an ESOP works, how to

1     comply with both the IRS and Department of Labor regulations,

2     and to advise them as to who the players in the transaction

3     might be.

4         Q.   In any of those instances that you've been involved

5     or been retained by a company to create an ESOP, did the

6     company ever retain an ERISA counsel?

7         A.   Well, I would assume they consider me their ERISA

8     counsel.  When we are retained by the company, that's the area

9     of law that an ESOP comes under, is ERISA.

10        Q.   And in any of those instances where you were

11    retained to help on an ESOP transaction, were you aware that

12    it had been previously considering selling to a private buyer?

13        A.   I don't understand that question.

14        Q.   Okay.  Let me rephrase.  Just to clarify for the

15    record, you have identified that you've been involved in a

16    number of ESOP transactions; correct?

17        A.   Yes.

18        Q.   Okay.  In those instances when you went in and

19    talked to the company after you're retained, at any time did

20    they tell you, Oh, we had already considered selling to a

21    private buyer?

22        A.   Yes.

23        Q.   Okay.  What percentage of times do you remember

24    hearing that?

25        A.   I don't think I could put a percentage on it, but

1    just want to make sure I understood it, the private buyer is

2    not limited by what an appraiser identifies as the value;

3    correct?

4         A.   Absolutely right.  They can pay anything they want.

5         Q.   Okay.

6         A.    I assume.  I'm not a securities law expert, I know

7    there's certain fiduciary issues that come into play how much

8    they can pay, but I assume they can pay what they want.

9         Q.   Oh, another thing I wanted to clarify, just to make

10   certain.  So you're not being paid by the ESOP, you're being

11   paid by the company; correct?

12        A.   Correct.

13             MR. JOHANSON:  Objection as to form.

14             THE WITNESS:  My client --

15             MR. MINKIN:  There's no question.

16             THE WITNESS:  Oh, sorry.

17   MR. CHAPA:

18        Q.   I should ask you to make sure I'm clear, so have you

19   ever been involved in a non-ESOP purchase by a private buyer

20   of a company?

21        A.   Yes.

22        Q.   Okay.  And in those instances, what was your -- what

23   was your role in that instance or those instances?

24             MR. BATTERMAN:  Objection; compound, complex, lacks

25   foundation in time and space.

1          MR. JOHANSON:  Join.

2          MR. MINKIN:  Join.

3          THE WITNESS:  Over 40 years of law practice, I've

4    been involved in many transactions where one company buys

5    another company or one individual buys another company.

6    MR. CHAPA:

7         Q.   Okay.  In those instances, is it typical for the

8    private buyer to do due diligence.

9          MR. BATTERMAN:  Objection; vague.

10         THE WITNESS:  (Inaudible.)

11         MR. CHAPA:  I'm sorry.  Did you answer?  I didn't

12    hear.

13         MR. MINKIN:  Vague and ambiguous, "typical."

14         MR. CHAPA:  But did Mr. -- I didn't hear

15    Mr. Hansen's answer if he had one.

16         MR. MINKIN:  He didn't give one.

17         THE WITNESS:  I didn't give an answer.  The question

18    was vague.

19    MR. CHAPA:

20         Q.   Okay.  Did you not understand my question?

21         A.   That's correct.

22         Q.   Okay.  In the instances you reference -- you say

23    you've been involved in many transactions where a private

24    individual or entity purchases a company; is that correct?

25         A.   Yes.

 1          Q.   Okay.  In those instances, what -- were you

 2    typically on the buyer side, seller side, or could be either

 3    one?

 4          A.   Either.

 5               MR. MINKIN:  Objection; compound.

 6               THE WITNESS:  Yeah.  I have been involved in

 7    transactions representing buyers and I've been involved in

 8    transactions representing sellers.

 9    MR. CHAPA:

10          Q.   Okay.  And the transactions you were involved in,

11    was it typical that the buyer would do due diligence before he

12    closed the transaction?

13               MR. MINKIN:  Objection; vague and ambiguous.

14               MR. BATTERMAN:  Join.

15               MR. JOHANSON:  Join.  Also, I don't understand what

16    this has to do with the litigation we're involved in here,

17    Mr. Chapa.

18               MR. MINKIN:  Do you recall the question?

19               THE WITNESS:  I got lost in that dialogue.

20    MR. CHAPA:

21          Q.   Okay.  In the transactions you were involved in

22    before, was it typical for the buyer to do due diligence to

23    determine whether to close a transaction?

24               MR. MINKIN:  Same objection.

25               THE WITNESS:  I would say it's all over the block.

Gregory Hasen - Confidential                                      50

1    Sometimes they -- the client will come to me and say, I'm

2    buying this company for $1 million, can you prepare the

3    documents?  I don't know what due diligence they've done.

4    Sometimes they will go through exhaustive due diligence, it's

5    all over the block.

6    MR. CHAPA:

7         Q.   In the instance -- do you know -- strike that.

8              Have you ever seen a transaction where you know for

9    a fact that the buyer did not do due diligence?

10        A.   I don't recall.

11        Q.   With respect to ESOP transactions, how many times

12   were you involved when the company decided not to select or

13   use an independent fiduciary to close a transaction?

14        A.   I don't recall.

15        Q.   Would anything help refresh your recollection?

16        A.   Again, please.

17        Q.   Would anything help refresh your recollection?

18        A.   You're talking about a 40-year history of practice.

19   I don't keep a detailed record of all the transactions I've

20   been involved in as to which ones do and don't, so any answer

21   I give you would be a guess.

22        Q.   Okay.  So there's nothing that would help refresh

23   your recollection; is that accurate?

24        A.   I believe that's correct.  If I recall, you asked me

25   for a specific number.

1    Q.    Correct.

2    A.    Nothing would refresh my recollection, I don't keep

3    track of that.

4    Q.    I don't think I asked you this question before.

5    Prior to calendar year 2012, did you ever recommend or

6    identify for a client that they could utilize Mr. Saakvitne as

7    an independent fiduciary?

8        MR. MINKIN:   Asked and answered, but you can answer

9    it again.

10       THE WITNESS:   I don't remember the dates, but I

11   believe the answer is yes.   I worked with Mr. Saakvitne prior

12   to the Bowers + Kubota transaction.

13   MR. CHAPA:

14   Q.    Do you know how many times you would have mentioned

15   his name for a transaction prior to calendar year 2012?

16   A.    No.

17   Q.    And why would you have identified him in those

18   instances prior to 2012?

19   A.    Because I would have worked with him and found him

20   to be an intelligent, competent, reliable person to work with.

21   Q.    Any other reasons?

22   A.    Not that I recall.

23   Q.    In any of those instances prior to 2012 when you

24   would work with -- when Mr. Saakvitne was involved in the

25   transaction you were involved in, do you know how he made a

1      MR. CHAPA:

2          Q.   Okay.  Once Mr. -- once Mr. -- strike that.

3               Once an independent fiduciary is put in place,

4      there's a responsibility to monitor the independent fiduciary;

5      is that correct?

6               MR. JOHANSON:  Objection; calls for an expert legal

7      opinion for which the witness has not been qualified or is

8      being paid.

9               MR. BATTERMAN:  Join.

10              MR. MINKIN:  Join.

11              THE WITNESS:  There are -- there are fiduciary

12     duties under ERISA, yes, if that's your question.

13     MR. CHAPA:

14         Q.   Correct.  Now, you would not be advising the company

15     officials on how to monitor the independent fiduciary, would

16     you?

17              MR. JOHANSON:  Objection; leading.  Object to the

18     form of the question.

19              MR. BATTERMAN:  Objection; vague.

20              MR. MINKIN:  Join.

21              MR. JOHANSON:  Join.

22              THE WITNESS:  (Inaudible) the question.

23              MR. CHAPA:  I'm sorry, Mr. Hansen, did you ask a

24     question?

25              THE WITNESS:  No, I just -- I'm sorry, I have to

1    speak up.  I don't know how to answer your question.  It's

2    confusing to me.

3    MR. CHAPA:

4        Q.    Okay.  Let me make it easier.  In any of those

5    instances, did the company officials ever come to you and ask

6    you about what their responsibilities were in terms of

7    monitoring the independent fiduciary they put in place?

8        A.    I don't remember specifically.

9        Q.    Do you remember if that ever occurred in the Bowers

10   + Kubota ESOP transaction?

11           MR. MINKIN:  Objection; attorney-client privilege.

12   Unless it's waived and I don't know if it's been waived by the

13   court yet.

14           MR. JOHANSON:  Well, that's the --

15           MR. CHAPA:  That would be a fiduciary function.  The

16   court has ruled on that and said the fiduciary exception does

17   apply.

18           MR. JOHANSON:  Could you read the question back,

19   Ms. Gran.

20       (Reporter read as requested.)

21           MR. JOHANSON:  I would like a five-minute break to

22   consult on that issue.  Thank you.

23           MR. CHAPA:  Well, the only thing -- the question I

24   have for you, though, I want to make certain we're on the same

25   page, is the only one that can answer the question of --

1    determine whether it's a privilege or not is Mr. Minkin.  So,

2    I mean, you can have your break, but, I mean, that question

3    has to be posed by his own attorney, not by anyone else.

4              MR. JOHANSON:  I don't -- I don't agree with you.

5    The company --

6              MR. CHAPA:  You think that --

7              MR. JOHANSON:  Let me finish, Mr. Chapa.  I don't

8    agree with you.  The company has a privilege here, B+K

9    Consulting, Inc. and the company has independent counsel on

10   the line.  I'm representing Mr. Bowers and Mr. Kubota and I'm

11   asking to consult with the company about the privilege that

12   may or may not apply here.

13             MR. CHAPA:  Okay.

14             MR. MINKIN:  And from my perspective, I don't know

15   what the court ruled, I have not been provided that, but the

16   question in and of itself gave me cause for concern because I

17   was not about to have my client violate his ethical duties and

18   disclose attorney-client communications without knowing what

19   has been agreed to and/or what the court has ruled.

20             MR. JOHANSON:  And for the record, Mr. Chapa

21   cavalierly said what the court had ruled like it was in this

22   particular situation, Mr. Minkin, and I don't think that has

23   happened, so that's why I'm taking the time to speak with

24   Mr. Batterman, company counsel.

25             MR. CHAPA:  Okay.  Five-minute break.

1          MR. MINKIN:   Off the record at 10:46.

2       (Pause in Proceedings:   10.46 a.m.-10.55 a.m.)

3          MR. CHAPA:   Back on the record.

4          MR. BATTERMAN:   This is Scott Batterman speaking on

5    behalf of the company.   It's our understanding that once a

6    fiduciary is selected -- and we note for the record that the

7    secretary has stated more than once that fiduciary selection

8    is not, in fact, an issue in this case.   Once a fiduciary is

9    selected, the board may have a very narrow obligation to

10   monitor the fiduciary.   We don't accept the secretary's

11   position as they have stated it with respect to the ambits,

12   the metes and bounds of this duty.   We believe it's a very

13   narrow duty as it's stated in the case law.   And with the very

14   narrow issue of what the -- what advice may have been given

15   with respect to the narrow duty to monitor, the company is

16   willing to allow that question to be answered; however, we're

17   going to keep a very close eye on each question as it comes up

18   as it relates to communications between Mr. Hansen and the

19   company or its representatives.

20          MR. JOHANSON:   And Mr. Bowers and Mr. Kubota join in

21   Mr. Batterman's position on behalf of the company B+KC.

22          THE WITNESS:   I have a hard time understanding

23   Mr. Batterman.   I heard what David said, but I had a hard time

24   understanding --

25          MR. MINKIN:   So just to clarify for Mr. Hansen, the

Greg Olsen - Confidential                                             59

1     company will allow limited inquiry into this area, but that's

2     it.

3                   MR. BATTERMAN:  At this time, yes.  Yes.

4                   MR. MINKIN:  Okay.

5                   MR. CHAPA:  You want me to restate the question?

6                   THE WITNESS:  Yes, please.

7                   MR. CHAPA:  Okay.  Madam Court Reporter, can you

8     restate the question, please.

9           (Reporter read as requested.)

10                  MR. MINKIN:  Based upon the representation of

11    corporate counsel, you can answer the question.

12                  THE WITNESS:  I don't recall.

13    MR. CHAPA:

14          Q.   Would anything help refresh your recollection?

15          A.   You say can you?

16                  MR. MINKIN:  No.  Anything.

17    MR. CHAPA:

18          Q.   No.  Anything, would anything or anyone help refresh

19    your recollection?

20          A.   Well, I imagine if there was an exhibit, an email by

21    which they asked me that question, that might -- this is over

22    eight years ago, if I recall, so a written record would be

23    helpful, if you have that.

24          Q.   Anything else besides that?

25          A.   Not that I can think of.

1        Q.    Now, in your experience in the transactions you were

2    involved, the ESOP transactions you were involved in, is it

3    typical for the appraiser that's retained by the ESOP to share

4    his fair market valuation report -- strike that.

5            In the ESOP transactions you were involved in over

6    the years you've been practicing, is it typical for the

7    appraiser retained by the ESOP to share his values with the

8    selling shareholders?

9            MR. BATTERMAN:   Objection; vague.   Objection; lacks

10   foundation and calls for speculation.

11           MR. JOHANSON:   Join.

12           MR. MINKIN:   Join.

13           THE WITNESS:   It's a very general question.   First

14   of all, the valuation advisor is not engaged by the ESOP as

15   you stated in the question, he is engaged by the ESOP trustee.

16   MR. CHAPA:

17       Q.    Is there a distinction there?

18       A.    So was that your question?

19       Q.    Well, I guess -- I'm sorry.

20       A.    Your question was when an appraiser is engaged by an

21   ESOP trustee, is it common for the trustee to share the

22   valuation with other people?

23       Q.    Either the trustee or the appraiser, correct.

24       A.    I don't know what's common.

25       Q.    Okay.   In your practice, have you ever seen that

1    happen before?

2          A.    I believe I have seen it happen, yes.

3          Q.    And how many times?

4          A.    I don't recall.

5          Q.    Was it more than ten?

6          A.    Excuse me.

7          Q.    Was it more than ten?

8          A.    No.

9          Q.    Was it more than five?

10         A.    I don't recall.  It varies with the appraiser, it

11   varies with the trustee.

12         Q.    I want to make certain I understand.  So the purpose

13   of the -- of the appraiser identifying value, fair market

14   value, is for the benefit of the ESOP solely; correct?

15         MR. JOHANSON:  Objection as to the form; leading

16   premise.

17         MR. BATTERMAN:  Objection; vague.

18         MR. JOHANSON:  Misstates the law, probably, too.

19         THE WITNESS:  Why don't you ask the question again.

20   MR. CHAPA:

21         Q.    Okay.  What do you believe the purpose of the

22   appraiser coming up with fair market value is?

23         A.    You're not speaking about Bowers + Kubota, you're

24   speaking about generally under ERISA?

25         Q.    Correct.  In your experience, what was the purpose

1    of having the appraiser do the fair market value?

2              MR. BATTERMAN:  Objection to the extent it calls for

3    a legal conclusion and expert testimony from the witness.

4              MR. JOHANSON:  Join.

5              THE WITNESS:  I'm sorry, I can't -- I think it's

6    Mr. Batterman's microphone, I'm having a hard time

7    understanding anything he's saying.

8              MR. MINKIN:  He's making objections.

9              THE WITNESS:  Okay.

10             MR. MINKIN:  So based on those objections -- you

11   still have to answer the questions.  He's protecting the

12   record.

13             THE WITNESS:  Hopefully, I'm being responsive to

14   your question because I wasn't quite sure.  The purpose of the

15   appraiser is to assist the trustee in determining in an ESOP

16   transaction that the trustee -- if it's a stock purchase

17   transaction, that the trustee is not paying more than fair

18   market value -- excuse me, not more than adequate

19   consideration for the stock being purchased.  That's a part of

20   the process, a part of the puzzle, but not all of the puzzle.

21   Frequently, a valuation advisor is coming up with a valuation

22   on an annual basis having nothing to do with the transaction.

23   He's providing that number to a trustee each and every year to

24   assist the trustee in his process of establishing the updated

25   current valuation in each and every year.

1    MR. CHAPA:

2        Q.   So there's no reason for the appraiser to give that

3    value to the selling shareholder; correct?

4            MR. BATTERMAN:  Objection; argumentative, lacks

5    foundation.

6            MR. JOHANSON:  Join.

7            THE WITNESS:  No reason?  Well, I can see a seller

8    wanting to see the valuation.  I wouldn't say there's no

9    reason, you might have a seller that wants to see it.

10   MR. CHAPA:

11       Q.   Besides that, is there any other reason?

12       A.   Not that I can think of immediately.

13       Q.   Could it not be to the -- strike that.

14            Wouldn't it be to the detriment of the ESOP to give

15   that value away to the selling shareholder?

16            MR. BATTERMAN:  Objection; calls for speculation,

17   vague, improper hypothetical, leading, argumentative.

18            MR. MINKIN:  Join.  Vague.

19            MR. JOHANSON:  Calls for an expert opinion for which

20   Mr. Hansen has not been qualified and is not being paid.  Join

21   in all of the other objections.

22            THE WITNESS:  Am I still supposed to answer?

23            MR. MINKIN:  Yes.

24            THE WITNESS:  Sorry.  We would normally tell a

25   buyer -- the buyer has to come up with whatever number the

Greg Olsen - Confidential                                    64

1    buyer is willing to sell for and he cannot rely upon the value

2    determined for the trustee.   Usually, the valuation advisor's

3    engagement letter very specifically states that it's not to be

4    relied upon by anybody but the trustee and, you know, often

5    says it can't be shared with anybody but the trustee.

6    MR. CHAPA:

7        Q.   So it would be to the detriment of the ESOP to give

8    that number to the selling shareholder, then?   I didn't

9    understand your answer.

10            MR. BATTERMAN:   Same objections.   Asked and

11   answered.

12            MR. JOHANSON:   Mischaracterizes the witness's

13   testimony, it speaks for itself.

14            MR. MINKIN:   Calls for a legal conclusion.

15            MR. JOHANSON:   Join.

16            MR. MINKIN:   Do you recall the question?

17            THE WITNESS:   No, I don't recall the question.   It

18   got confusing there.

19   MR. CHAPA:

20       Q.   Okay.   So the question is:   It would to the

21   detriment of the ESOP --

22            MR. MINKIN:   Ruben, your mic is off.   Your mic is

23   off, Ruben.

24            MR. BATTERMAN:   I hear him.

25            MR. CHAPA:   Yeah, I'm --

 1              THE WITNESS:  Now we hear you.

 2    MR. CHAPA:

 3       Q.   Okay.  So it would be to the detriment of the ESOP

 4    to give the appraiser value to the selling shareholder;

 5    correct?

 6              MR. BATTERMAN:  Objection; argumentative, calls for

 7    an opinion, lacks foundation.

 8              THE WITNESS:  The first part of the question was:

 9    Is it to the benefit of the ESOP?  Is that your question?

10    MR. CHAPA:

11       Q.   No.  Would it be to the detriment of the ESOP to

12    give the appraiser's fair market value to the selling

13    shareholder?

14       A.   That, I think, could be argued both ways.

15       Q.   How would you argue it's to the benefit?

16              MR. BATTERMAN:  Objection; legal conclusion,

17    argumentative, calls for a narration, vague, speculative,

18    lacks foundation.

19              MR. JOHANSON:  Join.

20              THE WITNESS:  Maybe you could ask a question to

21    which I could give a yes or no answer.

