# EXHIBIT "8"



November 19, 2020

Mr. David R. Johanson
Senior Partner
Hawkins Parnell & Young, LLP
1776 Second Street
Napa, CA 94559

**Rebuttal Report with respect to Valuation of Bowers + Kubota Consulting, Inc. prepared by Steven J. Sherman of Loop Capital Financial Consulting Services**

Dear Mr. Johanson:

## Introduction

The following sets forth my rebuttal report with respect (this "Rebuttal Report") to the Expert Report of Steven J. Sherman of October 19, 2020 (the "Sherman Report"), for purposes of the above captioned litigation, namely, *Eugene Scalia, Secretary of the United States Department of Labor ("Plaintiff") v. Sharon L. Heritage, as successor to Nicholas L. Saakvitne, Deceased, Nicholas L. Saakvitne, a Law Corporation, a California corporation, Brian J. Bowers, an individual, Dexter C. Kubota, an individual, Bowers + Kubota Consulting, Inc., a corporation (nominal defendant), and Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan (the "ESOP") (nominal defendant)*, in the United States District Court, for the District of Hawaii, No. 1:18-cv-155 (this "Litigation"). Sharon L. Heritage, Nicholas L. Saakvitne, Nicholas L. Saakvitne, a Law Corporation, Brian J. Bowers, Dexter C. Kubota, and Bowers + Kubota Consulting, Inc. shall be referred to herein as the "Defendants".

This Rebuttal Report is in addition to my Expert Report submitted on this date (the "Initial Report").

Hawking Parnell & Young, LLP has retained me, Ian C. Rusk, on behalf of Rusk O'Brien Gido + Partners, LLC, to, in part, review the appraisal analysis prepared by Steven J. Sherman of Loop Capital Financial Consulting Services ("LCFCS") on October 19, 2020 (the "Sherman Report") of 100% of the stock of Bowers + Kubota Consulting, Inc. ("Bowers + Kubota", "B+KC" or "the Company") as of December 14, 2012, and prepare and issue this Rebuttal Report.

The Initial Report sets forth my valuation analysis of the fair market value of 100% of the stock of Bowers + Kubota, as of December 14, 2012. The Initial Report indicated a fair market value of $43,050,000, or $43.05 per share for the Company. The fair market value in the Initial Report is consistent with valuation analyses prepared by Libra Valuation Advisors, Inc. ("LVA") as of the same date in connection with the acquisition of 100% of the issued and outstanding Bowers + Kubota capital stock from trusts controlled by Brian J. Bowers ("Mr. Bowers") and Dexter C. Kubota ("Mr. Kubota") by the Bowers + Kubota Employee Stock Ownership Plan and Trust (the "B+KC ESOP") on December 14, 2012, for $40,000,000, or $40.00 per share (the "Transaction"), and an analysis designated as a Restricted Use Report prepared by GMK Consulting, LLC ("GMK") on May 9, 2012.

By contrast, the Sherman Report grossly understates the fair market value of 100% of the issued and outstanding capital stock of Bowers + Kubota at $26.95 per share. The primary causes of this understatement of fair market value are as follows:

- A flawed analysis of Bowers + Kubota's historical earnings

- Making arbitrary and unsupported downward adjustments to the Company's management's projections of future earnings

- Incorrect application of a minority interest discount to valuation indications that already reflect minority interests (the guideline public company method and discounted cash flow method)

- Failure to account for the incremental value of holding 100% voting control over the Company compared to a minority interest

- Reliance on an unsolicited and non-binding "indication of interest" from URS Corporation as an indication of fair market value

Each of these flaws in the Sherman Report is addressed in detail below.

### Assignment and Compensation

Counsel for Brian J. Bowers, Hawkins Parnell & Young LLP, has retained me to provide certain opinions as an expert concerning the Transaction.

My compensation for this assignment is at the hourly rate of $350.00 and related hourly charges of between $2,000.00 and $4,000.00 for assistance provided by employees of my firm Rusk O'Brien Gido + Partners LLC. My compensation is not contingent upon my conclusions or the outcome of this Litigation.

### Summary of Qualifications and Experience

The opinions expressed are based on my twenty-two years of experience personally conducting business appraisals and providing merger and acquisition and ESOP advisory services for hundreds of architecture, engineering and environmental consulting firms, large and small, throughout the U.S. and abroad with a focus on business valuation / appraisal, ownership planning, ESOP advisory services, mergers & acquisitions, and strategic planning. Attached hereto as Exhibit A is my curriculum vitae.

