# Exhibit "11"

# UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| EUGENE SCALIA,<br>Secretary of Labor, U. S. Department of Labor,<br><br>  Plaintiff,<br><br>VS.<br><br>SHARON L. HERITAGE, an individual; NICHOLAS L. SAAKVITNE, A LAW CORPORATION, a California corporation; BRIAN J. BOWERS, an individual; DEXTER C. KUBOTA, an individual; BOWERS + KUBOTA CONSULTING, INC., a corporation;<br>BOWERS + KUBOTA CONSULTING, INC. EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>  Defendants. | No. 1:18-cv-155 |

## REPORT OF HOWARD L. KAPLAN
### NOVEMBER 30, 2020

## I.   INTRODUCTION

### A.   BOWERS + KUBOTA CONSULTING, INC. and the BOWERS + KUBOTA CONSULTING, INC.  ESOP

On December 14, 2012, the Bowers + Kubota Consulting, Inc. ("B+K") Employee Stock Ownership Plan ("ESOP") acquired 1,000,000 shares of the Bowers + Kubota Consulting, Inc. common stock from the Brian J. Bowers Trust (the "Bowers Trust") and the Dexter C. Kubota Trust (the "Kubota Trust") in exchange for notes in the amount of $20,400,000 to the Bowers Trust

and $19,600,000 to the Kubota Trust (the "Transaction"). The ESOP and Trust agreements were executed on December 14, 2012, and were retroactively effective as of January 1, 2012.

Nicholas L. Saakvitne ("Saakvitne") was appointed the trustee of the ESOP for purposes of the Transaction to ensure that the ESOP's purchase of the B+K stock was fair from a financial viewpoint to the ESOP. Saakvitne was retained on or about November 26, 2012, and continued to serve as the trustee of the ESOP after the Transaction until October 2, 2018, the date of Saakvitne's death.

### B.    REPORT

I am familiar with the practices followed by independent ESOP trustees for special transactions in which an ESOP buys or sells employer stock. The purpose of this report is to provide my analysis regarding whether Saakvitne's actions in connection with the Transaction were consistent with the practices followed at the time of the Transaction by experienced ESOP trustees in determining whether to enter the Transaction.

In addition, I was asked to share my opinions regarding the report of Mark Johnson dated October 19, 2020.

### C.    DOCUMENTS AND LAWS REVIEWED

In connection with my conclusions expressed in this report, I reviewed materials made available by Morgan, Lewis & Bockius LLP, and the documents used to form the principal basis for my conclusions are listed in the Addendum.

### D.    EXPERIENCE

#### 1.    EMPLOYMENT.

I am the owner of the Kaplan Financial Group LLC dba Kaplan Fiduciary Group, an independent firm focused on providing consulting services to fiduciaries of ESOPs and other qualified employer plans holding employer securities. I am located in greater Atlanta, Georgia.

Prior to starting Kaplan Fiduciary, I held several relationship and management positions as an employee of trust companies and banks providing fiduciary services to qualified plans, including ESOPs and other retirement plans holding employer securities. I have worked in the institutional and retirement plan trust business for over 30 years in varied trust officer positions, from sales to consulting to management, and spent more than half that time working with ESOPs and employer securities. Attached hereto as EXHIBIT A is my resume.

2.    <u>PROFESSIONAL ACTIVITIES AND LECTURES</u>.

I am an active member of The ESOP Association ("TEA"), the National Center for Employee Ownership ("NCEO"), and until recently, a member of the Employee-owned S Corporations of America ("ESCA"). For TEA, I currently serve on the Fiduciary Committee and previously served on the Valuation Committee, the Legislative and Regulatory Committee, and the Ownership Culture Committee. I am a regular speaker on fiduciary topics at TEA and NCEO conferences and a frequent special guest instructor at the Beyster Institute, Rady School of Management at University of California, San Diego.

3.    <u>TESTIMONY</u>.

I have been engaged as a consulting expert on four other matters, and I have been deposed twice and have testified in court once. My billing rate for work on this matter is $500 per hour ($600 per hour for deposition and testimony).

## II.    **EMPLOYEE STOCK OWNERSHIP PLANS**

### A.    **BRIEF OVERVIEW**

- ESOPs were created primarily to drive employee ownership
- ESOPs have been very successful and significantly increased employee wealth and retirement benefits
- ESOP trustees are appointed to act in good faith and protect the interest of ESOP participants and beneficiaries
- ESOP trustees use professional skill and prudence
- ESOP trustee practices have adapted over time

To properly evaluate fiduciary actions in the context of an ESOP, it is important to understand the history of ESOPs and Congress's intent to promote employee ownership. I will discuss the reasons for the popularity of ESOPs today. I will also put into context governance practices and the responsibilities of corporate entities, and the ERISA-governed fiduciary duties of managing and controlling an ESOP.

### B.    **GENERAL BACKGROUND**

ESOPs are qualified defined-contribution employee benefit plans designed to invest primarily in the employer's stock and enable employee-participants to own shares of the company in which they work. ESOPs are qualified in the sense that the company, the selling shareholder, and participants receive tax benefits.

Beginning in the 1950s, Louis B. Kelso, a lawyer and economist who pioneered the use of ESOPs as a form of corporate ownership, became concerned about the concentration of stock ownership (capital) among the wealthy and the fact that most Americans were providers of labor. Kelso believed that "[l]abor is the source of subsistence, capital is the source of affluence. My idea is to make everyone a capitalist, and therefore, financially secure." He emphasized that Employee Stock Ownership (ESO) financing was designed to provide financing for a company and make employees beneficial owners of the companies they worked for. Kelso created the first ESOP in 1956 to enable the employees of Peninsula Newspapers, a small business in northern California, to buy the company from its owners.

In the early 1970s, Kelso shared his ESOP concept with Senator Russell Long (D-LA) and sought the Senator's support for ESOP legislation. Senator Long embraced ESOPs and was instrumental in passing legislation supporting the creation of ESOPs, including the Employee Retirement Income Security Act ("ERISA"), passed by Congress in 1974. Senator Long believed that ESOPS could make "the have-nots into haves without taking away from the haves."[1]

Congress intentionally promoted the concept of employee ownership. In Senator Long's words, "[t]here are but three political-economic roads from which we can choose... We could take the first course and further exacerbate the already concentrated ownership of productive capital in the American economy. Or we could join the rest of the world by taking the second path, that of nationalization. Or we can take the third road, establishing policies to diffuse capital ownership broadly, so that many individuals, particularly workers, can participate as owners of industrial capital. The choice is ours."[2] Senator Long explained that an "ESOPs primary purpose, however, is not to serve as a retirement vehicle," but "an incentive for corporations to structure their financing in such a way that employees can gain an ownership stake in the company for which they work," and "providing retirement benefits for employees has always been a secondary purpose for the establishment of a stock bonus plan."[3]

The Tax Reform Act of 1976 explained as follows:

---

[1] NCEO, Employee Ownership, https://www.nceo.org/assets/pdf/misc/Employee-Ownership-NCEO.pdf?

[2] "Russell B. Long." AZQuotes.com. Wind and Fly LTD, 2020. 23 Nov. 2020. https://www.azquotes.com/quote/1128747

[3] 129 Cong. Rec. 33,821 (Nov. 17, 1983) (statement of Sen. Long proposing the Employee Stock Ownership Act of 1983); accord 90 Stat. at 1590.

4

"INTENT OF CONGRESS CONCERNING EMPLOYEE STOCK OWNERSHIP PLANS. The Congress, in a series of laws [including ERISA] has made clear its interest in encouraging [ESOPs] as a bold and innovative method of strengthening the free private enterprise system which will solve the dual problems of securing capital funds for necessary capital growth and of bringing about stock ownership by all corporate employees. The Congress is deeply concerned that the objectives sought by this series of laws will be made unattainable by regulations and rulings which treat [ESOPs] as conventional retirement plans, which reduce the freedom of the employee trusts and employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these plans."[4]

Congress included a key provision in ERISA, *see* 29 U.S.C. § 1104(a)(2), that exempts ESOPs from the requirement to diversify retirement assets. This is significant since ESOPs could not exist without such an exemption.

Today, ESOPs are being formed for the same purpose initially suggested by Kelso (i.e. Peninsula Newspapers) – to award the beneficial interest of equity to the managers and employees who helped build the business. According to the NCEO in 2018, the most recent year for which data is available, 279 new ESOPs were created, covering more than 37,000 participants. In total, there are approximately 6,416 ESOPs in the U.S., worth over $1.4 trillion. The number of unique ESOP companies is approximately 6,266 (a company may sponsor multiple plans).[5]

ESOP-owned companies do more than provide employees with wages and benefits; they provide employees the opportunity to accumulate significant wealth through stock ownership and help companies, keep the jobs they provide, in their local communities. Companies and employees receive attractive tax advantages. Selling shareholders create legacies as they share ownership with employees.

---

[4] Tax Reform Act of 1976, § 803(h), 90 Stat. 1590. Oct. 4, 1976.
https://www.finance.senate.gov/imo/media/doc/testimony1.pdf

[5] National Center for Employee Ownership, "Employee Ownership by the Numbers, Sept. 2020.
https://www.nceo.org/articles/employee-ownership-by-the-numbers.

### C.   THE S-CORPORATION ESOP

In 1997, Federal legislation made it possible for ESOPs to own shares in S-Corporations (S-ESOPs). Prior to that date, only companies organized as C-Corporations were permitted to establish ESOPs.

The S-Corporation is a "pass through" entity since no federal tax is imposed on corporate income. The S-Corporation's income is taxed on a pro-rata basis with the individual shareholder reporting the income on his or her individual income tax returns. *When an ESOP trust (a tax-exempt entity) is the shareholder of an S-Corporation, its pro-rata share of S-Corporation income is free from federal tax.* S-Corporations that are 100% ESOP-owned are tax-free. As ESOP participants and beneficiaries receive ESOP benefits distributed from the S-Corporation, they pay federal income tax on the value of such distributions, or may rollover the proceeds into an Individual Retirement Account ("IRA") to defer taxes further.

S-ESOPs account for a little more than half of all ESOPs today and most S-ESOPs own 100% of the stock.

*As stated, 100% S-ESOP-owned companies do not pay federal income tax.* Pre-S-ESOP companies would use cash to pay federal income tax, now the post-S-ESOP company uses cash to primarily pay for loans used to purchase employer stock (a "leveraged" ESOP), or other possible purposes such as making capital investments or funding acquisitions.

### D.   ESOP PARTICIPANTS ACCUMULATE SIGNIFICANT WEALTH

In a leveraged ESOP, the value of participant accounts grows rapidly in the early years after forming the ESOP. Unlike 401(k) plans, ESOPs are funded primarily through company discretionary contributions and do not require participant investment. When the company makes a discretionary contribution, the cash received by the ESOP trust is used to pay debt. As the debt is paid, encumbered shares held against the loan are released and allocated to the individual participant accounts. For example, the following table illustrates the percentage of shares in participant accounts if an ESOP borrows funds to be paid back over 10 years. As the debt is paid each year, 10% of the shares get released each year.



Coupled with earnings growth increasing the value of the company, the balance of the participant's account can grow rapidly.

In a December 2018 report titled "S Corporation ESOPs and Retirement Security", the NCEO details a survey of S-ESOP companies regarding individual account balance detail for over 61,000 participants.[6]  The following are the report's conclusions:

- S-ESOP participants represented in the report have more than *twice* the average total retirement balance of Americans nationally.

- 97% of the companies offered another retirement plan in addition to the ESOP.  In contrast, 32% of all workers do not have access to a retirement plan, and worse, 49% are not participating in the plan that is available to them.

- Among those surveyed, S-ESOP workers nearing retirement (ages 55-64) have on average a median account balance of $147,552 in the ESOP and another $98,974 in other non-ESOP retirement plans.   In contrast, approximately 35% of near retirement workers have neither retirement savings nor a defined benefit pension. This grows to over 50% among low-income workers below a median income of $40,000 in this age bracket.