22              MR. CHAPA:  I'm just following up on what you said.

23    You said you could argue it both ways, I just don't understand

24    how you'd argue it's to the advantage of the ESOP, that's what

25    I'm trying to figure out.

```
 1              MR. JOHANSON:  Let's not laugh now, Mr. Chapa.

 2              MR. CHAPA:  I'm not laughing, I was smiling.

 3              MR. JOHANSON:  Well, I don't think you should smile,

 4     either.  This is a very --

 5              MR. CHAPA:  Well, I appreciate your comment, but I'm

 6     gonna do what I'm gonna do.

 7              MR. JOHANSON:  Well, I disagree with your conduct,

 8     so please stop.

 9              MR. BATTERMAN:  Mr. Chapa's inability to comprehend

10     different situations is not the basis for a question for an

11     opinion from a witness who is not being paid to give opinions.

12              THE WITNESS:  Perhaps I was being flippant in an

13     effort to try to get you an answer, Mr. Chapa.

14     MR. CHAPA:

15         Q.   Do you mean that you did not mean that you could

16     argue it both ways?  I don't understand what you mean by that.

17         A.   Yeah, I guess I was being flippant or answering too

18     quick.  I -- off the top of my head, I don't know how to say

19     it would be to the benefit -- to the benefit of the seller,

20     did you say, or to the benefit of the ESOP?

21         Q.   To the benefit of the ESOP.

22         A.   (Pause.)  I know in some cases there's been a

23     circumstance where -- well, that's not to the benefit of the

24     ESOP.  I know sometimes an auditor or a bank -- for example, a

25     bank, in order to get the financing, will say, We want to see
```

1    the ESOP appraiser's appraisal.  And the appraisal

2    specifically states that it can't be shared with other persons

3    or relied upon by other persons and the bank says, We won't

4    make the loan if we don't get it.  And the company and the

5    trustee might go to the appraiser and get an exception, a very

6    narrow exception letter to take that valuation to the bank or

7    to the auditor; otherwise, everything grinds to a halt.

8    That's an example of where you might say that's a benefit for

9    sharing the appraisal.

10         Q.    Any other instance?

11         A.    Not that I can think of off the top of my head.

12         Q.    And just to clarify, that sharing of the appraisal

13   is not to the selling shareholder, but, instead, to the third-

14   party financier; correct?

15         A.    I think I mentioned a third-party financier and also

16   auditors, sometimes the auditors will demand that they see it.

17         Q.    By the way, I forgot to ask you, with respect to

18   Mr. Saakvitne in the instances where he was appointed by the

19   company that was -- that retained you to be the independent

20   fiduciary, are there any instances where he failed -- where

21   he -- where he chose not to close the ESOP transaction?

22         A.    I don't recall.

23         Q.    Would anything help refresh your recollection?

24         A.    I imagine if you came up with a specific client name

25   where that happened, I might recall the facts, but I don't

1    complexity was going to evolve into the transaction.

2         Q.   In your experience, is it typical for the

3    independent fiduciary to retain an attorney for the ESOP?

4              MR. MINKIN:  Objection; vague and ambiguous,

5    speculation.

6              THE WITNESS:  I've seen it both ways.

7    MR. CHAPA:

8         Q.   And how often do you see that the independent

9    fiduciary who's engaged to determine whether to close a

10   transaction, ESOP transaction or not, does not retain an

11   attorney?

12             MR. MINKIN:  Vague and ambiguous as to timeframe.

13             THE WITNESS:  Yeah.  I don't know how to answer how

14   often.  Some trustees have in-house counsel, they don't need

15   to engage outside counsel.  Some trustees are also attorneys.

16   So it varies, every case varies.

17   MR. CHAPA:

18        Q.   In 2012, did Mr. Saakvitne have in-house counsel?

19        A.   Mr. Saakvitne -- I guess I would say yes in the

20   sense that Mr. Saakvitne is a licensed attorney, so he was

21   playing that role himself, that was his decision to make.

22        Q.   Wouldn't the retainer agreement identify whether he

23   was going to take on that role as well or what do you mean by

24   that?

25             MR. BATTERMAN:  Objection; vague.  Objection; calls

1    for speculation, compound, complex, argumentative, leading.

2              MR. JOHANSON:  Join.

3              MR. MINKIN:  Join.  And lacks foundation.

4              THE WITNESS:  Maybe you could break that question

5    down into a simpler form.

6    MR. CHAPA:

7         Q.    Okay.  Why do you -- if I understand you correctly,

8    you're saying that Mr. Saakvitne served as his own attorney

9    with respect to the independent fiduciary engagement for the

10   Bowers + Kubota ESOP transaction.  Is that accurate?

11             MR. MINKIN:  Objection; misstates the testimony.

12             MR. BATTERMAN:  Join.

13             MR. JOHANSON:  Join.

14             THE WITNESS:  I don't recall if he had outside

15   counsel.  I don't recall.

16   MR. CHAPA:

17        Q.    In your experience, if an attorney -- if the

18   independent fiduciary did not retain an outside counsel, did

19   you ever see the appointing fiduciary ask the independent

20   fiduciary why an outside counsel is not retained?

21        A.    That's a complicated question.

22             MR. BATTERMAN:  Objection; compound, complex.

23             THE WITNESS:  Yeah.  I don't understand the

24   question.

25   /////

    1   MR. CHAPA:

    2       Q.    Okay.  We spoke a little bit about independent

    3   fiduciaries and your recommendation to companies that retain

    4   you, what about appraisers, what -- in 2012, what independent

    5   appraisers or what -- strike that.

    6           In 2012, what -- what would you be looking for to

    7   recommend an appraiser to a company that's looking to close an

    8   ESOP transaction?

    9       A.    What would I be looking to?

   10       Q.    In other words, why would you recommend one over

   11   another?

   12       A.    I wouldn't recommend one over another.  I would

   13   usually give -- normally, I wouldn't recommend.  I would

   14   recommend that they hire an independent trustee and the

   15   independent trustee would pick an appraiser from a list that

   16   that fiduciary or trustee is comfortable with.

   17       Q.    Is that typically how it happened?  It wouldn't be

   18   you making a suggestion as to who the appraiser would be, it

   19   would be the independent fiduciary identifying who the

   20   appraiser is going to be?

   21       A.    Yes.

   22       Q.    And that holds true for the calendar year 2012;

   23   correct?

   24       A.    That's a general statement.  I don't recall all the

   25   transactions I was involved in in that year.

1      Q.   There's no reason to believe that wouldn't hold true

2    for 2012; correct?

3      A.   I don't know how to answer that.

4      Q.   Because there's some exception in 2012?

5           MR. BATTERMAN:  Objection; vague.

6           THE WITNESS:  Let's go back to the underlying

7    question.

8    MR. CHAPA:

9      Q.   Okay.  The underlying question I believe you

10   answered was you said typically you don't recommend who the

11   appraiser is going to be.  Is that accurate?

12     A.   I don't recommend which independent appraiser is

13   chosen to perform the valuation.  I would normally give --

14   if -- it depends on whether -- if a company hires an

15   independent trustee, that trustee determines from his list or

16   her list who to choose as the independent valuation advisor.

17   But as we discussed earlier, the law does not dictate that the

18   company hire an independent trustee.  If a company has not

19   engaged an independent trustee and they were to ask my opinion

20   of independent valuation experts that might perform this

21   service and they ask me for a recommendation, I might give

22   them a list of names of qualified professionals that I know.

23     Q.   Okay.  And that holds true in 2012 as well; correct?

24     A.   That's always been my practice, yes.

25     Q.   Okay.  So in those instances where the company asked

Greg Claassen - Confidential                                      78

1    you for a recommendation, what would -- what would you be

2    looking for or identifying as the -- to make that

3    recommendation; in other words, what makes that independent

4    appraiser qualified?

5         A.   Is your question where a company does not hire an

6    independent trustee?

7         Q.   Correct.

8         A.   So why don't repeat your question in that context,

9    then.

10        Q.   Okay.  So in an instance where the company does not

11   retain an independent trustee, what would you -- in your

12   giving a recommendation of an independent appraiser, what

13   criteria would determine which independent appraisers you're

14   going to recommend?

15             MR. BATTERMAN:  Objection; vague, calls for

16   speculation, improper hypothetical, lacks foundation as to

17   time, space, or any particulars.

18             THE WITNESS:  The only criteria that I would use

19   would be to provide the names of qualified independent

20   valuation experts that I had experience with in the past

21   either through transactions or through reputation that I would

22   know would be capable or reputable and reasonable in price and

23   responsive, I guess, is the most general question I could

24   give -- general answer I could give.

25   /////

Greg Olsen - Confidential                          81

```
 1    conflict of interest to do so subsequent to the close of the

 2    transaction?

 3              MR. BATTERMAN:  Objection; calls for an opinion

 4    outside the scope of this witness's reason for testifying.  If

 5    you want an expert opinion, you should pay him for it.

 6    Objection; vague, improper hypothetical, lacks foundation,

 7    calls for speculation.

 8              MR. JOHANSON:  Join.

 9              MR. MINKIN:  Join.

10              THE WITNESS:  I don't --

11              MS. FAMILONI:  Join.

12              THE WITNESS:  I don't see where it's a conflict.

13    Maybe you could give me a specific example of where you're

14    going, why you think it's possibly a conflict, and then I

15    could respond, but I don't see why it would be a conflict.

16    MR. CHAPA:

17         Q.   Okay.  If the -- if the appraiser who was the -- if

18    the appraiser who closed the transaction made a mistake,

19    wouldn't he want to perpetuate that mistake; in other words,

20    wouldn't he want to make certain it's not seen post

21    transaction?

22              MR. BATTERMAN:  Objection; calls for speculation,

23    vague, lacks foundation, improper hypothetical, argumentative,

24    and leading.

25              MR. JOHANSON:  Join in all of the above.
```

1           THE WITNESS:  I think as a general rule there's an

2    interest in consistency.  Appraisal, just like appraising art

3    or real estate, I believe there's both science and art

4    involved and different appraisers use different methods and

5    place different emphasis on different factors.  You could hire

6    four different appraisers for a company and get four different

7    values.  So to be jumping around -- if you were not aware of

8    some problem or defect or mistake or error in the valuation, I

9    guess I would normally think the same appraiser would better

10   serve the ESOP from a consistency point of view and from a

11   fairness point of view for the participants.  If you jumped

12   around to different appraisers or go appraisal shopping to try

13   and get a higher or a lower value, that would be unfair to the

14   participants.  So I guess in summary, I'm inclined to think

15   it's normal -- normally better to be sticking with the same

16   appraiser.  I'm talking in the universe of ESOP transactions,

17   it's been my experience that it's more common than not that

18   the initial appraiser remains in place.

19   MR. CHAPA:

20       Q.   In your experience in terms of the formation of an

21   ESOP, do you have any checklist of things that have to be done

22   with respect to the ESOP formation or transaction?

23           MR. MINKIN:  Vague and ambiguous as to timeframe.

24           THE WITNESS:  Every transaction would be different,

25   as we discussed at length before, and whereas one case might

Greg Hansen - Confidential                                          83

1    have a checklist with nine items on it, another one might have

2    a checklist with 90 items on it.

3    MR. CHAPA:

4         Q.   All right.  So do you have a checklist of common --

5         A.   Usually -- I'm sorry.  Go ahead.

6         Q.   I'm sorry if I interrupted.  You can go ahead.

7    Sorry.

8         A.   I would normally -- it's often my practice after a

9    meeting with a client, especially a lengthy meeting with

10   several parties involved, to sit down and generate a checklist

11   of my own just to aid my memory and assist in my follow-up.

12   It's not one set document that I would ever use.

13        Q.   Okay.  In calendar year 2012 and before that, can

14   you take me through the process once you're retained by a

15   client to determine whether to close an ESOP transaction?

16   What steps would you take?

17             MR. BATTERMAN:  Objection; vague as to who's

18   determining to close.

19             MR. MINKIN:  Yeah.

20             MR. BATTERMAN:  Are you asking whether he makes the

21   decision to close?

22             THE WITNESS:  I'm sorry, I'm not sure who was

23   talking, whether that was Ruben or Scott or --

24             MR. BATTERMAN:  It was me, Scott.

25             THE WITNESS:  Could you say it again, please.

```
 1                MR. CHAPA:  Certainly.
 2                MR. BATTERMAN:  I'm trying to figure out who's --
 3        why don't you repeat the question and maybe it'll make sense
 4        this time.
 5        MR. CHAPA:
 6            Q.   In calendar year 2012 and before that, can you take
 7        me through the process from when you're retained by the
 8        company until the time the decision is made on whether to
 9        close the transaction, what steps would be taken?
10            A.   Well, that's a long, convoluted process, but
11        normally in a first meeting, a client would ask me about an
12        ESOP and I would explain to them that it's a retirement plan
13        and how the contributions are limited and how the tax law
14        works and who has to be covered by the plan and who the
15        players are.  And in that initial discussion, I would ask the
16        client to explain to me what their objectives are.  Do they
17        desire to sell all their stock at one time?  Do they desire to
18        obtain bank financing?  Do they desire to remain employed?  Do
19        they have any family members that work for the company that
20        they want to remain as employees or remain as shareholders?
21        It's not uncommon for me to ask a very important question of a
22        client:  What do you think this company is worth?  Or a
23        similar question of:  Well, what's your number that you're --
24        you're not willing to proceed without getting the number?  A
25        whole variety.  So that's -- that's the initial dialogue and
```

1    that can usually take several hours, especially with a

2    sophisticated client who asks us lots and lots of questions.

3               And that might take many, many months to form up

4    what the transaction looks like.  Financing can tremendously

5    complicate the transaction.  Often the company will have an

6    existing bank relationship where it's fairly easy and smooth,

7    often in a larger transaction we will shop the proposed

8    transactions to two or three or four lenders.  We might hire

9    somebody else to do that shopping for us and they'll get bid

10   sheets from a variety of banks, that can take months, lots of

11   complexity.  There can be discussions about, again, is it a 30

12   percent transaction, is it a 51 percent transaction, is it a

13   100 percent transaction.  Every company's different, every

14   seller's different.

15              Once the nature and structure of the transaction has

16   been decided on and the -- the parties are in place, the

17   trustee and the appraiser are in place -- oh, often a client

18   will ask me, How long does it take to do an ESOP transaction,

19   and there is no law to answer that question, there's no

20   specific answer.  We will often say we recommend at least

21   five, six, seven, eight, nine -- ideally, I like to have six

22   to nine months, at a minimum, before a proposed close.  And

23   I'm talking about from the first time we communicate with the

24   client, because it's not something to be rushed into.

25              So are we getting there, Ruben?

1     Q.    Yes.   And then is there any additional steps?   Now

2   that you've actually got them to the point of identifying

3   they're looking to close a transaction, are there additional

4   steps that you would actually go through?

5     A.    Well, the buyer and the seller are going to make

6   offers back and forth.   There might be employment contracts

7   involved.   There might be stock options involved, stock

8   appreciation rights involved, warrants involved, bank

9   guarantees involved, leases involved, subsidiaries involved,

10   unions involved, all variety of events.   So if you're asking

11   me how long it take to close a transaction, I've seen a

12   transaction close in two months; I recall one ESOP transaction

13   where we set up the ESOP with the objective of closing the

14   transaction by December of that year and the ESOP was set up

15   and they didn't close it until three and a half years later.

16   They funded -- they made contributions into the plan for three

17   or four years and then finally closed the transaction at the

18   end of that time.   So it's all over the map.

19     Q.    Okay.   And up to 2012, what was the highest ESOP

20   transaction you had been involved in?

21     A.    What do you mean by "highest"?

22          MR. JOHANSON:   Objection.

23          MR. CHAPA:   Value.

24          MR. JOHANSON:   Objection as to form; vague,

25   ambiguous, unintelligible.

1              THE WITNESS:  Yeah.  I -- I would like to ask you to

2    clarify your question, please.

3    MR. CHAPA:

4         Q.    Okay.   Prior to calendar year 2012, had you ever

5    been involved in closing an ESOP transaction where the company

6    was valued at more than $40 million?

7         A.    Yes.

8         Q.    How many times?

9         A.    I don't recall.

10        Q.    And what were the values?

11        A.    I don't recall, but I recall there were bigger deals

12   than that.

13        Q.    I didn't hear the last part.  You recall there was?

14        A.    I don't recall, but I know -- I believe there were

15   transactions bigger than that that I was involved in.

16        Q.    Was it more than three transactions?

17        A.    I don't recall.   At least one.

18        Q.    Was that transaction more than $50 million?

19        A.    I don't recall a number.  I don't want to guess.

20        Q.    In your experience, have you ever been involved in a

21   transaction where the independent fiduciary identified fair

22   market value -- or adequate consideration was less than what

23   the seller was asking for?

24        A.    I don't recall specifically, but I presume yes.

25   There's always an offer and an acceptance back and forth and

1    it's probably the rule rather than the exception that the --

2    the buyer might propose a higher price than the trustee is

3    willing to accept.

4        Q.   You mean the seller might propose a higher price?

5        A.   Yes.  Thank you for correcting.  I meant to say

6    where the seller is asking for a higher number than the

7    trustee is willing to pay, that would not be uncommon.

8        Q.   And approximately how many times did that happen?

9        A.   I don't recall.

10       Q.   Was it more than five times?

11       A.   Probably.

12       Q.   And prior to 2013, was it typical for you to give

13   your clients who you're retained by a copy of the ESOP -- a

14   copy of a document that's captioned, ABCs of ESOPs?

15       A.   I don't recall.

16       MR. CHAPA:  Why don't -- Heather, if you could put

17   up on the screen the document, ABCs of ESOPs, and the document

18   number is 702, Exhibit 702.

19       (Exhibit 702 marked for identification)

20       THE WITNESS:  Exhibit 702?

21       MR. MINKIN:  Hang on.  Don't worry about the

22   numbering.

23       THE WITNESS:  Okay.

24       MR. CHAPA:  Heather, can you put up -- thank you.

25       MR. MINKIN:  It's on its way.  Okay.  You see this?

MR. CHAPA:

      Q.    I'm showing you what has been marked as Exhibit 702.
It purports to be a copy of a document captioned, The ABCs of
ESOPs.   Have you ever seen a copy or the original of
Exhibit 702 before?

      A.    Have I ever seen this before?

      Q.    Correct.

      A.    It appears that it's an outline that I drafted.

      Q.    And was it created in the normal course of business?

            MR. MINKIN:  I'm going to ask that the entire
document that's been marked as 702 be allowed to be seen by
the witness before you start asking particular questions,
Mr. Chapa, if possible.

            MR. CHAPA:  Okay.  Can you please -- Heather, can
you please scroll through 702, please.

            MR. MINKIN:  Thank you.

            MR. CHAPA:  Certainly.

            THE WITNESS:  This exhibit --

            MR. MINKIN:  Don't worry.

            THE WITNESS:  Okay.

            MS. DAKINS:  Mr. Hansen.

            THE WITNESS:  Yes.

            MS. DAKINS:  Just let me know if I either am going
too fast or too slow or -- I'll try to go as -- just let me
know.

```
 1    hand side.  Are you able to shrink this a little bit?

 2              MS. DAKINS:  Yeah, let me try to do that.

 3              MR. MINKIN:  There we go.

 4              THE WITNESS:  Better, much better.

 5              MS. DAKINS:  Is that good?

 6              MR. MINKIN:  Yes.  Thank you.

 7              MS. DAKINS:  You're welcome.

 8              MR. MINKIN:  The joys of Zoom deposition.

 9              THE WITNESS:  That's fine the way you're going.

10    (Pause - referring.)

11    MR. CHAPA:

12         Q.   I think that's the end of the document; is that

13    correct?  Yes.

14         A.   Yes.

15         Q.   Okay.  Did you provide a copy of Exhibit 702 to

16    Bowers + Kubota prior to December 14, 2012?

17         A.   I don't recall.

18         Q.   Is there any reason to believe you did not?

19              MR. BATTERMAN:  Objection; vague.

20              THE WITNESS:  I don't recall.

21              MR. CHAPA:  Could you turn to page 9 of Exhibit 702,

22    please.  It's Bates stamp Bowers/Kubota 12792.  Specifically

23    we're looking at paragraph No. 3 at the top.

24              MR. JOHANSON:  What page, Mr. Chapa?

25              MR. CHAPA:  It's Bowers/Kubota Bates stamped 012792
```

 1    or actual page -- numbered page 9.