### Testimony During Last Five Years

*McDonough Associates, Inc. David Leibowitz, Chapter 7 Trustee of McDonough Associates, Inc., Plaintiff, v. Bowman International, Inc. f/k/a/ Bowman International, LLC and Bowman Consulting Group, Ltd.*, U.S. District Court, Northern District of Illinois, Case No.15 C 3021; Deposition date April 25, 2016.

### Publications During Last 15 Years

I have been a contributing editor and co-author of the following publications in the last 15 years:

- *The Valuation Survey of A/E/P and Environmental Consulting Firms*, (2003 through 2009 editions) ZweigWhite (Natick, MA)

- *The Insider's Guide to Ownership Transition Planning*, ZweigWhite (Natick, MA)

- *The A/E Business Valuation and Merger & Acquisition Transactions Study*, (2014 – 2019 editions), Rusk O'Brien Gido + Partners, LLC (Sudbury, MA)

- *2015 A/E Ownership Transition Study*, Co-published by Practice Lab, Inc. and Rusk O'Brien Gido + Partners, LLC (Sudbury, MA)

**Documents Considered**

I reviewed and considered the following documents in issuing this Rebuttal Report:

The Expert Report of Steven J. Sherman, ASA, CPA, October 19, 2020 (the "Sherman Report").

<u>Internal Sources:</u>
1. Documents produced in discovery in this Litigation by Robert H.Y. Leong & Company, CPAs ("RHYL"), including, including, without limitation:
    a. Combined B+KC Financial Statements for 2010 (RHYL000549-000587);
    b. Combined B+KC Financial Statements for 2011 (RHYL000588-000679);
    c. B+KC ESOP transaction documents, dated December 14, 2012 (RHYL000207-RHYL000548);
    d. RYHL Permanent File (RHYL000001-000206);
    e. RYHL Work Papers 2008 (RHYL001155-001490);
    f. RYHL Work Papers and B+KC Tax Returns for 2009 (RHYL001491-001781);
    g. RYHL Work Papers and B+KC Tax Returns for 2010 (RHYL001782-002120);
    h. RYHL Work Papers and B+KC Tax Returns for 2011 (RHYL002121-002435);
    i. RYHL Work Papers and B+KC Tax Returns for 2012 (RHYL002436-002855)
2. Interim financial statements for the Company for eight months ended August 31, 2012, prepared by RYHL (RHYL000680-000836);
3. Pro forma financial statements for the Company prepared by management on December 6, 2012, for the projected fiscal year ended December 31, 2012 (LIBRA-DOL INV 004976-004980);
4. Supporting contract backlog report prepared by the Company's management on December 6, 2012 (LIBRA-DOL INV 004975, 004982-004985);
5. Amended and Restated Articles of Incorporation for B+KC (RHYL000359-000365);
6. Amended and Restated By-laws for B+KC (RHYL000366-000379);
7. Federal and state (Hawaii) corporate tax returns for FY 2009 – 2011 for the Company (RHYL001491-002435);
8. Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan document (Effective as of January 1, 2012) (RHYL000213-000321);
9. Bowers + Kubota Consulting, Inc. Employee Stock Ownership Trust Agreement (RHYL000313-000321);
10. Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan Summary Plan Description (RHYL000322-000352);
11. Bowers + Kubota Consulting, Inc. Resolutions of Board of Directors By Unanimous Written Consent Without a Meeting (RHYL000353-000354);
12. Joint Action of the Directors and Shareholders of Bowers + Kubota Consulting, Inc. (RHYL000355-000358);
13. ESOP Stock Purchase Agreement, dated December 14, 2012, with Exhibits (RHYL000380-000464);
14. Bowers + Kubota Consulting, Inc. Stock Appreciation Rights Plan (draft) (RHYL000005-000023);
15. The documents and correspondence produced during discovery set forth in LIBRA-DOL INV 004340-005612;
16. Teleconference interviews conducted with the Company's senior management team on October 29, 2020;
17. Employment Agreement of Brian J. Bowers, dated December 14, 2012 (RHYL000445-000454);

18. Employment Agreement of Dexter C. Kubota, dated December 14, 2012 (RHYL000455-000464);
19. Restricted Use Report prepared by GMK Consulting, Inc. on May 9, 2012 (Bowers/Kubota 007203-007214);
20. DOL Exhibit 515, URS Corporation Indication of Interest, dated December 3, 2011; and
21. Deposition Transcript of Brian J. Bowers as the Section 30(b)(6) Representative of the Company, dated October 13, 2020 (pages 1-4; 19-82 and 110-118).