- S-ESOPs offer higher benefits and lower turnover than other comparable companies.  Other studies over the past twenty years have been consistent and have concluded similarly:

---

[6] Nancy Wiefek, "S Corporation ESOPs and Retirement Security", Nancy Wiefek, Ph.D. and Nathan Nicholson, National Center for Employee Ownership (NCEO), Dec. 2018. https://www.nceo.org/assets/pdf/articles/NCEO-S-ESOPs-Retirement-Dec-2018.pdf

- ESOPs have been found to boost sales and productivity by more than 2% a year when compared to similar companies.[7]

- In the last recession, ESOP companies were only half as likely as non-ESOP firms to go out of business and are also less likely to lay people off.[8]

- Employees are also better compensated in ESOP companies than are employees in comparable non-ESOP companies, and they enjoy better benefits.[9]

- According to an NCEO study, on average ESOP companies contributed 75% more to their ESOPs than other companies contributed to their primary defined contribution plan.[10]

- In a 2020 recent report released by the Rutgers School of Management regarding majority-owned ESOPs and the 2020 pandemic, ESOPs retained jobs at a 4 to 1 ratio, far less likely to cut pay, and maintained standard hours and salaries at a significantly higher rate.[11]

It has been my experience that this research supports the positive impact ESOP-owned companies provide to their employees and communities.  Investments in any business includes risk, including ESOP investments in company stock, but the reason ESOP companies tend have

---

[7] Joseph Blasi, Douglas Kruse, and Dan Weltmann, "Firm Survival and Performance in Privately-Held ESOP Companies," Sharing Ownership, Profits, and Decision-Making in the 21st Century, Advances in the Economic Analysis of Participatory & Labor-Managed Firms, Volume 14, 2013, pp.109-124. https://www.nceo.org/article/key-studies-employee-ownership-and-corporate-performance

[8] Fidan Kurtulus, "How Did Employee Ownership Firms Weather the Last Two Recessions," Fidan Kurtulus and Douglas Kruse, Upjohn Institute, 2017 https://www.nceo.org/article/key-studies-employee-ownership-and-corporate-performance

[9] Peter Kardas "Wealth and Income Consequences of Employee Ownership: A Comparative Study of Washington State" Study Peter Kardas, Jim Keogh and Adria Scharf, Washington Department of Community, Trade, and Economic Development of the University of Washington 1998 https://www.nceo.org/article/research-employee-ownership

[10] Corey Rosen, "Retirement Security and Wealth Accumulation in S ESOP Companies," The National Center for Employee Ownership September 2005 http://esca.us/wp-content/uploads/2015/10/NCEO_STUDY.pdf

[11] Rutgers School of Management and Labor Relations, "Employee-Owned Firms in the Covid-19 Pandemic" (2020) https://cleo.rutgers.edu/articles/employee-owned-firms-in-the-covid-19-pandemic-how-majority-owned-esop-other-companies-have-responded-to-the-covid-19-health-and-economic-crises/

lower risk, and a lower default rate is that they perform better. Multiple studies show that ESOP-owned companies have stronger performances after establishing the ESOPs than before.[12]

E. **TYPES OF ESOP COMPANIES**

ESOP-owned companies exist in nearly every industry and across firms of many different sizes, yet these companies often exhibit similar characteristics:

- A history of an employee-focused corporate culture with a greater ratio of human resource related expenditures to revenues (i.e. wages and benefits).
- A history of with stable financial performance with less profit volatility.
- A track record of proven and steady leadership.

According to the NCEO, the largest majority employee-owned company by far is Publix Super Markets (Lakeland, FL), which has close to 200,000 employees and has been in Fortune's *100 Best Companies to Work For* every year since its inception in 1998.[13] Other notable ESOPs include WinCo Foods (Woodburn, OR), Amsted Industries (Chicago, IL), W.L. Gore and Associates (Newark, NJ), Davey Tree Experts (Kent, OH), and Robert W. Baird & Co. (Milwaukee, WI).[14]

ESOPs tend to be more prevalent in certain industries. The architectural, engineering and construction industries having a greater number of ESOP-owned companies, including Burns and McDonnell Engineering (Kansas City, MO), HDR, Inc. (Omaha, NE), Kleinfelder (San Diego, CA), Brown and Caldwell (Walnut Creek, CA), Parsons (Pasadena, CA), Schweitzer Engineering (Pullman, WA), Black & Veach (Overland Park, KS), Terracon (Olathe, KS), Austin Industries (Dallas, TX), and Performance Contracting, Inc (Lenexa, KS).[15]

Like Publix, employee-owned companies are proudly overrepresented on lists of "Best Places to Work" because, in addition to an ownership interest, they often foster a culture of trust and respect between employees and company leadership. According to Corey Rosen of the NCEO,

---

[12] NCEO, ''Default Rates on ESOP Loans, 2009-2013'' (2014). https://www.nceo.org/articles/default-rates-esop-loans-2009-2013
[13] Publix, http://corporate.publix.com/about-publix/newsroom/news-releases/publix-makes-fortunes-100-best-companies-to-work-for-23-straight-years
[14] National Center for Employee Ownership, "The Employee Ownership 100: America's Largest Majority Employee-Owned Companies," July 2020 https://www.nceo.org/articles/employee-ownership-100
[15] National Center for Employee Ownership, "The Employee Ownership 100: America's Largest Majority Employee-Owned Companies," July 2020. https://www.nceo.org/articles/employee-ownership-100

the "majority of companies that have stock on the *Great Place to Work Institute's 'Best 100 Companies to Work For'"* list have one or more broad-based employee ownership programs."[16]

F.   CORPORATE GOVERNANCE IN AN **ESOP** COMPANY

To understand how ESOP-owned companies operate in a business environment, it is important to understand how their corporate governance generally works.  Corporate governance is the process of allocating authority and responsibility among a company's shareholders, board of directors (the "Board") and management.

**Chart 1: Hierarchy of Corporate Governance**



This chart illustrates the hierarchy of authority in a typical domestic company with partial or complete ESOP ownership.  In a 100% ESOP-owned company, the ESOP trust is the sole shareholder. ESOP participants own a beneficial (or financial) interest in the trust.  The trustee of the ESOP is responsible for the voting rights of the trust which includes electing Board members.

It is the Board's responsibility to oversee the company and often delegate oversight functions in the form of Board committees. The Board appoints the CEO and his or her management team.  The CEO and management team are responsible for the day-to-day affairs of

---

[16] National Center for Employee Ownership, "Great Employee-Owned Workplaces," Dec. 2018. https://www.nceo.org/great-employee-owned-places-work/id/34/.

the corporation and overseeing employees.  Employees meeting specific eligibility requirements outlined in the plan documents become participants and enjoy a beneficial interest in the ESOP.

The typical Board responsibilities of ESOP-owned companies include growing shareholder value, setting corporate strategic goals and business strategy, appointing officers and Board committees, evaluating CEO and senior management team performance, determining compensation for CEO and senior management, evaluating and approving significant corporate transactions, reviewing corporate financial statements, facilitating succession planning, establishing corporate standards and conduct, and managing corporate risk.

Governance and Board roles for an ESOP-owned company are the same as that of any domestic corporation, however, ESOP-owned companies have unique considerations that non-ESOP companies do not.  ESOP-owned companies place more focus on employee education regarding ESOP provisions, have planning issues for the annual valuation of stock, must consider the impact of the annual repurchase obligation relating to participant stock, and have ongoing responsibility for appointing and monitoring ESOP fiduciaries.

Boards have a duty of care and a duty of loyalty to all company shareholders.  In making business decisions, Boards must exercise reasonable care in the decisions made on behalf of the company.  These include the following:

- Boards act in good faith for the benefit of the company and believe that the actions taken are in the company's best interest.

- Actions taken should be based on a reasonable investigation of options available within the time and financial constraints presented before making corporate decisions.

- Board members have a duty to refrain from self-dealing and may not act in their own best interest.  If a conflict exists and cannot be resolved, there should be a process in which those conflicted are removed from the decision process.

- Board decisions are inherently risky, so even if a Board strictly adheres to their fiduciary duties of care and loyalty, decisions could be made that impact a company negatively.

As mentioned, at an ESOP-owned company, it is the Board's responsibility is to appoint and monitor the trustee of an ESOP.  As important, it is the trustee's ongoing duty to monitor and vote for the Board.  These responsibilities of the parties are circular and ESOP company-boards

11

and management take this very seriously.  Although a rare occurrence, trustees can and do remove or replace Board members when circumstances warrant.  Boards also have removed trustees when needed as well, mostly replacing internal trustees for conflict.

      1.   <u>THE BOARD'S SETTLOR FUNCTIONS VS. ERISA FIDUCIARY RESPONSIBILITIES</u>

In most ESOP-owned companies, the Board maintains primarily settlor functions regarding the ESOP. A settlor (or "trustor") is the entity that establishes and grants a trust, and his or her role is to transfer control of an asset to a trustee who manages it for the trust's designated beneficiaries. Settlors make decisions to install benefit plans, design plan provisions, terminate existing plans, or amend plans.  Other common settlor functions of a Board include determining contributions to the ESOP, declaring dividends or distributions, and managing repurchase obligations (a unique corporate requirement to repurchase shares pursuant to participant distribution put rights).

As stated previously, all Boards owe duties of care and loyalty to the company stockholders.

ERISA imposes certain standards of fiduciary duties on ESOP trustees and other qualified employer plan fiduciaries:

a)   <u>Duty of Loyalty</u> – fiduciaries must discharge their duties solely in the interests of plan participants and beneficiaries.

b)   <u>Duty of Prudence</u> – fiduciaries must act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

c)   <u>Exclusive Purpose</u> – fiduciaries must act for the exclusive purpose of providing benefits to participants and their beneficiaries and to defray the reasonable expenses of administrating the plan.  The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries in defraying reasonable expenses as administering the plan.

d)   <u>Duty to Diversify</u> - ERISA imposes a duty to diversify plan investments but exempts ESOP fiduciaries from that requirement.

ERISA defines the term "fiduciary" to include any person who:

- exercises any discretionary authority or discretionary control over the management of a plan;
- exercises any authority or control over the management or disposition of the plan's assets;
- renders investment advice for a fee; or
- has any discretionary authority or responsibility in the administration of the plan.

The determination of fiduciary status is made on a de facto basis and is based on a person's function, not title.

As a result, a plan can have more than one fiduciary and individuals may be limited in their respective fiduciary roles, generally:

a) A <u>Board</u> uses its discretionary role to delegate responsibilities to the Plan Administrator, Trustee and/or Investment Manager.  As the "appointing" fiduciary, this role is typically limited to selecting and monitoring the actions of the fiduciaries the Board appoints.

b) The <u>Plan Administrator</u> (or Plan Sponsor or Named Fiduciary) has the discretion over the management of the plan and the authority and responsibility in the administration of the plan.

c) The <u>Trustee</u> has the authority and control over the management of the Plan Trust.

d) The <u>Investment Manager</u> can be delegated authority and control over management of certain plan assets and renders investment advice for a fee.

The engagement of an Investment Manager for an ESOP is rare and occurs when there is non-company stock and/or cash investments in the trust.  Since fiduciary status is defined by function, not title, I will share the typical functions of the Plan Administrator and the Trustee.

2.  <u>PLAN ADMINISTRATOR</u>

The Plan Administrator (or Plan Sponsor) is the named fiduciary in the plan document and has discretionary authority to manage and administer the ESOP.  This is often an administrative (or ESOP) committee.

The Plan Administrator or committee interprets provisions of the plan, allocates contributions, maintains separate accounts for participants, furnishes participant statements and ensures statements are error-free.  It also prepares and files required returns, reports, notices, and

disclosures, as well as adopts a distribution policy and applies it in a uniform and non-discriminatory manner.  This includes:

    a) Determine the method and timing of participant distributions.

    b) Direct the trustee with respect to payment and applicable tax withholding of distributions.

    c) Pay reasonable plan expenses.

    d) Direct the segregation of assets.

    e) Adopt an investment policy for non-employer stock assets.

    f) Interpret and determine benefits under the plan and establishes a claims procedure.

    g) Hire advisors such as auditors, attorneys, third-party administrative service providers and other advisors.

    3. <u>ESOP TRUSTEE</u>

The trustee's duties and obligations are defined in a trust agreement.  The trustee has the authority and the control over the assets of the ESOP trust and holds title and custody of trust assets for the beneficial interest of the plan's participants and beneficiaries.  In general, the functions of the trustee include managing the ESOP's investments, determining annual value for plan assets, including employer stock, and exercising the ESOP's shareholder.  A trustee may:

    a) Vote the ESOP's shares for/against directors.

    b) Use discretion regarding approval of certain transactions or other extraordinary issues, unless delegated to another fiduciary.

    c) Question, seek clarification, raise objections and challenge the actions and decisions of management.

    d) Obtain financial statements from the company with sufficient information. to make informed decisions.

    e) Attend shareholders' meeting and demand special meetings if needed.

    f) Engage experts as needed, including legal and financial advisors.

    g) Exercise control in a discretionary manner at any time deemed necessary.

Through his or her voting right, the trustee shall use its discretion to replace directors, increase or decrease the size of a Board, change executive management and operations, alter corporate strategy or the entire corporate organization, and even sell a company.

An ESOP trustee will monitor the board and be knowledgeable regarding the board's decisions on important ESOP-related matters, such as repurchase liability, significant corporate transactions (e.g., acquisition of target), and executive compensation.

ESOP trustees may periodically manage the *pass-through* voting to participants for a sale of all or substantially all of the company's assets, mergers, liquidation, recapitalization, reclassification, dissolution, or consolidation, but not the sale of stock.  Trustees manage the voting process to ensure sufficient and understandable information is provided and ensure privacy and oversee the voting tabulation process.  Trustees vote shares in accordance with the plan documents and will vote un-voted shares.  As mentioned, the sale of stock does not require pass-through voting but may provide for it if written into the plan document.