 2             MR. JOHANSON:  Thank you.

 3             MR. CHAPA:  Certainly.

 4    MR. CHAPA:

 5        Q.   We're looking at paragraph 3.  It starts out, If the

 6    stock acquired by the ESOP is publicly traded, participants

 7    must be permitted to direct the voting of shares allocated to

 8    their accounts under the plan.  The trustee votes unallocated

 9    shares consistent with his or her fiduciary duty to the ESOP

10    trust.  Did I read those two sentences correctly?

11        A.   Yeah, I -- I think you read them correctly, yeah.

12        Q.   Okay.  So once the ESOP buys the company, the ESOP

13    via the trustee makes all corporate decisions; correct?

14        A.   No.

15             MR. BATTERMAN:  Objection; vague.

16             MR. JOHANSON:  Objection; calls for a legal opinion

17    for which you're not paying the witness and he's not qualified

18    to give.  Go ahead.

19             MR. MINKIN:  Can you ask it again, please.

20    MR. CHAPA:

21        Q.   Certainly.  Once the ESOP purchases the company, the

22    ESOP via the trustee makes all corporate decisions; is that

23    accurate?

24             MR. BATTERMAN:  Objection; vague --

25             THE WITNESS:  No.

1              MR. CHAPA:  Let me refine my question further.

2    MR. CHAPA:

3         Q.   If the ESOP purchases 100 percent of the company,

4    after the transaction closes, who owns the company?

5              MR. JOHANSON:  Calls for a legal conclusion.

6              MR. MINKIN:  Join.

7              THE WITNESS:  The ESOP owns the stock of the company

8    after closing a 100 percent ESOP transaction.

9    MR. CHAPA:

10        Q.   And in the documents you drafted to close this

11   transaction with Bowers + Kubota, the ESOP was purchasing 100

12   percent of the company; correct?

13        A.   Well, I'm not looking at the -- this is an outline

14   that you're showing me.  I don't recall the specific documents

15   in the Bowers + Kubota transaction.  We're not looking at that

16   right now.

17        Q.   Correct.  Do you remember, though, whether the ESOP

18   purchased a hundred percent of Bowers + Kubota?

19        A.   I believe they purchased -- I believe the ESOP

20   purchased a hundred percent, is my best recollection.

21        Q.   Okay.  And assuming that's correct, who owns the

22   company after December 14, 2012, with respect to Bowers +

23   Kubota?

24        A.   Was December 14th, 2012, the date of the closing?

25        Q.   Correct.

1        A.    Okay.  I don't -- I don't see that in this document,

2    but assuming you're stating the facts correctly, then the ESOP

3    trustee owns the stock of the company after the closing.

4        Q.    So that means the ESOP owns the company; correct?

5        A.    Yes.

6        Q.    Okay.  And so that means the ESOP can make the

7    corporate decisions such as when to buy or when to sell --

8    well, strike that -- such as selling the company; correct?

9              MR. JOHANSON:  Objection as to form; vague,

10   ambiguous, unintelligible.

11             THE WITNESS:  You're asking a simple question that

12   could cover a multitude of scenarios.  Are you asking about a

13   stock sale or an asset sale or a merger or a liquidation?

14   MR. CHAPA:

15       Q.    You can pick any one of those and wouldn't it be

16   true that the ESOP makes that decision?

17             MR. JOHANSON:  Objection.  Objection; vague,

18   ambiguous, unintelligible.

19             MR. MINKIN:  Repeat your answer.

20             THE WITNESS:  Oh.  I said the answer could be

21   different in all of those circumstances.  Sometimes the board

22   of directors might have the authority to -- to engage in a

23   transaction involving the assets of the company and sometimes

24   the -- and in certain cases, the trustee might have the

25   authority to sign off on a transaction and in certain

```
 1                    MR. JOHANSON:  Join.

 2    MR. CHAPA:

 3         Q.   I'll focus my question on the Bowers + Kubota

 4    situation.  You drafted the closing documents, in those

 5    instances, if the -- if the ESOP does not have the ability to

 6    actually dictate to the board, doesn't that mean the ESOP

 7    doesn't control the company?

 8                    MR. JOHANSON:  Objection; compound, complex, vague,

 9    ambiguous, unintelligible, calls for a legal conclusion.

10                    MR. BATTERMAN:  Join in the above plus argumentative

11    and leading.

12                    THE WITNESS:  I don't know how to answer your

13    question.

14    MR. CHAPA:

15         Q.   Okay.  Typically, doesn't an owner have the ability

16    to make those decisions?

17                    MR. BATTERMAN:  Objection; vague.

18                    MR. JOHANSON:  Join.  Vague, ambiguous,

19    unintelligible.

20                    THE WITNESS:  Maybe you could ask me a specific

21    question involving who's in control about a specific

22    transaction and I'll do my best to answer it.

23    MR. CHAPA:

24         Q.   Okay.  With the Bowers + Kubota ESOP after it

25    purchased 100 percent of the company, if it wanted to sell the
```

1   company, the board wouldn't have the authority to make that

2   decision, it would be the ESOP; correct?

3           MR. JOHANSON:  Objection; misstates the law, calls

4   for a legal conclusion for which this witness has not been

5   qualified and is not being paid, vague, ambiguous,

6   unintelligible, foundation.

7           THE WITNESS:  So your question is:  Does the trustee

8   of an ESOP have the authority to sell the stock of the

9   company?

10          MR. CHAPA:  To sell the company, correct.

11          MR. JOHANSON:  Objection.

12          MR. CHAPA:  Specifically with respect to Bowers +

13  Kubota.

14          MR. JOHANSON:  Objection.  That was not the

15  question, but go ahead.

16          THE WITNESS:  I'm going to answer the question to

17  the best of my ability and in a generalized way, not -- not --

18  this is -- I'm not answering the question for Bowers + Kubota.

19  It is the general rule if an ESOP owns 100 percent of the

20  stock of a company, the trustee of the ESOP has the authority

21  to sell those shares if it determines it's prudent to do so

22  and for the benefit of the participants and beneficiaries in

23  the ESOP.  That's a very simplistic summary of, I mean,

24  there's bank financing involved, there's guarantees involved,

25  leases involved, employment contracts involved.

```
 1    MR. CHAPA:
 2         Q.   Would that hold true with respect to Bowers + Kubota
 3    as well?
 4         A.   Ask me a specific question.
 5         Q.   Bowers + Kubota purchased a hundred percent of
 6    the -- of the company, Bowers + Kubota ESOP purchased a
 7    hundred percent of the company, the -- it wants to sell, by
 8    decision of the trustee, the company, could the ESOP sell the
 9    company?
10              MR. JOHANSON:   Objection as to form; vague,
11    ambiguous, unintelligible.   Go ahead.
12              MR. MINKIN:   Incomplete hypothetical, legal
13    conclusion.
14              THE WITNESS:   I will propose both the question and
15    the answer.   The trustee of the Bowers + Kubota ESOP owned a
16    hundred percent of the stock and an unrelated third party came
17    along and offered to buy a hundred percent of the stock and
18    the trustee determined that it was a fair and adequate
19    consideration transaction for the benefit of the participants,
20    that trustee could sell those shares.
21              MR. CHAPA:   All right.   This might be a good time to
22    break, so am I correct -- what time do you guys want to take a
23    lunch?   I don't know Hawaii time --
24              MR. MINKIN:   It's now 12:10 here in the afternoon.
25              MR. CHAPA:   Okay.   So you tell me how long you want
```

```
 1    to take for lunch.
 2              MR. MINKIN:  Half an hour.
 3              MR. CHAPA:  That's fine with me.
 4         (Pause in Proceedings:  12.11 p.m.-12.57 p.m.)
 5              MR. CHAPA:  All right.  Back to -- oh.  Heather, can
 6    you put that exhibit back on, I think it was 702, I think.
 7    Please.  Can you turn to page 10 of that document, it's Bates
 8    stamps Bowers/Kubota 012793.
 9    MR. CHAPA:
10         Q.   Specifically I'm looking at the top of the page,
11    third paragraph in, it starts out, A small handful of
12    specialized companies and bank trust departments are available
13    to be appointed as independent fiduciaries in ESOP
14    transactions.  Did I read that sentence correctly, Mr. Hansen?
15         A.   Yeah.  You read it correctly, yeah.
16         Q.   Is that accurate that there wasn't that many -- at
17    least the way I'm reading this, there wasn't that many
18    independent fiduciaries available.
19              MR. BATTERMAN:  Objection; lacks foundation as to
20    time.
21              MR. MINKIN:  Misstates the document.
22              MR. JOHANSON:  Join.
23              MR. CHAPA:  Mr. Hansen, did you have -- did you
24    respond?  I didn't hear you.
25              THE WITNESS:  Could you say that again, please.
```

1    MR. CHAPA:

2        Q.    Certainly.  Let me just ask you:  What did you mean

3    by that sentence?  How's that?

4        A.    Well, it means it's a very specialized service and

5    there's not that many qualified people to provide it.  You

6    can't just go to any bank on the block and get them to do the

7    job for you, that about summarizes it.

8                MR. CHAPA:  Okay.  If you could turn to page 12,

9    please, Heather, it's Bates stamp -- of Exhibit 702.  It's

10   Bates stamped Bowers/Kubota 012795.

11   MR. CHAPA:

12       Q.    Specifically I'm looking at the first full

13   paragraph.  It says, As discussed in Section VII above, the

14   stock of an ESOP company must be valued by an independent

15   appraiser.  Do you see that?

16       A.    Yes.

17       Q.    And then it says, In a privately held company with a

18   value in the 1 to 10 million range, this will typically cost

19   between 10 to 20 thousand dollars annually.  Did I read that

20   correctly?

21       A.    Yes.

22       Q.    Is that an accurate -- well, first of all, do you

23   know when -- you don't know when you wrote this ABCs of ESOPs,

24   did you -- do you?

25       A.    This is an outline that I've probably revised 15

1    times in the last 20 years and when this particular version

2    was done, I don't know.   I expect this is accurate at the time

3    I did it, which was probably in about 2010.

4         Q.   Okay.  So --

5         A.   By the way --

6         Q.   I'm sorry.

7         A.   -- this is not a Bowers + Kubota document.  This is

8    a general outline that I use and why Bowers + Kubota's name is

9    on the bottom of it, I don't know.

10        Q.   Well, just for clarification, it's simply through

11   discovery when we exchanged documents, it just identifies that

12   they provided us those documents.  And they Bates stamped it

13   so they know the actual pages that they provided.  So there is

14   no representation to you that this is something that

15   Mr. Bowers or Mr. Kubota or that the company actually created,

16   there's no such representation.

17        A.   Thank you.

18        Q.   Certainly.  So in 2012, would that range have been

19   correct, it typically would cost between 10,000 and $20,000

20   for a 1 to $10 million transaction?

21        A.   Well, it's correct that that was my rough estimate.

22   I mean, it would depend upon which expert that you engaged.

23        Q.   Okay.

24        A.   If you engage one of the large banks, it can be

25   substantially more than that.

1    based on the transaction price closing?

2            MR. BATTERMAN:  Objection; vague, calls for

3    speculation, lacks foundation.

4            THE WITNESS:  When you say "incrementally," I think

5    you're trying to apply some mathematical connection and so my

6    answer would be no.

7    MR. CHAPA:

8        Q.   Okay.  But it would be higher; correct?

9        A.   The transaction would, presumably, be more

10   complicated at that level involving employment contracts and

11   stock appreciation rights and things like that, which would

12   probably result in a higher valuation price.

13       Q.   Okay.  And then if you go down to the bottom of this

14   page, the last paragraph, that first sentence it says -- and,

15   again, we're on Exhibit 702, page 12, last paragraph, first

16   sentence.  It says, The attorney will normally act as the

17   quarter -- well, in quotes, quarterback in coordinating the

18   team of professionals and will be the primary architect of the

19   ESOP plan document and the overall deal structure.  Did I read

20   that sentence correctly?

21       A.   Yes.

22       Q.   When you're referencing the attorney, are you

23   referencing yourself or who are you referencing?

24       A.   I am referencing -- if I recall this version of the

25   outline, it was probably referencing the attorney to be hired

1   by the company considering an ESOP transaction.

2       Q.   So with respect to the Bowers + Kubota transaction,

3   that would have been you as the attorney; correct?

4       A.   My law firm.

5       Q.   Okay.  And with respect to the Bowers + Kubota

6   transaction in 2012, did -- to close that transaction, was an

7   outside lender ever considered?

8           MR. MINKIN:  Objection; attorney-client privilege.

9   Mr. Batterman, Mr. Johanson.

10          MR. JOHANSON:  Sorry, I was on mute there,

11  Mr. Minkin.  I apologize.  This is the life of Zoom.

12          Mr. Batterman, do you want to respond?

13          MR. BATTERMAN:  Let me take a look at (pause) -- at

14  this point I'm not sure that falls outside of the -- well, I

15  don't know if that falls in the fiduciary exception, so I'm

16  going to assert the attorney-client privilege unless you

17  demonstrate that it doesn't.

18          MR. JOHANSON:  Are you gonna give any instruction,

19  Mr. Batterman?

20          MR. BATTERMAN:  I instruct the witness not to answer

21  that until I get something from Mr. Chapa to indicate that it

22  falls within the court's prior order in this case.

23          MR. CHAPA:  It's an factual issue, though, it's not

24  a -- I'm not asking for did he have a conversation, it's his

25  own observations.  So it has nothing to do with attorney-

1    client privilege, it's a matter of did you observe a third

2    party lender --

3              MR. BATTERMAN:  No.  That's not what your question

4    was.

5              MR. CHAPA:  Okay.  I'll rephrase it.  That's not a

6    problem.  Let me withdraw -- let me withdraw the question and

7    I'll rephrase the question.

8    MR. CHAPA:

9        Q.   For the Bowers + Kubota transaction in 2012, was a

10   third-party lender consulted or sought to close that

11   transaction?

12             MR. MINKIN:  Again, same objection.  It would

13   require communications between the corporate entity and

14   Mr. Hansen as to whether that was done by anyone if it wasn't

15   done by him.

16             MR. BATTERMAN:  I would instruct you not to answer

17   that unless he was personally involved in a communication with

18   the third-party lender, because the third-party lender

19   wouldn't fall within the privilege.

20             MR. JOHANSON:  I join in the positions taken by

21   Mr. Batterman and Mr. Minkin.

22             MR. MINKIN:  Mr. Hansen, do not answer that

23   question unless you have knowledge separate and apart from

24   communications with the corporate entity.

25             MR. CHAPA:  Just to clarify for the record, so

1    you're saying -- if he personally observed this, you're still

2    saying that that's protected by the attorney-client privilege,

3    is that what you're arguing?

4         MR. BATTERMAN:  No, I'm just arguing exactly the

5    opposite, if you're paying attention.  What I'm saying is if

6    his knowledge of this comes strictly from his client, it's

7    privileged.  If his knowledge comes from dealing with a third

8    party, communicate with a third party, that's not privileged

9    because the third-party lender doesn't fall within the scope

10   of the privilege.  I thought I made that fairly clear.

11        MR. CHAPA:  Okay.  I guess -- I don't want to argue

12   about this since it's not necessary.  If you want to take a

13   break and ask him if he knows the answer to the question -- if

14   he doesn't, then there's purpose to, basically, me filing a

15   motion and you guys having to defend.

16        MR. MINKIN:  Let me go off.  Let me go off and mute

17   and talk with Mr. Hansen very briefly.

18        MR. CHAPA:  Okay.

19        MR. MINKIN:  Thank you.

20        MR. CHAPA:  Thanks.

21     (Pause in Proceedings:  1.08 p.m.-1.09 p.m.)

22        MR. MINKIN:  Okay.  Mr. Hansen has no recollection

23   of talking with a third-party lender independently.  So,

24   Mr. Chapa, I don't know how do you want handle that.  Do you

25   want him to state that for the record or do you want -- as an

1      officer of the court, I'll make that representation.

2                  MR. CHAPA:   Just to make it clean, if he could state

3      it for the record, I'd appreciate it.

4                  THE WITNESS:   I have no recollection.

5      MR. CHAPA:

6          Q.   All right.  Let's go to the Bowers -- let's move to

7      Bowers + Kubota transaction in 2012.   Were you retained by the

8      Bowers -- by Bowers + Kubota Consulting, Inc. in 2012?

9          A.   I forget exactly when I was retained, but -- either

10     2012 or 2011, I forget the exact date.   I'd have to find --

11     I'd have to see the engagement letter.

12         Q.   Okay.  And what was the purpose of B+K retaining

13     you?

14         A.   To advise them --

15                 MR. MINKIN:   I'm going to -- has this been already

16     covered by the magistrate in the discovery rulings?

17     Otherwise, the retention gets into the communications.

18                 MR. BATTERMAN:   Can I have the question read back,

19     please.

20         (Reporter read as requested.)

21                 MR. BATTERMAN:   Yeah.  I'm going to instruct him not

22     to answer that question.  I mean, aside from the fact that

23     it's speculative, because he's -- that comes in the attorney-

24     client privilege, clearly.

25                 MR. JOHANSON:   Yeah.  Mr. Batterman, I join.

1              And Mr. Chapa, if you show him the engagement

2      letter, that's a different story, but you don't -- haven't

3      shown him the engagement letter.

4      MR. CHAPA:

5          Q.   Mr. Hansen, are you going to follow that

6      instruction?

7              MR. MINKIN:  Mr. Hansen, don't answer that -- don't

8      answer the previous question because it invades the attorney-

9      client communication privilege.  So the question now to you

10     is:  Are you going follow my instruction as your counsel?

11             THE WITNESS:  On the advice of my attorney, I'm not

12     going to answer that question.

13     MR. CHAPA:

14         Q.   Okay.  Were you retained for any other purpose than

15     what's in the retainer agreement?

16         A.   No.

17         Q.   Okay.  Do you recall, was your first contact with BK

18     approximately July 2012?

19         A.   I don't remember when the first contact was.

20         Q.   Do you recall who contacted you?

21         A.   (No audible response.)

22         Q.   I'm sorry.  Did you answer?

23         A.   I'm thinking.

24         Q.   Okay.  Sorry.

25         A.   Probably Brian Bowers.

1    No. 694, please.

2         (Exhibit 694 marked for identification)

3              MR. JOHANSON:  What is it, Mr. Chapa?

4         MR. CHAPA:  It purports to be a copy -- I'm gonna

5    call it -- of what I think is the ESOP structure, but if

6    there's a better name on the document, I'd rather refer to it

7    that way.

8              It's the first page.  Can you start back up on the

9    first page of Exhibit 694, please.  Thank you.  The first page

10   identifies certain figures and taxes and then if you'd start

11   scrolling, please.

12             MR. JOHANSON:  By the way, for the record, this has

13   been marked as confidential - subject to a protective order in

14   this matter, to the extent that it is and it appears to be to

15   me, we would ask that this portion of the transcript be marked

16   confidential - subject to the protective order, Ms. Gran.