External Sources:
22. The Bureau of Economic Analysis (U.S. Department of Commerce) < http://www.bea.gov/>;
23. Federal Reserve Board's Summary of Commentary on Current Economic Conditions ("The Beige Book"), prepared by the Richmond District, November 28, 2012; http://www.federalreserve.gov/monetarypolicy/beigebook/beigebook201301;
24. State of Hawai'i, Department of Business, Economic Development & Tourism, *Quarterly Statistical & Economic Report*, 3rd Quarter 2012;
25. IBISWorld, *Engineering Services—U.S. Industry Report,* Industry Code: *54133, December 2012;*
26. IBISWorld, *Architects in the U.S. Industry Report,* Industry Code: *54131, August 2012;*
27. Architectural Billings Index, The American Institute of Architects (Washington, DC), http://www.aia.org/;
28. United States Federal Reserve Statistical Release, Selected Interest Rates, http://federalreserve.gov/Releases/H15/update/;
29. Duff and Phelps' *2012 Risk Premium Report;*
30. FactSet Mergerstat, LLC, 2012 *Control Premium Study;*
31. Business Valuation Resources, DealStats (formerly Pratt's Stats) http://www.bvmarketdata.com;
32. ZweigWhite's *2012 Financial Performance Survey of Architecture, Engineering, Planning & & Environmental Consulting Firms* (Natick, MA);
33. Yahoo!® Finance;
34. Capital IQ (Standard & Poor's); and
35. IRS Revenue Ruling 59-60, 1959-1 CB 237—IRC Sec. 2031

## Opinions

I continue to hold the opinions expressed in the Initial Report and I have formed additional opinions based on my review and analysis of the Sherman Report. My additional opinions are as follows: The Sherman Report grossly understates the fair market value of 100% of the issued and outstanding capital stock of the Company at $26.95 per share. The primary causes of this understatement of value are as follows:

- A flawed analysis of Bowers + Kubota's historical earnings;

- Making arbitrary and unsupported downward adjustments to management's projections of the Company's future earnings;

- Incorrect application of a minority interest discount to valuation indications that already reflect minority interests (the guideline public company method and discounted cash flow method);

- Failure to account for the incremental value of holding 100% voting control over the Company compared to a minority interest; and

- Reliance on an unsolicited and non-binding "indication of interest" from URS Corporation as an indication of fair market value.

4

Through a combination of downward adjustments to both the Company's current and projected earnings, unwarranted discounts for lack of control, and failure to account for the value of the 100% voting block of the Company's capital stock that the B+KC ESOP purchased, the Sherman Report substantially understates the fair market value of Bowers + Kubota on December 14, 2012.

### Incorrect Analysis of Bowers + Kubota's Historical Earnings

The Sherman Report criticized the trustee's and independent fiduciary's independent appraiser, LVA, for its use of pro forma 2012 EBITDA levels provided by the Company's management, stating, "LVA assumed historical EBITDA for 2012 was in excess of $9 million which was not supported by historical results". The Sherman Report substituted an EBITDA for 2012 of less than $5 million without justification for this material and unsupported substitution that has no basis in fact and was not known or knowable on December 14, 2014.[1]

In its application of the guideline public company method and guideline merged and acquired company method, the Sherman Report developed a hypothetical fiscal year 2012 EBITDA for Bowers + Kubota of $4,849,000 by adding to the eight months ended August 31, 2012, EBITDA four months of fiscal year 2011 EBITDA using a straight monthly average of the full 2011 fiscal year EBITDA, and without adjusting the 2011 EBITDA to remove the owners' shares of incentive bonuses. This hypothetical approach to valuation substantially understates the 2012 pro forma EBITDA for the Company due to the use of earnings from 2011, which was an atypically low profit year for the Company, and the failure to adjust 2011 EBITDA to remove the owners' bonuses.