### 4.   TRUSTEE FUNCTIONS IN AN ESOP TRANSACTION

Trustees' functions are more specific in an ESOP transaction, and typically an engagement letter documents the terms of the appointment as negotiated between the trustee and the company. Upon appointment regarding a proposed transaction, the trustee has unfettered discretionary authority and only the trustee has the authority to enter or negotiate a transaction on behalf of the ESOP.  Trustees are engaged in advance of the actual formation the ESOP, although most ESOPs are effective at the beginning of the tax year in which they are formed.

The duties of a trustee in an ESOP transaction include: deciding whether to proceed and engage in the proposed transaction; hiring independent experts; determining that the transaction price reflects fair market value (the "FMV"); and negotiating the final transaction price and structure.

### **Summary**

It is important to recognize the history and objectives of Congress in promoting ESOPs, and to understand the key motivations behind adopting this form of shareholder ownership.

ESOPs were primarily created to drive employee ownership.

ESOPs have significantly increased individual wealth and retirement benefits for employees of ESOP-owned companies.  ESOP participants have more than twice the retirement balance of other employees, work for companies that pay better, and generally receive better benefits, including other retirement plans.  ESOP-owned companies are regularly recognized among the "best places to work" nationally and locally.  In down-times, ESOP-owned companies prove to be more resilient and better protect jobs.

Professional ESOP Trustees witness successful ESOPs first-hand and have regularly issued six-figure retirement distributions to non-management participants of successful ESOP companies. This money is more likely than not the single largest amount of the individual's savings, and in many cases, their only savings.

Trustees act in good faith, with skill and prudence consistent in providing benefits exclusively for and in the best interest of ESOP participants and beneficiaries. As in any profession, practices evolve over time and will continue to change.

## III.   BOWERS + KUBOTA CONSULTING, INC.

B+K was an architectural and engineering firm specializing in construction and program management, architectural and engineering design and project development from preliminary analysis and planning through complete design. Established in 1980, the firm is located in Hawaii and provides services throughout the Hawaiian Islands and the Pacific Rim. Its major clients include various governmental entities at the state, federal and local levels.

The company was over 30 years old when the ESOP was contemplated and had consistent financial growth. It employed approximately 120 people with many long-time employees and low turnover. B+K sponsored an employee wellness program and provided excellent benefits including a 401(k) profit-sharing plan that was established in 1988. B+K received many industry accolades, including its selection as the nation's *Best Civil Engineering Firm to Work For* in 2011 and 2012 by *CE News*.

B+K elected to become an S-Corp upon the conversion to a 100% ESOP-owned company. Looking at the information provided, B+K was an exemplary candidate for a 100% S-ESOP with the characteristics present for a successful employee-owned business.

## IV.   OPINION

**Saakvitne Acted Consistently with Industry Practice in Reviewing and Determining Whether to Enter Into the Transaction**

1.   TRUSTEES FOLLOW CERTAIN STANDARDS OF FIDUCIARY DUTY

As discussed in the prior section, ERISA imposes standards of fiduciary duties on ESOP trustees and other qualified employer plan trustees. Section 404(a)(1) requires a fiduciary to act "…with the care, skill, prudence, and diligence under the circumstances then prevailing that

16

a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

It is my opinion as a professional ESOP trustee who has engaged in activities similar to the Transaction that Saakvitne's actions were consistent with those an experienced ESOP trustee would use on behalf of an ESOP.

2.   TRUSTEES HAVE LITTLE REGULATORY GUIDANCE FOR THE ESOP FIDUCIARY PROCESS

a.   At the time of the Transaction in 2012, trustees had little guidance from the Department of Labor ("DOL") regarding how the fiduciary process should be performed, specifically as it relates to the financial and valuation matters of ESOP transactions.  In 1988, the DOL issued "Proposed Regulations Relating to the Definition of Adequate Consideration" ("Adequate Consideration Proposal") but never finalized these regulations.   The Adequate Consideration Proposal, defined adequate consideration as the "fair market value" as determined in "good faith" by the trustees.  FMV is defined in the Adequate Consideration Proposal as follows[17]:

'…the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for that asset."

According to the American Society of Appraisers, "[i]n legal interpretations of fair market value, the willing buyer and willing seller are hypothetical persons dealing at arm's length, rather than any 'particular' buyer or seller." In other words, a price would not be considered representative of fair market value if influenced by special motivations not characteristic of a typical buyer or seller.[18]

---

[17] Proposed Regulations Issued by The Department of Labor, The Definition of Adequate Consideration, May 1988. http://www.asky.net/pdfs/DOL%20Proposed%20Regs.pdf

[18] The American Society of Appraisers, The Opinion of the College on Defining Standards of Value Initiation, Chair Shannon P. Pratt, FASA, Published in Valuation, vol. 34, no. 2 (June

17

b.     Guided by independent interpretation of court decisions over the years and the never-finalized Adequate Consideration Proposal, trustees have adopted various approaches to procedural prudence regarding fiduciary obligations under ERISA.  Unfortunately, the DOL, despite being directed by Congress to provide regulatory guidance over thirty years ago, has yet to act.

c.     Without direct guidance on fiduciary processes, trustees found corollary guidance in the DOL Voluntary Fiduciary Correction Program ("VFCP") regarding general rules for acceptable corrections regarding FMV Determinations[19].

**Voluntary Fiduciary Correction Program**

**Section 5. General Rules for Acceptable Corrections**

(a) **Fair Market Value Determinations**. Many corrections require that the current or FMV of an asset be determined as of a particular date, usually either the date the plan originally acquired the asset or the date of the correction, or both. In order to be acceptable as part of a VFC Program correction, the valuation must meet the following conditions:

(1) If there is a generally recognized market for the property (e.g., the New York Stock Exchange), the FMV of the asset is the average value of the asset on such market on the applicable date, unless the plan document specifies another objectively determined value (e.g., the closing price).

(2) If there is no generally recognized market for the asset, the FMV of that asset must be determined in accordance with generally accepted appraisal standards by a qualified, independent appraiser and reflected in a written appraisal report signed by the appraiser.

---

1989). http://www.appraisers.org/docs/default-source/college-of-fellows-articles/defining-standards-of-value.pdf

[19] US Federal Register, https://www.federalregister.gov/documents/2006/04/19/06-3674/voluntary-fiduciary-correction-program-under-the-employee-retirement-income-security-act-of-1974

(3) An appraiser is "qualified" if he or she has met the education, experience, and licensing requirements that are generally recognized for appraisal of the type of asset being appraised.

(4) An appraiser is "independent" if he or she is not one of the following, does not own or control any of the following, and is not owned or controlled by, or affiliated with, any of the following:

    (i) The prior owner of the asset, if the asset was purchased by the plan;

    (ii) The purchaser of the asset, if the asset was, or is now being, sold by the plan;

    (iii) Any other owner of the asset, if the plan is not the sole owner;

    (iv) A fiduciary of the plan;

    (v) A party in interest with respect to the plan (except to the extent the appraiser becomes a party in interest when retained to perform this appraisal for the plan); or;

    (vi) The VFC Program applicant.

This section provides the only direct DOL guidance to trustees and independent fiduciaries addressing the engaged appraiser being "qualified" and/or "independent."

d.    In the absence of clear regulatory guidance on fiduciary procedures, trustees have adopted fiduciary practices over time. At the time of the Transaction, trustees relied on both common-sense fiduciary practices and on the advice of professional legal and financial experts.

Prior to 2014, there was no DOL direct guidance on fiduciary process matters. From July 2014, there have been a series of DOL out-of-court litigation settlements with various ESOP trustees. It is my understanding that these litigation settlements only apply to the parties involved, and do not have the force of law. Of course, ESOP professionals

19

prefer the DOL provide guidance through regulation, not litigation. Many ESOP trustees use these collective litigation settlement agreements as guides, but do not necessarily concur with agreements made by these settling parties. With the most recent litigation settlement in the early 2020, there are now six litigation settlement agreements, each one including the general elements in a prior litigation settlement, but several incorporating new conditions.

The Transaction took place in December 2012. In examining the facts and circumstances present at that time of the Transaction, it is my opinion that Saakvitne used care, skill, prudence, and diligence under the circumstances prevailing in the fourth quarter of 2012 that other professional ESOP trustees familiar with these practices would have used for ESOP transactions.

3.  SAAKVITNE WAS APPOINTED AS TRUSTEE FOR THE ENGAGEMENT AND CONTINUED TO SERVE IN THAT CAPACITY AFTER THE TRANSACTION

    a.  Saakvitne was engaged as a trustee for the yet-to-be formed B+K ESOP on November 26, 2012, to serve in connection with a proposal to engage in the Transaction.

    b.  Saakvitne agreed to serve as Trustee and Independent Fiduciary for the B+K ESOP to:

        i.  Evaluate the proposed purchase of all or a significant percentage of the outstanding shares of the Sponsor (the company).

        ii.  Negotiate the terms of the purchase on behalf of the B+K ESOP.

        iii.  Continue to serve as Trustee should the purchase occur and the Sponsor elect to have him continue to serve.

        iv.  Assist in participant communications.

        v.  Coordinate the distribution of benefits.

        vi.  Provide assistance in maintaining the B+K ESOP's tax-qualified status and ERISA compliance.

    c.  Trustees are initially engaged so the proposed transaction can occur at arms-length, removing sellers from the decision-making on behalf of the ESOP during the transaction process. So, it is a frequent practice to serve as

Trustee for an ESOP transaction only.  However, Saakvitne was appointed
to serve as Trustee after the transaction to safeguard the B+K ESOP's
interest, which included preserving control discretion.

d.      Saakvitne's hourly fees for the transaction were structured in a way which
were very reasonable for the services contemplated and would be limited to
$20,000.    However the $15,000 retainer was payable whether the
transaction was consummated or not.  He also charged ongoing service fees
as trustee after the transaction at regular hourly rates, subject to a minimum
11 hours per year.

4.      <u>SAAKVITNE WAS A QUALIFIED TRUSTEE</u>

Saakvitne was an experienced ERISA Attorney and ESOP fiduciary, with sufficient
education and knowledge to successfully carry out fiduciary duties as Trustee of the ESOP
(Exhibit B)

a.      Saakvitne received his undergraduate degree from the University of
Massachusetts Honors College and received a Juris Doctorate from NYU
School of Law in 1976 and an L.L.M. in Taxation the following year.

b.      He was a Fellow of the American College of Employee Benefits Counsel
and was an ERISA attorney for over 30 years.

c.      Saakvitne was a regular attending member of TEA and NCEO.

d.      Saakvitne served as ERISA fiduciary for employee benefit plans beginning
in 1997.

e.      Fiduciary services comprised more than 99% of Saakvitne's practice.

f.      Saakvitne regularly worked closely with the Employment Benefit Security
Administration ("EBSA") division of the DOL and the Pension Benefit
Guaranty Corporation ("PBGC") serving as Trustee and Independent
Fiduciary for numerous orphan retirement plans.

g.      Saakvitne served as Independent Fiduciary for more than 250 plans and
oversaw the distribution of approximately $1 billion of participant benefits.

h.      Saakvitne was appointed as a plan fiduciary by Federal and California State
courts.

i.      Saakvitne served as Trustee and Independent Fiduciary for more than 40
ESOPs on an ongoing basis.

21

  j. Saakvitne acted as Independent Fiduciary to review and approve Class Action ERISA litigation settlements.

  k. Saakvitne continued to serve as Trustee and Independent Fiduciary for ESOP and ERISA plans until his death on October 2, 2018.

5. <u>SAAKVITNE ENGAGED AN INDEPENDENT AND QUALIFIED FINANCIAL ADVISOR</u>

  a. Saakvitne was a highly experienced retirement plan and ESOP trustee and he followed fiduciary procedures and processes that were commonly performed by other professional ESOP trustees in 2012.

  b. Saakvitne engaged Libra Valuation Associates, Inc. ("LVA") as the financial valuation advisor on behalf of the ESOP.  Gregory Kniesel was managing director of LVA and the appraiser assigned to this engagement.

  c. Trustees had limited DOL fiduciary guidance regarding the engagement of financial advisors.  Saakvitne, like many other trustees, followed the DOL's VFCP guidance regarding FMV determinations.

   (1) As a private company, there was no generally recognized market for B+K (private) stock, meaning its FMV had to be determined in accordance with generally accepted appraisal standards.  Kniesel was an expert on these matters and was a qualified, independent appraiser who documented his analysis in a signed written report.

   (2) Kniesel was "qualified."  Kniesel is an Accredited Senior Appraiser with the American Society of Appraisers and has met the educational, experience, and licensing requirements recognized for appraisers. (Exhibit C)

   (3) Kniesel was "independent":

    (a) Kniesel did not own or control, and was not owned or controlled by, the prior owners of B+K.

    (b) Kniesel did not own or control, and was not owned or controlled by, a fiduciary of the ESOP.

    (c) Kniesel did not own or control, and was not owned or controlled by, a party in interest with respect to the ESOP,

and was not a party in interest when retained to perform this appraisal.