17             MR. BATTERMAN:  The company joins in that request.

18             MR. MINKIN:  Also, we're at 154 percent, can we drop

19   down to about 125 so we get all the words in --

20             THE WITNESS:  And go back to the beginning.

21             MR. MINKIN:  -- and hand notations so that we can

22   see.  Thank you.

23             THE WITNESS:  Now just leave it there for a moment.

24   Just a minute.

25             MR. MINKIN:  Mr. Chapa, do you want the witness to

1    review the entire document or just the handwritten portion in

2    the beginning?

3              MR. CHAPA:  Why don't we start -- it's probably

4    easier to go page by page.  So the first page -- can you

5    scroll down for a second so I can see the Bates number,

6    please.  We're talking about Exhibit 694, we're talking about

7    Bates stamp number -- a little bit lower -- Bowers/Kubota

8    012750.  If you could scroll back up for Mr. Hansen, please.

9    MR. CHAPA:

10        Q.   Mr. Hansen, there's some handwritten marks on this

11   document.  Do you know whose writing that is?

12        A.   It's probably mine.

13        Q.   Okay.  And do you recognize this first page?

14        A.   Recognize it?  It's probably my handwriting, like I

15   said.  I don't recall this.  I don't recall what this is about

16   right now.

17             MR. CHAPA:  Okay.  All right.  If we can scroll down

18   so Mr. Hansen has a chance to look at the document, please.

19             THE WITNESS:  Can you slow down?  Okay.  Stop.  Can

20   you go down a little bit more, please.  Okay.  Okay.  Okay.

21   Okay.  Okay.  Is that back to the first page now?  I don't

22   know where we are.

23             MR. BATTERMAN:  No.  That's page 11.

24             MR. MINKIN:  Page 11 of 22.

25             THE WITNESS:  This is a lot to digest.  Do you have

```
 1    a question?
 2              MR. CHAPA:  I do, but I'll go -- I'll go up -- let's
 3    go back up to page -- it's the second page, 12752.  There we
 4    go, that one.
 5    MR. CHAPA:
 6         Q.   My question is:  On 12752 of Exhibit 694 it
 7    identifies the transaction equals ESOP purchase of 33 percent
 8    of common stock using $5 million bank loan.  First, what is
 9    this -- you've seen this document before; correct?
10         A.   Well, it appears that I put it together.  I don't
11    recall it, though.
12         Q.   Okay.  And this was done in the normal course of
13    your business; correct?
14         A.   I don't know what that means.
15         Q.   Did you create this document in the normal course of
16    your business?
17         A.   It appears -- I don't know about normal course, but
18    it was -- it was appropriate in this transaction to educate
19    the client as to a hypothetical structure, this is what it
20    looks like.
21         Q.   Okay.  And there's no reason to believe this is not
22    true and accurate, is there?
23         A.   It's all hypothetical.
24         Q.   I understand, but the document itself, there's no
25    question -- is there any reason to believe that the document
```

Greg Hansen - Confidential                118

```
 1   is not what it purports to be?
 2        A.   Well, I don't see where it's been altered by
 3   anybody, if that's what you mean.  I don't think it's forged
 4   or anything.
 5        Q.   Correct, that's what I was asking.  So with respect
 6   to this page, particularly, 12752, it identifies a
 7   hypothetical 33 percent -- sale to the ESOP of 33 percent of
 8   common stock; is that correct?
 9        A.   Yes.
10        Q.   And it says, using $5 million of a bank loan;
11   correct?
12        A.   Well, are you talking about Item 1 down below?
13        Q.   Correct.  Right under Item 1, Transaction -- it says
14   Transaction equals ESOP purchase of 33 percent of common stock
15   using $5 million bank loan.  Did I read that correctly?
16        A.   Yes.
17        Q.   Okay.  When you were first retained by BK for this
18   matter, was it your understanding that the transaction would
19   result -- would be a 33 percent purchase by the ESOP?
20        A.   No.
21             MR. JOHANSON:  Mr. Batterman.  Mr. Batterman, could
22   you jump in there, please.
23             MR. BATTERMAN:  (No audible response.)
24             MR. JOHANSON:  Mr. Batterman, I believe that, you
25   know, if he's not talking about this document and he's talking
```

1    instruct Mr. Hansen not to answer this question.  I believe

2    that this document had a number of different scenarios and you

3    can ask about those scenarios without impinging on or invading

4    the attorney-client privilege based upon Mr. Hansen's answer.

5              MR. JOHANSON:  Yeah.  And, Mr. Minkin, that's what I

6    was trying to help Mr. Chapa out with as well.

7    MR. CHAPA:

8         Q.  Mr. Hansen, are you going to follow that direction?

9         A.  I'm going to follow the advise of my attorney and

10   not answer that question.

11        Q.  Again, just to clarify, you were acting as ERISA

12   counsel for Bowers + Kubota with respect to this transaction;

13   correct?

14             MR. JOHANSON:  Objection; leading.

15             MR. MINKIN:  Misstates the testimony.

16             MR. JOHANSON:  Join.

17             MR. BATTERMAN:  Join.

18             THE WITNESS:  I believe my engagement letter, which

19   is an exhibit somewhere, speaks for itself as to exactly what

20   our engagement was.

21   MR. CHAPA:

22        Q.  Okay.  But do you believe you were ERISA counsel or

23   some other type of counsel?

24             MR. MINKIN:  Objection; arguing with --

25   argumentative.  The document speaks for itself.

1              THE WITNESS:  Do you have the engagement letter you

2    could put up to refresh my memory?

3    MR. CHAPA:

4         Q.   Do you not recall whether you were ERISA counsel or

5    not?

6              MR. BATTERMAN:  Objection; argumentative.

7              MR. MINKIN:  Hold on.  Argumentative, lacks

8    foundation, misstates the testimony.

9              MR. JOHANSON:  Join.

10   MR. CHAPA:

11        Q.   Mr. Hansen, do you recall?

12             MR. MINKIN:  If you can answer.  If you don't know

13   the answer, don't answer.  Don't guess.

14             THE WITNESS:  Repeat the question.

15   MR. CHAPA:

16        Q.   Certainly.  Do you recall if you were ERISA counsel

17   for this transaction, the BK transaction in 2012?

18        A.   I --

19        Q.   Let me -- sorry.  Let me refine that.  Do you recall

20   if you were ERISA counsel for the BK company in 2012 regarding

21   this transaction?

22        A.   I was counsel to the company, advising them with

23   respect to the feasibility and implementation of an ESOP, an

24   ESOP is governed by ERISA.  I don't recall exactly what the

25   engagement letter said.

1       Q.    Okay.   Do you know why you created this document
2   Exhibit 694?

3       A.    The document is a series of hypotheticals attempting
4   to display alternative structures.   And as to why, it was an
5   attempt to illuminate or educate the company.

6       Q.    Do you recall when you created this document,
7   Exhibit 694?

8       A.    Can you scroll down, see if there's a date on it.

9             No.   I don't see a date on it, so my answer is no.

10            MR. CHAPA:   If you could scroll down to -- Heather,
11  if you could scroll down to Bates stamp No. 12766, I think
12  it's PDF page 17, please.   Yes.

13            MR. JOHANSON:   What's the Bates number?

14  MR. CHAPA:

15      Q.    If you look at this page 12766, it identifies Roman
16  numeral IV, Transaction.   Transaction equals ESOP purchase 100
17  percent of common stock for 35 million and company converts to
18  S corporation in 2012 and becomes tax exempt.   No bank loan.
19  Do you see that?

20      A.    Yes.

21      Q.    And that hypothetical was created by yourself; is
22  that correct?

23      A.    I presume so.

24      Q.    Okay.   And it says, Enterprise value of $35 million.
25  Where did you get the $35 million figure?

1    A.    This is a hypothetical transaction.   I made it up.

2    Q.    So why not 20 million?  Why not 5 million?  Why 30

3    million?

4            MR. BATTERMAN:  Objection; argumentative.

5    Objection; harassing the witness.

6            MR. MINKIN:  Join.

7            MR. JOHANSON:  Also, I'm concerned that there's a

8    potential for Mr. Hansen to provide information that he

9    discussed with his clients.  It's not -- that is protected as

10   an attorney-client privileged communication.

11           MR. MINKIN:  Mr. Chapa, if you could rephrase the

12   question, perhaps we can narrow the issues down that remain on

13   the record.

14   MR. CHAPA:

15   Q.    And to clarify, you were talking -- you're

16   representing, in this instance, Bowers + Kubota, the company;

17   correct?

18   A.    Yes.

19   Q.    I should just ask you before we even get into

20   arguing about this stuff, do you know why you selected $35

21   million?

22   A.    It's a round number.

23   Q.    Okay.  Do you recall if that was the only reason you

24   selected $35 million or were there other reasons?

25   A.    Well --

 1              MR. MINKIN:  Without -- without divulging attorney-
 2      client communications, if there were other reasons separate
 3      and apart from attorney-client communications, please answer.
 4      If it only involves attorney-client communications, don't
 5      answer that question.
 6              THE WITNESS:  If I recall, as you scroll through
 7      this document, all the examples use different numbers.  These
 8      are a series of hypotheticals to explore different possible
 9      alternative transactions.
10      MR. CHAPA:
11          Q.   Is there any correlation with the numbers that you
12      selected to this particular case or is it just -- strike that.
13              Is there any correlation between the numbers you
14      selected and this particular case?
15          A.   I don't recall.  It's a nice, large, round number.
16      That number could have been 10 million and the examples would
17      have been adjusted accordingly and they would've equally
18      displayed the concepts I was attempting to communicate, or it
19      could've been a hundred million.
20          Q.   Was -- you interacted with -- strike that.
21              You were at meetings with Mr. Saakvitne when he
22      became the independent trustee; is that accurate?
23          A.   Could you repeat that, please.
24          Q.   Certainly.  You were at meetings with Mr. Saakvitne
25      when he became the independent trustee; is that correct?

1              MR. MINKIN:  Vague and ambiguous, "meetings."

2              MR. JOHANSON:  Join.

3              THE WITNESS:  I had more than one client with

4    Mr. Saakvitne.  I may have met with him on other matters or he

5    would come to our local conference here in Hawaii in October

6    and I might have lunch with him or coffee with him.

7    MR. CHAPA:

8         Q.   In the fall of 2012, on this matter, the Bowers +

9    Kubota ESOP purchasing the shares -- a hundred percent shares

10   of the company, did you have any meetings with Mr. Saakvitne?

11             MR. MINKIN:  Objection; asked and answered.  Same

12   objection.  Vague and ambiguous to the phrase "any meetings."

13             MR. JOHANSON:  Join.

14             MR. BATTERMAN:  Join.

15             MR. MINKIN:  You can answer it once, answer it

16   again.

17             THE WITNESS:  I have -- I have had several clients

18   with Mr. Saakvitne.  I've had phone conversations with him,

19   emails with him, and when he came to Hawaii, which he did

20   annually, I would always meet with him at least once on

21   whatever client or clients that we were working on at the

22   time.

23   MR. CHAPA:

24         Q.   And so that means, yes, you met with him with

25   respect to this transaction in two -- in the fall of 2012; is

1    that correct?

2           MR. MINKIN:  Objection; argumentative, lacks

3    foundation, calls for speculation, asked and answered.

4           MR. JOHANSON:  Join.

5           MR. BATTERMAN:  Join.  And misstates testimony.

6           THE WITNESS:  Okay.  Do I answer the question?

7           MR. MINKIN:  You have to answer it again.

8           THE WITNESS:  Is that the same question I --

9           MR. CHAPA:  No, it's not the same question.  I'm

10   asking specifically on this case.

11          THE WITNESS:  I don't recall.

12   MR. CHAPA:

13     Q.   Okay.  Do you know if at any -- if you were at any

14   meetings with Mr. Saakvitne in the fall of 2012 with respect

15   to the Bowers + Kubota case transaction, if Mr. Saakvitne ever

16   made an offer to purchase less than a hundred percent of the

17   ESOP -- of the Bowers + Kubota Consulting company?

18     A.   I don't understand how I can answer a hypothetical

19   question about a hypothetical meeting.

20     Q.   I'm not -- I'm not asking hypothetical.  I'm

21   asking -- you said you don't recall, so I'm asking, do you

22   recall any instance where he actually was at a meeting with

23   you and he offered to purchase less than a hundred percent of

24   the company?  And I'm talking about Bowers + Kubota

25   Consulting, Inc. company.

 1       A.   I do not recall that, no.

 2            MR. CHAPA:  Okay.  You can remove this exhibit,

 3    please, Ms. Dakins.  Thank you.

 4    MR. CHAPA:

 5       Q.   In the fall of 2012 was LVA contracted to be the

 6    appraiser to determine fair market value with respect to the

 7    Bowers + Kubota Consulting, Inc.?

 8            MR. JOHANSON:  Objection; vague and ambiguous,

 9    unintelligible, foundation.

10            THE WITNESS:  Is your question, were they engaged?

11            MR. CHAPA:  Correct.

12            THE WITNESS:  By whom?

13    MR. CHAPA:

14       Q.   I guess the first question is:  Were they engaged?

15    And then the next question would be:  By whom?  So I don't --

16    you can answer both, if you want.

17       A.   Well, it's my recollection that LVA was engaged by

18    Mr. Saakvitne in this ESOP transaction.

19       Q.   Okay.  And prior to Mr. Saakvitne engaging him, had

20    he -- had LVA been retained by Bowers + Kubota Consulting,

21    Inc.?

22            MR. MINKIN:  Objection; speculation, lacks

23    foundation.

24            MR. JOHANSON:  Leading.  Join.

25            THE WITNESS:  I don't recall.  Perhaps you have the

1    engagement letter to show as an exhibit that will help me.

2              MR. CHAPA:  Okay.  I'll try.  Hold on one second.

3              THE WITNESS:  Perfect.  Pardon me, I would like to

4    take about a five-minute break.

5              MR. CHAPA:  That's fine.  Take a ten-minute break.

6              MR. JOHANSON:  Me too, Mr. Hansen.  Thank you.

7         (Pause in proceedings 1.48 p.m.-1.54 p.m.)

8              THE REPORTER:  Back on.

9              MR. CHAPA:  Let's -- if you could turn to

10   Exhibit 651, please.

11        (Exhibit 651 marked for identification)

12             MR. JOHANSON:  What is it?

13   MR. CHAPA:

14        Q.   Exhibit 651 purports to be a copy of a letter from

15   LVA dated October 20th, 2012.  Did you ever seen a copy of the

16   original of Exhibit 651 before, Mr. Hansen?

17        A.   Okay.  Can we go to the bottom, the full length of

18   the document, please.  Can you go back to the top.

19             Okay.  What was your question?

20        Q.   Have you ever see a copy or the original of

21   Exhibit 651 before?

22        A.   I don't recall specifically, but it looks like I'm

23   copied on it, so I probably saw it.

24        Q.   And this purports to be a letter from LVA to the

25   board of trustees, do you see that at the top of the page, the

```
 1      first page of Exhibit 651?

 2           A.   Yes.

 3                MR. JOHANSON:   Foundation, form.

 4   MR. CHAPA:

 5           Q.   Do you know if LVA was retained as the appraiser for

 6   this BK ESOP purchase?

 7                MR. MINKIN:   Vague and ambiguous as to timeframe.

 8                MR. JOHANSON:   Join.

 9                MR. BATTERMAN:   Join.

10                MR. MINKIN:   And also asked and answered.

11                THE WITNESS:   I didn't -- I missed the question.

12   MR. CHAPA:

13           Q.   Was LVA retained as the appraiser for the BK ESOP

14   transaction that closed on December 14, 2012?

15                MR. MINKIN:   Asked and answered, but you can answer

16   it again.

17                THE WITNESS:   My recollection is yes, LVA was

18   engaged by Nick Saakvitne, trustee of the B+K ESOP in this

19   transaction.

20   MR. CHAPA:

21           Q.   Is there any reason to believe that the board of

22   trustees did not -- is not the first ones to have retained

23   LVA?

24           A.   That the board of trustees?

25           Q.   Let me strike -- let me strike that and go back on
```

1    because they...with respect to advice relating to separate

2    functions and...retaining LVA to conduct the initial company

3    valuation, etc., etc.  The judge specifically ruled that this

4    is within the attorney-client privilege.  So as -- I'd ask --

5    I'd ask Mr. Minkin to instruct the witness not to answer

6    questions with respect to that issue.

7              MR. JOHANSON:  Join.

8              MR. MINKIN:  Mr. Hansen, based on the question from

9    the Department of Labor and the assertion of the attorney-

10   client privilege, do not answer that question.

11   MR. CHAPA:

12        Q.   Mr. Hansen, will you accept -- will you follow that

13   direction?

14        A.   On the advice of my attorney, I'm not going to

15   answer that question.

16        Q.   Okay.  So going back to my previous question, you're

17   carbon copied on this retainer agreement from LVA; correct?

18        A.   My name is on the bottom of it, yes.

19        Q.   Okay.  So you received -- there's no doubt in your

20   mind that you received a copy of this, correct, Exhibit 651?

21             MR. MINKIN:  Objection; argumentative, lacks

22   foundation.

23             If you're able to answer.

24             THE WITNESS:  I have no reason to conclude that I

25   didn't get the email.  I don't remember it, but I probably got

```
 1    independent fiduciary on this transaction?
 2         A.   The fall of 2012.
 3         Q.   Do you recall if he was retained prior to LVA being
 4    retained?
 5         A.   No.
 6         Q.   Do you recall if LVA provided a preliminary letter
 7    regarding value on November 21st, 2012?
 8         A.   I don't recall.  This was eight years ago.
 9              MR. CHAPA:  All right.  Let me see if I can give you
10    a -- get a copy up there on the screen.  I think it's 519,
11    Ms. Dakins.  Is that accurate?
12              MS. DAKINS:  I believe so.
13              MR. CHAPA:  Will you put up Exhibit 519, please.
14         (Exhibit 519 marked for identification)
15    MR. CHAPA:
16         Q.   I'm showing Exhibit 519 which purports to be a
17    letter from LVA and it states -- a letter to the board of
18    trustees, care of Brian Bowers.  Do you see that?
19         A.   Yes, I do.
20         Q.   Have you ever seen a copy or the original of
21    Exhibit 519 before?
22         A.   Isn't this the same letter we were looking at a few
23    minutes ago?
24         Q.   No.  A few moments ago we were looking at the
25    retainer agreement, which was Exhibit 651 and was dated
```

1    -4316.  It's a duplicate of the first two -- the first four

2    pages, but the rest of it, if you scroll through it, is

3    different.

4    MR. CHAPA:

5        Q.   Okay.  Just to clarify something I was trying to ask

6    earlier, with respect to LVA, was LVA ever retained by Bowers

7    + Kubota Consulting for any other purpose, like a valuation

8    regarding the company separate from an ESOP transaction, that

9    you know of?

10       A.   I don't know.

11            MR. BATTERMAN:  Instruct the witness not to

12   answer -- never mind.

13   MR. CHAPA:

14       Q.   All right.  This -- had you ever seen a copy of

15   Exhibit 519?

16       A.   Say it again, please.

17       Q.   Prior to me showing you right now Exhibit 519, have

18   you ever seen copy or the original of Exhibit 519?

19       A.   Well, I believe it shows I received a copy of this

20   at the bottom and since it's a signed letter, I presume I did

21   see this before.  I don't recall, though.

22       Q.   Okay.  And if this was issued before Mr. Saakvitne

23   was retained, then would this signify that LVA was already

24   retained?

25            MR. MINKIN:  Objection; calls for speculation.

1               MR. BATTERMAN:  Objection; hypothetical.

2               MR. MINKIN:  Also calls for a legal conclusion.

3               MR. JOHANSON:  Join.

4               THE WITNESS:  It's a hypothetical.  I don't recall

5       when Mr. Saakvitne was retained.