Adjusting EBITDA to remove the owners' share of incentive bonus expense is necessary because Mr. Bowers and Mr. Kubota had executed employment agreements in the Transaction that dictated that the Company would pay bonuses to them only in years in which earnings exceeded the Company's projections, and that those bonuses would be limited to 10% of the Company's earnings in excess of projections.[2]

The Sherman Report dismissed management's pro forma fiscal year 2012 income statement as not supported by historical results. In fact, the Company had achieved a similar level of earnings in 2010 and earnings were trending upward through August of 2012. The table below shows historical EBITDA levels after adjustments to remove Mr. Bowers' and Mr. Kubota's (the "owners'") share of incentive bonuses and the profit-sharing contributions that the Company determined would not be continuing following the adoption of the B+KC ESOP.

**Adjusted EBITDA**

| Fiscal Year FY 2008 | Fiscal Year FY 2009 | Fiscal Year FY 2010 | Fiscal Year FY 2011 | Annualized YTD 8/31/12 | Pro Forma FY 2012 |
|---|---|---|---|---|---|
| $3,473,698 | $3,303,276 | $8,531,717 | $4,022,277 | $9,737,094 | $9,124,434 |
| 27.2% | 23.8% | 37.5% | 22.0% | 42.7% | 39.1% |

Furthermore, the Company's pro forma 2012 income statement was updated by management as of December 6, 2012, and was supported by a backlog of contracts in place totaling $54.4 million in net

---

[1] Expert Report of Steven J. Sherman, ASA, CPA, Page 5.
[2] Employment Agreements of Brian Bowers and Dexter Kubota, LIBRA-DOL INV 005584.

service revenue. As noted in the Initial Report, the Company's backlog represented over 26 months of projected revenue. This is an extraordinarily high level of backlog relative to projected revenue. The industry median backlog according to ZweigWhite's *2012 Financial Performance Survey of Architecture, Engineering, Planning & Environmental Consulting Firms* (Natick, MA) was 5.5 months, and the upper quartile was 8.5 months. It was, therefore, perfectly reasonable and appropriate for LVA to rely upon the pro forma 2012 income statement for the Company provided by management.

Ignoring the Company's pro forma 2012 income statement provided by management renders the Sherman Report unreliable and simply hypothetical and not based in facts or reality. By substituting an incorrect 2012 EBITDA of less than $5 million, together with a making similarly unsupported downward adjustments to projected 2013 EBITDA (as detailed below) in the application of the guideline public company method and guideline merged & acquired company method, the Sherman Report has understated Company's equity value by approximately **24.4%**.

### Arbitrary and Unsupported Adjustments to Management's Financial Projections for the Company

Management provided detailed financial projections for the Company for fiscal years 2013 through 2017 that were entirely in keeping with the latest revenue and earnings trends for Bowers + Kubota, and strongly supported by contracts in place. In its analysis, the Sherman Report made arbitrary and substantial downward adjustments to management's earnings projections for the Company. These adjustments consisted of an upward adjustment to incentive bonuses, and an upward adjustment to pass-through subconsultant expenses. The net result of these adjustments was a reduction in projected EBITDA margins from an average of 33.5% of net service revenue, as projected by management, to 20.1% in the Sherman Report projection (far below the Company's historical profit margins).

Furthermore, the adjustments in the Sherman Report actually caused the Company's projected EBITDA levels to decrease as a percentage of revenue AND in dollar amounts over the five-year projection period, from $5.3 million in 2013 to $5.0 million in 2017, in spite of a $5.1 million actual increase in revenue projected over the same period. These adjustments appear to be engineered to drive down the Company's indicated value from the discounted cash flow model. We have analyzed these incorrect adjustments below.

<u>Incentive Bonus Adjustment</u>: The Sherman Report noted that the projected incentive bonuses in management's projections for the Company were lower as a percentage of gross revenue than historical bonuses, and, therefore, an upward adjustment was warranted. This analysis failed to consider that the primary reason for the lower projected bonuses was that the owners' bonuses, which had historically made up 49% to 68% of the Company's total bonuses, were to be based on a percentage of earnings only above the Company's projected earnings in accordance with the terms of the owners' employment agreements, as previously discussed.