Pursuant to ESOP trustee practices as performed in 2012, Saakvitne reasonably selected Kniesel as a "qualified" and "independent" appraiser.

d.  LVA and Kniesel

   i.  On November 29, 2010, Saakvitne engaged LVA as his Financial Advisor pursuant to the proposed Transaction. Saakvitne was aware that LVA had previously provided a preliminary report of value dated November 21, 2012, which had been addressed to "The Board of Trustees of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust", in care of Brian Bowers, Trustee.

   ii.  As common at the time, appraisers often provided a feasibility report, such as LVA's preliminary report, to an acting trustee or an ESOP exploratory committee for a proposed ESOP transaction before being engaged by the professional trustee for the transaction. This approach provided a general range of value to assist the decision-makers on the overall viability of an ESOP transaction before embarking on the costly process of the ESOP formation.

   Among other things, FMV ranges are used to model potential leverage capacity, financial obligations, contribution levels, participant benefits, regulatory limits, administrative issues, employee engagement planning and transactional structuring. When experienced ESOP professionals were involved, the financial advisor was providing general guidance on FMV, and was not intending to influence any decisions outside of corporate and potential ESOP decisions. In other words, these preliminary reports are not prepared to meet selling shareholder objectives.

   FMV range in the LVA preliminary report provided guidance so that the Trustee could determine the feasibility of the ESOP from a business perspective.

   iii.  Saakvitne was an experienced ESOP trustee with an ERISA background but was not a valuation expert. In these circumstances,

23

it is a reasonable and accepted practice to engage a financial expert appraiser with years of experience valuing ESOP-owned companies and who has a strong national reputation.

Very few, if any, ESOP trustees in 2012 were valuation experts. Most were bankers or lawyers. Professional trustees were not expected to employ valuation expertise on their staff. It was a regular practice for trustees to select competent qualified appraisers and rely on their expertise.

On the selection of an appraiser, trustees will have sufficient knowledge of the qualifications of the appraiser's work and confidence in their ability to conduct a thorough due diligence process.

iv.   Saakvitne reasonable determined that he should engage LVA as the valuation expert.

Saakvitne had known Kniesel prior to this engagement. Both were active members of the ESOP associations. Saakvitne engaged Kniesel on a prior assignment and knew first-hand of his qualifications, experience, and processes for valuing ESOP-owned companies. Under the DOL's VFCP guidance, Kniesel was an independent and qualified appraiser.

6.   <u>SAAKVITNE FOLLOWED A PROCESS CONSISTENT WITH THAT OF OTHER TRUSTEES</u>

a.   Saakvitne took the following actions in connection with his investigation of the Transaction:

i.   Saakvitne met in person and telephonically with senior management of B+K to become sufficiently knowledgeable about the company, its business, and its management.

ii.   Saakvitne visited the company facilities in Hawaii.

iii.   Saakvitne engaged a highly qualified financial advisor experienced with the ESOP valuation process.

iv.   Saakvitne reviewed and confirmed that the financial advisor conducted sufficient due diligence of the company and was

24

knowledgeable of the LVA reports and recommendations. LVA presented Saakvitne a valuation report establishing a FMV for the company stock and a fairness opinion confirming that:

a)     the B+K ESOP paid no more than adequate consideration,

b)     The terms of loans to the selling shareholders were, at least, favorable to the B+K ESOP from a financial point of view, and

c)     the Transaction was fair to the ESOP from a financial point of view.

v.     Saakvitne reviewed the documents associated with the Transaction, including the B+K ESOP Plan and Trust, Stock Purchase Agreement dated December 14, 2012 ("SPA"), loan agreements and other transaction documents.

7.     SAAKVITNE COMMENCED NEGOTIATIONS DECEMBER 11, 2012

a.     Bowers, in his individual capacity commenced price negotiations by email with Saakvitne on December 10, 2012. The following day, Saakvitne counter-offered on behalf of the ESOP twice, and Bowers counter-offered once as follows:

| Date/ Time PST* | Party | FMV Offer/ Counter | Loan Rate | Loan Term | Conditions |
|---|---|---|---|---|---|
| 12/10 10:24PM | Bowers | $41 million | 10% | 20 yrs. | |
| 12/11 3:42PM | ESOP | $39 million | 6% | 25 yrs. | |
| 12/11 6:01PM | Bowers | $40 million | 8% | 25 yrs. | |
| 12/11 7:55PM | ESOP | $40 million | 7% | 25 yrs. | Plus, employment & management agreements |
| 12/11 9:23PM | Agreement Accepted | $40 million | 7% | 25 yrs. | Plus, employment & management agreements |

*All times are Pacific Standard Time (PST), although some emails were absent time stamp and presumed to be Hawaii Standard Time (HST)

b.    Saakvitne stressed the importance of the fairness in his decision-making and negotiation and focused on the terms of the loan rate.  In order to illustrate the impact on the value, which was not considered in the FMV analysis, the following table shows the present value of the interest expense over the life of the loans and comparing the first Bowers offer and the final agreement. To summarize, Saakvitne negotiated the following difference on behalf of the ESOP, $1 million in principal value (2.4%) and an additional $1.7 million in the present value of the interest expense (7.0%). (Exhibit D)

|  | Principal | PV of Interest Expense |
|---|---|---|
| Bowers Offer | $ 41,000,000.00 | $ 24,452,520.49 |
| Final Agreement | $ 40,000,000.00 | $ 22,739,339.41 |
| Difference | $   1,000,000.00 | $   1,713,181.08 |
| Percentage | 2.4% | 7.0% |

8.    THE B+K ESOP PAID FOR THE RIGHT TO CONTROL

Equity shareholders of a one-class voting common stock company owning a majority share have the voting power to dictate the direction of the firm and the right to control the company.  If one person or entity owns control, such shares command a higher price than other shares because majority control shares represent a level of oversight in the company that non-control shareholders do not possess.

a)    After closing the Transaction, the B+K ESOP would own 100% of B+K's voting stock.  Therefore, the B+K ESOP would own a right of control.  With control, the ESOP, at any time in the future, maintains the right to replace, increase, or decrease the company's Board.  With the right to control the Board the B+K ESOP can change CEO and executive management, company's operations, corporate strategy, reorganize, or sell part or all of B+K.

Similarly, if the ESOP trustee were to sell a majority of the shares in B+K to a third-party, the trustee would demand a premium for control.

b)    It has been my experience that most ESOPs that acquire majority ownership at that time of the Transaction purchased the right to control the company

26

and paid for that right.  It is my opinion that the structure of the Transaction warranted a consideration for control because the trustee negotiated the Transaction in a way that the ESOP would own the ongoing control right and could exercise control as described above.

c)    Trustees of 100% owned companies may exert control by:

    a.    Selecting and replacing Board members and changing the number of Board seats and by doing so, can influence the Board in changing senior management.

    b.    Considering and reviewing business decisions that may have a material impact on the business.

    c.    Regularly reviewing financial and business reports from the business, among other things.

d)    There were no demands for retention of board seats and no limiting agreements or provisions in the B+K ESOP Transaction documents that would restrict the B+K ESOP's right to control the firm post-transaction.

e)    Saakvitne was an independent trustee, he was not conflicted, and his only obligation was to the B+K ESOP and the fiduciaries.  He was not a member of management or on the Board.  As Trustee, he retained the right to control on the B+K ESOP's behalf.

9.    SAAKVITNE'S RELIANCE ON THE VALUATION WAS REASONABLE

a)    At the time of the Transaction, it was reasonable for Saakvitne to rely on the valuation report prepared by LVA as of December 14, 2012 for the Transaction (the "LVA Report") and fairness opinion (the "Opinion") because the LVA Report met the requirements of the applicable Internal Revenue Codes and Adequate Consideration Proposal at the time of the Transaction, LVA conducted a thorough due diligence, and LVA conducted an in-depth independent financial and business analysis to assess FMV.

b)    It was evident from the LVA Report that Kniesel had met with management and was knowledgeable of the company's business and industry, operations and leadership, assets owned, and financial statements within the context of the Transaction contemplated.

c)      LVA assessed the financial projections it received and determined that they were not unreasonable and after additional investigation used the projections in their Discounted Cash Flow analysis.

d)      LVA included two market approaches in their valuation:  Guideline Public Company Method (GPC) and Industry Acquisitions Method (IAM)

e)      LVA determined the value of the company to range from $37,470,000 to $41,250,000 as of December 7, 2012 and received a Fairness Opinion and a confirmation of the FMV of $40,150,000 before the close of the Transaction on December 14, 2012.

f)      LVA made certain reasonable adjustments to the company's earnings, including an add-back of its independent assessment of excess cash, normalizing the cessation of profit-sharing contributions and normalizing federal income tax.

g)      LVA provided sufficient analysis and appropriately concluded its value based on a controlling-interest and used a reasonable discount for lack of marketability.

h)      LVA concluded in the LVA Report and Fairness Opinion, a determination of value for the Transaction that did not exceed fair market value.  LVA determined that the terms of the B+K ESOP transaction  loans, notes, and pledge agreements were at least as favorable to the B+K ESOP as would be the terms of comparable loans among a company, a seller and an ESOP resulting from arm's length negotiations between independent parties.  LVA stated that the Transaction was fair to the ESOP from a financial point of view.

i)      Therefore, it is my opinion that Saakvitne reasonably and appropriately accepted the LVA Report and Fairness Opinion and that he could rely on the Report and Opinion in his deliberation of final negotiations with the seller.

10.     <u>SAAKVITNE ACTED WITH THE APPROPRIATE STANDARD OF CARE</u>

It is my opinion that Saakvitne's process and actions were typical of an experienced trustee's process under similar circumstances at the time of the Transaction.

11.    <u>SAAKVITNE ACTED WITH THE APPROPRIATE DUTY OF LOYALTY AND EXCLUSIVE PURPOSE</u>

Saakvitne was independent of all parties and as a professional trustee, he was knowledgeable, and acted solely in the interests of plan participants and derived no benefit for acting otherwise.  He was at no time was under any obligation to consummate the Transaction.  It is my opinion that Saakvitne acted solely in the interests of plan participants and beneficiaries and for the exclusive purpose of providing benefits to plan participants and beneficiaries.

12.    <u>CONCLUSION.</u>

Saakvitne utilized a prudent process, acted solely in the interests of plan participants and beneficiaries, with the exclusive purpose of providing benefits to plan participants and beneficiaries.  He prudently determined whether to enter into the Transaction and reasonably investigated the Transaction while adhering to the standards of practice prevailing among ESOP trustees in connection with the transaction by conducting independent investigations of the Transaction in a diligent and thorough manner and by acting in the way a prudent person familiar with this Transaction would have acted under similar circumstances.

I conclude that Saakvitne, acting in his capacity as ESOP Trustee, employed a reasonably prudent fiduciary process in determining whether to enter into the Transaction, engaged proper expertise, and considered the relevant factors as they appeared at that time.

Saakvitne reasonably relied on a well-qualified financial appraiser, made reasonable decisions based on the facts and information that were known and present at that time, and relied on customary and reasonable practices in the purchase of privately held stock by an ESOP.

## V.    <u>RESPONSES TO MARK JOHNSON'S REPORT</u>

I have read Mr. Johnson's report dated October 19, 2020 and submit my comments and opinions.

According to the information Johnson submitted, he has expertise in benefit plan design, management, financing, communication, operation, regulation and related labor relations experience and has been involved with employee benefit plans, group life and health plans, pension and 401(k) plans, severance plans and programs, and other qualified and non-qualified arrangements for over 25 years.  He claims to have served as a fiduciary, benefits executive, plan administrator, negotiator, and consultant.

Noticeably absent from his resume and expertise is any reference to serving in a fiduciary capacity to or providing fiduciary advisory services for small private ESOP-owned companies (like B+K) or working with other ESOP professionals. ESOPs are unique and the skills applied in serving billion dollar 401(k) plans do not transfer to becoming an expert of ESOP industry practices commonly used by ESOP trustees.

I challenge Johnson's ability to offer an expert opinion on:

- The care, skill, prudence, and diligence required by a fiduciary in an ESOP transaction.

- The circumstances prevailing in 2012 that may or may not be different 8 years later

- A matter in which he may have never served in a like capacity and familiar with ESOP matters

- The conduct of a unique enterprise like an employee ownership program within a qualified retirement plan

- The role, responsibility, and character of an ESOP Trustee.

Johnson does not reference any membership in any ESOP professional and trade organizations: TEA, the NCEO, or the ESCA.

**IN RESPONSE TO JOHNSON'S COMMENTS IN HIS SCOPE OF REVIEW AND SUMMARY OF FACTS AND OPINIONS:**

I.   Johnson wrongly states in his Scope of Review that the B+K ESOP was created by "the owners of the Bowers + Kubota Consulting." B+K was the Plan Sponsor of the ESOP. Brian Bowers ("Bowers") and Dexter C. Kubota ("Kubota") were acting in their corporate capacity, not individually. Shareholders cannot create qualified retirement plans; these are settlor decisions made by management on behalf of the company and approved by the Board.

II.  Summary of facts and opinions

1.   The company considered one option other than the ESOP. The company had received a general indication of interest letter from URS, but it was clearly not a binding nor a bona fide offer. This was a "place-holder" offer and insufficiently formalized for proper board consideration.