6       MR. CHAPA:

7           Q.   Okay.  In your experience, have you ever seen an

8       appraiser provide a report, a preliminary valuation report or

9       analysis, prior to being retained?

10          A.   I don't recall if I've seen that before.

11          Q.   And with respect to your being retained by Bowers +

12      Kubota Consulting, Inc., were you retained for any general

13      corporate advice or solely with respect to the ESOP?

14          A.   Well, our engagement letter speaks for itself, but

15      it is very common in our work in an ESOP transaction that

16      oftentimes the articles of incorporation might have to be

17      reviewed and amended, the bylaws might have to be reviewed and

18      amended, there might be employment agreements for the

19      principals, there might be a lease agreement.  So I don't

20      recall in this specific case, but it's not unusual for us to

21      do something other than just the ESOP.

22          Q.   As you identified, on page DOL -4311 it has you as

23      carbon copied and on the first page it has Mr. -- it being

24      directed to Mr. Bowers.  There's no indication on this letter

25      that it's directed to Mr. Saakvitne.  Do you know if

1   Mr. Saakvitne received this letter on November 21st, 2012?

2            MR. MINKIN:   Objection; foundation, speculation.

3            THE WITNESS:   I don't know the answer to that

4   question.

5   MR. CHAPA:

6       Q.   I don't know if I -- I don't think I've asked you

7   this question before.   Did Bowers + Kubota Consulting ever

8   tell you that it attempted to sell the BK shares prior to

9   retaining you?

10           MR. MINKIN:   Objection.

11           MR. BATTERMAN:   Objection; it calls for attorney-

12  client privileged communication.

13           MR. MINKIN:   Based on the assertion of the attorney-

14  client privilege, Mr. Hansen, don't answer that question.

15  MR. CHAPA:

16      Q.   Mr. Hansen, are you going to follow that direction?

17      A.   Based on the advice of my attorney, I'm not going to

18  answer that question.

19           MR. CHAPA:   Ms. Dakins, if you can remove this and

20  place Exhibit 703 on, up on the screen, please.

21      (Exhibit 703 marked for identification)

22  MR. CHAPA:

23      Q.   Exhibit 703 purports to be a copy of an email from

24  Mr. Hansen to Mr. Saakvitne dated November 27th, 2017.   What

25  you're seeing on the screen is all there is to see besides the

1    Bates stamp on the lower right-hand corner.  The Bates stamp

2    is Bowers/Kubota 018453.  Have you ever seen a copy or the

3    original of Exhibit 703 before?

4         A.   I don't recall.

5         Q.   All right.  If you look at the body of this email,

6    it identifies -- well, actually, the subject identifies B+K

7    Actions By Consent Regarding Board of Directors.  Do you see

8    that?  Did I read that correctly?

9         A.   Yes.

10        Q.   Okay.  And then you see in the body it says, Nick,

11   attached is a simple form for the annual trustee appointment

12   for directors.  I could do each one for each year 2013 through

13   2017.  Do you think we should say anything more to reflect

14   this is being done after the fact to record actions actually

15   taken earlier?  Did I read that correctly?

16        A.   Yes.

17        Q.   So was this a task -- strike that.  Was appointing

18   directors within the control of the company -- I mean, strike

19   that, of the ESOP?

20             MR. JOHANSON:  Objection to the extent you're

21   calling for a legal opinion for which you haven't qualified

22   the expert and he's not being paid.

23             MR. MINKIN:  Join.

24             MR. BATTERMAN:  Join.

25             THE WITNESS:  Well, I'm not an expert on corporate

Gregg Olsen - Confidential                                                                 143

1    formalities, but I think it's -- it's pretty basic that the

2    shareholder of a corporation is the proper party to appoint

3    the directors of the corporation each year and although maybe

4    not required by law, it's good housekeeping to have an annual

5    shareholder's resolution doing that.

6    MR. CHAPA:

7        Q.    And in this instance, the shareholder would be the

8    ESOP; correct?

9        A.    Let's see.  The date of this -- yeah, this is a 2017

10   email, so at this point in time the trustee is the owner of

11   the stock and the trustee is the proper party, as the

12   shareholder, to appoint the directors.

13       Q.    Just to clarify, you mean the ESOP is the owner of

14   the stock and the trustee on behalf of the ESO makes that

15   appointment; is that correct?

16       A.    I think they're both correct.  The trustee is the

17   technical owner.  I'm not sure of the actual preferred way to

18   state that, the ESOP owns the stock, the ESOP trustee owns the

19   stock; but the ESOP only acts through the trustee, so the

20   trustee is the proper party to appoint the directors.

21       Q.    Is there any reason why it was not done

22   contemporaneously; in other words, in 2013 that direction

23   wasn't given?

24           MR. BATTERMAN:  Objection; calls for speculation,

25   lacks foundation.

1          THE WITNESS:   I don't know.

2    MR. CHAPA:

3          Q.   And how were the directors appointed, then, from

4    2013 to 2016 with no direction?

5          MR. JOHANSON:   Objection; the premise of the

6    question assumes facts not in evidence.

7          MR. BATTERMAN:   Objection; calls for speculation,

8    lacks foundation.

9          MR. JOHANSON:   Join.

10          MR. MINKIN:   Join.   And argumentative.

11          THE WITNESS:   I will attempt to give you a helpful

12    answer.   I would say most of our small business clients don't

13    do a very good job of their annual housekeeping and appoint

14    their directors every year and once they have directors that

15    are appointed, they stay appointed until somebody resigns or

16    dies or is replaced regardless of whether there's

17    documentation of it.

18    MR. CHAPA:

19          Q.   However, here, though, the corporate ownership

20    changed in 2012, so it's not matter of -- isn't that correct?

21          A.   The ESOP purchased 100 percent of the stock in 2012,

22    that's correct.

23          Q.   So does that -- does this indicate, though, that

24    Mr. Bowers and Mr. Kubota were the ones that made all the

25    corporate decisions prior to these directions?

1           MR. BATTERMAN:  Objection; leading, argumentative,

2    assumes facts not in evidence, calls for speculation, lacks

3    foundation.

4           MR. JOHANSON:  Join.

5           MR. MINKIN:  Join.  Legal conclusion, also.

6           THE WITNESS:  I got lost in there.  Can you repeat

7    it?

8    MR. CHAPA:

9        Q.   Certainly.  So were there other -- let me rephrase

10   or restate --

11       A.   Thank you.

12       Q.   Or give you a whole new question.  Are there any

13   other corporate decisions that were not made by the ESOP and

14   instead -- strike that.

15           Were there any other corporate decisions between

16   2013 and 2017 that were not made by the ESOP?

17           MR. BATTERMAN:  Objection; calls for speculation,

18   calls for a narrative, lacks foundation, calls for

19   speculation, assumes facts not in evidence.

20           MR. MINKIN:  Join.

21           THE WITNESS:  I believe we discussed this at length

22   earlier.  The board of directors continue to run the

23   corporation even after the ESOP goes in place.  I suspect

24   there were many, many decisions that the board of directors

25   made in the meantime, like hiring and firing employees and

Greg Hasen - Confidential                                        146

 1    signing leases and executing contracts and similar actions.

 2    MR. CHAPA:

 3         Q.    Why at this time on November 27, 2017, was it

 4    decided that the -- that the ESOP trustee would actually

 5    provide these directions?

 6              MR. MINKIN:   Objection; speculation, lacks

 7    foundation.

 8              MR. JOHANSON:   Join.

 9              THE WITNESS:   I don't recall.

10    MR. CHAPA:

11         Q.    Was it because there was an EBSA investigation

12    ongoing?

13         A.    I don't recall.

14         Q.    Would anything help refresh your recollection?

15         A.    I don't recall.

16              MR. CHAPA:   If you could turn to Exhibit 704,

17    please, Ms. Dakins.

18         (Exhibit 704 marked for identification)

19    MR. CHAPA:

20         Q.    And this purports to be a copy of an action by

21    consent of the shareholders and it's Bowers + Kubota 18262

22    through 18266 and this is -- have you ever seen a copy or the

23    original of Exhibit 704 before?

24         A.    Could you scroll down, please.  This is repetitive.

25         Q.    They're different dates.  The first one is for 2013,

1    which is Bates stamp 18262, 18263 is for 2014, etc., etc.

2          A.    I see.

3          Q.    But I think the wording, essentially, you're right,

4    is repetitive with the exception of the years, as far as I can

5    discern.

6          A.    And so what was your question?

7          Q.    My question is:  Did you ever see a copy or the

8    original of Exhibit 704 before?

9          A.    I don't recall.

10         Q.    Did you create this format?

11         A.    I don't recall.

12         Q.    If you look in the lower left-hand corner of the

13   first page, 18262, right there it has a number sequence.  Is

14   that a number sequence that your firm used?

15         A.    That's possible.

16         Q.    And with respect -- I'm sorry.

17         A.    I'm sorry.  It's probably a standard Word document

18   identifier and it may well be from our office.

19         Q.    Are these after-the-fact consents, do they -- do

20   they have any meaning to it?

21              MR. BATTERMAN:  Objection; vague, lacks foundation,

22   calls for speculation, calls for a legal conclusion,

23   argumentative.

24              THE WITNESS:  I didn't understand the question.

25   /////

1    MR. CHAPA:

2        Q.   Essentially, what significance do these play if the

3    person already served in that capacity for the year that had

4    gone by?

5            MR. JOHANSON:  Objection to the extent you're

6    calling for a legal conclusion by a lay witness who has not

7    been qualified and you're not paying.  Vague, ambiguous,

8    speculation, bad -- or improper hypothetical.

9            MR. MINKIN:  Join.

10           MR. BATTERMAN:  Join.

11           THE WITNESS:  Maybe you could rephrase it in a way I

12   could answer.

13   MR. CHAPA:

14       Q.   What I'm asking, essentially, is:  Are these

15   meaningless?  Is Exhibit 074 and the consents of shareholders

16   meaningless?

17           MR. JOHANSON:  That is --

18           THE WITNESS:  It's good housekeeping to have for the

19   record.

20   MR. CHAPA:

21       Q.   And any other reason besides that?

22       A.   Not that I can think of.

23           MR. CHAPA:  Okay.  If you could turn to Exhibit 636,

24   Ms. Dakins, please.

25           (Exhibit 636 marked for identification)

1              MR. JOHANSON:  What is it, Mr. Chapa?

2              MR. CHAPA:  It purports to be an email and

3    attachments to the email.  The email is dated October 18,

4    2012.  It's from Mr. Bowers to Mr. Kniesel and it's a string

5    email which includes Mr. Hansen.

6              Can you scroll through that for Mr. Hansen, please.

7              MR. BATTERMAN:  I note the confidential stamp on the

8    bottom of this document and we request that this portion of

9    the deposition also be sealed.

10             MR. JOHANSON:  Join.

11             MR. CHAPA:  Can you go back to the first page,

12   please.  Thank you.

13   MR. CHAPA:

14        Q.   Exhibit 636, first page, it's a string email.  At

15   the top it's an email from Mr. Bowers to Mr. Kniesel and then

16   the second email below it is an email from Mr. Kniesel to you.

17   Do you see that?

18        A.   I'm reading it.  Okay.  I've read it.

19        Q.   Okay.  The second email about middle of the page on

20   DOL Exhibit 636, Bates stamped Bowers/Kubota -7186, it says --

21   it's from Mr. Kniesel to you.  Greg, Watch for a call from

22   Brian Bowers shortly.  Actually, I take that back.  The third

23   email is from yourself, I can't tell if it was to Mr. Kniesel

24   or who it was directed to, but it mentioned, Greg, Watch for a

25   call from Brian Bowers shortly.  This is the matter we

1    discussed with Gary Kuba.  It turns out both Brian and his

2    partner Dexter Kubota are flying to Chicago today and I

3    suggested they call you right away in case in makes sense to

4    consider meeting with them there.  Do you see that?

5        A.   Yes, I do.

6        Q.   Did I read it correctly?

7        A.   Yes, you did.

8        Q.   All right.  So does this indicate you were involved

9    in identifying Mr. Kniesel for -- as an appraiser for this BK

10   ESOP purchase?

11            MR. JOHANSON:  Objection; the document speaks for

12   itself, leading.

13            THE WITNESS:  Is there a question?

14            MR. CHAPA:  Madam Court Reporter, could you repeat

15   the question, please.

16        (Reporter read as requested.)

17            THE WITNESS:  No.  This is an indication of an

18   introduction of Mr. Bowers and Mr. Kubota to Mr. Kniesel.

19   Mr. Kniesel lives in New York and since they just happened to

20   be going to Chicago and because there's a lack of qualified

21   report -- valuation experts in Hawaii, whenever somebody's

22   traveling and it's convenient, I try to make introductions to

23   potential consultants.

24   MR. CHAPA:

25        Q.   You mentioned this is the matter you discussed with

1    conversation he had with any representative of Bowers + Kubota

2    Consulting, Inc.

3              MR. MINKIN:  Based on the assertion of the attorney-

4    client privilege and the other objections, you are not to

5    answer this question unless you can do it without divulging

6    attorney-client communication.

7              THE WITNESS:  On the advice of my attorney, I'm not

8    going to answer that question.

9    MR. CHAPA:

10        Q.   And just to clarify -- strike that.

11             MR. CHAPA:  Okay.  Turn to Exhibit 502, please,

12    Ms. Dakins.

13        (Exhibit 502 marked for identification)

14    MR. CHAPA:

15        Q.   Exhibit 502 purports to be a copy of a document that

16    has the caption at the top, Bowers + Kubota ESOP, Trustee

17    Meeting on December 3rd, 2012.  Do you see that?

18        A.   Yes, I do.

19        Q.   Did you ever see a copy of the original of

20    Exhibit 502 before, a one-page document?

21        A.   I don't recall, but, you know, it appears that it's

22    my document.

23        Q.   Okay.  And then there's handwritten marks or

24    scribbles or whatever you want to call it up in the top

25    corner, do you know whose writing that is?

Greg Hansen - Confidential                          153

```
 1          A.    Why don't you go down through the whole document so
 2    I can see what else is in it.   Is that the end of the
 3    document?
 4          Q.    That's it.
 5                MR. MINKIN:   Just one page.
 6                THE WITNESS:   It doesn't look like my handwriting.
 7    MR. CHAPA:
 8          Q.    It does not?
 9          A.    No, it does not.
10          Q.    Okay.   If you look at the handwritten marks under
11    bullet point 3, it says Dividend and then it says No.   Do you
12    know what that references?
13                MR. BATTERMAN:   Objection; lacks foundation, calls
14    for speculation at this point.
15                MR. JOHANSON:   Yes.   Join.
16                THE WITNESS:   Well, it appears to me this is a --
17    just a thought process.   What's going to be -- how is this
18    final transaction going to shape up?   Will there be warrants?
19    Will there be dividends?   Will there be stock appreciation
20    rights?   But I think somebody else wrote that dividend in
21    there, I don't believe it was me.
22    MR. CHAPA:
23          Q.    And did this trustee meeting take place on
24    December 3rd, 2012?
25                MR. JOHANSON:   Objection; the word "trustee
```

1    meeting," premise, assumes facts not in evidence.

2              MR. BATTERMAN:  Objection; vague.

3              MR. MINKIN:  Join.  Lacks foundation.

4              MR. JOHANSON:  Join in all of the above.

5              THE WITNESS:  Are you asking can I say did the

6    meeting occur?

7              MR. CHAPA:  Correct.

8              THE WITNESS:  I don't recall specifically.  I mean,

9    I would assume yes if I did a memo -- no, this is not an after

10   the fact -- this appears to be before -- yeah.  This appears

11   to be an agenda before a meeting.

12   MR. CHAPA:

13        Q.  Do you know -- or do you recall -- do you have any

14   recollection of a meeting -- if the meeting took place or not?

15        A.  Not specifically, no.

16        Q.  Okay.

17        A.  I suspect you might have an exhibit that will help

18   me answer that question, though.

19        Q.  Okay.  If you look at the bottom quarter of this

20   page on Exhibit 502, it says, Officers -- and we're talking

21   about, I don't know, three lines above -- above from the

22   bottom, it says, Officers/Owners Going Forward.  First bullet

23   point:  Trustee after sale and remain BOD members.  Do you see

24   that?

25        A.  Yes.

1          Q.    What was meant by that?

2          A.    Could you go back to the top for a moment, please.

3     Okay.  Can you go back down again.  I'm going to speculate

4     here.  The question you asked earlier, you asked me what

5     percentage of the time do we see a transaction trustee staying

6     on after a transaction and would that be a conflict and --

7          Q.    Just to clarify, that question wasn't the trustee,

8     the question was the appraiser.

9          A.    Oh, okay.  Thank you.  I was wrong, then.

10               So here's -- here's what I'm thinking here, this is

11    a note -- just kind of a note to myself asking the question of

12    whether the same trustee is going to continue after the sale

13    and the same people are going to be -- remain board of

14    directors members after the sale and those are decisions that

15    need to be made.

16               MR. CHAPA:  If we could move to Exhibit 671, please,

17    Ms. Dakins.

18         (Exhibit 671 marked for identification)

19    MR. CHAPA:

20         Q.    This purports to be a copy of a fiduciary agreement

21    between Bowers + Kubota Consulting, Inc. and Nicholas L.

22    Saakvitne.  It's Bates stamped DOL -557 through DOL -560.

23               If you would scroll through this for Mr. Hansen, I'd

24    appreciate it.

25               Okay.  With respect to this Exhibit 671, do you know

```
 1   purchase price amount was redacted or struck?

 2        A.   I don't recall.  This was 2012, I believe.  I don't

 3   recall.

 4             MR. CHAPA:  Okay.  If we could turn to Exhibit 695,

 5   please, Ms. Dakins.  This purports to be a copy of a string

 6   email, Bates stamp Bowers/Kubota 12748 through 12749.  Will

 7   you scroll through that for Mr. Hansen, please.

 8        (Exhibit 695 marked for identification)

 9             MR. JOHANSON:  Mr. Chapa, how long are you going to

10   go today?

11             MR. CHAPA:  I don't know yet.  It's hard to say.

12             MR. MINKIN:  Do you anticipate going beyond seven

13   hours?

14             MR. CHAPA:  Going beyond seven hours?  I don't think

15   you guys will let me, so, no, I don't anticipate that.  I

16   mean, seven hours of me actually taking testimony, no.

17             THE WITNESS:  Can you back up?  You're going too

18   fast for me to read this document.  Back up.  Back up.  Okay.

19   Stop there.  Yeah.  I believe part of this email has been cut

20   off, it's not the full string.  It would be helpful to see

21   what comes before.

22   MR. CHAPA:

23        Q.   Before the top portion, the October 19, 5:22:27?

24        A.   Does it start at the top or the bottom?

25             MR. MINKIN:  Bottom.
```

1              THE WITNESS:  Where is the beginning of the email

2       string?

3              MR. BATTERMAN:  The earliest email would be the one

4       furthest down.

5              THE WITNESS:  Let's go back to the top.  It appears

6       to be the top, but Mr. Kniesel says, Yes, I hope to be able to

7       get there too.  He's responding to something that's been

8       excluded from this email.  Do you have an earlier page?

9              MR. CHAPA:  I may, but I don't have it with me.  I

10      apologize.

11      MR. CHAPA:

12          Q.   So my question is:  At the very first email at the

13      top it says, Attached is a rough chart showing performance for

14      past years.  It might help you to know that they have two

15      entities (brother sisters corps).  Do you see that?

16          A.   Yes, I do.

17          Q.   Did I read that correctly?

18          A.   Yes, it appears like you did.

19          Q.   Okay.  So what was your involvement in terms of --

20      in terms of identifying performance of the company?