The Sherman Report increased bonus expenses to 8% of gross revenue, arguing that a 4.7 percentage point reduction from the historical level of 12.7% was a more reasonable reduction in consideration of the formation of the B+KC ESOP as a new employee benefit. The historical level of 12.7% includes the owners' bonuses. When the owners' bonuses are removed, historical staff and management bonuses for the Company over the years 2008 through 2011 actually averaged 6.4% of gross revenue as illustrated below, not 12.7% as stated in the Sherman Report.

6

|  | FYE 2008 | FYE 2009 | FYE 2010 | FYE 2011 |
|---|---|---|---|---|
| Total Bonuses: | $2,743,000 | $2,777,000 | $2,966,000 | $3,129,000 |
| Owners Portion: | $1,865,000 | $1,718,000 | $1,440,000 | $1,570,000 |
| **Staff & Management Portion:** | $878,000 | $1,059,000 | $1,526,000 | $1,559,000 |
| **% of Gross Revenue:** | 5.8% | 6.9% | 5.6% | 7.3% |
| | | | **4-year Average:** | **6.4%** |

In fact, the Company's staff and management bonuses used in the management's projections are quite generous by almost any measure. According to the *2012 Financial Performance Survey of Architecture, Engineering, Planning & Environmental Consulting Firms,* the median bonus cost as a percentage of gross revenue in 2012 was 2.1% compared to 3.8% used in management's projections, and the median bonus cost as a percentage of total labor cost was 5.1%, compared to 10.9% of labor cost in management's projections.[3]

In summary, no upward adjustment to the Company's management's projected bonuses is warranted. By erroneously adding $7.0 million in bonus expense to management's projections, the Sherman Report has incorrectly understated the Company's equity value by **12.6%**.

"Engineering Consultants" Expense Adjustment: The Sherman Report mistakenly treated the expense category titled "subconsultants" as a direct labor cost of the Company—referring to this category as "engineering consulting" costs, lumping it together with payroll and bonus expense, and arguing that an upward adjustment in these expenses is warranted to bring the expenses in line with historical levels.[4] This reveals a misunderstanding by Mr. Sherman of the nature of this expense.

In the architecture, engineering & construction/program management industry, subconsultant expenses represent services outside of those provided by the contracting company. These expenses are typically accounted for separately from operating expenses and billed to the client for reimbursement in addition to the Company's professional fees. For this reason, subconsultant and reimbursable expenses are commonly referred to as "pass through expenses" as they have no impact on the Company's earnings (unless the company is allowed to charge an administrative mark-up, which was not the case with Bowers + Kubota). Firms in the same industry typically focus on net service revenue (gross revenue less subconsultant and reimbursable expenses) when calculating performance metrics or developing projections.

Bowers + Kubota based its projections on its contracted backlog of projects and expected monthly net service revenue billings on these contracts (i.e., net of subconsultant expenses). As subconsultant and reimbursable expenses would simply be passed through to the client without any administrative mark-up, the amount would have no bearing on earnings. Management of the Company included a flat $2 million per year assumption for subconsultant expenses in its projections. Bowers + Kubota management has described that this estimate was based on an average of historical subconsultant expenses over the years 2008 through 2011, adjusted to remove subconsultant expenses associated with two large Army Corps of Engineers design projects as no such projects were anticipated over the projection period.

---

[3] 2012 Financial Performance Survey of Architecture, Engineering, Planning & Environmental Consulting Firms, ZweigWhite (Natick, MA).

[4] Expert Report of Steven J. Sherman, ASA, CPA, Page 24.

7

But the projected level of subconsultant expenses is irrelevant due to the fact that if a project required additional subconsultant services the fees for these services would be "passed through" to the client, there would be a corresponding increase in gross revenue, and projected earnings would be unchanged.

By erroneously adding $10.5 million in subconsultant expenses without making a corresponding upward adjustment to gross revenue, the Sherman Report has understated Company's equity value by another **19.7%**.

We have restated the Sherman Report's application of the discounted cash flow valuation method, removing the unwarranted adjustments to bonuses and subconsultant expenses, but keeping all other assumptions used by the Sherman Report unchanged. As illustrated below, the resulting equity value is $41.38 million, or **$41.38 per share**.