ESOPs are very prevalent in the architectural, engineering, and construction ("AEC") industry and a frequently topic of consideration at industry conferences and publications. I have worked with many AEC firms and I have found that these firms are very familiar with the benefits of the ESOP option. It is one of the best corporate equity transfer alternatives for owners and employees alike:

a)  Competitive Edge - AEC companies invest heavily in human resources and compete for talent in a highly competitive marketplace and also to retain its employees. The ESOP is a highly attractive benefit for employees and a difference-maker when attracting talent.

b)  Efficiency/Productivity – AEC ESOP firms have proven to be more productive than non-ESOP firms in that industry. "The broad-based employee ownership under an ESOP will motivate a firm's main asset, its staff, to work smarter. Working smarter usually equates to higher profits over time"

c)  Tax Shield - 100% S-ESOP owned AEC firms do not pay taxes. The increase in cash flows is used for debt payments, growth, acquisitions, share repurchases, reinvestment and/or acquisitions. When debt is paid, employees directly benefit from the increase in equity. This works is the same for homeowners, every time the mortgage is paid, the equity value in their home increases."[20]

2.  Bowers engaged LVA. Bowers was not acting in his individual capacity. This was a common industry practice at that time since the feasibility and design of the future ESOP required an understanding of value to decide whether to move forward or not. Kubota did not serve as trustee of the ESOP. Saakvitne was engaged as Trustee once there was a decision to go forward.

---

[20] Menke (www.menke.com), "High Performance Ownership: employee owned Architecture, Engineering & Construction firms command higher valuations" https://www.menke.com/esop-archives/high-performance-ownership-employee-owned-architecture-engineering-construction-firms-command-higher-valuations/

3.     Saakvitne was told of his selection as independent trustee and fiduciary on November 21, 2012.  A trustee requires sufficient information to determine whether to accept the appointment.   The obvious information required, among other factors, are an approximate value of the company, approximate closing date, potential structure, and advisors for consideration.

In what was a very common industry practice at that time, Saakvitne was informed that Kniesel provided a preliminary evaluation.  Saakvitne was familiar with Kniesel and had engaged him previously, knowing first-hand Kniesel's expertise and the quality of his work.  The preliminary value was an estimate of what a value range could be.  With this common practice, it was known by all parties that the value and any terms were subject to the discretion of the trustee for the transaction and that specific parameters, including FMV, are conditional and completely negotiable.

4.     Saakvitne was engaged on November 26, 2012 and the transaction closed on December 14, 2012.  Although the LVA Report was delivered in June, all information *as of* the closing date was known or knowable at that time. It was a common practice at that time that final reports would be delivered post-transaction.  It was customary and typical at that time that a trustee would receive draft of the FMV establishing the FMV for the transaction understanding that a final version would come after the transaction.   As long as the fairness opinion would be delivered in time for the transaction, trustees could proceed.  In this case, the opinion was delivered prior to transaction and although later than contemplated it is not unusual that Kniesel delivered the final Transaction report at approximately the same time he completed the December 31, 2012 year-end valuation report.  In the end, it made no difference when that final report was delivered, so long as it only relied upon information that was known or knowable at the time of the Transaction.

5.     It is not unusual that the Company, and Bowers and Kubota acting in their corporate capacity, did not consider other trustees.  Saakvitne was a well-known, experienced ESOP trustee with fiduciary appointments in Hawaii. Saakvitne was also recommended by the ESOP attorney, Greg Hansen of

32

Case Lombardi and Petit.   There are a relatively small number of professional ESOP trustees in the United States and even fewer in Hawaii.

6.    Saakvitne:

a)    Had significant experience in ESOP transaction matters, and being an ERISA attorney he understood his role as trustee.  He performed sufficient due diligence consistent with his responsibilities and in common practice with processes used by other professionals at that time when negotiating FMV, and the terms and conditions considered in his decision to engage in the Transaction.

b)    Understood his responsibilities regarding the Transaction and emphasized the importance of other terms and conditions in an ESOP transaction.  Saakvitne did not say that negotiating FMV was unimportant.  He offered that he understood his duties as to FMV, but emphasized that other issues required consideration.   He consider the loan rate and terms significant because value can be saved over the lifetime of those notes if negotiated in the ESOP's favor.  To illustrate Saakvitne's point, the following table compares how his negotiation of interest rate resulted in interest expense savings of $1.7 million and $1 million of FMV. (EXHIBIT D)

|  | Principal | PV of Interest Expense |
|---|---|---|
| **Bowers Offer** | $ 41,000,000 | $ 24,452,520 |
| **Final Agreement** | $ 40,000,000 | $ 22,739,339 |
| **Delta** | $   1,000,000 | $   1,713,181 |
| **Percent** | 2.4% | 7.0% |

c)    I do not find any information supporting Johnson's conclusion that Saakvitne bid against himself.  Johnson's report fails to mention an email from Bowers at 6:01 P.M. PST.  Johnson's statement that "[t]here is no record of the sellers replying to the previous offer prior to Mr. Saakvitne increasing it" is wrong.  Attached as EXHIBIT E is the email sequence to support the following record of negotiations:

| Date/ Time PST* | Party | FMV Offer/ Counter | Loan Rate | Loan Term | Conditions |
|---|---|---|---|---|---|
| 12/10 10:24PM | Bowers | $41 million | 10% | 20 yrs. | |
| 12/11 3:42PM | ESOP | $39 million | 6% | 25 yrs. | |
| 12/11 6:01PM | Bowers | $40 million | 8% | 25 yrs. | |
| 12/11 7:55PM | ESOP | $40 million | 7% | 25 yrs. | Plus, employment & management agreements |
| 12/11 9:23PM | Agreement Accepted | $40 million | 7% | 25 yrs. | Plus, employment & management agreements |

*All times are Pacific Standard Time (PST), although some emails were absent time stamp and presumed to be Hawaii Standard Time (HST)

d)      Saakvitne knew of LVA's ESOP expertise and experience and determined LVA was highly qualified to serve the successor trustee of this yet to be formed ESOP.  At that time, it was a customary practice for trustees to consider engaging financial advisors who were providing a preliminary feasibility analysis to a prior trustee or ESOP exploratory committee of a yet to be formed ESOP.  LVA was not engaged by the shareholders.  If the acting trustee or exploratory committee determined that the ESOP was a viable alternative, it was at this point the Company would engage a professional trustee for the ESOP and did.

The only party qualified to determine whether LVA had sufficient information to perform the valuation was LVA itself.  The trustee must be able to rely on LVA's professional expertise and should not be expected to duplicate LVA's valuation analytics. Saakvitne was an experienced ESOP trustee and an attorney, not a valuation expert.  Trustees are not valuation or legal experts and therefore rely on the expertise of the professional and qualified advisors he or she hires.  If an ESOP trustee cannot rely on experts it engages and is required to perform those experts' functions, then there is no need to engage experts.

e)      Performed sufficient diligence commonly used in practice by other ESOP trustee professionals at that time.  As stated, Saakvitne is a

34

trustee, not a valuation expert, and therefore properly relied on his valuation expert.  If Saakvitne were not a lawyer himself, he would have engaged competent legal counsel and would rely equally on their expertise.  In that case, neither he, nor any other professional, would be required to independently investigate their legal advice.  It has always been my experience in the ESOP industry that the standard for the trustee's reliance on experts is the same whether for legal, financial, or other advisors.

f)  Saakvitne appropriately relied on Kniesel's professional expertise when LVA considered the impact of change to an accrual accounting method from a cash basis.  Kniesel stated in his deposition he took the accrual accounting into consideration.  This is consistent with industry practices for establishing the FMV in an arm's length corporate "willing buyer/willing seller" determination and is an *apple to apples* comparison to other corporations.

g)  Appropriately relied on LVA's determination of FMV and the control premium used, which was addressed and supported in the financial statements and valuation analysis.  Kniesel effectively supported his determination on the use and amount of a control premium using publicly available research and analysis.

7.  At no time did Kniesel perform work for Bowers or Kubota in their personal capacities as shareholders.  This was a common practice of professional trustees at that time with the fiduciary process administered by expert ESOP professionals with sufficient knowledge to guard against influence and conflicts.

8.  URS submitted an indication of interest letter, not a binding bon fide offer letter.  An indication of interest is not a binding bid and would not be a reasonable indicator of FMV, but nonetheless was taken into consideration by Kniesel.  URS's indication of interest, as with any other potential suitor

is *investment value*, not FMV.  The difference is very important, and the
two values must not be confused:[21]

a)    Investment Value is the value of a specific property to a particular
      investor.

b)    Treasury Regulation §20.2031-1(b), defines FMV this way: "fair
      market value is the price at which property would change hands
      between a willing buyer and a willing seller, neither being under any
      compulsion to buy or to sell and both having reasonable knowledge
      of relevant facts."  Investment value is specific and FMV is general.
      An ESOP cannot pay investment value.

            A better indication is the estimate of FMV conducted
      independently by GMK Valuation Advisory Services ("GMK") in
      May 2012.  Based upon what was known or knowable at that time,
      GMK determined a FMV range from $31.2 million to 46.8 million
      and is more in line with LVA's FMV determination as of December
      14, 2012.

9.    Kniesel confirmed that he was aware of the indication of interest and
      considered it but concluded appropriately that it was an unusable data point.

10.   Bowers and Kubota are appointing fiduciaries in respect to their selection
      and delegation of authority to a trustee.  In an arm's length transaction such
      as the Transaction, the discretionary decisions for the ESOP trust are solely
      that of the Trustee.  To the extent Bowers and Kubota have responsibility,
      it is limited to the oversight of the administration of the ESOP and the
      selection and monitoring of the activities of the trustee.   Appointing
      fiduciaries must be able to rely on the expertise of the qualified trustee.  It
      is unreasonable to assert that Bowers and Kubota retain fiduciary authority
      after appointing a discretionary trustee to be the sole fiduciary of the ESOP
      and the participants.  It contradicts the very reason for the Board's decision
      to appoint trustees in the first place - to avoid conflict and engage in a

---

[21] Investopedia.com

prudent arms-length process to protect the interests of the ESOP participants.

11.    Control of the company passed to the ESOP when it purchased all of the outstanding shares of the common stock on December 14, 2012. Thereafter, the ESOP had unrestricted control of B+K, and the trustee could exercise unfettered discretionary authority to control the Board and could remove or replace Board members, and increase or decrease the number of Board members at any time. Through this control, the ESOP also could indirectly remove or replace corporate management, change corporate strategy, reorganize, and sell part or all of the company stock. If the ESOP chose to sell majority ownership of B+K, the trustee would have expected that a control premium be paid by the buyer. Saakvitne continued to serve as Trustee after the transaction closed. On behalf of the ESOP, Saakvitne held the control rights described above and could implement changes at any time deemed necessary. Trustees have replaced full boards or certain members, fired management, reorganized, and sold companies.

It is important to note that a Settlor (or "Trustor") establishes a trust to separate certain trust rights. For ESOPs, trusts are used to separate:

a)    Beneficial ownership of financial rights – ESOP participants and beneficiaries (in whole) own an irrevocable right to the financial value of the ESOP trust.

b)    Discretionary/Voting rights – an appointed fiduciary is responsible to exercise discretionary authority to conduct.

Therefore, participants and beneficiaries do not exercise discretion unless delegated to them by regulation or by plan documents.

Respectfully submitted,

Howard L. Kaplan
Kaplan Fiduciary
November 30, 2020

**ADDENDUM**

**LIST OF DOCUMENTS RELIED UPON**

<u>LEGAL DOCUMENTS</u>

Secretary of Labor's Complaint

Answer and Affirmative Defenses of Brian Bowers and Dexter Kubota

Answer and Affirmative Defenses of Bowers+Kubota Consulting, Inc

Answer and Affirmative Defenses of Nicholas Saakvitne and Saakvitne Law Firm

Secretary's Response to Bowers' First Set of Interrogatories

Secretary's Supplemental Response to Bowers' First Set of Interrogatories

B+K's Response to Secretary's First Set of Interrogatories

Brian Bowers' Responses to Secretary's First Set of Interrogatories

Brian Bowers' Responses to Secretary's Second Set of Interrogatories

Dexter Kubota's Responses to Secretary's First Set of Interrogatories

Dexter Kubota's Responses to Secretary's Second Set of Interrogatories

Sharon Heritage's Responses to Secretary's First Set of Interrogatories

Nicholas Saakvitne's Responses to Secretary's First Set of Interrogatories

Sharon Heritage's Supplemental Responses to Secretary's First Set of Interrogatories

Nicholas Saakvitne's Responses to Secretary's First Set of Interrogatories

Secretary's Responses to B+K's First Set of Requests for Admissions

Secretary's Response to Kobuta's First Set of Interrogatories

**DEPOSITIONS**

Deposition of Brian Bowers, February 22, 2018 along with Exhibits

Deposition of Gregory Hanson, February 23, 2018 along with Exhibits

Deposition of Gregory Kniesel, December 22, 2017 and January 23, 2018, along with Exhibits

Deposition of Nicholas Saakvitne, November 21, 2017 along with Exhibits

Deposition of Kubota, along with Exhibits

**CASE DOCUMENTS**

Form 5500 for Bowers & Kubota Consulting, Inc, Taxable Year Ended December 31, 2012

Form 5500 for Bowers & Kubota Consulting, Inc, Taxable Year Ended December 31, 2013

DOL 000001-0550

DOL 000551-1347

DOL 001348-1853

DOL 001854-2227

DOL 002228-3227

DOL 003228-4227

DOL 005892-5909

DOL 005951-6011

LIBRA-DOL INV 004279-4317

SAK000152

SAK000153_0154

## PUBLICLY AVAILABLE DOCUMENTS

"Russell B. Long." AZQuotes.com. Wind and Fly LTD, 2020.; 23 November 2020. https://www.azquotes.com/quote/1128747

Tax Reform Act of 1976, § 803(h), 90 Stat. 1590. October 4, 1976.