21          A.   Well, it appears that I was just forwarding some

22      materials that the company gave me to their potential

23      appraiser to maybe help him decide if he was going to be

24      involved.

25          Q.   And is that typical that you would provide

```
 1    information to an appraiser that hasn't been retained yet?
 2         A.   I don't know what's typical.  Appraisers usually
 3    want to know something about the company before they get
 4    appraised.  I would say usually that communication is directly
 5    with the company.  For some reason, they must have asked me to
 6    forward this.
 7         Q.   And do you provide -- in any other ESOP transaction
 8    you were involved in have you provided financial information
 9    to an appraiser that had not been retained yet?
10         A.   I don't recall.
11         Q.   If you go down after the first paragraph, you go to
12    the next sentence, it says, I do not have other company
13    documentation yet, just a lot of my notes from meetings.  Do
14    you see that?
15         A.   I do.
16         Q.   Did you turn over those notes to the Department of
17    Labor?
18         A.   My attorney would have handled that, so I don't
19    know.
20         Q.   And when you reference a lot of notes, how many
21    pages are we talking about?
22         A.   I don't know.
23         Q.   And then you -- after that it says, Also attached
24    are some rough scenario examples I gave them.  Do you see
25    that?
```

1        A.    Yes, I do.

2        Q.    Are the rough scenario examples what we looked at

3   talking about selling 30 percent for the $5 million bank loan?

4   Is that what you're referencing here?

5        A.    I don't know, but probably.  Is there an attachment

6   to this email that -- it says also attached.

7        Q.    Yeah.  There is an attachment, yes, and it

8   identifies a PDF number, but I don't know if that corresponds

9   with the scenarios we were looking at.

10            MR. JOHANSON:  Do you have the attachment,

11   Mr. Chapa?

12            MR. CHAPA:  I do not.

13            MS. DAKINS:  Ruben.

14            MR. CHAPA:  Yes.

15            MS. DAKINS:  The attachment is up.

16            MR. CHAPA:  If you can scroll down for -- the first

17   page, scroll down a little bit, please, I want to see if it

18   lines up with the attachment number on the email.  A little

19   further.  No.  Keep going, keep going, keep going.  Stop,

20   stop, stop right there.  No, it doesn't line up.  Okay.  Never

21   mind.

22            MR. BATTERMAN:  You might want to look at the

23   document's actual name.

24            MR. CHAPA:  Okay.  Is there a name to this document?

25   It doesn't look like it.  Okay.

1          THE WITNESS:  Is there some way to see if that was

2     the attachment.

3          MS. DAKINS:  I clicked on the attachment and that's

4     what came up.

5          MR. CHAPA:  Okay.  Then that's the attachment.

6     Thank you.

7          MR. JOHANSON:  That's a good idea.  Good job.

8          MR. MINKIN:  At least one person in this group of

9     lawyers is technologically proficient.

10         MR. JOHANSON:  There we go.

11         MR. CHAPA:  Okay.  So if you can click on it again

12    for Mr. Hansen, please.  And is there a Bates stamp number on

13    that?  Go down a little bit.  No.  Okay.

14         MR. MINKIN:  It predates the Bates stamping.

15         MR. CHAPA:  Excuse me.

16         MR. MINKIN:  It appears that this attachment

17    predates the Bates stamping that got done later on.

18         MR. CHAPA:  I would agree.

19         MR. BATTERMAN:  Or the document was Bates stamped --

20    the clicked on document has been Bates stamped, but it also

21    exists in electronic form attached to the same document we

22    looked at previously.

23    MR. CHAPA:

24         Q.   Okay.  So this rough scenario examples that we're

25    looking at, you shared them also with Mr. Kniesel, is that it?

1        A.   It appears -- that appears to be the case.

2        Q.   Okay.  So Mr. Kniesel was aware of different

3   possible scenarios in terms of closing this ESOP transaction;

4   is that correct?

5        A.   Well, I think the notes speak for themselves.

6             MR. CHAPA:  If you turn the last -- on page 12749,

7   if we can turn to that page, please.  Oh, go back to the

8   original email.  Thank you.  The second page, 12749, please,

9   and then I want to look at the second-to-last paragraph and I

10  specifically want to focus on the second -- third sentence.

11  Strike that.  Might as well do the whole paragraph.

12  MR. CHAPA:

13       Q.   That paragraph says, It may also be wise for you to

14  lecture them a bit on an independent fiduciary at least for

15  the stock purchase.  The next sentence says, I was thinking we

16  would nick.  Paul Horn said he does this service and I think

17  he's real sharp and he gave me a ballpark $10,000 fee (cheap),

18  but that is kind of a wild card bringing in another guy from

19  New York.  Then it says another sentence.

20            MR. BATTERMAN:  Oh, please read it into the record.

21            MR. CHAPA:  I don't need to.

22            MR. JOHANSON:  Yeah, we have a bunch of New Yorkers

23  on this phone, so why not, Scott, huh?

24            MR. MINKIN:  Scott, Jeff, and Minkin, all on this

25  phone, originally from New York, so right now we blow up

1    Mr. Hansen.

2              THE WITNESS:  I think the reason I said that is

3    because Mr. Kniesel is also from New York and that's why I

4    added that at the end.

5              MR. CHAPA:  Okay.

6              MR. MINKIN:  New Yorkers.

7    MR. CHAPA:

8         Q.   So the reason I asked the question, though -- I want

9    to ask the question is:  Did you ever identify Mr. -- well,

10   strike that.

11             This is a conversation between yourself and

12   Mr. Kniesel; correct?

13        A.   It's an email between myself and --

14        Q.   Correct.

15        A.   Yes.

16        Q.   Did you ever give the company the name Mr. Horn as a

17   potential independent fiduciary?

18        A.   I recall that I gave them, as I said earlier, two or

19   three names for independent fiduciary.  I suspect Mr. Horn was

20   one of them, I don't recall specifically.

21        Q.   And do you know whether they did a request for

22   proposal from the individuals that you identified as potential

23   independent fiduciaries?

24        A.   I don't know.

25        Q.   And what was the reason that you were thinking about

 1   using Nick?  Which I assume is Nick Saakvitne; is that

 2   correct?

 3       A.   That's correct.

 4       Q.   So what was the reason that you were thinking about

 5   using Nick?

 6       A.   I've used him before, he was reliable, he's smart,

 7   he's also an attorney.

 8       Q.   Okay.

 9       A.   He's -- I think he used to work for the Department

10   of Labor.  He had done hundreds of ESOP transactions.

11       Q.   Prior to 2012 he had done hundreds of ESOP

12   transactions?

13       A.   That's my understanding.

14       Q.   And what is the basis for your belief?

15       A.   Just conversations with other experts in the ESOP

16   field.  Maybe not prior to 2012, but -- I mean, ultimately he

17   had done hundreds, but at that point in time I'm not sure how

18   many, but I had done several with him before then.

19            MR. CHAPA:  Okay.  Now if you can turn to

20   Exhibit 696, please.

21       (Exhibit 696 marked for identification)

22   MR. CHAPA:

23       Q.   It purports to be a copy of an email Bates stamp

24   Bowers/Kubota 17834 and it's through 17835, a two-page

25   document.

1          Q.   My impression is it's the LVA engagement letter.

2          A.   Let's see.

3               MR. JOHANSON:  Objection to Mr. Chapa testifying.

4               THE WITNESS:  LVA.  I don't recall.

5    MR. CHAPA:

6          Q.   You don't recall, is that what you said?

7          A.   I don't recall, yes.

8          Q.   If you go down on the first page, 17834,

9    Exhibit 696, under No. 1, there's a No. 1, Fairness Opinion,

10   then it identifies, Your first reaction may be why are all

11   these additional LVA fees showing up and specifically why

12   $16,000 additional for a fairness opinion.  Do you see that?

13         A.   Yes.

14         Q.   Did I read that correctly?

15         A.   Yes.

16         Q.   Do you recall how much LVA ended up charging to

17   close this transaction?

18              MR. JOHANSON:  Objection.

19              THE WITNESS:  No.  Excuse me.  I do not recall.

20   MR. CHAPA:

21         Q.   If you go down further, it says -- I think next

22   sentence.  Well, the sentence after that says, I can explain

23   that while many ESOP fiduciaries, myself included, are

24   comfortable in ESOP stock purchases with adequate

25   consideration valuations as of the transaction date and no

Greg Olsen - Confidential                    172

1   fairness opinions in the context of vanilla transactions, [no

2   warrants, no unusual features, etc.] up to somewhere between

3   10 million and 20 million, for transactions that go above that

4   figure (admittedly an arbitrary threshold) I believe that ESOP

5   standard of care, accepted practice, etc., invariably is to

6   obtain a fairness opinion.  Do you see that?

7       A.   I do.

8       Q.   Did I read that correctly?

9       A.   I -- as far as I can tell, yeah, you were reading it

10  correctly.

11      Q.   Do you agree with Mr. Saakvitne's statement about

12  transactions over $20 million warranting an additional

13  consider -- additional seriousness or concern?

14          MR. BATTERMAN:  Objection; calling for an opinion,

15  expert opinion from a witness who has not been retained for

16  that purpose.

17          MR. JOHANSON:  Join.

18          THE WITNESS:  I'm not a professional trustee, I'm

19  not a valuation expert, I don't know how to answer that.

20  MR. CHAPA:

21      Q.   All right.  Is there any reason to dispute that

22  contention?

23          MR. BATTERMAN:  Objection; argumentative.

24          MR. MINKIN:  Join.

25          MR. JOHANSON:  Join.

1          THE WITNESS:  I'll give this answer:  I believe a

2    fairness opinion might be analogized to an umbrella insurance

3    policy that you'll probably never need, but it's a valuable

4    additional closer look, more expert review, and valuable to

5    have.  I think that's one perspective to consider.

6    MR. CHAPA:

7          Q.   Prior to retaining LVA, was LVA asked whether it

8    would work with Saakvitne on this -- on this BK ESOP

9    transaction?

10               MR. BATTERMAN:  Objection; lacks foundation.

11               THE WITNESS:  Could you say that again, please.

12   MR. CHAPA:

13         Q.   Certainly.  Prior to retaining LVA, was LVA asked

14   whether it would work with Saakvitne?

15               MR. MINKIN:  Objection.

16               MR. JOHANSON:  Excuse me, Mr. Hansen.

17               Mr. Batterman, that could potentially involve

18   attorney-client communications.

19               MR. BATTERMAN:  Well, to the extent his knowledge

20   comes only from conversations with his client, then it should

21   be considered privileged.  To the extent it came from some

22   other source, there's no impediment to his answering.

23               MR. MINKIN:  So, Mr. Hansen, if the only way you

24   have knowledge about that to respond to the question from

25   Mr. Chapa is attorney-client communication, you're not to

Gregorysen - Confidential                                    174

```
 1    answer.  If you have knowledge from another source separate
 2    and apart from attorney-client communication, then by all
 3    means, answer the question.
 4              THE WITNESS:  Okay.  I apologize.  I didn't
 5    understand the question to begin with.  Could you -- you know,
 6    Mr. Chapa --
 7              MR. CHAPA:  Yes.
 8              THE WITNESS:  When they change the -- I can't see
 9    your face on the screen.  I'm kind of hard and when I can see
10    your face, it helps me read you.  That's a little better.
11    Could you repeat the question.
12    MR. CHAPA:
13         Q.  Yes.  All right.  So I'm only asking for prior to
14    retaining LVA, was LVA asked whether it would work with
15    Mr. Saakvitne?  I'm asking, basically, if you had that
16    conversation with LVA.  I'm not asking whether you learned
17    that from the company or a company official.
18         A.  I don't recall.
19              MR. CHAPA:  Please turn to Exhibit 697, please.
20    This purports to be a string email, Bates stamp B+KC -1398
21    through -1400.  Can you scroll through this, please.
22         (Exhibit 697 marked for identification)
23              THE WITNESS:  We can only see part of the screen
24    now.  Can you shrink it?  Thank you.
25              MR. MINKIN:  Thank you.
```

 1    the client.

 2              MR. BATTERMAN:  Join in that.

 3              MR. JOHANSON:  Join.

 4              MR. MINKIN:  So is there -- is there a way,

 5    Mr. Chapa, to work around the attorney-client communication?

 6    Or, obviously, it's speculation.

 7    MR. CHAPA:

 8         Q.   Let me ask you this:  Just based upon your own

 9    opinion -- based on your own understanding, not any

10    communication between yourself and the company and Mr. Bowers

11    or Mr. Kubota, do you know with respect -- strike that.  Make

12    it even easier.

13              Do you know how much Mr. Kuba was gonna charge to do

14    a valuation of the B+K Consulting for 2012?

15              MR. BATTERMAN:  Objection; assumes facts not in

16    evidence, vague.

17              MR. JOHANSON:  Yeah.  Vague, ambiguous, time,

18    purpose, engagement letter.

19              THE WITNESS:  I don't know if he was ever proposed

20    to do a valuation for purposes of an ESOP, I don't know if

21    that was in the cards.

22    MR. CHAPA:

23         Q.   If we can go to second page, Bates page -1399, lower

24    half of the page.  It says, Tom -- and this is an email from

25    Mr. Bowers to Mr. Hansen and cc'ed to a number of other

Greg Hansen - Confidential                                        177

```
 1    individuals and it says, Tom:  FYI.  Gary Kubo felt
 2    uncomfortable completing our valuation and bowed out on
 3    Wednesday.  Do you see that?
 4         A.   I do.
 5         Q.   Is that an accurate reading of that sentence?
 6         A.   You read it correctly, yes.
 7         Q.   When you reference Gary Kubo, did you mean Mr. Gary
 8    Kuba?
 9              MR. BATTERMAN:  I'm going to object that this isn't
10    from Mr. Hansen.
11              THE WITNESS:  Who is speaking?
12              MR. BATTERMAN:  This is Mr. Batterman.  This is an
13    email from Brian Bowers.  He's asking you what you meant by
14    something you didn't write.
15              MR. CHAPA:  Actually, I withdraw that question.
16    MR. CHAPA:
17         Q.   Did you understand when you received this email the
18    reference to Gary Kubo was actually Gary Kuba?
19         A.   That's my thinking, yes.
20         Q.   Okay.  Do you know why Mr. Kuba felt uncomfortable
21    completing the valuation?
22              MR. JOHANSON:  Objection; assumes that Mr. Kuba felt
23    uncomfortable.
24              MR. BATTERMAN:  Objection; assumes facts not in
25    evidence, vague, calls for speculation, and lacks foundation.
```

Greg Olesen - Confidential                    178

```
 1              MR. JOHANSON:  Join.

 2              MR. MINKIN:  You can answer.

 3              THE WITNESS:  I have no idea.

 4    MR. CHAPA:

 5         Q.   Did you ever meet with Mr. Kuba to ask him whether

 6    he'd complete the valuation?

 7         A.   No.

 8              MR. JOHANSON:  Objection.  I object to the form of

 9    the prior question.  Thank you.

10              MR. CHAPA:  If we can turn to Exhibit 698, please.

11    This purports to be a copy of a string email Bates stamped

12    Libra DOL INV -4419 through -4425.

13         (Exhibit 698 marked for identification)

14              THE WITNESS:  Mister -- Mister -- let me add one

15    thing to my last comment.

16              MR. CHAPA:  Certainly.

17              THE WITNESS:  This is eight years.  I know Gary

18    Kuba, I have worked with him on other valuations.  I know I

19    met with him on something with Mr. Kniesel when he was in town

20    once, it might have been some earlier year.  I have no

21    recollection if we -- I discussed Bowers + Kubota with Gary

22    Kuba.  But the way you phrased your question, did I meet with

23    Mr. Kuba, I have met with him before.  I don't recall if I met

24    with him on this matter.

25    /////
```

Greg Jensen - Confidential                                      181

```
 1                MR. CHAPA:  I don't know, in all honesty, how it
 2       works.
 3                THE WITNESS:  Can you do that?  I guess you can have
 4       a string and you're on, you're off, you're on, you're off.
 5                MR. MINKIN:  Yep.
 6                THE WITNESS:  Okay, all right.  Could you repeat the
 7       question, please.
 8       MR. CHAPA:
 9            Q.    Certainly.  That statement I just read to you about
10       structuring something that works well for all parties, was it
11       your impression that he was going to structure something to
12       the benefit of the ESOP as well as the company?
13                MR. MINKIN:  Same objections.
14                THE WITNESS:  I don't believe I was ever asked about
15       that.  I don't know exactly what the intention was here.
16                MR. CHAPA:  If we could turn to Bates stamp
17       No. -4422, which I assume is page 5 on the PDF, but I don't
18       know.  Two more.
19                MR. JOHANSON:  Which page, Mr. Chapa?
20                MR. CHAPA:  Right there.
21       MR. CHAPA:
22            Q.    We're on Bates stamp page No. -4422 of Exhibit 698,
23       specifically the lower half of the page.  It's an email and it
24       says, Greg, Watch for a call from Brian Bowers shortly, this
25       is the matter we discussed with Gary Kuba.  Do you see that
```

1      first sentence there?

2           A.   Yes, I do.

3           Q.   Okay.  Did I read it correctly?

4           A.   I believe you did.

5           Q.   And why were you alerting Mr. Kniesel about this?

6           A.   Say that again.

7           Q.   Why were you alerting Mr. Kniesel about this?

8                MR. MINKIN:  Vague, "about this."

9                THE WITNESS:  About this, yeah.

10               MR. BATTERMAN:  Objection; the document speaks for

11     itself.

12               THE WITNESS:  I believe this is -- as I mentioned

13     earlier, this was an introduction to a qualified appraiser

14     that I knew and since they'd be flying halfway across the

15     country, it would be convenient for them to meet.

16     MR. CHAPA:

17          Q.   And you said -- in that email you say, this is the

18     matter we discussed with Gary Kuba.  When was that discussion?

19          A.   As I said, I don't know the date when that was.  As

20     I said, I've met with Gary and I've met with Greg.  I believe

21     Greg and Gary and I played golf together one year, I don't

22     even know if it was about this time.  This implies that the

23     three of us discussed it, but I don't have any recollection

24     beyond that.

25          Q.   But wouldn't you be keeping information like this

1    confidential?

2         A.   Let me think about that.  What information are you

3    talking about?

4         Q.   I don't know.  All I know is it says, this is the

5    matter we discussed with Gary Kuba, so I don't know what the

6    discussion was.  Do you recall what the discussion was?

7         A.   I think the discussion was probably this is a

8    company thinking about doing an ESOP.

9         Q.   Do you recall if you divulged any financial

10   information during that discussion?

11        A.   No, I don't recall.

12             MR. CHAPA:  All right.  If we could turn to

13   Exhibit 699, please.  It purports to be a one-page email,

14   Bates stamped SAK -47.

15        (Exhibit 699 marked for identification)

16   MR. CHAPA:

17        Q.   All right.  This email is from you to Mr. Saakvitne;

18   correct?

19        A.   Yes.

20        Q.   And this is dated November 21st, 2012; correct?

21        A.   Yes.

22        Q.   So here it says in the second paragraph, it says,

23   They agreed to hire you on my advice.  They asked me what the

24   fees would be and I told them I didn't know, but I estimated

25   between 17 and $22,000, which I realize may be low.  Do you

 1    see that?

 2          A.    Yes, I do.

 3          Q.    Did I read that correctly?

 4          A.    I believe you did.

 5          Q.    So this means at that point in time -- do you know

 6    at that point on October 21st, had they hired Mr. Saakvitne?

 7          A.    I don't recall what the date of the engagement

 8    letter with Mr. Saakvitne was.