**Sherman Report Discounted Cash Flow Model (corrected)**

|  | 17 Days Ended 12/31/2012 | FYE 12/31/2013 | FYE 12/31/2014 | FYE 12/31/2015 | FYE 12/31/2016 | FYE 12/31/2017 | Terminal Year |
|---|---|---|---|---|---|---|---|
| LCFCS's EBIT Projection | $281 | $5,272 | $5,267 | $5,226 | $5,141 | $5,005 | $5,218 |
| Remove Bonus Adj. | NA | $1,027 | $1,078 | $1,132 | $1,189 | $1,248 | $1,286 |
| Remove Subconsultant Exp. Adj. | NA | $1,332 | $1,498 | $1,673 | $1,857 | $2,050 | $2,111 |
|  | $281 | $7,631 | $7,843 | $8,031 | $8,187 | $8,303 | $8,615 |
| Less Tax (@ 38.2%) | ($107) | ($2,915) | ($2,996) | ($3,068) | ($3,127) | ($3,172) | ($3,291) |
| After Tax Profit | $174 | $4,716 | $4,847 | $4,963 | $5,060 | $5,131 | $5,324 |
| Plus Depreciation | $9 | $200 | $210 | $221 | $232 | $243 | $188 |
| Working Capital Adj. | ($73) | $288 | ($64) | ($67) | ($71) | ($74) | ($47) |
| Less Capital Exp's | ($6) | ($150) | ($158) | ($165) | ($174) | ($182) | ($188) |
| Free Cash Flow | $104 | $5,054 | $4,835 | $4,952 | $5,047 | $5,118 | $5,277 |
|  |  |  |  |  |  | Terminal Value | $43,078 |
| Present Value | $103 | $4,680 | $3,885 | $3,452 | $3,053 | $2,686 | $21,061 |
|  |  |  |  |  |  | Sum of Present Values: | $38,921 |
|  |  |  |  |  |  | Plus Excess Cash: | $1,890 |
|  |  |  |  |  |  | Plus Marketable Securities: | $3,439 |
|  |  |  |  |  |  | Plus LLC Investments: | $249 |
|  |  |  |  |  |  | Marketable Minority Interest Value: | $44,499 |
|  |  |  |  |  |  | Less Discount for Lack of Marketability (@ 7%): | ($3,115) |
|  |  |  |  |  |  | Non-marketable Minority Interest Value: | $41,384 |

### Incorrect Application of a Minority Interest Discount to Valuation Indications That Already Reflect Minority Interests

The application of control premiums and discounts for lack of control in the Sherman Report are internally inconsistent, not supported by empirical data, and not supported by the facts of Transaction.

In the guideline public company method, the Sherman Report applied a 5% control premium to the resulting fair market value—acknowledging that this valuation approach "is based on public company

8

shares which are traded on a non-controlling basis".[5] But, curiously, the Sherman Report then deducted a 10% minority interest discount from the overall concluded value, revealing a significant internal inconsistency in the Sherman Report's valuation analysis.[6]

In the discounted cash flow method, the Sherman Report chose not to apply a control premium in spite of the fact that this method uses rates of returns observed in the publicly traded stock market to discount projected cash flows to their present value, and, therefore, produces a minority interest valuation indication, just as the guideline public company method does. Furthermore, the Sherman Report subsequently applied a 10% minority interest discount to its valuation indication that was already based on a minority interest valuation indication.

The Sherman Report took indicated values that already reflected minority interests, and discounted them as if they had reflected controlling interests, rendering the valuation analysis included in the Sherman Report to be fundamentally and fatally flawed, unreliable and not based upon facts known or knowable on the date of the Transaction.

### Failure to Acknowledge the Incremental Value of Holding 100% Voting Control Over the Company (as Opposed to a Minority Interest)

The Sherman Report effectively valued a 100% block of stock, with complete voting control, on the same basis as it would have valued a single share of stock representing 0.1% voting power. This ignores a fundamental concept in business valuation—that on a per share basis, a block of stock that conveys to the owner a level of control, is worth more than a block of stock that represents a minority interest. This concept is supported by numerous studies and market observations, as cited in the Initial Report that I incorporate here by this reference.[7]

The Sherman Report justified its decision to treat a 100% interest in Bowers + Kubota as a minority interest by citing the fact that the Company's President, Brian J. Bowers, and Vice President, Dexter C. Kubota, retained control of the Company by virtue of continuing in their roles as executives of the Company and its directors, stating, "Post-transaction the Company was governed and operated in effectively the same manner it had been pre-transaction".[8]