National Center for Employee Ownership, "Employee Ownership by the Numbers, https://www.nceo.org/articles/employee-ownership-by-the-numbers; September 2020

Nancy Wiefek, "S Corporation ESOPs and Retirement Security", Nancy Wiefek, Ph.D. and Nathan Nicholson, National Center for Employee Ownership (NCEO) December 2018.

Joseph Blasi, Douglas Kruse, and Dan Weltmann, "Firm Survival and Performance in Privately-Held ESOP Companies," Sharing Ownership, Profits, and Decision-Making in the 21st Century, Advances in the Economic Analysis of Participatory & Labor-Managed Firms, Volume 14, 2013, pp.109-124.

Fidan Kurtulus, "How Did Employee Ownership Firms Weather the Last Two Recessions," Fidan Kurtulus and Douglas Kruse, Upjohn Institute, 2017.

Peter Kardas "Wealth and Income Consequences of Employee Ownership: A Comparative Study of Washington State" Study Peter Kardas, Jim Keogh and Adria Scharf, Washington Department of Community, Trade, and Economic Development of the University of Washington 1998.

Corey Rosen, "Retirement Security and Wealth Accumulation in S ESOP Companies," The National Center for Employee Ownership September 2005.

Rutgers School of Management and Labor Relations, "Employee-Owned Firms in the Covid-19 Pandemic" (2020).

NCEO, ''Default Rates on ESOP Loans, 2009-2013'' (2014).

Publix,        http://corporate.publix.com/about-publix/newsroom/news-releases/publix-makes-fortunes-100-best-companies-to-work-for-23-straight-years.

National Center for Employee Ownership, "The Employee Ownership 100: America's Largest Majority Employee-Owned Companies," https://www.nceo.org/articles/employee-ownership-100 July 2020.

National Center for Employee Ownership, "Great Employee-Owned Workplaces," https://www.nceo.org/great-employee-owned-places-work/id/34/; December 2018.

Proposed Regulations Issued by The Department of Labor, The Definition of Adequate Consideration, May 1988.

The American Society of Appraisers, The Opinion of the College on Defining Standards of Value Initiation, Chair Shannon P. Pratt, FASA, Published in Valuation, vol. 34, no. 2 (June 1989).

US Federal Register, (https://www.federalregister.gov/documents/2006/04/19/06-3674/voluntary-fiduciary-correction-program-under-the-employee-retirement-income-security-act-of-1974).

Menke (www.menke.com), "High Performance Ownership: employee owned Architecture, Engineering & Construction firms command higher valuations."

Investopedia.com, https://www.investopedia.com/articles/investing/110315/investment-value-vs-fair-market-value-how-they-differ.asp

**EXHIBITS:**

     A.     HOWARD L. KAPLAN CURRICULUM VITAE

     B.     NICHOLAS SAAKVITNE BACKGROUND AND EXPERIENCE

     C.     BIOGRAPHIES OF GREGORY KNIESEL

     D.     NEGOTIATION VALUE ANALYSIS

     E.     NEGOTIATION E-MAIL SEQUENCE

**EXHIBIT A**

**HOWARD L. KAPLAN CURRICULUM VITAE**



**Howard L. Kaplan**
83 Blue Surf Court
Jasper, GA 30143
Phone: 404-308-0330
Email:  hkaplan@kaplanfiduciary.com

*Curriculum vitae, 2020*

Summary of Experience

Howard Kaplan has over 30 years of experience in the trust and financial services industries and currently serves as a fiduciary consultant and board advisor to employee stock ownership plan (ESOP) companies.  In addition, he has held various organizational and relationship management positions throughout his career, applying procedural prudence in a fiduciary capacity and advising plan sponsors regarding their fiduciary obligations under the Employee Retirement Income Security Act (ERISA).

Detailed Employment Experience

**2015-Present KAPLAN FINANCIAL GROUP LLC DBA KAPLAN FIDUCIARY, Jasper, GA**

Mr. Kaplan, as President and CEO, provides consulting and advisory services to internal and professional ERISA fiduciaries, as well as Boards of employee-owned companies.

**2015–2017 TI-Trust Company, formerly FIRST BANKERS TRUST SERVICES, Atlanta, GA,** *a trust company headquartered in Quincy, IL*

As Senior Vice President, Mr. Kaplan represented First Bankers as trustee or independent fiduciary for ESOP/KSOP transactions and successor trustee engagements. He served as the lead engagement officer for over twelve new relationships.  During his tenure, he was instrumental in refining several fiduciary and trust practices.

**2014-2015 FIRST FIDUCIARY CONSULTING CORP., Atlanta, GA,** *a firm affiliated with Benefit Trust Company, Overland Park, KS*

Mr. Kaplan, as Senior Director, was co-founder of a consulting company providing ERISA and fiduciary services to a "sister" trust company.  Within a very short time, FFCC developed administrative procedures, marketing materials, on-boarded former and new clients and completed several fiduciary transactions.

**2000-2014 RELIANCE TRUST COMPANY, Atlanta, Georgia,** *an FIS Global Company*

As a Senior Vice President and a founding member and manager of the ERISA fiduciary consulting group, Kaplan helped grow the team to become a nationally recognized provider of independent fiduciary and trustee services representing participants in 401(k), defined benefit, ESOP and non-qualified retirement plans.  As manager of retirement client services, he served in a senior management position directing custody, cash management and trustee/fiduciary services.

**1995 –2000 WELLS FARGO BANK, Atlanta, GA (formerly First Union)**

As a Vice President and Manager of Employee Benefit Services, Kaplan led the Southern Region during a period of rapid technology advancements and service changes in the retirement industry. Within the five-year period, gross revenue for the region quadrupled and margins increased dramatically.

**1990-1995 BANK OF AMERICA, Atlanta, GA (formerly NationsBank)**

Within five years, Kaplan rose from an institutional salesperson to serving as a Vice President and the Southeast Area Manager of 401(k) Daily Valuation Sales, Consulting and Communications, functioning as the technical consultant and advisor on administrative and investment applications to 401(k) and other retirement plans.

**1984–1990 WELLS FARGO ADVISORS, North Palm Beach, FL (formerly Prudential-Bache)**

**MORGAN STANLEY, Palm Beach, FL (formerly Smith Barney)**

Financial Advisor to individual clientele specializing in managed portfolios, fixed-income and equity investments.

Education

2005    Received *Accredited Investment Fiduciary Auditor*™ designation from the Center for Fiduciary Studies, University of Pittsburgh

2001    Completed the *Senior Leadership and Strategic Impact Program* at the Amos Tuck School of Business at Dartmouth College

1992    Received *CRSP*™ *Designation* after completing *Employee Benefits Plan Courses*, Cannon Trust School.

1980    Bachelor's degree. Business Administration/Finance and Marketing, University of Florida, Gainesville, FL

Memberships and Affiliations

- Private Directors Association (PDA)
- The ESOP Association (TEA): serving on various committees including: Fiduciary Committee, Legislative and Regulatory Committee, Ownership Culture Committee and the Valuation and Appraisal Committee
- Employee-Owned S Corporations of America (ESCA)
- The National Center for Employee Ownership (NCEO)

Past

- American Society of Pension Professionals & Actuaries (ASPPA)
- American Bankers Association (ABA)
- Foundation for Fiduciary Studies (now FI360)
- Society of Professional Asset-Managers & Record Keepers (SPARK)
- Society of Certified Retirement Plan Specialists (CRPS)
- Cannon Financial Institute, Trust School

# **ADDENDUM**

## **Engagements and Presentations**

A<small>S</small> C<small>ONSULTING</small> A<small>DVISOR</small>

- Board governance and organizational advisor to newly formed ESOP owned company
- Board governance and organizational advisor to a mature ESOP in leadership transition
- Board advisor engaged to select a successor trustee
- Advisor to internal trustees of a newly formed ESOP owned company
- Advisor to professional trustee on process and procedure for ESOP transactions

A<small>S</small> E<small>XPERT</small> W<small>ITNESS</small>

- Provided reports, deposition and federal court testimony regarding a fiduciary's process and decisions to engage in an ESOP transaction (for defendants).
- Provided reports supporting ESOP trustee's claim of fiduciary breach against fiduciary (for plaintiff).
- Provided report and deposition regarding trustee's decision to divest employer stock (defendant).

A<small>S</small> R<small>EPRESENTATIVE OF THE</small> T<small>RUSTEE</small>/ I<small>NDEPENDENT</small> F<small>IDUCIARY TO</small>:

Served as Senior Vice President of several chartered banks serving in the capacity of trustee or independent fiduciary for over a hundred ESOP formations, sales, and other transactions including:

- Termination of ESOP holding a minority interest
- Several engineering/construction 100% ESOP trustee appointments
- A minority-owned ESOP of a large privately-held maritime company
- A U.S. Department of defense contractor ESOP
- A newly formed ESOP to purchase 100% of a nationally recognized private shoe company
- Monitor the participant voting process for a publicly-traded apparel company
- To a U.S. Government contractor sale of an 88% ESOP-owned company
- A large professional employer organization's multiple-employer 401(k) plans
- A large automobile club and insurance company's 401(k) plan's stable value portfolio
- A 401(k) plan in which prior fiduciaries were enjoined from a fiduciary role, pursuant to a DOL agreement
- A private 100% ESOP-owned auto industry supplier
- A sale of an ESOP-owned construction company and subsequent termination and distribution of the plan
- Several minority-owned ESOP insurance companies
- Monitor the sale of an insurance agency to a publicly-traded company
- A minority-owned ESOP company engaged in retail convenience grocery and gasoline sales

PUBLICATIONS, PRESENTATIONS AND LECTURES

*"Employee Ownership Management Program, The ESOP Team Session (Virtual),"* Beyster Institute, Rady School of Management, University of California, San Diego. Oct. 2020

*"Certificate Program for Non-Professional ESOP Fiduciaries,"* UCSD Beyster Institute Program at Ohio employee Ownership Center at Kent State University, Kent OH Sept. 2018, 2019 and 2020

*"Building a Better Board,"* ESOP Association New South Chapter Conference Chattanooga Feb. 2020

*"Process and Procedure: Administering Your ESOP,"* Fiduciary and Governance Session and the Company Valuation Session. Beyster Institute Program, Rady School of Management, University of California, San Diego. Jan. 2020

*"For the New ESOP: What You Should Know,"* NCEO Annual Conference, Virtual. April 2020

*"ESOP Company Corporate Governance,"* NCEO Annual Conference Preconference Program, Virtual April 2020

*"Certificate Program for Non-Professional ESOP Fiduciaries, " UCSD Beyster Institute Program at University of California,* San Diego Feb. 2018, 2019, 2020

*"Board Directors & Trustees Roles in ESOP Companies,"* ESOP Association Vegas Conference. Nov. 2019

*"Building a Better Board,"* ESOP Association New South Chapter Conference Birmingham, AL Oct. 2019

*"What Goes In to A Valuation and How to Communicate It,"* ESOP Association New South Chapter Conference Chattanooga Sept. 2019

*"Advanced Governance of Employee Ownership Companies: Corporate Directors' Exchange.* Beyster Institute," Rady School of Management, University of California, San Diego. June 2019

*"Board of Directors and Trustee Roles in ESOP Companies," The ESOP Association National Conference,* Las Vegas, NV Nov. 2018

*"Interplay Between the Board of Directors and the Trustees,"* ESOP Association Annual Meeting May 2019

*"Building a Better Board,"* NCEO Annual Conference Atlanta GA, April 2019

*"Valuation and Other Considerations over the ESOP Life Cycle," moderator and co-presenter at the New South ESOP Association Meeting,* Birmingham AL September 2018

*"Getting the Right Board; and Getting the Most Out of Them," co-presenter at the Annual ESOP Association Meeting,* Washington DC, May 2018

*"Moderating the Governance Tensions of Self Interests, Corporate Responsibilities and Fiduciary Duties Through the Adoption of Appropriate Corporate Organizational Models,"* co-presented at the ESOP Association New South Chapter, Atlanta, GA and the Carolinas Chapter, Hilton Head, SC March/April 2018

*"Valuation and Communications,"* moderator and co-presenter at the Annual ESOP Association meeting, Washington, DC, May 2017