 9          Q.    The second paragraph, This is looking like a $12

10    million preferred stock transaction.  I should say the third

11    paragraph.  There is a slight possibility they will change

12    their mind and do a hundred percent transaction for 40

13    million, and we might add warrants to the situation.  I expect

14    that answer by Friday.  Do you see that?

15          A.    I do.

16          Q.    Did I read that correctly?

17          A.    I think you did.

18          Q.    The 12 million preferred stock transaction, what

19    percentage shares would the ESOP have received then?

20          A.    I believe this goes back to our earlier conversation

21    when I advised that as part of our initial conversation with

22    any ESOP client, I would talk with them about alternative

23    structures, different ways to put a deal together, and ask a

24    client what they're doing price would be or what they think a

25    transaction might be worth.  So I think that this is just a

Greg Johansen - Confidential                              185

1    thumbnail trying get the trustee interested to know -- to let

2    us know if he's interested in participating.   And I believe

3    the reason for the 12 million is they were considering a --

4              MR. MINKIN:  Hold on.  Hold on.  If that involves

5    attorney-client communication --

6              THE WITNESS:  Yeah.

7              MR. MINKIN:  Okay.  Don't answer that -- don't

8    expound on that 12 million.

9              THE WITNESS:  Okay.

10             MR. MINKIN:  Unless you have independent

11   information.

12             THE WITNESS:  Independent, independent of this

13   transaction, I would comment that it's very common -- or at

14   least ten years ago it was common for a company to engage in

15   an ESOP transaction for 30 percent of the stock instead of 100

16   percent of the stock.   Some simple math tells me -- let me do

17   my math here correctly -- 30 percent of 40 million is 12

18   million, so if I speculate where that number comes from,

19   that's a conceptual 30 percent transaction.

20   MR. CHAPA:

21        Q.   You say there in the first sentence, This is looking

22   like a $12 million preferred stock transaction.   At that point

23   on November 21st, 2012, did you believe the transaction would

24   close at that value?

25             MR. JOHANSON:  Again, Mr. Batterman, I'm concerned

1        about attorney work product.

2                MR. BATTERMAN:  I've been trying to parse where this

3        is going.

4                Would you read back that last question for me,

5        please.

6           (Reporter read as requested.)

7                MR. BATTERMAN:  I'm going to instruct the witness

8        not to answer any of this to the extent it came through

9        communications with clients insofar it relates to initial

10       valuation issues.

11               MR. MINKIN:  And, again, based on the assertion of

12       the attorney-client privilege, if your knowledge is based upon

13       communications, I instruct you not to answer the question.

14               THE WITNESS:  This doesn't involve -- this doesn't

15       involve a communication with the client.  This involves -- it

16       looks like an early dialogue with Mr. Saakvitne and in an

17       attempt to -- whenever I would speak to an appraiser or a

18       trustee, they would say, Give me a thumbnail, what kind of

19       transaction are you talking about?  Are you talking about

20       warrants?  Are you talking about real estate?  Are you talking

21       about an S corporation or a C corporation?  Are union

22       employees involved?  Is it big deal?  Is it a little deal?

23               MR. JOHANSON:  Mr. Hansen, Mr. Hansen, could I

24       interrupt you, please.  Sorry.  Again, I have a concern that

25       if you have to rely upon information from your clients in

G. Hansen - Confidential                    188

```
 1    valuations are based upon conversations with the clients, with

 2    the client corporation, then you can't go into that

 3    conversation.

 4             MR. BATTERMAN:  He can testify as to what he said to

 5    Mr. Saakvitne, but he can't testify as to anything getting

 6    into the details of how those numbers came about.

 7             MR. MINKIN:  Correct.

 8             MR. CHAPA:  Unless he actually divulged that to

 9    Mr. Saakvitne.

10             MR. BATTERMAN:  You can testify as to anything you

11    said to Mr. Saakvitne.

12             MR. CHAPA:  Okay.

13             MR. BATTERMAN:  Actually said to Mr. Saakvitne.

14             MR. MINKIN:  Greg, has that clarified it for you or

15    muddied it?

16             THE WITNESS:  Muddied it.  I'm going to attempt one

17    more clean answer.

18             MR. CHAPA:  I appreciate it.  Thank you, Mr. Hansen.

19             THE WITNESS:  We previously went over my memorandum

20    displaying five or six different alternative transaction

21    structures to highlight how a deal might work.  This is a

22    different version of that attempt to give a thumbnail

23    communication to Mr. Saakvitne of how a deal might work.

24    MR. CHAPA:

25        Q.   And then the second sentence you say, There's a
```

1    slight possibility they will change their mind and do a

2    hundred percent transaction for 40 million.  Do you see that?

3         A.   Yes.

4         Q.   All right.  So at that point in time did you believe

5    that the transaction was more than likely to close at less

6    than a hundred percent?

7              MR. JOHANSON:  Objection.  Same objection as during

8    the previous questioning.  It's the same type of question.

9              MR. BATTERMAN:  To the extent that his belief is

10   based upon ideas expressed to him by his clients, I'd instruct

11   him not to respond.

12             MR. MINKIN:  Again, if the information that formed

13   the basis of this second paragraph came to you from the

14   clients, you're not to answer because it invades the attorney-

15   client privilege.

16             THE WITNESS:  On the advice of my attorney, I'm not

17   going to answer that question.

18   MR. CHAPA:

19        Q.   Was this an accurate representation, those two

20   sentences, at that time?

21        A.   Was this a what?

22             MR. BATTERMAN:  Objection; vague.

23             MR. MINKIN:  Vague and ambiguous, "accurate."  The

24   document speaks for itself.

25   /////

```
1    MR. CHAPA:

2         Q.   I don't know if you understood my question,

3    Mr. Hansen.  The question I asked was, was this an accurate

4    representation, those two sentences I read previously?

5              MR. BATTERMAN:  Same objection as to vague and

6    ambiguous.  Accurate in what respect?

7              MR. MINKIN:  The document speaks for itself.

8              THE WITNESS:  Yeah.

9              MR. CHAPA:  Mr. Hansen, are you waiting for me or --

10             THE WITNESS:  Oh.  The document speaks for itself I

11   think is all I can say.

12   MR. CHAPA:

13        Q.   Okay.  But, I mean, it could be you intended

14   something different, that's why I'm asking.  So in other

15   words, is this accurate?  Those two sentences, are they

16   accurate?

17             MR. MINKIN:  Vague and ambiguous, "accurate."  You

18   can answer yet again about the document.

19             THE WITNESS:  The document speaks for itself.  I

20   don't remember -- I don't remember beyond what the document

21   says.

22   MR. CHAPA:

23        Q.   You don't remember what?  Excuse me.

24        A.   I don't remember anything beyond what the document

25   says.
```

1      Q.    You weren't trying to mislead Mr. Saakvitne with

2   those two sentences, were you.

3            MR. BATTERMAN:   Objection; argumentative.

4            MR. MINKIN:   Join.   If you can answer, the question

5   is there.   Were you trying to lead Mr. Saakvitne?

6            THE WITNESS:   I never mislead --

7            MR. CHAPA:   Mislead.

8            THE WITNESS:   I never mislead anybody.

9            MR. CHAPA:   Thank you.

10           THE WITNESS:   You're welcome.

11           MR. CHAPA:   Ms. Dakins, can we move on to the next

12   exhibit, which is Exhibit 700, please.   It purports to be a

13   copy of a one-page string email Bates stamped Bowers/Kubota

14   19347.

15        (Exhibit 700 marked for identification)

16           THE WITNESS:   Can we shrink this just a fraction

17   since we're cutting off -- yeah, that's better.   Let's see,

18   where does it start?

19           MR. MINKIN:   The bottom.

20           Okay.   Was there a question pending or you're

21   letting the witness read and review it first?

22           MR. CHAPA:   Letting the witness review it first.

23           MR. MINKIN:   Thank you.

24           THE WITNESS:   Hold it still.   Hold it still for a

25   minute.

 1    MR. CHAPA:

 2         Q.   Okay.  So if we can go to that -- okay.  At the very

 3    bottom of this page --

 4              Just leave it this way.  Leave it this way.

 5         A.   I can read it.

 6         Q.   In the middle of the page now it says, Nick, please

 7    either -- Nick, please either copy Greg K. on your draft

 8    engagement letter, or at least send him your exact title to

 9    use -- I've asked him to revise his current engagement letter

10    to the company to run directly to the trustee.  Do you see

11    those -- that sentence?

12         A.   Yes, I do.

13         Q.   Did I read that correctly?

14         A.   I believe you did.

15         Q.   And this was from you to Mr. Saakvitne; correct?

16         A.   Yes, it is.

17         Q.   And this is November 24th and you're asking

18    Mr. Saakvitne to send a copy of the draft engagement letter to

19    Mr. Kniesel; correct?

20         A.   Yes.

21         Q.   Does this mean that Mr. Saakvitne had not been

22    retained yet as the independent fiduciary?

23              MR. MINKIN:   Objection; legal conclusion.

24              THE WITNESS:   I don't know.

25    /////

Greg Nielsen - Confidential                                    193

```
 1    MR. CHAPA:
 2        Q.   Is there any reason to believe that he had been
 3    retained as the independent fiduciary as of this date,
 4    November 24, 2012?
 5        A.   Didn't you previously have an exhibit reflecting his
 6    actual engagement letter?  I don't recall the date.
 7        Q.   Yes, I did.  And that was the question that was
 8    posed was whether his handwritten marks November -- as you
 9    said, it could've been the number 2, it could've been 21, it
10    could've been 28.
11        A.   Okay.  So we don't know the exact date of the
12    engagement, so --
13        Q.   I'm not -- go ahead.
14        A.   So I don't know the exact date of the engagement, so
15    I don't know whether this is asking him to send a copy of a
16    prior draft or not.  I just don't know how to answer that.  I
17    don't know how to get the proper date.
18        Q.   And then you mentioned at the latter part of that
19    sentence, I've asked him to revise his current engagement to
20    the company to run directly to the trustee.  So the revised
21    current engagement letter, is that Mr. Kniesel's?
22        A.   I will ask him to revise.  I believe that's
23    referring to Mr. Kniesel.
24        Q.   So you're asking Mr. Kniesel to change the
25    engagement letter from the company to the trustee, is that it?
```

Greg Hansen - Confidential                                    201

```
 1        A.   On the advice of my attorney, I'm not going to

 2   answer that question.

 3             MR. CHAPA:  If you could turn to Exhibit 516,

 4   please, it purports to be a copy of what appears to be an

 5   invoice from Mr. Saakvitne dated on the first page August 5th,

 6   2013, Bates stamp SAK -48 through -52.

 7        (Exhibit 516 marked for identification)

 8   MR. CHAPA:

 9        Q.   First I should ask you, Mr. -- Mr. Hansen, have you

10   ever seen this invoice, Exhibit 516?

11        A.   Can you go through the full invoice, please.

12        Q.   Certainly.

13        A.   Is that the full invoice?  Okay.  What was the

14   question?

15        Q.   Okay.  So the question is:  Did you -- would you see

16   Mr. Saakvitne's invoices that he charged to the -- the

17   company?

18        A.   You say would I or did I?

19        Q.   Did you?

20        A.   I don't recall if I ever saw this before.

21        Q.   Okay.

22        A.   I'm not copied, am I?

23        Q.   I don't see -- I just see it says Bowers + Kubota

24   ESOP.  I don't know -- it says, Attention:  Mr. Bowers, but I

25   don't know if anyone else was copied or not.
```

1          A.   I don't recall if I've seen this.

2          Q.   Okay.  So the first entry on that first page Bates

3     stamp SAK -48, DOL Exhibit 516, is entered on November 23rd,

4     2012, do you see that?

5          A.   Yes.

6          Q.   Okay.  And then the next entry is November 26th,

7     2012, it says, Prepare fiduciary agreement; correspondence

8     regarding same, telephone conference with Greg Hansen.  Do you

9     see that?

10         A.   Yes, I do.

11         Q.   So the fiduciary agreement was the retainer

12    agreement, wasn't it?

13         A.   I believe so.

14         Q.   And he's preparing it on November 26th, so could he

15    have been -- could he have been appointed prior to

16    November 26th?

17         A.   I don't know.  I mean, he might have had an oral

18    agreement to get started, but perhaps there was no written

19    agreement yet.

20         Q.   Do you remember if there was an oral agreement to

21    get started?

22         A.   I don't.

23         Q.   Okay.  Could he have been appointed prior to

24    November 23rd, the first entry on this invoice?

25              MR. JOHANSON:  Ms. Gran, could we have a count on

Greg Hansen - Confidential                           210

1    indicate to me they were appointed.

2         Q.   Anything else besides that?

3         A.   Not that I can think of.

4              MR. CHAPA:  If we could turn to DOL Exhibit 510,

5    please.

6         (Exhibit 510 marked for identification)

7    MR. CHAPA:

8         Q.   This is a two-page document Bates stamped DOL -6988

9    through DOL -6989.  Did you ever see a copy of the original of

10   this resolution of the board of directors?

11        A.   (Pause - referring.)

12             MR. JOHANSON:  What's the exhibit number again?

13             MR. CHAPA:  510, DOL Exhibit 510.

14             THE WITNESS:  (Pause - referring.)  Can you scroll

15   back to the top, please.  You can go quickly.  Okay.

16             MR. CHAPA:  Tell me when you're ready, Mr. Hansen.

17             THE WITNESS:  I'm ready.

18   MR. CHAPA:

19        Q.   In that second paragraph, first sentence, it says,

20   Whereas, the corporation has determined to establish and adopt

21   a retirement plan and trust for the benefit of its eligible

22   employees, effective as of January 1st, 2012, said plan and

23   trust to be known, collectively, as the Bowers + Kubota

24   Consulting, Inc. Employee Stock Ownership Plan.  Do you see

25   that?

Greg Hansen - Confidential                                             211

1    A.    Yes.

2    Q.    So was the plan, the BK ESOP, was it as of

3    January 1, 2012, then?

4    A.    The law allows for an ESOP to become retroactive to

5    the beginning of the calendar year, but I believe this is

6    dated December 3rd.

7    Q.    So the ESOP was effective as of January 1st, 2012;

8    is that correct?

9         MR. JOHANSON:  Calls for a legal conclusion and an

10   actual issue in the case.

11        MR. MINKIN:  Join.

12        MR. BATTERMAN:  Objection; vague.

13        MR. JOHANSON:  Actually, ultimate issue.  Sorry.

14   Ultimate issue in the case.  It requires the court's

15   determination.

16        MR. CHAPA:  Mr. Hansen.

17        THE WITNESS:  I didn't understand the question.

18   MR. CHAPA:

19   Q.    So the ESOP was effective of January 1st, 2012; is

20   that correct?

21   A.    Well, the ESOP -- there was no ESOP prior to the

22   execution of the documents and the documents, it appears to

23   me -- this resolution is dated December 3rd, I imagine you

24   also have the plan and the trust.  Until the board acts and

25   the plan and trust are adopted, there is no ESOP.

1          Q.    Then why say that the effective date is January 1st,

2    2012, then?

3               MR. BATTERMAN:  Objection; argumentative.

4               MR. MINKIN:  Calls for a legal conclusion.

5               MR. JOHANSON:  Join.

6    MR. CHAPA:

7          Q.    Is that as mistake?

8               MR. MINKIN:  Argumentative.

9               MR. JOHANSON:  Join.

10              MR. MINKIN:  If you're able to answer.

11              THE WITNESS:  Oh.  I don't see the -- the plan and

12   the trust document itself.  On the assumption that it was

13   dated the same day as this resolution, the earliest possible

14   date for the ESOP and trust to be in effect was December 3rd,

15   but for purposes of eligibility of participants, how much

16   salary you take into account, the law allows you to look back

17   to January 1, the beginning of the fiscal year, and I believe

18   that's why the -- the law allows that retroactivity provision.

19   But until the documents are signed, there is no ESOP.

20   MR. CHAPA:

21        Q.    So you're saying for one purpose there is and for

22   other purposes there are not, is that what you're suggesting?

23              MR. BATTERMAN:  Objection; argumentative.

24   Objection; harassing the witness.

25              MR. MINKIN:  Join.  Also calls for a legal

1     conclusion.

2               MR. JOHANSON:  Join.

3               MR. CHAPA:  Mr. Hansen.

4               THE WITNESS:  I don't think I can answer it any

5     better than I just did.

6     MR. CHAPA:

7          Q.    Okay.  So is there any other reason why it would not

8     be effective besides what you said about the signature on the

9     document?

10              MR. BATTERMAN:  Objection; vague.

11              THE WITNESS:  Yeah, vague.

12              MR. MINKIN:  Join.

13              MR. JOHANSON:  Join.

14              THE WITNESS:  I will add one comment.  My comment

15    would be that most or all ESOP transactions that I have ever

16    seen are structured this way.  They're not in place and

17    documented until at or near the end of the year with the

18    retroactivity to the beginning of the year is common so

19    that -- you want to give the benefit to the employees of a

20    full year worth of salary.  If I had made -- if I had not

21    taken advantage of that provision in the law, we couldn't

22    count salaries prior to December 3rd and the participants

23    wouldn't get virtually any allocations in the first year.

24    MR. CHAPA:

25         Q.    Okay.  Is there any other reason why the effective

1    date that's identified on this board resolution is not

2    accurate besides what you said about the signature on the

3    board resolution dictating?

4              MR. BATTERMAN:  Objection; vague.

5              MR. MINKIN:  Argumentative.  Vague and ambiguous as

6    to the phrase "accurate."

7              THE WITNESS:  I can't think of any other reason

8    beyond my answer.

9              MR. CHAPA:  Okay.  Thank you.

10             THE WITNESS:  You're welcome.

11   MR. CHAPA:

12        Q.   Oh, something I forgot to ask you before:  With

13   respect to the dividend, the dividend that was paid -- the

14   dividend on the BK shares, the first time it was paid was post

15   transaction, December 31st, 2012; is that correct?

16        A.   I don't recall.

17        Q.   Okay.  Would the dividend be paid prior to the

18   closing of the calendar year?

19             MR. BATTERMAN:  Objection; vague.

20             MR. JOHANSON:  Asked and answered.

21             MR. MINKIN:  Speculation.

22             THE WITNESS:  Could you rephrase it, please.

23   MR. CHAPA:

24        Q.   Would the dividend be paid prior to the close of the

25   calendar year?

Greg Kniesen - Confidential                                    215

1       A.    You're talking about in Bowers + Kubota?

2       Q.    Correct, in Bowers + Kubota.

3       A.    In order to be -- in order for a dividend -- in

4    order for corporation that sponsors an ESOP to be able to

5    deduct a dividend in a particular tax year, that dividend

6    needs to be declared and paid prior to the end of that year.

7       Q.    If this dividend was declared on December 31st,

8    2012, would the declaration have to be made by the ESOP as the

9    owner or who would make that declaration?

10              MR. BATTERMAN:  Objection; compound, complex.

11   Objection; calls for a legal conclusion.

12              THE WITNESS:  Can you -- can you rephrase that?

13   MR. CHAPA:

14      Q.    If the dividend was paid on December 31st, 2012,

15   would the declaration issue a dividend have to be made by the

16   ESOP?

17      A.    No.

18      Q.    Who would have the authority to make that?

19      A.    The payor of the dividend.

20      Q.    Well, isn't the ESOP that's actually making -- isn't

21   it -- is it the company that is the payor of the dividend?