This statement ignores the fact that Bowers + Kubota was an exceptionally profitable and growing firm. As detailed in the Financial Performance & Condition section of the Initial Report and summarized in the table below, the Company was outperforming its peers in almost every measure. For an ESOP trustee to jeopardize this performance by making unwarranted changes to the corporate governance or management of the Company simply for the sake of exercising its powers of control could be construed as a breach of its ERISA fiduciary duty. Rather than focusing on hypothetical actions that the B+KC ESOP trustee elected NOT to take, Mr. Sherman should have simply acknowledged and accounted for the fact that Messrs. Bowers and Kubota did convey 100% voting control to the B+KC ESOP, with all the associated powers under the Company's articles of incorporation and by-laws.

The following table is excerpted from my Initial Report and details key financial performance metrics for the Company and comparisons to median and top quartile metrics for the industry.[9]

---

5 Expert Report of Steven J. Sherman, ASA, CPA, Page 69.
6 Expert Report of Steven J. Sherman, ASA, CPA, Page 66.
7 Expert Report of Ian C. Rusk, ASA, CM&AA, Page 23.
8 Expert Report of Steven J. Sherman, ASA, CPA, Page 35.
9 Expert Report of Ian C. Rusk, ASA, CM&AA, Page 21.

| Key Financial Statistics | FY 2008 | FY 2009 | FY 2010 | FY 2011 | Pro forma 2012 | *Industry Median** | *Industry Top Q** |
|---|---|---|---|---|---|---|---|
| Discretionary Pre-tax Profit Margin | 31.0% | 30.2% | 43.5% | 30.2% | 42.4% | *8.9%* | *15.4%* |
| Revenue factor | 2.36 | 2.24 | 2.69 | 2.20 | 2.53 | *1.75* | *1.90* |
| Overhead rate | 0.64 | 0.56 | 0.53 | 0.55 | 0.47 | *1.74* | *1.55* |
| Average AR collection period | N/A | N/A | 39 | 84 | N/A | *73* | *56* |
| Current ratio | 0.67 | 0.99 | 1.80 | 2.11 | N/A | *2.1* | *3.43* |
| Total liabilities to equity | 0.59 | 0.57 | 0.86 | 0.70 | N/A | *1.1* | *0.5* |
| Interest-bearing debt to equity | 0.00 | 0.00 | 0.00 | 0.00 | N/A | *0.1* | *0.0* |

*Industry comparison data is from ZweigWhite's *Financial Performance Survey of Architecture, Engineering & Environmental Consulting Firms* (Natick, MA) and represents median an top quartile statistics

In the Initial Report, I examined various studies of the value of holding a controlling interest. These studies included the *BVR Factset Mergerstat Control Premium Study*, which measures the premiums paid in merger & acquisition transactions, and various dual class capitalization studies, which analyze the implied incremental value of voting rights in publicly traded companies. These studies indicate that the premium associated with the value of control can be as high as 42% in strategic acquisitions, and that shares of stock with voting rights command an average premium of approximately 5% over non-voting shares. This suggests that the 100% block of stock being valued should warrant a premium of at least 5%.

The combination of the failure to account for the voting control, together with the misapplication of minority interest discounts previously discussed results in an understatement of the Company's value in the Sherman Report of **14.3**%.

### Reliance on an Unsolicited "Indication of Interest" from URS Corp.

The Sherman Report cited an unsolicited "indication of interest" (that was not based on due diligence, a site visit of the Company, or any real significant interaction with and information from the Company's management) from a national engineering firm—URS Corporation—as a data point that should have been considered and "reconciled" in LVA's valuation analysis, and suggests that Bowers + Kubota had actively marketed itself for sale and "…dedicated time and resources seeking bids from companies in its sector such as Jacobs Engineering Group, Parsons Corporation, and URS Corporation ('URS')", which is not factually accurate.[10]

In fact, the Company had not actively marketed itself for sale. The Company's initial contact with URS involved preliminary discussions of a teaming arrangement to pursue projects in Hawaii—a very common way for companies in the engineering industry to secure large public sector contracts. Furthermore, the indication of interest from URS, which was non-binding, was executed prior to conducting financial due diligence or a comprehensive valuation analysis of the Company, and was ultimately not pursued.[11]