*"Is an ESOP Right for Your Engineering Firm,"* co-presented at the American Counsel of Engineering Companies Annual Conference, Washington, DC April 2017

*"A Year in the Life of an ESOP Trustee,"* moderator and co-presenter at the National ESOP Association Conference, Las Vegas, NV, Nov. 2016

*"Is an ESOP Right for You?"* co-presented at the American Counsel of Engineering Companies Annual Conference, Hawaii, Oct. 2014

*"Case Study on Expanding Corporate Governance: Appvion"* moderator and co-presenter at the NCEO Conference, April 2104

*"ESOPs and B Corps,"* co-presented at the ESOP Association Trade Conference, Nov. 2012

*"Appointing an Institutional Trustee – Best Practices\*"* co-presented at the South ESOP Conference, Oct. 2012

*"Duties of an ESOP Trustee,"* co-presented at the Annual ESOP Association Conference, May 2012

*"ESOP Valuation Basics,"* co-presented at the NCEO Conference, April 2012

*"Internal vs. External Trustee – Crossfire,"* co-presented at the ESOP Association Conference, Nov. 2011

*"Who Should Act as Your ESOP Trustee?"* co-presented at the NCEO Annual Conference, April 2011

*"Uses of Company Stock in Qualified Plans,"* co-presented at the ASPPA Benefits Conference of the South, May 2010

Contributing Author of ESOP Association Fiduciary Handbook Chapter entitled "The Decision to Terminate an ESOP," Released 2010

Co-Editor of ESOP Association Fiduciary Handbook, Released 2010

*"Employee Participation in Formal Governance:  Ideas and Practices"* co-presented at the ESOP Association Trade Conference, Nov. 2009

Featured Speaker at the ESOP Association Annual Board of Directors of ESOP Companies Retreat, Sept. 2009

*"Trustee's Annual ESOP Checklist"* co-presented at the ESOP Association Conference, May 2009

*"Internal vs. External ESOP Trustee: Cross-fire"* co-presented at the ESOP Association Conference, Nov. 2008

*"Internal vs. External ESOP Trustee: Overview and Potential Conflicts,"* co-presented at the ESOP Association Conference, Nov. 2007

*"Company Stock: From Tittle to DeFelice,"* presented at Reliance Trust Advisor Symposium, Aug. 2007

*"Governance and Fiduciary Overview: Potential Conflicts,"* co-presented at the ESOP Association Conference, May 2007

*"The New Investment Advisor Paradigm; Concept of Fiduciary 'Outsourcing,'"* co-presented at the FEI Employee Benefits Group Meetings, Dec. 2006

*"Fiduciary Responsibility; A Corporate Trustee's Perspective"* presented at the DAC Conference, April 2003

Lectured on various course curricula at the Cannon Institute's Employee Benefits Schools primarily focused on trust, fiduciary, investment and administrative topics relating to qualified retirement plans, 1992 to 1996.

**EXHIBIT B**

**Nicholas L. Saakvitne**

Los Angeles, CA

**Nicholas L. Saakvitne** [N.Y.U. School of Law J.D. 1976, L.L.M. in Taxation 1977; Fellow,
American College of Employee Benefits Counsel] has been an ERISA attorney for 34 years.
Since 1997, he has acted as an ERISA fiduciary for employee benefit plans, and such fiduciary
service now comprises more than 99% of his practice. Having served as a Trustee and
Independent Fiduciary to coordinate the termination of orphan retirement plans (working closely
with the EBSA division of the U.S. Department of Labor and, for defined benefit pension plans,
with the Pension Benefit Guaranty Corporation) he believes he has served as fiduciary for more
than 250 plans and has overseen approximately $1 billion of plan benefit payments/direct
rollovers. Nick has been appointed as a plan fiduciary by many Federal courts, and on occasion
by California state courts. He has served as Trustee and Independent Fiduciary for more than 40
Employee Stock Ownership Plans (and other retirement plans holding employer stock) over the
past 10 years, on an ongoing basis for active plans, to negotiate stock purchase or stock/asset sale
transactions, or to approve settlements or review other ESOP fiduciary transactions, and this is a
growing area of his practice. On frequent occasions, Nick has acted as Independent Fiduciary for
retirement plans to review and approve Class Action ERISA litigation settlements, working with
nationally recognized members of the plaintiffs' Bar and established defense counsel.

Source:  American College of Employee Benefits Counsel

https://www.acebc.com/profiles/nicholas-saakvitne

**EXHIBIT C**

Gregory E. Kniesel, ASA

Gregory E. Kniesel, ASA is Managing Director of Libra Valuation Advisors and directs the firm's national valuation practice. Mr. Kniesel is widely recognized as an expert in securities valuation and design, control premiums, minority interest and lack of marketability discounts, Rule 144 and other restricted securities, and fractional interests in real estate. Furthermore, Mr. Kniesel has extensive experience with issues of adequate consideration, fairness, solvency, and employee stock ownership plans. Mr. Kniesel has performed and managed valuation assignments for many purposes including employee stock ownership plans, estate and gift taxes, acquisition/divestiture, transaction fairness, solvency, bankruptcy and marital dissolution. In addition to valuing the common stock of numerous companies in a variety of industries, Mr. Kniesel has valued preferred stock, debt instruments, intangible assets, options, warrants, and fractional interests in real estate. Mr. Kniesel has also performed and managed a wide variety of investment banking assignments, including merger and acquisition and management and ESOP leveraged buyout transactions. Prior to founding Libra Valuation Advisors, Mr. Kniesel was Managing Director of FMV Opinions, where he spent 10 years and directed that firm's national ESOP valuation practice. Prior to that, Mr. Kniesel spent three years with Houlihan, Lokey, Howard and Zukin, a specialty investment banking and business valuation firm, and five years in Corporate Banking in the western United States.

Mr. Kniesel has taught business valuation courses for the California CPA Foundation, continuing legal education classes for the California Bar Association and the State Bar of Georgia, and has spoken at numerous professional conferences and seminars on various business valuation topics, including ESOPs, and merger and acquisition issues, and has provided expert testimony regarding business valuation issues. Mr. Kniesel sits on the Valuation Advisory Committee of the ESOP Association and is an Accredited Senior Appraiser with the American Society of Appraisers. Mr. Kniesel received his Bachelor of Arts degree in Business Administration from the California State University at Fullerton, where he majored in Finance and graduated first in his class with high honors. Mr. Kniesel is presently a candidate for the Chartered Financial Analyst charter through the Association for Investment Management and Research.

### Publications

"S Corporation ESOPs in Dispositive Sales and Reorganization Transactions" - (co-authored with Allen Buckley, Esq.) Published in Valuation Strategies –January/February 2001

"Shifting Control in an ESOP Context" - (co-authored with David R. Johanson, Esq.) Published in The Journal of Employee Ownership Law and Finance (NCEO) Vol. 12 #2 - Spring 2000

"Preferred Limited Partnership - the FLPs of Choice?" - (co-authored with Mil Hatcher, Esq.) Published in Valuation Strategies - July/August 1999

"Preferred Limited Partnerships - Now the FLPs of Choice?" - (co-authored with Mil Hatcher, Esq.) Published in the Journal of Taxation -December 1998

"Independent Appraisers Corner" - Published in The ESOP Express - Winter 1997

45

# EXHIBIT D

## NEGOTIATION VALUE ANALYSIS

# DOL v. Saakvitne, et al
## Determination of Interest Expense Savings Negotiated by Saakvitne

|  | PV of Interest Expense | |
|---|---|---|
|  | Initial Offer | Counter Offer |
| Bowers Offer | $ 24,452,520.49 | $ 24,523,289.71 |
| Saakvitne Offer | $ 20,137,538.73 | $ 22,739,339.41 |
| **Interest Expense Savings** | $ 4,314,981.76 | $ 1,783,950.30 |

|  | Principal | PV of Interest Expense |
|---|---|---|
| Bowers Offer | $ 41,000,000.00 | $ 24,452,520.49 |
| Final Agreement | $ 40,000,000.00 | $ 22,739,339.41 |
| Delta | $ 1,000,000.00 | $ 1,713,181.08 |
| % of Initial Bower offer | 2.4% | 7.0% |



# DOL v. Saakvitne, et al.
## Present Value of Interest Expense Under Different Proposals

Interest Rate: 10.00% / 7.00%

$ 1,713,181

| Date | Interest Expense Bowers Original | Interest Expense Actual Deal | Number of Periods | Discount Factors Bowers Original (10.00%) | Discount Factors Actual Deal (7.00%) | PV of Interest Expense Bowers Original | PV of Interest Expense Actual Deal |
|---|---|---|---|---|---|---|---|
| 12/31/2012 | 190,959 | 130,411 | 0.05 | 0.9956 | 0.9969 | 190,113 | 130,001 |
| 12/31/2013 | 3,679,253 | 2,583,846 | 1.05 | 0.9051 | 0.9316 | 3,329,960 | 2,407,212 |
| 12/31/2014 | 3,607,335 | 2,539,432 | 2.05 | 0.8228 | 0.8707 | 2,968,064 | 2,211,060 |
| 12/31/2015 | 3,528,225 | 2,491,909 | 3.05 | 0.7480 | 0.8137 | 2,639,067 | 2,027,740 |
| 12/31/2016 | 3,441,205 | 2,441,060 | 4.05 | 0.6800 | 0.7605 | 2,339,979 | 1,856,414 |
| 12/31/2017 | 3,345,482 | 2,386,651 | 5.05 | 0.6182 | 0.7107 | 2,068,080 | 1,696,295 |
| 12/31/2018 | 3,240,187 | 2,328,434 | 6.05 | 0.5620 | 0.6642 | 1,820,900 | 1,546,652 |
| 12/31/2019 | 3,124,363 | 2,266,141 | 7.05 | 0.5109 | 0.6208 | 1,596,191 | 1,406,799 |
| 12/31/2020 | 2,996,956 | 2,199,488 | 8.05 | 0.4644 | 0.5802 | 1,391,909 | 1,276,094 |
| 12/31/2021 | 2,856,808 | 2,128,169 | 9.05 | 0.4222 | 0.5422 | 1,206,199 | 1,153,941 |
| 12/31/2022 | 2,702,646 | 2,051,858 | 10.05 | 0.3838 | 0.5067 | 1,037,372 | 1,039,779 |
| 12/31/2023 | 2,533,067 | 1,970,205 | 11.05 | 0.3489 | 0.4736 | 883,892 | 933,085 |
| 12/31/2024 | 2,346,531 | 1,882,836 | 12.05 | 0.3172 | 0.4426 | 744,365 | 833,372 |
| 12/31/2025 | 2,141,341 | 1,789,352 | 13.05 | 0.2884 | 0.4137 | 617,523 | 740,181 |
| 12/31/2026 | 1,915,632 | 1,689,324 | 14.05 | 0.2622 | 0.3866 | 502,211 | 653,088 |
| 12/31/2027 | 1,667,352 | 1,582,293 | 15.05 | 0.2383 | 0.3613 | 397,383 | 571,692 |
| 12/31/2028 | 1,394,244 | 1,467,771 | 16.05 | 0.2167 | 0.3377 | 302,084 | 495,621 |
| 12/31/2029 | 1,093,825 | 1,345,232 | 17.05 | 0.1970 | 0.3156 | 215,449 | 424,526 |
| 12/31/2030 | 763,364 | 1,214,115 | 18.05 | 0.1791 | 0.2949 | 136,690 | 358,083 |
| 12/31/2031 | 399,857 | 1,073,820 | 19.05 | 0.1628 | 0.2756 | 65,090 | 295,986 |
| 12/31/2032 | | 923,705 | 20.05 | | 0.2576 | | 237,952 |
| 12/31/2033 | | 763,081 | 21.05 | | 0.2408 | | 183,714 |
| 12/31/2034 | | 591,214 | 22.05 | | 0.2250 | | 133,025 |
| 12/31/2035 | | 407,316 | 23.05 | | 0.2103 | | 85,652 |
| 12/31/2036 | | 210,545 | 24.05 | | 0.1965 | | 41,378 |
| **Total** | 46,968,629 | 40,458,208 | | | | $ 24,452,520 | $ 22,739,339 |