22      A.    Yes.

23      Q.    And who owns the company on December 31st, 2012?

24      A.    The ESOP.

25      Q.    So doesn't the ESOP have to make that declaration?

Greg Hansen - Confidential                                    216

```
1          A.    No.

2                MR. BATTERMAN:  Objection; calls for a legal

3    conclusion.  Objection; misstates the law.

4                MR. JOHANSON:  Yes.  Join.

5    MR. CHAPA:

6          Q.    So why does the ESOP not -- all right.  Who is the

7    one that makes the declaration, then?

8          A.    The board of directors of the corporation.

9          Q.    Do they have the authority to make that declaration?

10               MR. BATTERMAN:  Objection; calls for a legal

11   conclusion, argumentative.  Objection; take Corporations 101.

12               MR. MINKIN:  Join.

13               MR. JOHANSON:  Join.

14               THE WITNESS:  As we discussed before, the board of

15   directors and the officers run the corporation.  The board of

16   directors is the proper entity to declare and pay a dividend

17   to the shareholders.  The ESOP is the shareholder.

18   Shareholders don't declare dividends.

19   MR. CHAPA:

20         Q.    Doesn't the board of directors derive all their

21   power from the owner of the company?

22               MR. MINKIN:  Objection; calls for a legal

23   conclusion.  He's not here as an expert.

24               MR. JOHANSON:  Join.

25               MR. BATTERMAN:  Objection; vague.
```

1              THE WITNESS:  Yeah, that's -- it's a simple point.

2     The board of directors declare and pay dividends.  Just like

3     in any corporation in the United States, the board of

4     directors declare and pay it.

5     MR. CHAPA:

6          Q.   Can the ESOP remove the board of directors?

7          A.   Can they what?

8          Q.   Remove the board of directors?

9              MR. MINKIN:  Calls for a legal conclusion.

10             THE WITNESS:  The ESOP trustee appoints the board of

11    directors.

12    MR. CHAPA:

13         Q.   Therefore, can they remove them?

14         A.   In certain circumstances, yes.

15         Q.   What would those circumstances be?

16             MR. BATTERMAN:  Objection; calls for -- objection;

17    calls for Corporations 101.

18             THE WITNESS:  Yeah.  It --

19             MR. BATTERMAN:  It requires a review of the articles

20    of incorporation.

21             THE WITNESS:  Right.

22    MR. CHAPA:

23         Q.   Is there any other basis besides the articles of

24    incorporation that dictate when an ESOP can remove the board

25    of directors?  I mean, when the -- for purposes of Bowers +

Greg Hansen - Confidential                                    218

1      Kubota?

2           A.   For purposes --

3                MR. BATTERMAN:  Calls for an opinion regarding the

4      Hawaii corporations law.

5                MR. JOHANSON:  For which this witness has not been

6      qualified and he's not being paid.

7                THE WITNESS:  Trying to think how to answer that.

8      It's -- this is ESOPs 101, Corporations 101.  ESOPs -- an ESOP

9      trustee that owns a hundred percent of the stock has the power

10     to appoint the board of directors and in certain rare, rare

11     circumstances, could also remove one or more directors.  I

12     think I've seen it happen twice in my career.

13     MR. CHAPA:

14          Q.   We went over earlier the fact that on an annual

15     basis the ESOP had to actually designate who the board of

16     directors was, wasn't it?  Didn't it?

17          A.   That's correct.

18          Q.   Okay.  If the ESOP chose to select a different

19     person every year, did it have that authority?

20                MR. BATTERMAN:  Objection; calls for a legal

21     conclusion.

22                THE WITNESS:  Yes.

23     MR. CHAPA:

24          Q.   And wouldn't that be removing, then, the previous

25     board of directors?

Greg Rosen - Confidential                                    219

1            THE WITNESS:  I didn't hear the comment from

2    Mr. Batterman.

3            MR. BATTERMAN:  Yeah.  I'm going to object that it

4    calls for a legal conclusion and it's argumentative and

5    misstates the law.  Removal is different from election under

6    the law.

7            THE WITNESS:  One would have to look at --

8            MR. MINKIN:  There's no question.

9            THE WITNESS:  Okay.  Excuse me.  I'm not sure, is

10   there a question hanging?

11           MR. CHAPA:  No.  If we could turn to Exhibit 707,

12   please.  Ms. Dakin, please.  It's a one-page document,

13   purports to be an email, Bates stamped Bowers/Kubota 18531.

14       (Exhibit 707 marked for identification)

15   MR. CHAPA:

16       Q.   If you look at that Exhibit 707, it's an email from

17   Mr. Kuba to yourself dated August 31st, 2012.  It says, Gary,

18   we had another -- it says, Gary, we had another meeting, it

19   went very well.  I suggested that they should move forward

20   with a formal valuation with a target December 1 ESOP

21   transaction, but that we should get your value opinion ASAP.

22   It's from you to Mr. Kuba.  At this stage was there a

23   determination that there'd be no independent fiduciary or --

24       A.   I don't recall this.

25       Q.   And it mentions an 8/31 -- it mentions a meeting

Greg Hansen - Confidential                                          220

1    yesterday, that would've been August 30th?

2         A.   Yes.   Is there a prior string on this email?

3         Q.   Not that I have.   The meeting that's referenced

4    yesterday, who was at that meeting?

5         A.   I don't recall.   I'm not sure who it refers to.

6    It's referring to Bowers + Kubota, I assume it's Bowers +

7    Kubota.   Was that your question?

8         Q.   Yeah, that's fine.   Thank you.

9         A.   You're welcome.

10        Q.   Once Mr. Saakvitne was retained as the independent

11   fiduciary in the Bowers + Kubota matter, what was your role

12   with respect to Mr. Saakvitne?

13             MR. BATTERMAN:   Objection; vague.

14             MR. MINKIN:   Join.

15             THE WITNESS:   What was my role?   I represented the

16   company.   Oh, I didn't have a direct role with Mr. Saakvitne.

17   MR. CHAPA:

18        Q.   Okay.   If the deal was not closed before

19   December 19, 2012, and you left town, would the -- could the

20   deal close before the end of 2012?

21             MR. BATTERMAN:   Objection; incomplete hypothetical.

22   Objection; vague.

23             MR. MINKIN:   Join.

24             MR. JOHANSON:   Join.

25             MR. MINKIN:   Calls for a legal conclusion.

1              MR. CHAPA:   I'm sorry.   Did you answer the question?

2              THE WITNESS:   The practical answer is it would be

3    difficult because I would -- I was coordinating most of the

4    documents, but -- but the ultimate answer is yes, it could've

5    been closed because I have strong support people in my office

6    that would have followed all my directions and if the company

7    had decided to proceed and still close by December 31, we --

8    we could've gotten it done.   But remote practice back then

9    wasn't what it is today.

10   MR. CHAPA:

11        Q.   What other -- did you designate anyone in your

12   office to act in your -- your stead if that was -- if that

13   happened?

14        A.   We talking about generally in my practice?

15        Q.   No.   I'm talking about with respect to this

16   particular transaction.

17        A.   I don't recall.   I was alerting them my travel

18   plans.

19        Q.   Okay.

20        A.   And it turned out that we got closed within that

21   timeline, so it was not necessary.

22        Q.   And in how many instances had Mr. Kniesel worked

23   with other attorneys in your office before 2012?

24              MR. BATTERMAN:   Objection; calls for speculation,

25   lacks foundation.

1          MR. MINKIN:  Join.

2          THE WITNESS:  I don't know.

3          MR. JOHANSON:  It may be attorney-client privileged.

4          MR. BATTERMAN:  I think "I don't know" covers it.

5          MR. JOHANSON:  I think so, too.

6    MR. CHAPA:

7          Q.   And before Mr. Saakvitne was -- strike that.  When

8    Mr. Saakvitne was retained, did you ever talk to him about

9    seeking financing from a third party for this ESOP

10   transaction?

11         A.   I don't recall, but it wouldn't be Mr. Saakvitne

12   seeking the financing, it would be the company.

13         Q.   Correct, but wouldn't Mr. Saakvitne have to approve

14   of any financing from a third party?

15         A.   He would ultimately have to approve the

16   reasonableness of the overall transaction which would include

17   the financing terms and that is the main issue that the

18   fairness opinion from the appraiser would go into.  So the

19   trustee along with the assistance of the valuation advisor

20   would be approving of the financing structure.

21         Q.   Okay.  Did you have any conversations with

22   Mr. Saakvitne regarding a third-party financier for the BK

23   ESOP?

24         A.   I don't recall.

25         Q.   With respect to the BK ESOP, was there an actual

Gregory Rasen - Confidential                                    223

```
 1    valuation report used to close the transaction on December 14,

 2    2012, that was in existence on December 14, 2012?

 3          A.   How do you define "valuation report"?

 4          Q.   Have you ever seen a valuation report?

 5          A.   Many times.

 6          Q.   Okay.  Is the ones -- are the ones that you've seen,

 7    are they multipage documents that provide a significant amount

 8    of detail about the company?

 9          A.   Different valuation advisors have different

10    approaches, but there is always, at a minimum, an opinion

11    letter supporting their value on the date of the closing of

12    the transaction.  However the, quote, report is defined,

13    usually the lengthy report with all the exhibits is provided

14    some time later, that's my normal experience.

15          Q.   Have you ever had any ESOP transactions where the

16    valuation was -- valuation report was provided either

17    contemporaneously or shortly before the close of the

18    transaction?

19          A.   The full report?

20          Q.   Correct.

21          A.   I don't think so.

22          Q.   Okay.

23          A.   I don't think so.  That doesn't make sense.

24          Q.   So how does the independent fiduciary know all of

25    the variables and the bases that was used and the assumptions
```

Greg Bassen - Confidential                                    224

```
 1    that was used by the appraiser to come a conclusion?
 2              MR. BATTERMAN:  Objection; compound, argumentative.
 3              MR. MINKIN:  And calls for speculation.
 4              THE WITNESS:  I'm not a trustee.
 5              MR. JOHANSON:  Join.
 6              THE WITNESS:  I'm not a valuation advisor.
 7    MR. CHAPA:
 8         Q.   You said you're not a valuation advisor, that's what
 9    you said?
10         A.   That's correct.  I am not a valuation advisor.
11         Q.   I'm sorry, I don't know -- I don't think you ever
12    answered the question.  Was there a valuation report that
13    existed before December 14, 2012, to close this transaction
14    for BK ESOP?
15         A.   I -- hold on.  Could you please repeat that?
16         Q.   Certainly.  Before December 14, 2012, was there a
17    valuation report that existed to close the BK ESOP
18    transaction?
19         A.   There was one -- there was one on the closing date.
20    Whether there was draft one -- I expect there was a draft one
21    before the closing.  There's always a draft one that the
22    trustee gets and reviews and comments upon, but the final
23    opinion letter, in my experience, is always dated on the
24    closing date.
25         Q.   Okay.  You said the valuation report was a pretty
```

1     lengthy document, you say there was one that existed on

2     December 14, 2012?

3          A.    No.   I said that it's my experience that on the date

4     of the closing there is always, at a minimum, an opinion

5     letter that is several pages long that will support the value

6     at the closing, but the full-on report with all the narrative

7     and the schedules, etc., comes later.

8          Q.    Okay.   In the BK ESOP transaction, that report came

9     later; correct?

10         A.    I'm sure it did.   I don't recall specifically, but

11    it doesn't come on the same day as the closing.   There's a lot

12    of work to that.   The valuation advisor stays up late the

13    night before the transaction, looks at the stock market,

14    checks his comparables, and signs a letter the date of the

15    transaction.

16         Q.    Did LVA ever request from you a copy of the URS

17    letter?

18         A.    No.   There would -- there would be no reason to

19    request from me.   LVA gets its documentation and due diligence

20    directly from the company.

21         Q.    In September of 2012, did you perform any work on

22    the BK matter?

23         A.    I'm sure I did.   I don't recall specifically, but

24    I'm sure I did.

25         Q.    With respect to Mr. Kuba and GMK, did he ever tell

Greg Jensen - Confidential                                      226

```
 1    you why he was uncomfortable performing the valuation for the

 2    ESOP transaction in 2012?

 3         A.   I don't recall.

 4              MR. JOHANSON:  That's asked and answered.

 5              THE WITNESS:  Yeah.

 6    MR. CHAPA:

 7         Q.   Would anything help refresh your recollection?

 8         A.   Do you have an engagement letter for Mr. Kuba?

 9         Q.   Anything besides an engagement letter from Mr. Kuba?

10         A.   An email from Mr. Kuba explaining why would be

11    helpful.

12         Q.   Anything else?

13         A.   Not that I recall.

14         Q.   One thing I forgot to ask you before, with respect

15    to -- to declaring a dividend, could the owner of the company,

16    the ESOP, for example, in BK --

17         A.   I didn't hear you.  I didn't hear the first part of

18    the question, please.

19         Q.   I'm sorry.  With respect to declaring a dividend --

20         A.   Okay.

21         Q.   -- with respect to the Bowers + Kubota ESOP, could

22    the owner of the company, which is Bowers + Kubota ESOP post

23    December 14, 2012, could it declare a dividend?

24              MR. BATTERMAN:  Objection; asked and answered.

25    Objection; calls for a legal conclusion.  Objection; misstates
```

1    the law.

2              THE WITNESS:  Once again, shareholders do not

3    declare dividends.

4    MR. CHAPA:

5        Q.   Are you saying the shareholder could not?

6              MR. BATTERMAN:  Objection; argumentative.

7    Objection; asked and answered.  Objection.

8              MR. MINKIN:  Argumentative.

9              MR. JOHANSON:  Join.

10             Can we take a five-minute bio break, please.

11             MR. CHAPA:  Certainly.

12         (Pause in Proceedings:  5.11 p.m.-5.15 p.m.)

13             MR. CHAPA:  Back on the record, please.

14   MR. CHAPA:

15       Q.   Mr. Hansen, I just want to make certain I

16   understand.  So are you saying that the sole owner of a

17   private company has no say on whether to pay dividends or not?

18             MR. BATTERMAN:  Objection; argumentative.

19   Objection; calls for a legal conclusion.

20             MR. MINKIN:  Join.

21             MR. JOHANSON:  Join.

22             THE WITNESS:  The board of directors of a

23   corporation is the proper body that declares dividends.

24   Shareholders can replace the board if they want, but they

25   don't declare dividends.

1   you see fit.  So, therefore, I object to the

2   characterization -- mischaracterizations that were made.

3              MR. MINKIN:  Number one --

4              MR. CHAPA:  Mr. Johanson, if you wish to make a

5   motion to the court and ask for an additional amount of time

6   and also ask for an extension because it doesn't sound like

7   we'll be able to complete this discovery by November 30th, we

8   can talk about that.

9              MR. BATTERMAN:  I will state for the record that a

10  vast portion of this deposition seemed to be an effort to

11  obtain education in ESOPs 101 or to try to turn the witness

12  into DOL's expert in that hours and hours were spent on

13  hypothetical questions that had nothing to do with the

14  specific transaction at issue and I will make that

15  representation to the court if this does come down to a

16  motion.

17             MR. MINKIN:  We do want a copy of the transcript,

18  even though the deposition is not completed, so that we can

19  review it.  Also for the record, we were provided a listing of

20  exhibits that -- that Mr. Hansen has not seen since 2012 that

21  were provided early this morning by the Department of Labor.

22  If they had been provided as a professional courtesy in

23  advance, perhaps we could've reviewed them so we wouldn't have

24  spent time looking at them and if counsel had asked questions

25  without -- and succinct question without repeating himself

```
 1              C E R T I F I C A T E

 2   STATE OF HAWAII               )
                                   )      SS.
 3   COUNTY OF MAUI                )

 4              I, SANDRA J. GRAN, do hereby certify:

 5              That on November 23, 2020, at 9:02 a.m. appeared
     before me GREG HANSEN, the witness whose deposition is
 6   contained herein; that prior to being examined he was by me
     duly sworn or affirmed pursuant to Act 110 of the 2010 Session
 7   of the Hawaii State Legislature.

 8              That the deposition was taken down by me in machine
     shorthand and was thereafter reduced to typewritten form under
 9   my supervision; that the foregoing represents, to the best of
     my ability, a true and correct transcript of the proceedings
10   had in the foregoing matter.

11              That pursuant to Rule 30(e) of the Hawaii Rules of
     Civil Procedure, a request for an opportunity to review and
12   make changes to the transcript:

13         X    Was made by the deponent or a party (and/or
                their attorney) prior to the completion of the
14              deposition.
           ____ Was not made by the deponent or a party (and/or
15              their attorney) prior to the completion of the
                deposition.
16         ____ Was waived.

17              I further certify that I am not an attorney for any
     of the parties hereto, nor in any way concerned with the
18   cause.

19              DATED this 1st day of December, 2020, in Maui,
     Hawaii.

20

21

22   _____
     SANDRA J. GRAN, RPR, HI CSR 424
23

24

25
```

## WITNESS CORRECTION SHEET

### CASE:  SCALIA VS. HERITAGE; CASE NO. 1:18-CV-155 SOM-WRP

### DEPOSITION OF GREG HANSEN, TAKEN ON 11-23-20.

| PAGE | LINE | CORRECTION | REASON |
|------|------|-----------|--------|
| 40 | 1 | Delete the words "how they help" | Clarification |
| 58 | 11 | Delete the words "the ambits" | Clarification |
| 63 | 24 and 25 | The word "buyer" should be "seller" | Clarification |
| 64 | 1 | The word "buyer" should be "seller" | Clarification |
| 88 | 2 | The word "buyer" should be "seller" | Clarification |
| 184 | 24 | Change the word "doing" to "ideal" | Clarification |
| 194 | 4 | Add the word "draft" after the word earlier | Clarification |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

(If additional space is needed, attach a blank sheet)

Signature of Deponent: _____   Date: JAN - 5 2021

=================================================================

## CERTIFICATE

[X] Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

[ ] Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

[ ] Please be advised that signature and/or corrections were received and are **not being filed** with the transcript because:

   [ ] the deponent failed to sign and/or make corrections within 30 days after notification that the transcript was available for review.

   [ ] a request for an opportunity to review the transcript was **not** made by the deponent or a party before completion of the deposition.

[ ] Please be advised that the above-named case is going to trial and/or hearing and the deponent has **not** had 30 days to read and sign the deposition before the filing of this transcript with the Court.

DATED: 1-15-21     , HONOLULU, HAWAII.

CSR NO. 179

*Ralph Rosenberg* by *d.j.*
**Ralph Rosenberg Court Reporters, Inc.**
*1001 Bishop Street, Suite 2460, Honolulu, HI 96813*
**Phone:  (808) 524-2090   Fax:  (808) 524-2596**

REC'D JAN 1 2 2021

Page 232

```
 1          W I T N E S S   C E R T I F I C A T E

 2

 3          I, GREG HANSEN, hereby certify that I have read the

 4   foregoing typewritten pages 1 through 231, inclusive, and

 5   corrections, if any, were noted by me, and the same is a true

 6   and correct transcript of my testimony.                  OmH

 7

 8          Dated this 5th day of January 2021, 2020.

 9

10          Byrm Hansen

11          GREG HANSEN

12

13   Signed before me this 5th day of January, 2021, 2020.

14

15

16          Christi K. Maumau

17

18

19

20

21   EUGENE SCALIA, Secretary of Labor, United States Department of
     Labor vs. SHARON L. HERITAGE; NICHOLAS L. SAAKVITNE, A
22   LAW CORPORATION; BRIAN J. BOWERS; DEXTER C. KUBOTA;
     BOWERS + KUBOTA CONSULTING, INC.; BOWERS + KUBOTA
23   CONSULTING, INC. EMPLOYEE STOCK OWNERSHIP PLAN, CASE
     NO. 1:18-cv-155-SOM-WRP
24   November 23, 2020, S. Gran

25
```

REC'D JAN 1 2 2021

DEC - 3 2020