An unsolicited, non-binding indication of interest is not a valid data point for an independent appraiser to consider as it does not constitute a transaction. Furthermore, the URS indication of interest was not the product of an organized effort to market the Company for sale, and the price and terms had not been reviewed in due diligence or negotiated. The URS indication of interest expressly states that "it does not constitute an offer or a commitment on URS Corporation's part to submit a definitive proposal for the acquisition of the Company." For these reasons, the URS indication of interest cannot be relied upon as a representation of the Company's fair market value, and it would

---

[10] Expert Report of Steven J. Sherman, ASA, CPA, Pages 5 & 9.

[11] Deposition of Brian Bowers, B+K 30(b)(6).

not have been appropriate for LVA to consider it in any way. For these reasons, and given the failure of the Sherman Report to address how its conclusion was influenced by the URS indication of interest renders the conclusions therein unreliable.

## Summary

Through a combination of downward adjustments to both the Company's current and projected earnings, unwarranted discounts for lack of control, and failure to account for the value of the 100% voting block of stock being transacted, the Sherman Report significantly understates the fair market value of Bowers + Kubota on December 14, 2012.

I reserve the right to expand or modify these opinions as additional information becomes available.

Sincerely,

Ian C. Rusk, ASA
Managing Principal
**Rusk O'Brien Gido + Partners, LLC**

**Exhibit A**

**Ian C. Rusk, ASA**
**Managing Principal**

For over twenty years Ian has personally worked with hundreds of architecture, engineering and environmental consulting firms, large and small, throughout the U.S. and abroad with a focus on business valuation / appraisal, ownership planning, ESOP advisory services, mergers & acquisitions, and strategic planning. Prior to co-founding Rusk O'Brien Gido + Partners, Ian served as a principal in the financial advisory services group of the A/E consulting, research and publishing firm ZweigWhite.

Ian's experience includes conducting business valuations/appraisals for a variety of purposes, including internal ownership planning, merger & acquisition due diligence, litigation support and ESOP transaction & administrative purposes. He has worked with firms in almost every state in the U.S., as well as firms in Canada, Australia, the Caribbean, and the Middle East. Altogether, he has performed over 500 business appraisals of companies in the architecture, engineering and environmental consulting industries. Over 200 of these appraisals have been conducted for ESOP purposes, including annual administrative appraisals, new ESOP formations, and ESOP transaction fair market value and fairness opinions and related valuation reports.

His experience with mergers & acquisitions includes assisting both buying and selling clients through the process of acquiring a firm, or selling their firm. These services include initial strategic planning, researching the pool of potential candidates, conducting valuation analysis, initiating discussions between parties, assisting with due diligence, and advising clients during the negotiation process right through to the closing.

Ian is a professionally trained and accredited business appraiser and holds the Accredited Senior Appraiser (ASA) designation with the American Society of Appraisers. He also holds the Certified Merger & Acquisitions Advisor (CM&AA) certification from the Alliance of Merger & Acquisition Advisors. Professional affiliations include membership in the National Center for Employee Ownership (NCEO) and the ESOP Association.

Ian has conducted numerous seminars on the topic of business valuation for such organizations as Business Valuation Resources (BVR), the American Council of Engineering Companies (ACEC), the American Institute of Architects (AIA), and others. He was a contributing editor and co-author of the following publications:

- *The Valuation Survey of A/E/P and Environmental Consulting Firms*, (2003 through 2009 editions) ZweigWhite (Natick, MA)
- *The Insider's Guide to Ownership Transition Planning*, ZweigWhite (Natick, MA)
- *The A/E Business Valuation and Merger & Acquisition Transactions Study*, (2014 – 2019 editions), Rusk O'Brien Gido + Partners, LLC (Sudbury, MA)
- *2015 A/E Ownership Transition Study*, Co-published by Practice Lab, Inc. and Rusk O'Brien Gido + Partners, LLC (Sudbury, MA)

Ian received his Master of Business Administration (MBA) with a concentration in finance and entrepreneurship from the F.W. Olin Graduate School of Business at Babson College in Wellesley, Massachusetts (1999) and a Bachelor of Arts (BA) degree in Economics from Tufts University in Medford, Massachusetts (1989).