**DOL v. Saakvitne, et al.**

**Loan Amortization Schedule ($41 million Loan at 10% Interest for 20 Years) [1]**

| Assumptions | |
|---|---|
| Interest Rate | 10.00% |
| Payments | 20 |
| Loan Amount | $   41,000,000 |

| Payment Number | Date | Beginning Balance | Payment | Interest | Principal | Ending Balance |
|---|---|---|---|---|---|---|
| Loan | 12/14/2012 | | | | | $   41,000,000.00 |
| 1 | 12/31/2012 | 41,000,000.00 | $   4,398,431.43 | 190,958.90 | 4,207,472.53 | 36,792,527.47 |
| 2 | 12/31/2013 | 36,792,527.47 | 4,398,431.43 | 3,679,252.75 | 719,178.69 | 36,073,348.78 |
| 3 | 12/31/2014 | 36,073,348.78 | 4,398,431.43 | 3,607,334.88 | 791,096.56 | 35,282,252.23 |
| 4 | 12/31/2015 | 35,282,252.23 | 4,398,431.43 | 3,528,225.22 | 870,206.21 | 34,412,046.02 |
| 5 | 12/31/2016 | 34,412,046.02 | 4,398,431.43 | 3,441,204.60 | 957,226.83 | 33,454,819.19 |
| 6 | 12/31/2017 | 33,454,819.19 | 4,398,431.43 | 3,345,481.92 | 1,052,949.51 | 32,401,869.67 |
| 7 | 12/31/2018 | 32,401,869.67 | 4,398,431.43 | 3,240,186.97 | 1,158,244.47 | 31,243,625.21 |
| 8 | 12/31/2019 | 31,243,625.21 | 4,398,431.43 | 3,124,362.52 | 1,274,068.91 | 29,969,556.29 |
| 9 | 12/31/2020 | 29,969,556.29 | 4,398,431.43 | 2,996,955.63 | 1,401,475.80 | 28,568,080.49 |
| 10 | 12/31/2021 | 28,568,080.49 | 4,398,431.43 | 2,856,808.05 | 1,541,623.38 | 27,026,457.10 |
| 11 | 12/31/2022 | 27,026,457.10 | 4,398,431.43 | 2,702,645.71 | 1,695,785.72 | 25,330,671.38 |
| 12 | 12/31/2023 | 25,330,671.38 | 4,398,431.43 | 2,533,067.14 | 1,865,364.30 | 23,465,307.08 |
| 13 | 12/31/2024 | 23,465,307.08 | 4,398,431.43 | 2,346,530.71 | 2,051,900.73 | 21,413,406.36 |
| 14 | 12/31/2025 | 21,413,406.36 | 4,398,431.43 | 2,141,340.64 | 2,257,090.80 | 19,156,315.56 |
| 15 | 12/31/2026 | 19,156,315.56 | 4,398,431.43 | 1,915,631.56 | 2,482,799.88 | 16,673,515.68 |
| 16 | 12/31/2027 | 16,673,515.68 | 4,398,431.43 | 1,667,351.57 | 2,731,079.87 | 13,942,435.82 |
| 17 | 12/31/2028 | 13,942,435.82 | 4,398,431.43 | 1,394,243.58 | 3,004,187.85 | 10,938,247.97 |
| 18 | 12/31/2029 | 10,938,247.97 | 4,398,431.43 | 1,093,824.80 | 3,304,606.64 | 7,633,641.33 |
| 19 | 12/31/2030 | 7,633,641.33 | 4,398,431.43 | 763,364.13 | 3,635,067.30 | 3,998,574.03 |
| 20 | 12/31/2031 | 3,998,574.03 | 4,398,431.43 | 399,857.40 | 3,998,574.03 | (0.00) |
| | | | $   87,968,628.67 | $   46,968,628.67 | $   41,000,000.00 | |

**Notes/Sources:**

[1] Amortization schedule structured using same format as actual Brian Bowers ESOP Note and Dexter Kubota ESOP Note. See, RHYL000207 - 0548 at RHYL000408 and RHYL000417. See LIBRA-DOL INV 005573 - 5577 at LIBRA-DOL INV 005577 for loan assumptions.

**DOL v. Saakvitne, et al.**

**Loan Amortization Schedule ($40 million Loan at 7% Interest for 25 Years) [1]**

| Assumptions | |
|---|---|
| Interest Rate | 7.00% |
| Payments | 25 |
| Loan Amount | $ 40,000,000 |

| Payment Number | Date | Beginning Balance | Payment | Interest | Principal | Ending Balance |
|---|---|---|---|---|---|---|
| Loan | 12/14/2012 | | | | | $ 40,000,000.00 |
| 1 | 12/31/2012 | 40,000,000.00 | $ 3,218,328.34 | 130,410.96 | 3,087,917.38 | 36,912,082.62 |
| 2 | 12/31/2013 | 36,912,082.62 | 3,218,328.34 | 2,583,845.78 | 634,482.55 | 36,277,600.07 |
| 3 | 12/31/2014 | 36,277,600.07 | 3,218,328.34 | 2,539,432.00 | 678,896.33 | 35,598,703.74 |
| 4 | 12/31/2015 | 35,598,703.74 | 3,218,328.34 | 2,491,909.26 | 726,419.08 | 34,872,284.66 |
| 5 | 12/31/2016 | 34,872,284.66 | 3,218,328.34 | 2,441,059.93 | 777,268.41 | 34,095,016.25 |
| 6 | 12/31/2017 | 34,095,016.25 | 3,218,328.34 | 2,386,651.14 | 831,677.20 | 33,263,339.05 |
| 7 | 12/31/2018 | 33,263,339.05 | 3,218,328.34 | 2,328,433.73 | 889,894.60 | 32,373,444.45 |
| 8 | 12/31/2019 | 32,373,444.45 | 3,218,328.34 | 2,266,141.11 | 952,187.23 | 31,421,257.22 |
| 9 | 12/31/2020 | 31,421,257.22 | 3,218,328.34 | 2,199,488.01 | 1,018,840.33 | 30,402,416.89 |
| 10 | 12/31/2021 | 30,402,416.89 | 3,218,328.34 | 2,128,169.18 | 1,090,159.15 | 29,312,257.73 |
| 11 | 12/31/2022 | 29,312,257.73 | 3,218,328.34 | 2,051,858.04 | 1,166,470.30 | 28,145,787.44 |
| 12 | 12/31/2023 | 28,145,787.44 | 3,218,328.34 | 1,970,205.12 | 1,248,123.22 | 26,897,664.22 |
| 13 | 12/31/2024 | 26,897,664.22 | 3,218,328.34 | 1,882,836.50 | 1,335,491.84 | 25,562,172.38 |
| 14 | 12/31/2025 | 25,562,172.38 | 3,218,328.34 | 1,789,352.07 | 1,428,976.27 | 24,133,196.11 |
| 15 | 12/31/2026 | 24,133,196.11 | 3,218,328.34 | 1,689,323.73 | 1,529,004.61 | 22,604,191.50 |
| 16 | 12/31/2027 | 22,604,191.50 | 3,218,328.34 | 1,582,293.41 | 1,636,034.93 | 20,968,156.57 |
| 17 | 12/31/2028 | 20,968,156.57 | 3,218,328.34 | 1,467,770.96 | 1,750,557.38 | 19,217,599.19 |
| 18 | 12/31/2029 | 19,217,599.19 | 3,218,328.34 | 1,345,231.94 | 1,873,096.39 | 17,344,502.80 |
| 19 | 12/31/2030 | 17,344,502.80 | 3,218,328.34 | 1,214,115.20 | 2,004,213.14 | 15,340,289.66 |
| 20 | 12/31/2031 | 15,340,289.66 | 3,218,328.34 | 1,073,820.28 | 2,144,508.06 | 13,195,781.60 |
| 21 | 12/31/2032 | 13,195,781.60 | 3,218,328.34 | 923,704.71 | 2,294,623.63 | 10,901,157.97 |
| 22 | 12/31/2033 | 10,901,157.97 | 3,218,328.34 | 763,081.06 | 2,455,247.28 | 8,445,910.69 |
| 23 | 12/31/2034 | 8,445,910.69 | 3,218,328.34 | 591,213.75 | 2,627,114.59 | 5,818,796.10 |
| 24 | 12/31/2035 | 5,818,796.10 | 3,218,328.34 | 407,315.73 | 2,811,012.61 | 3,007,783.49 |
| 25 | 12/31/2036 | 3,007,783.49 | 3,218,328.34 | 210,544.84 | 3,007,783.49 | 0.00 |
| | | | $ 80,458,208.43 | $ 40,458,208.43 | $ 40,000,000.00 | |

Notes/Sources:

[1] Represents a consolidation of the Brian Bowers ESOP Note and the Dexter Kubota ESOP Note. See RHYL000207 - 0548 at RHYL000408 and RHYL000417. Slight rounding differences may exist.

# EXHIBIT E

## NEGOTIATION E-MAIL SEQUENCE

## NEGOTIATION SEQUENCE

Subj:     RE: ESOP Offer- Bowers + Kubota Consulting, Inc.
Date:     12/11/2012 9:23:30 P.M. Pacific Standard Time
From:     bbowers@bowersandkubota.com
To:       Saaklaw@aol.com
CC:       dkubota@bowersandkubota.com, GMH@caselombardi.com, Gregkniesel@aol.com

Nick: Your offer is acceptable. To summarize:
Price $40 million
Terms: 100% leveraged with seller loans. 25 year loan (fully amortized, no prepayment penalties) at 7% annual
interest. No warrants as part of the sale.
We have already forwarded to Greg Hansen language for the Management Agreement between the two entities.
We agree that compensation for the two officers will not be greater than that represented to Greg Kniesel and are
incorporating such language into an employment agreement.
Thank you.
*Brian Bowers, P.E.*
**Bowers + Kubota Consulting**
**Bowers + Kubota Management**

Hawaii Business's *2012 Best Places to Work*

Ph:  (808) 836-7787 / (808) 833-1841
Fax: (808) 834-4833
Email: bbowers@bowersandkubota.com



**From:** Saaklaw@aol.com [mailto:Saaklaw@aol.com]
**Sent:** Tuesday, December 11, 2012 4:55 PM
**To:** Brian Bowers
**Cc:** Dexter Kubota; GMH@caselombardi.com; Gregkniesel@aol.com
**Subject:** Re: ESOP Offer- Bowers + Kubota Consulting, Inc.

Dear Brian,

If you can accept a 7% annual interest rate for the notes, then I believe we have
a final agreement--I accept the $40 million purchase price and other terms you set forth in your most recent
email.

Implicit in our agreement is:

--Employment Agreements for the two of you reflecting compensation
  and bonuses not inconsistent with representations made to Greg Kniesel; and

-- Memorandum Re Management Agreement between the two entities.

*****************************

If this is acceptable, please let me know and we can continue Greg Hansen's efforts to generate all the necessary
paperwork!

Mahalo.

best--Nick
SAAKVITNE LAW CORP
532 Colorado Ave 2nd Fl
Santa Monica, CA 90401-2408

310-451-3225
FAX 310-451-9089
www.erisafiduciary.com

Page 1

**Subj:** RE: ESOP Offer- Bowers + Kubota Consulting, Inc.
**Date:** 12/11/2012 6:01:17 P.M. Pacific Standard Time
**From:** bbowers@bowersandkubota.com
**To:** Saaklaw@aol.com
**CC:** dkubota@bowersandkubota.com, GMH@caselombardi.com

Nick: Thank you for your offer on behalf of the ESOP. Our counter-offer is as follows:

Price  $40 million

Terms: 100% leveraged with seller loans.  25 year loan (fully amortized, no prepayment penalties) at 8% annual interest.  No warrants as part of the sale.

Please let us know if this counter offer is acceptable.

Regards,

*Brian Bowers, P.E.*
**Bowers ÷ Kubota Consulting**
**Bowers ÷ Kubota Management**
HawaiiBusiness's *2012 Best Places to Work*

Ph:  (808) 836-7787 / (808) 833-1841
Fax: (808) 834-4833
Email: bbowers@bowersandkubota.com

---

**From:** Saaklaw@aol.com [mailto:Saaklaw@aol.com]
**Sent:** Tuesday, December 11, 2012 1:42 PM
**To:** Brian Bowers
**Cc:** Dexter Kubota; GMH@caselombardi.com
**Subject:** Re: ESOP Offer- Bowers + Kubota Consulting, Inc.

Dear Brian and Dexter,

Thank you very much for your offer; I am very impressed with the company under your leadership; I do not think your offer unreasonable; and I would like to counter on behalf of the ESOP with terms not very different, as follows:

Price  $39 million

Terms:  100% leveraged with seller loans.  25 year loan (fully amortized, no prepayment penalties) at 6% annual interest.  No warrants as part of sale.

Please let me know if this counter offer is acceptable.

Mahalo.

Best—Nick Saakvitne
SAAKVITNE LAW CORP
532 Colorado Ave 2nd Fl
Santa Monica, CA 90401-2408

310-451-3225
FAX 310-451-9089
www.erisafiduciary.com

---

In a message dated 12/10/2012 10:24:58 P.M. Pacific Standard Time, bbowers@bowersandkubota.com writes:



DOL 006317

Nick:  As the sole trustee of the Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan (ESOP), the sellers (Dexter Kubota and Brian Bowers) make the following offer to purchase 100% of the common stock of the company:

Price:  $41 million

Terms:  100% leveraged with seller loans.  20 year loan at 10% interest.  No warrants as part of the sale.

Please advise if this offer is acceptable.

Regards,

*Brian Bowers, P.E.*
*President*
Bowers ÷ Kubota Consulting
Bowers ÷ Kubota Management
HawaiiBusiness's *2012 Best Places to Work*

Ph:  (808) 836-7787 / (808) 833-1841
Fax: (808) 834-4833
Email: bbowers@bowersandkubota.com

page 2

DOL 006318