IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARTIN J. WALSH, Secretary of ) Labor, United States Department of Labor, ) ) Plaintiff, ) ) vs. ) ) BRIAN BOWERS, an individual; ) DEXTER C. KUBOTA, an individual; BOWERS + KUBOTA ) CONSULTING, INC., a corporation; BOWERS + KUBOTA ) CONSULTING, INC. EMPLOYEE STOCK OWNERSHIP PLAN, ) ) Defendants. ) _____ ) | CIVIL NO. 18-00155 SOM-WRP POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF REMAINING DEFENDANTS |

**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF REMAINING DEFENDANTS**

**I.       INTRODUCTION.**

Defendants Brian Bowers and Dexter Kubota owned all the stock in an engineering firm called Bowers + Kubota Consulting, Inc. (the "Company").  They created an Employee Stock Ownership Plan ("the ESOP")[1] to which they sold all their shares for $40,000,000.  The Government then sued Bowers and Kubota, alleging that they had violated the Employee Retirement Income Security Act of 1974 ("ERISA") by manipulating data to induce the

_____

[1] This order refers to "an ESOP" (rather than "the ESOP") when discussing the generic concept of an ESOP, reserving "the ESOP" for the particular ESOP that purchased the Company's shares.

ESOP to pay more than the Company's fair market value.  This court determines that no ERISA violation has been established.

Part of the Government's case is based on a preliminary nonbinding indication of interest by a private company to purchase the Company for what the Government says was $15,000,000.  That indication of interest expressly recognized that the dollar amount needed to be adjusted to reflect the cash and debt on the Company's balance sheet.  Had that adjustment occurred, the quoted dollar figure would have risen to about $29,000,000.  In any event, the Company never agreed to sell for $15,000,000, meaning that that figure did not represent what a willing buyer and willing seller would mutually agree to.  The indication of interest ends up having little relevance to the fair market value of the Company.  The Government also cites its expert, Steven J. Sherman, who valued the Company at $26,900,000.  However, because that valuation rests on errors, the court is not persuaded by it.

The Government does not establish that the Company was worth less than $40,000,000 on the day of its sale.  That is, the record does not show that the ESOP paid more than the Company's fair market value.  Nor does this court find that Bowers and Kubota breached any fiduciary duty or are liable for any prohibited transaction, as they demonstrate that the Company was worth at least $40 million on the day of its sale.

Accordingly, this court, following a one-week nonjury trial,[2] finds in favor of Bowers and Kubota and against the Government.

## II.      FINDINGS OF FACT.

### A.    Overview.

On December 14, 2012, Bowers and Kubota, through their respective trusts, sold all 1,000,000 shares of the Company to the Company's ESOP for $40,000,000.  Before the sale, the Brian J. Bowers trust, dated December 22, 2010, owned 510,000 of the 1,000,000 shares of the Company, and the Dexter C. Kubota Trust, dated March 17, 2006, owned the other 490,000 shares.  *See* Joint Ex. 36 at DOL 000312.  Thus, $20,400,000 of the sales price was to be paid to Bowers's trust, and $19,600,000 to Kubota's trust. *Id.* at DOL 000312-13.  Nicholas L. Saakvitne, the ESOP's independent fiduciary and trustee, executed the purchase agreement on behalf of the ESOP.  *Id.* at DOL 000325.

The ESOP, which paid for the shares with funds lent by Bowers and Kubota, agreed to pay Bowers and Kubota interest of 7

---

[2] The trial proceeded in accordance with this court's nonjury trial procedures, pursuant to which direct examination is presented through written declarations, rather than through oral testimony in open court.  *See* Procedures for Trials Before Judge Susan Oki Mollway ¶ 15, https://www.hid.uscourts.gov/ (click on "Judge's Requirements," then on "Senior Judge Susan Oki Mollway," then on "Trial Procedures").  Under this procedure, the court rules on objections to the declarations, then hears live cross-examinations and live redirect examinations.  Some of the witnesses testified by agreement via videoconference.  The trial was conducted with various COVID-related protections in effect.

percent per annum on the amounts owed.  The loan was for 25 years.  *See* Joint Exs. 39-42.

Once they sold their shares, Bowers and Kubota ceased to be the owners of the Company, and instead employees had the option of owning stock and thereby becoming part-owners of the Company.  Of course, as with any stock purchase, whether an employee benefits by being a stock owner depends on the price of the stock and also on whether the Company's performance leads to increases or decreases in the value of the stock.  Clearly, if the stock is overvalued, the employee who holds stock does not enjoy the benefit that an ESOP should be designed to confer.  Unlike stock purchases outside the employment context, the Company's employees had and have certain protections under ERISA.

The Government's central contention in this case is that the sale for $40,000,000 violated ERISA.  *See* Joint Ex. # 1; *see also* ECF No. 1.  Before trial, the Government settled its claims against Saakvitne, the original trustee of the ESOP, and against the Saakvitne Law Corporation.  See ECF No. 453.  What went to trial were the following claims:

a.   Bowers and Kubota failed to discharge fiduciary duties with the proper care, skill, prudence, and diligence in violation of 29 U.S.C. § 1104(a)(1)(A), (B), and (D) (Complaint ¶ 37);

4

b.   Bowers and Kubota are liable for breaches of fiduciary responsibilities by other fiduciaries under 29 U.S.C. § 1105(a)(1)-(3) (Complaint ¶¶ 40-43);

c.   Bowers and Kubota engaged in prohibited transactions between a plan and a party-in-interest in violation of 29 U.S.C. § 1106(a)(1)(A) (Complaint ¶¶ 45-47);

d.   Bowers and Kubota engaged in prohibited transactions with the Company's ESOP in violation of 29 U.S.C. § 1106(a)(1)(A) (Complaint ¶¶ 49-50); and

e.   Bowers and Kubota knowingly participated in a transaction prohibited by ERISA under 29 U.S.C. § 1132(a)(5) (Complaint ¶¶ 52-53).

**B.   The Company.**

The Company is a Hawaii corporation that provides architectural and engineering design, project management, and construction management services throughout Hawaii and the Pacific Rim.  See Am. Trial Decl. of Brian J. Bowers ¶ 6, ECF No. 640, PageID #21376.

The Company's predecessor, KFC Airport, Inc., was formed in or about 1980.  In or about 1997, Bowers bought 100 percent of the shares of KFC Airport.  Bowers is the Company's president and sits on its board of directors.  *See* Am. Trial Decl. of Dexter C. Kubota ¶ 5, ECF No. 639, PageID # 21360; Am. Bowers Decl. ¶¶ 3, 5, and 6, ECF No. 640, PageID # 21376.

5

Kubota joined the Company in 1988 and later purchased 49 percent of the Company's shares, leaving Bowers with the other 51 percent of the Company's shares.  Kubota is the Company's vice president and sits on its board of directors.  *See* Am. Kubota Decl. ¶¶ 3, 5, and 6, ECF No. 639, PageID # 21360; Am. Bowers Decl. ¶ 4, ECF No. 640, PageID # 21376.

Bowers and Kubota placed the ownership of their respective Company shares into their respective trusts, which they controlled for their own benefit.  *See* Am. Bowers Decl. ¶ 8, ECF No. 640, PageID # 21376.  The court therefore treats what was the trusts' ownership of the Company as indistinguishable from ownership by Bowers and Kubota for purposes of the present decision.

### C.   The Company's Financial Statements.

Thomas Nishihara, a certified public accountant ("CPA") and the vice president of Robert H.Y. Leong & Company Certified Public Accountants A Professional Corporation, has been the Company's outside accountant since 2008.  *See* Decl. of Thomas Nishihara ¶¶ 1, 3, 5, ECF No. 593, PageID #s 19654-55.

Nishihara has prepared the Company's tax returns and financial statements.  *Id.* ¶¶ 6-7, PageID # 19655.  From 2008 to 2011, Nishihara prepared those financial statements using the income tax basis of accounting, which is essentially a cash basis accounting method.  *Id.* ¶ 15, PageID # 19657.  The cash basis of

6

accounting examines when revenue is received and when expenses are paid. *See* Bowers Test., ECF No. 640, PageID # 20439. In 2012, at the requests of Gary Kuba and Gregory Kniesel, who were hired to appraise the Company, Nishihara began using the accrual basis, which involves reporting revenues when earned and expenses when incurred. Nishihara actually converted the 2011 financial statement from a cash basis to an accrual basis. Under the accrual basis, annual expenses such as bonuses not yet earned may be reported as a contingency. *See* Nishihara Decl. ¶¶ 16-18, PageID # 19657.

Nishihara says that, for 2011 and 2012, he did not calculate the Company's earnings before interest, taxes, depreciation, and amortization ("EBITDA"). EBITDA is "essentially the pretax profits of the company." Test. of Steven J. Sherman, ECF No. 631, PageID # 20923. Nishihara explained that EBITDA can be calculated by taking the net income and adding interest, taxes, depreciation, and amortization. *See* Nishihara Test., ECF No. 629, PageID # 20527. Thus, Nishihara says, the Company's EBITDA could be calculated from the financial statements he prepared. *See* Nishihara Decl. ¶ 14, PageID # 19656; Nishihara Test., ECF No. 629, PageID # 20527.

Joint Exhibit 48 is an estimate of the Company's revenue for fiscal year 2012 prepared by Bowers and Kubota. *See* Kubota Amd. Decl. ¶ 19, ECF No. 639, PageID # 21363. It details

7

the Company's contracts and lists historical financial data, as summarized below:

| Year | Revenue |
|---|---|
| 2003 | $5,669,000 |
| 2004 | $7,417,000 |
| 2005 | $7,880,000 |
| 2006 | $9,803,000 |
| 2007 | $13,719,000 |
| 2008 | $15,005,000 |
| 2009 | $15,410,000 |
| 2010 | $21,500,000 |
| 2011 | $22,005,000 |
| 2012 (estimated) | $24,964,000 |

Joint Exhibit 48 contains a profitability comparison that details the Company's historical net income.[3]

Joint Exhibit 47 is a valuation of the Company by Libra Valuation Advisors ("LVA") as of December 14, 2012, the day the Company's shares were sold to the ESOP. There is no dispute about the accuracy of the historical EBITDAs listed in Joint Exhibit 47. This court therefore accepts those figures even though the calculation of the historical EBITDAs has not been detailed. Joint Exhibit 47 also lists the projected EBITDA of the Company for 2012 as $9,240,000 (rounded up to nearest

---

[3] The dollar amounts listed in the profitability comparison do not appear to represent EBITDA.

$10,000).  *See* Joint Ex. 47 at DOL 000235.  Exhibit 5 to Joint Exhibit 47 lists the Company's EBITDAs for 2008 to 2012:

| Year | EBITDA |
|------|--------|
| 2008 | $1,670,000 |
| 2009 | $1,585,000 |
| 2010 | $3,050,000 |
| 2011 | $2,614,000 |
| 2012 (estimated) | $9,235,000 |

*See* Joint Ex. 47 at DOL 000255.

Joint Exhibit 49 is LVA's valuation of the Company as of December 31, 2012, about two weeks after the sale.  It lists the Company's actual EBITDA in 2012 as $7,050,000 (rounded to the nearest $10,000).  *See* Joint Ex. 49 at DOL 000120; Joint Ex. 49, Ex 5, DOL 000138 (listing the 2012 EBITDA as $7,047,000).

The Government's expert, Steven J. Sherman, calculated "an adjusted EBITDA projection for 2012 of $4.9 million, more in line with the Company's historical financial performance."  *See* Sherman Decl ¶ 187, ECF No. 635, PageID # 21323.  Sherman opined that a company with historical profits of $2 million to $5 million would not "turn on a dime and go to nine or $10 million." Sherman Test., ECF No. 631, PageID # 20923.  However, as detailed below, Sherman's calculation overlooks certain circumstances.[4]

---

[4] Unless the court specifically notes problems with testimony or expressly states a credibility problem, the court found witnesses credible.

In November 2012, Bowers and Kubota projected the Company's revenue for 2013 to 2017. Bowers said they had a pretty good idea what their revenue would be for 2013 and that, for 2014 to 2017, they projected a 5 percent growth rate. The Company's earnings were trending upward in 2012, and the Company had a backlog of contracts. *See* Decl. of Ian C. Rusk ¶¶22-24, ECF No. 622, PageID #s 20159-60. Bowers said they calculated expenses based on historical averages. *See* Bowers Test., ECF No. 628, PageID # 20402; Def. Ex. 89, Bates No. Pia 010048 or LIBRA-DOL INV 004759. Bowers also testified that the Company ended up performing very well from 2013 to 2017. *Id.*, PageID # 20403.

**D.   Initial Discussions with URS.**

Between 2008 and 2012, Bowers and Kubota had considered and discussed selling the Company to: 1) others in the Company's management, 2) a private party, or 3) an employee stock ownership plan. *See* Test. of Brian J. Bowers, ECF No. 628, PageID # 20340; Am. Kubota Decl. ¶ 21, ECF No. 639, PageID # 21363. Bowers and Kubota ultimately ruled out a sale to others in the Company's management because those managers were not interested in buying the Company and/or lacked the financial means to do so. *See* Bowers Test., ECF No. 628, PageID # 20340.

Bowers and Kubota did communicate with private companies, including URS Corporation, about a possible sale. In 2011, Bowers and Kubota approached Sunnie House, the Pacific Sub

10

Region Manager of URS, to discuss whether URS might be interested in purchasing the Company. House then prepared a memorandum for the URS corporate acquisition team. *See* Decl. of Sunnie House ¶¶ 3, 5, 7, ECF No. 599, PageID #s 19707-08. Paul Vallone, URS's director of corporate development, was responsible for managing its mergers and acquisitions. *See* Depo. Desig. of Paul Vallone, ECF No. 653-1, PageID # 23329. After the Company provided URS with various documents, including its sales numbers, award list, resumes, and 2010 tax returns, Vallone helped URS evaluate a possible purchase of the Company, then sent the Company a preliminary nonbinding indication of interest on or about December 5, 2011. *See* House Decl., ¶¶ 8-9, PageID #s 19708; Depo. Designations of Paul Vallone, ECF No. 653-1, PageID # 23369; Joint Ex. 4 (copy of Nonbinding Letter of Interest). That indication of interest stated that URS was interested in purchasing the Company for $15,000,000, plus or minus "cash and debt on the Company's balance sheet." It noted that the communication did not constitute an offer and stated, "If the proposal contained in this letter is acceptable to you, we are prepared to move to the next steps in the acquisition process, enter into an agreement for exclusivity for a period of 90 days, and begin initial due diligence." Bowers acknowledged and agreed to those terms. *See* Joint Ex. 4.

11

When asked at his deposition whether URS had conducted a due diligence review of the Company before sending its indication of interest, Vallone responded, "Very little. There would have been some financial review in order to come up with that number of 15 million, but we did not begin to do detailed due diligence on the [C]ompany." Depo. Desig. of Paul A. Vallone, ECF No. 653-1, PageID # 23388.

The Company at the time had more than $7 million in cash and more than $7 million in working capital. Had this been added to the $15 million cited in URS's indication of interest, the dollar amount would have risen to about $29 million to $30 million. *See* Bowers Test., ECF No. 628, PageID # 20373; Kubota Test., ECF No. 628, PageID # 20495; Amd. Kubota Decl. ¶ 28, ECF No. 639, PageID # 21364 (indicating that the Company's cash and work in progress "was potentially another $15 million"); Amd. Trial Decl. of Gregory E. Kniesel ¶ 57, ECF No. 641, PageID # 21402 (indicating that URS's nonbinding proposed purchase price was $29 to $30 million). The Government ignores the actual "cash and debt on the Company's balance sheet" that the URS indication of interest expressly acknowledged should be considered. *See* Government's Proposed Findings of Fact and Conclusions of Law, ECF No. 655, PageID # 23541 (characterizing URS's preliminary nonbinding indication of interest as being for $15 million).

No agreement with URS was ever reached.  This court therefore finds that the URS preliminary nonbinding indication of interest has little relevance to the actual value of the Company. An individual who makes an offer of $15,000 for a used luxury car with a Blue Book value of $40,000 does not, by virtue of making a "lowball" offer that is never accepted, tend to establish that the car is worth only $15,000.  Here, there is no evidence that the URS indication of interest was the price that a willing buyer was willing to pay *and* that a willing seller was willing to accept. *See* IRS Revenue Ruling 59-60, § 2.02 (fair market value is "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."), https://www.pvfllc.com/files/IRS_Revenue_Ruling_59-60.pdf (last visited September 15, 2021).

On January 25, 2012, while in discussion with URS, the Company hired GMK Consulting to provide a valuation of the Company for negotiation purposes.  GMK's principal was Gary Kuba, a CPA accredited as a business valuator by the American Institute of Certified Public Accountants.  *See* Joint Ex. 6; Bower's Test., ECF No. 628, PageID #s 20353, 20376; Decl. of Gary Kuba ¶ 6, ECF No. 600, PageID #s 20545; Kuba Decl. ¶¶ 17 and 21, ECF No. 600, PageID #s 19713-14.  According to the Company's letter engaging

13

GMK, GMK was being asked to prepare a limited report for internal use only. *See* Joint Ex. # 6.

In the course of its discussions with URS, the Company had sent URS more than a hundred documents, including financial information and material showing projected profits of $9,284,000 for 2012. *See* Bowers Test., ECF No. 628, PageID # 20351; Joint Ex. 48. In a statement that would be echoed during trial by the Government's expert, Steven Sherman, Kuba expressed concern about the reasonableness of this projection because it represented a "significant jump" from the Company's past performance. Kuba Decl. ¶ 29, ECF No. 600, PageID # 19717. The Company listed its profit for 2011 as $6,452,000. It listed its profit for 2010 as $6,367,000, its profit for 2009 as $4,332,000, and its profit for 2008 as $4,332,000. *See* Joint Ex. 48.

On March 21, 2012, despite his earlier concerns about the projected 2012 profits, Kuba relied on that figure because "the scope of my assignment was an internal-use analysis for negotiation purposes." Kuba Decl. ¶ 29, ECF No. 600, PageID # 19717. Kuba then sent Bowers his preliminary valuation of the Company at about $38,184,000. *See* Govt. Ex. 33. Bowers forwarded the preliminary valuation to the Company's CPA, Nishihara, telling him that the value "seems very high." *Id.* Bowers later described this response as one of surprise, given

14

the much lower figure in the URS indication of interest.  *See* Bowers Test., ECF No. 628, PageID # 20387.

Before sending Bowers its valuation at $38,184,000, GMK had gone through several valuation drafts.  An early draft listed a range of $31 to $54 million.  After Bowers submitted comments, GMK reduced the upper range to be between $40 and $46 million. Ultimately, GMK ended up providing a valuation of approximately $39.7 million.  *See* Bowers Test., ECF No. 628, PageID # 20384; Joint Ex. 17, Bates No. Bowers/Kubota 007208 (valuation of $39,676,623).  Kuba said LVA charged very little for this quick and limited valuation, as Kuba did not dig into the underlying assumptions or do much due diligence.  *See* Decl. of Gary Kuba ¶ 25 and 29, ECF No. 600, PageID # 19716-17.  Given the limited scope of GMK's valuation, this court accords it little weight in determining the value of the Company.

The Company sent GMK's final valuation report to URS. This had clearly not been contemplated by GMK, which had been hired to produce a valuation for internal use only.  Shortly thereafter, the Company and URS ended their discussion about a possible sale of the Company.  *See* Bowers Test., ECF No. 628, PageID #s 20358, 20385: Kubota Test., ECF No. 628, PageID # 20448; Amd. Kubota Decl. ¶¶ 48-49, ECF No. 639, PageID # 21367; Kuba Decl. ¶ 50, ECF No. 600, PageID # 19723.

By June 2012, Bowers and Kubota, no longer exploring a sale to URS, were considering whether to sell the Company to an ESOP.  *See* Bowers Test., ECF No. 628, PageID #s 20358-59; Amd. Bowers Decl. ¶ 24, ECF No. 640, PageID # 21379; Def. Ex. 50 (June 19, 2012, email from Bowers to Kuba and Kubota, stating, "Gary: We may be moving in the ESOP direction.").

**E.   The Decision to Form the ESOP.**

Kuba recommended to Bowers that the Company hire Gregory M. Hansen, an attorney with the Honolulu law firm of Case Lombardi & Pettit, to help with the potential sale to the ESOP. *See* Amd. Bowers Decl. ¶ 25, ECF No. 640, PageID # 21379.  Hansen had significant experience with ESOPs.  In 2012, for example, more than 50 percent of Hansen's legal practice involved ESOPs. *See* Amd. Decl. of Gregory M. Hansen ¶ 14, ECF No. 642, PageID # 21414.

In late August 2012, Bowers and Kubota met with Hansen. *See* Amd. Bowers Decl. ¶ 26, ECF No. 640, PageID # 21379.  Hansen recalls asking what minimum price Bowers and Kubota would sell the Company for and remembers that they replied that they hoped to get $40 million.  *See* Amd. Hansen Decl., ECF No. 642, PageID # 21439; Hansen Test., ECF No. 629, PageID # 20593.  Hansen explained to them that the sale price could not exceed fair market value as determined in good faith by an independent professional.  *See* Hansen Test., ECF No. 629, PageID # 20602.  On

16

August 30, 2021, Hansen told Bowers and Kubota that they should get a formal valuation of the Company from Kuba as soon as possible.  *See* Amd. Hansen Decl. ¶ 55, ECF No. 642, PageID # 21426.

On September 2, 2012, the Company signed a formal retainer agreement with Hansen, who was to coordinate a team of professionals, draft plan documents, and provide advice relating to the structure of a possible sale of the Company to an ESOP. *See* Amd. Bowers Decl. ¶ 27, ECF No. 640, PageID # 21379; Amd. Hansen Decl. ¶ 41, ECF No. 642, PageID # 21422; Joint Ex 15 (copy of engagement letter).

In the Fall of 2012, Bowers and Kubota concluded that they would indeed form an ESOP.  *See* Amd. Kubota Decl. ¶ 51, ECF No. 639, PageID # 21368.  There were tax advantages for Bowers, Kubota, the Company, and ESOP participants if the ESOP was formed by the end of 2012.  *See* Amd. Kubota Decl. ¶ 55, ECF No. 639, PageID # 21368.  Marcus Piquet, a CPA, was retained to advise on tax accounting issues related to ESOP transactions.  *See* Depo. Desig. of Marcus Piquet, ECF No. 591-1, PageID #s 19519, 19528.

**F.   LVA Appraisal of the Company.**

In July 2012, Kuba told Bowers that GMK was willing to prepare a formal valuation of the Company in connection with the formation of an ESOP.  *See* Kuba Test., ECF No. 629, PageID # 20573; Joint Ex. 13 (email from Bowers to Nishihara, stating

17

that Kuba is interested in "assisting us with the ESOP"). However, in October 2012, Kuba told the Company that he no longer wished to work on the valuation because he had come to feel "uncomfortable with the structure of the transaction." Kuba Decl. ¶ 57, ECF No. 600, PageID # 19725. Kuba's discomfort may have related to the nature of the transaction being proposed at the time--a minority transaction involving preferred stock, a structure that Kuba was unfamiliar with. *See* Hansen Test., ECF No. 629, PageID #s 20646-47; Hansen Decl. ¶ 17, ECF No. 646, PageID # 23154. Additionally, Kuba was conscious that he had previously rendered a limited valuation using the Company's projections. *See* Hansen Test., ECF No. 629, PageID # 20644; Kuba Decl. ¶ 57, ECF No. 600, PageID # 19725. With Kuba's withdrawal, Hansen recommended that the Company retain LVA, whose principal valuation expert was Greg Kniesel. *See*. Kubota Decl. ¶ 57, ECF No. 639, PageID # 21369.

On October 20, 2012, LVA sent "The Board of Trustees of the Proposed Bowers + Kubota Employee Stock Ownership Plan" a proposed engagement letter. *See* Govt. Ex. 48. In the engagement letter, LVA agreed to provide a preliminary analysis and fair market value of the Company's stock no later than November 21, 2012, with a final summary letter no later than December 31, 2012. *See* Govt. Ex. 48, Bates No. DOL 001420.

18

Bowers sent Kniesel copies of the Company's accrual-basis financial statements for 2011 and 2012, as well as GMK's final valuation report. *See* Amd. Bowers Decl. ¶ 32, ECF No. 640, PageID # 21380; Amd. Kubota Decl. ¶ 59, ECF No. 639, PageID # 21369. Then, two days after the date of LVA's proposed engagement letter, Bowers and Kubota met Kniesel in Chicago. *See* Amd. Bowers Decl. ¶ 31, ECF No. 640, PageID # 21380; Amd. Kubota Decl. ¶ 57, ECF No. 639, PageID # 21369.

On November 21, 2012, LVA sent the Board of Trustees of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust a "preliminary fair market value of the common stock" of the Company. *See* Joint Ex. 20. LVA preliminarily determined that the "ESOP Controlling Interest Value" fell between $37,090,000 and $41,620,000. *Id.* The next day, Bowers sent Nishihara (the Company's outside CPA) LVA's preliminary valuation as an attachment to an email, stating, "Range is tighter and falls within Gary's previous range which is good." Joint Ex. 21.

**G.   Hiring Saakvitne as the ESOP Trustee.**

On November 21, 2012, Bowers and Kubota met with the Company's attorney, Hansen. Hansen had prepared a written agenda for the meeting that included a line item for "Trustee appointment--independent highly recommended." Joint Ex. 21. During the meeting, Hansen mentioned several names as possible trustees, but he strongly recommended Saakvitne as the ESOP

19

trustee.  Hansen had worked with Saakvitne on multiple ESOP transactions and considered Saakvitne to be a qualified and competent trustee.[5]  *See* Hansen Decl. ¶¶ 38-39, 69, ECF No. 642, PageID #s 21420-21, 21429; Hansen Decl. ¶ 27, ECF No. 646, PageID # 23158; Bowers Test., ECF No. 628, PageID # 20407-08.  Bowers and Kubota agreed to hire Saakvitne based on that advice, Saakvitne's resume, and a call with Saakvitne.  *See* Hansen Decl. ¶ 70(a), ECF No. 642, PageID # 21429; Hansen Test., ECF No. 629, PageID #s 20604-05; Bowers Test., ECF No. 628, PageID #s 20416-17; Kubota Test., ECF No. 628, PageID # 20479.

Also on November 21, 2012, Hansen sent an email to Saakvitne with the subject "Bower+Kubota" (sic), telling Saakvitne that "[t]hey agreed to hire you on my advice."  Govt. Ex. 58; Hansen Decl. ¶ 29, ECF No. 646, PageID # 23158.  The email further stated, "This is looking like a $12 million preferred stock transaction.  There is a slight possibility they will change their mind and do a 100% transaction for 40 million . . . ."  Govt. Ex. 58.  Hansen told Saakvitne that Hansen was leaving town on December 19, 2021, and that the sale would have to close by that date.  *Id.*  Saakvitne was not the only person that Hansen told about the possible $40,000,000 price.  *See* Depo. Desig. of Marcus Piquet, ECF No. 591-1, PageID #s 19579-80

---

[5] The court takes judicial notice of Saakvitne's death on or about October 2, 2018.  *See* Suggestion of Death, ECF No. 35. Saakvitne was therefore unavailable to testify at trial.

(Hansen asked Piquet to look into a $40,000,000 loan); Govt. Ex. 66 (Piquet's Preliminary Action Plan, based on conference call on December 7, 2012, stating, "Brian and Dexter sell their stock to the ESOP for $40MM.").

On November 22, 2012, Hansen sent an email to Saakvitne that attached LVA's draft valuation of the previous day, telling Saakvitne that his engagement letter should be with the Trustees of the Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan.  Govt. Ex. 59; Hansen Decl. ¶ 75, ECF No. 642, PageID # 21430.

On November 23, 2012, Hansen sent an email to Saakvitne that was cc'd to Kniesel of LVA.  The email asked Saakvitne to send Kniesel a copy of Saakvitne's draft engagement letter or to send Kniesel Saakvitne's exact title.  Hansen told Saakvitne that he had asked Kniesel to revise LVA's engagement letter to run directly to the ESOP trustee.  *See* Joint Ex. 24; Hansel Decl. ¶ 77, ECF No. 642, PageID # 21431.

On or about November 26, 2012, the Company and Saakvitne entered into an Employee Stock Ownership Plan Fiduciary Agreement Between Bowers + Kubota Consulting, Inc. and Nicholas L. Saakvitne.  Pursuant to this agreement, Saakvitne was to evaluate any proposed sale of the shares of the Company, negotiate terms on behalf of the ESOP, and continue to serve as

the ESOP's trustee after that.  *See* Joint Ex. 27; Kubota Test., ECF No. 628, PageID #s 20417-18.

On December 3, 2012, Bowers and Kubota, in their capacities as members of the Company's board of directors, signed a Resolution of Board of Directors by Unanimous Written Consent Without a Meeting that adopted the ESOP and appointed Saakvitne as the independent fiduciary and the sole ESOP trustee, retroactively effective as of January 1, 2012.  *See* Joint Ex. 28.

### H.   The ESOP Document.

On December 11, 2012, Bowers and Kubota, in their capacities as the Company's officers, adopted the Bowers + Kubota Consulting, Inc. Employee Stock Ownership Plan (Effective As Of January 1, 2012).  *See* Joint Ex. 38, Pages 1 and 90 of 100.

### I.   Negotiating the Sale to the ESOP.

On December 10, 2012, Bowers and Kubota offered to sell the "ESOP 100 percent of the Company's common stock for $41 million."  Joint Ex. 32 at Bowers/Kubota 0182242.  Bowers proposed that the sale would be financed at 10 percent interest per annum amortized over 20 years.  *Id.*

Saakvitne sent Bowers and Kubota a counteroffer, offering to pay $39 million with a 25-year loan at 6 percent interest.  Joint Ex. 32 at Bowers/Kubota 0182241-42.

Bowers then countered at $40 million, with a 25-year loan at 8 percent interest.  Joint Ex. 32 at Bowers/Kubota 0182241.

Saakvitne agreed to the $40 million price, but countered with a request for a loan at 7 percent interest, which Bowers and Kubota accepted.  Joint Ex. 32 at Bowers/Kubota 0182239-40.  Bowers and Kubota knew that the sale could only close at $40 million if an independent professional determined that that price did not exceed fair market value.  *See* Hansen Test., ECF No. 629, PageID # 20602 (Hansen told Bowers and Kubota that the sale price could not exceed fair market value as determined in good faith by an independent professional).

Saakvitne's negotiation saved the Company's ESOP millions of dollars.  *See* Bowers Test., ECF No. 628, PageID # 20433; Gregory K. Brown Test., ECF No. 631, PageID # 21049 ("Well, in a $40 million deal, each 1 percent would be saving $400,000 a year, 3 percent would be $1.2 million a year.  You know, that would drop off a little bit as the debt got paid down, but it would be quite a while where it would be, you know, a million dollars or more or even just slightly less of savings to the company because this was money that was, you know, being paid to the sellers.").

Bowers and Kubota had told Hansen that they wanted $40 million for the Company, and Hansen had told Saakvitne and others

23

about that price point.  The Government raises concern about how the parties ended up agreeing on the very amount that Bowers and Kubota wanted, suggesting that Saakvitne failed to really study the valuation and simply acquiesced in the sellers' price.  But, as detailed later in these findings of fact, Saakvitne had LVA's valuation indicating that the Company was worth at least $40 million.  Thus, Saakvitne had a good faith basis for agreeing to purchase the Company for $40 million.

### J.   Before Finalizing the Details of the Sale, Saakvitne Conducted Due Diligence.

Saakvitne was responsible for retaining a qualified independent appraiser to value the Company.  *See* Bowers Test., ECF No. 628, PageID # 20419.  He hired LVA, although, with his unfettered discretion to hire any independent appraiser, nothing required him to do so.  *See* Gregory Kniesel Test, ECF No. 630, PageID # 20751; Bowers Test., ECF No. 628, PageID # 20419-20; Kubota Test., ECF No. 628, PageID # 20487.  At most, Saakvitne knew that there was not much time to get a valuation by Hansen's deadline of December 19, 2012, if an appraiser unfamiliar with the Company were to begin its valuation analysis only after Saakvitne formally became the ESOP trustee on November 26, 2012.  But in fact that was not a rigid deadline.  *See* Kubota Test., ECF No. 628, PageID # 20494.  As Hansen testified, although he referred to that December date in connection with his personal schedule, he "did not intend in any manner to imply that a

24

transaction should be completed prior to the time that the parties were able to address all of their legal obligations and responsibilities relating to a transaction.  It was simply informational regarding my vacation schedule." Hansen Decl. ¶ 31, ECF No. 646, PageID # 23159.

On December 7, 2012, LVA changed its engagement letter to indicate that it was working for Nicholas L. Saakvitne, Trustee of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust. *Compare* Joint Ex. 20 *with* Joint Ex. 30; Kniesel Test., ECF No. 630, PageID # 20749.  The engagement letter signed by Saakvitne now stated that LVA prepare an analysis concerning the fair market value of the Company's stock and addressing whether the price the ESOP was paying for the stock was greater than its fair market value, whether the terms of a loan were at least as favorable to the ESOP as a comparable loan from an arm's length negotiation, and whether any sale was fair to the ESOP from a financial point of view.  *See* Joint Ex. 30.

On December 11, 2012, LVA sent Saakvitne a preliminary valuation of the Company, indicating a value range of $37,470,000 to $41,250,000.  *See* Def. Ex. 136 (LIBRA-DOL INV 005537) (indicating that the email was sent on December 11, 2012, at 3:30 p.m. EST).  Saakvitne had this preliminary valuation when he agreed to the terms of the sale.  *See* Joint Ex. 136 at Bowers/Kubota 018239 (email sent on December 11, 2012, at 4:55 pm

PST, which is 7:55 EST).  Apparently, Saakvitne also talked with Kniesel, of LVA, that same day.  *See* Govt. Ex. 74 at SAK000049 (admitted into evidence on June 24, 2021, ECF No. 631, PageID # 20994, but not mentioned in the minutes for that day).  Of course, the agreement on the price was only preliminary, as the closing documents were not executed until three days later and the parties knew of the requirement that an independent appraiser had to determine that the sale price did not exceed fair market value.

On December 14, 2012, LVA sent Saakvitne a summary of its valuation regarding the fair market value of the Company's stock.  *See* Joint Ex. 34.  LVA concluded that the fair market price of the Company's stock was $40.15 per share based on the 1,000,000 shares of the Company in existence.  *See* Joint Ex. 34 at DOL 003415.  Because the purchase price of $40,000,000 was slightly less than the $40,150,000 value LVA determined the Company was worth, LVA concluded that "the price paid by the ESOP to acquire the Common Stock in the Transaction is not greater than the fair market value of the Common Stock."  *Id.*  Saakvitne himself therefore viewed the proposed purchase price of $40,000,000 as not exceeding the fair market value of the shares. *See* Joint Ex. 35 at RHYL000481.  In its letter dated December 14, 2012, LVA also said that the terms of the loans to the ESOP from Bowers and Kubota were "at least as favorable to the ESOP, from a

financial standpoint, as would be the terms of a comparable loan resulting from arm's-length negotiation between independent parties." Joint Ex. 34 at DOL 003416. LVA further determined that the transaction was fair to the ESOP from a financial point of view. *Id.*

LVA's actual evaluation of the Company as of December 14, 2012, was attached to its summary. *See* Joint Exhibit 47. Saakvitne would have had this evaluation in hand when he entered into the stock purchase agreement dated the same day. *See* Exhibit 36.

Saakvitne apparently documented and billed for only 30.1 hours of work before the Company sold its stock to the ESOP. *See* Govt. Ex. 74. The Government's expert, Mark Johnson, opined that Saakvitne had clearly rushed the transaction, doing only minimal work and improperly relying on Kniesel, who Johnson said did not qualify as an independent appraiser, given his prior work for Bowers and Kubota. *See* Decl. of Mark Johnson ¶¶ 22(a) and (f), ECF No. 636, PageID #s 21339-40; Test. of Mark Johnson ECF No. 630, PageID # 20856. Gregory K. Brown, a defense expert with 45 years of legal practice involving ERISA, differed with Johnson's assessment, testifying that Saakvitne's due diligence was sufficient and consistent with those of ERISA fiduciaries. Brown characterized the sale of the Company as "relatively straightforward," noting that "[a] more complicated transaction

27

would have required more due diligence."  Amd. Decl. of Gregory K. Brown ¶¶ 7, 33, 50, ECF No. 648, PageID #s 23181, 23196-97, 23207.

Faced with these dueling opinions, this court turns to examining who bears the burden of proving either a deficiency in Saakvitne's performance as the ESOP trustee, or Saakvitne's satisfactory performance.  It is the Government, as the plaintiff, that must prove Saakvitne's failings.  The Government's expert, Johnson, did not detail what kind of review another trustee might have done.  Instead, he simply concluded, "Rather than taking the time to properly supervise and evaluate the process, [Saakvitne] seemed proud of bringing the transaction to conclusion based [on] a tight and entirely artificial time frame."  *See* Johnson Decl. ¶ 22(f), ECF No. 636, PageID # 21340; *see also* Johnson Test., ECF No. 630, PageID # 3-138 (stating that Saakvitne only spent 28 hours working on the transaction, but not quantifying whether 28 hours is more or less than one would expect based on comparably complex transactions).  This is insufficient to meet the Government's burden.

The court is not, however, suggesting that the Government was acting on a mere whim in questioning Saakvitne's reliance on a valuation provided by the very appraiser who had previously provided a preliminary fair market value to the Board of Trustees of the Proposed Bowers + Kubota Employee Stock

Ownership Plan before Saakvitne became the ESOP trustee.  For that reason, this court takes the time to study with some care what LVA did.

### K.   LVA's Valuation dated December 14, 2012.

LVA used three methods to determine the value of the Company: 1) the guideline public company method, 2) the industry acquisitions method, and 3) the discounted cash flow method.  *See* Joint Ex. 47 at DOL 000239.

Under the guideline public company method, LVA compared the Company to other publicly traded companies, concluding that the value of a 100 percent controlling interest in the Company using this method was $44,590,000.  *See* Joint Ex. 47 at DOL 000236-37.

Under the industry acquisition method, LVA examined the sale prices of other comparable companies, concluding that the value of a controlling interest in the Company using this method was $42,250,000.  *See* Joint Ex. 47 at DOL 000237-38.

Under the discounted cash flow method, LVA examined the Company's projected cash flow, including the residual value of the Company at the end of the forecasting horizon.  LVA then discounted that amount by 18 percent to reflect the Company's present value.  *See* Joint Ex. 47 at DOL 000238-39; Joint Ex. 47, Ex. 14 at DOL 000265.  LVA then added a control premium of 30 percent after examining other companies and determined that the

value of a 100 percent controlling interest in the Company under the discounted cash flow method was $40,390,000.  *See* Joint Ex. 47 at DOL 000239-40;  Joint Ex. 47, Ex. 14 at DOL 000265.

While the Government says that the LVA valuation is flawed because it used the 2012 projected EBITDA of $9.24 million in its discounted cash flow analysis, *see* Government's Proposed Finding of Fact ¶ 92, ECF No. 655, PageID # 23561, LVA does not appear to have done that.  *See* Joint Ex. 47 at DOL 000238-39 (noting that "[t]he analysis for the DCF Method is based on . . . projected income statements after an adjustment has been made . . . to include income taxes at a 40 percent rate").  *Id.* at DOL 000238.

LVA assigned greater weight to the discounted cash flow method "because Management projects moderately lower, but increasing, profitability through 2017."  *See* Joint Ex. 47 at DOL 000239.  LVA assigned the discounted cash flow method a weight equal to the weight of the other two methods combined.  Balancing the three methods, LVA concluded that a 100 percent controlling interest in the Company was worth $41,910,000.  *Id.*

LVA viewed the Company as having $5,328,000 in excess cash and marketable securities.  *See* Joint Ex. 47 at DOL 000231; Joint Ex. 47, Ex. 1 at DOL 000251.  It therefore added that amount to the $41,910,000 to reach an aggregate fair market value

of $47,240,000 for a controlling interest in the company.  *See* Joint Ex. 47 at DOL 000239.

Recognizing that there was a limited market for a controlling interest in an entity like the Company, LVA then applied a 15 percent discount for lack of marketability.  *See* Joint Ex. 47 at DOL 000245.  This meant that LVA subtracted $7,090,000 (representing a rounded 15 percent) from $47,240,000 for a total value of the Company of $40,150,000, leaving a per-share value of $40.15 for each of the million shares.  *See* Joint Ex. 47 at DOL 000246; Joint Ex. 47, Exhibit 16 at DOL 000267.

The Government's expert, Sherman, criticizes LVA's analysis as relying, in part, on an allegedly inflated projected EBITDA of $9,235,000.  Sherman notes that that figure exceeded the Company's historical numbers.  *See* Joint Ex. 47, Ex. 5 at DOL 000255; Sherman Test., ECF No. 631, PageID #s 20923, 20953. According to Sherman, a more appropriate EBITDA would have been $4,849,000, which would have yielded a value of only $21,821,000 under the guideline publicly traded company method (projected 2012 EBITDA of $9,240,000 x 4.5 multiple = $41,580,000 vs. "corrected" 2012 EBITDA of $4,849,000 x 4.5 multiple = $21,821,000).  *See* Sherman Decl. ¶ 190, ECF No. 635, PageID # 21324.  Using the "corrected" EBITDA in a merged or acquired company analysis, Sherman says that the Company would have been

31

worth $26,670,000. *See* Sherman Decl. ¶ 197, ECF No. 635, PageID # 21325.

Sherman also criticized LVA's report for having relied on projections that he did not think were supportable. He says profitability should have been lower given the Company's historical results. *See* Sherman Test., ECF No. 631, PageID # 20950. Defense expert Ian C. Rusk, however, noted that Sherman's dismissal of Bowers and Kubota's projections as not supported by historical results was in error. Rusk says that the Company had actually achieved similar earnings. Because the Company's earnings were trending upward in 2012 and because of a backlog of contracts, Rusk says the projections were not inaccurate. *See* Decl. of Ian C. Rusk ¶¶ 22-24, ECF No. 622, PageID #s 20159-60.

The court finds that Sherman's "corrected" EBITDA should have taken into account those relevant circumstances identified by Rusk, and the failure to do so renders Sherman's EBITDA unreliable. Additionally, Sherman should have known that his "corrected" EBITDA was too low because the actual EBITDA as of December 31, 2012, was $7,047,000. *See* Joint Ex. 49 at DOL 000138. Although Sherman was supposed to base his appraisal only on circumstances existing on or before December 14, 2012, the actual EBITDA as of December 31, 2012, should have at least caused him to reexamine the historical results that he claimed

32

required him to "correct" the EBITDA to only $4,849,000.  The
Company's earnings in 2010 and 2011, placed against the upward
trend the Company experienced in 2012 and the Company's backlog
of contracts, justified a higher EBITDA, further demonstrating
the unreliability of Sherman's "corrected" EBITDA.

In November 2012, Bowers sent LVA revenue growth
projections for 2014 through 2017.  Those projections used a 5
percent growth rate.  *See* Bowers Test., ECF No. 628, PageID
# 20402.  After 2012, the actual growth rate of the company
ranged between 10 and 14 percent, meaning that Bowers actually
understated the growth rate in November 2012.  *See id.*, PageID
# 20403.

**L.    Post-Transaction Valuations of the Company.**

Up to now, these findings of fact have focused on how
the Company was valued before being sold to the ESOP.  But the
court also has before it numerous after-the-fact valuations,
most, but not all, provided by expert witnesses for the precise
purpose of persuading this court in this case.

**1. LVA's 2013 Valuation.**

On June 7, 2013, LVA issued a valuation report for the
Company as of December 31, 2012.  With an effective date of just
two weeks after the sale, this report set the value of the
Company at $6,530,000, or $6.53 per share.  *See* Joint Ex. 49 at
DOL 000130.  Obviously, these figures were a far cry from LVA's

33

earlier valuation of $40.15 per share as of December 14, 2012. The reason for this marked drop is that the later valuation took into account the Company's obligations relating to the sale of Company stock to the ESOP.  While it was the ESOP that entered into a loan agreement under which the ESOP would pay Bowers $20,400,000 and Kubota $19,600,000 for their shares in the Company, the Company itself, on December 14, 2012, guaranteed the ESOP's obligations to make those loan payments.  *See* Guaranty, Joint Ex. 43.  This caused LVA, after the sale, to treat the loans as Company debt in its valuation as of December 31, 2012.

Exhibit 1 to Joint Exhibit 49 reflects LVA's treatment of the ESOP's debt as a Company liability, leaving the Company with $11,738,000 in assets but $45,306,000 in liabilities.  *See* Joint Ex 49, Ex. 1 at DOL 000134.  Because of the high level of debt, LVA did not use the discounted cash flow method that it had used in its valuation as of December 14, 2012.  *See* Joint Ex. 49 at DOL 000119.  The debt also caused LVA to adjust what the Company could be sold for and/or what comparable companies were worth.  *See* Joint Ex. 49 at DOL 000122-23.  Given these circumstances, the later LVA valuation does not assist this court in determining the value of the Company on the date of the sale, December 14, 2012.

## 2.    **Steven J. Sherman**.

Sherman, a CPA, currently works as a managing director at Loop Capital Financial Consulting.  He previously spent more than 30 years with KPMG LLP.  *See* Decl. of Steven J. Sherman ¶¶ 1-6, ECF No. 535, PageID #s 21274-75.

The court qualified Sherman as an expert witness for the Government with respect to the fair market value of the Company as of December 14, 2012, as well as with respect to analyzing LVA's valuation of that date.  *See* ECF No. 631, PageID #s 21051, 21053-54.

Sherman testified that, on December 14, 2012, the Company was worth $26.9 million.  *See* Sherman Decl. ¶ 635, ECF No. 635, PageID # 21282.  According to Sherman, the Company had a fair market value of $32,197,000, from which he deducted 7 percent ($2,254,000) for lack of marketability.  Sherman then deducted an additional $2,994,000 in light of the ESOP's "limited control."  *See* Sherman Decl. ¶¶ 163, 168, 171, ECF No. 635, PageID #s 21310 and 21311.  For reasons detailed in the paragraphs below, this court finds that Sherman significantly and unreasonably undervalued the Company.  Not only does this render his ultimate valuation unreliable, it also undermines the usefulness of his critique of LVA's valuation.

The court begins its consideration of Sherman's valuation by noting that he appears to have ignored the Uniform

35

Standards of Professional Appraisal Practice ("USPAP") in appraising the Company.  According to Kenneth J. Pia, an expert witness for the defense, application of USPAP was mandatory.  *See* Decl. of Kenneth J. Pia ¶¶ 15 n.1, 18-19, 24(C), ECF No. 650, PageID #s 21240-42; Test. of Kenneth J. Pia, ECF No. 632, PageID # 21117.  Pia says that Sherman's failure to follow USPAP "introduced substantial errors" into Sherman's analysis.  Pia Decl. ¶ 19, ECF No. 650, PageID # 21241.

Specifically, Pia testified that Sherman should have interviewed Company management and that the failure to do so violated USPAP's scope of work and competency rules, which require research and analysis to be sufficient to produce credible results and to be conducted in a manner that is not careless or negligent.  Pia Decl. ¶¶ 19, 24(I)(A)-(B), ECF No. 650, PageID #s 21241-42.  Pia noted that Sherman erred in how he treated subconsultant fees, and that the error could have been avoided by questioning Company management.  It turns out that, when the Company retained subconsultants, it passed to clients any fees charged by those subconsultants without any markup.  Pia Decl. 24(I)(G)(3), ECF No. 650, PageID # 23249; Bowers Test., ECF No. 628, PageID # 20413; Nishihara Test., ECF No. 629, PageID # 20528.  Sherman, however, treated those pass-through subconsultant fees as Company expenses, which Sherman then deducted in calculating the Company's value.  Pia pointed to this

36

error as one reason that Sherman reached an erroneously low Company value. *See* Test. of Kenneth K. Pia, ECF No. 632, PageID # 21131-32, 21134-35.

This court recognizes that, in the context of a lawsuit over valuation, a plaintiff's expert does not typically have a way to interview a defendant or a defendant's managers. The court is conscious that it should not rule in a way that would make it nearly impossible for any plaintiff's expert to render a credible opinion on valuation. At the same, time, plaintiff's attorneys typically depose defendants and their managers or agents and may thereby obtain information needed by expert witnesses. Here, Sherman appears to have proceeded without the benefit of information that would have helped him to avoid the error concerning subconsultant fees. Sherman conceded that he treated $10.521 million as subconsultant expenses, which he deducted in determining the value of the Company as of December 14, 2012. *See* Sherman Test., ECF No. 631, PageID # 20926. This was a notable error.

Moreover, the basis for that $10.521 million figure remains unclear. *See* Sherman Decl. ¶ 212, ECF No. 635, PageID # 21327 (referring to $2.9 million in subconsultant fees in 2012); *see also* Joint Ex. 49 at DOL 000135 (Dec. 12, 2012, LVA report referring to $2.923 million in subconsultant fees). Whatever the correct amount of subconsultant fees might have

37

been, Sherman treated those fees as amounting to $10.521 million
and as being Company expenses.  His resulting valuation of the
Company was correspondingly too low.

Sherman had a separate deduction of $2,994,000 from his
valuation to reflect what he called "limited control."  *See*
Sherman Decl., ECF No. 635, PageID # 21292.  This "limited
control" discount related to Sherman's conclusion that, after the
sale, Bowers and Kubota continued to exercise meaningful control
over the Company.  According to Sherman, this was evidenced by
the significant bonuses the Company paid them without documenting
approval by Saakvitne.  *See* Sherman Decl. ¶¶ 169, 171, ECF No.
635, PageID # 21312.

Pia faults Sherman for basing his "limited control"
discount on matters occurring after December 14, 2012.  According
to Pia, USPAP Advisory Opinion No. 34 states:

> A retrospective appraisal is complicated by
> the fact that the appraiser already knows
> what occurred in the market after the
> effective date of the appraisal.  With market
> evidence that data subsequent to the
> effective date was consistent with market
> expectations as of the effective date, the
> subsequent data should be used.  In the
> absence of such evidence, the effective date
> should be used as the cut-off date for data
> considered by the appraiser.

Pia also says the American Institute of Certified Public
Accountants Statement of Standards for Valuation Service Number
One similarly states that "the valuation analyst should consider

38

only circumstances existing at the valuation date and events occurring up to the valuation date." Pia Decl., ECF No 650, PageID # 23244. Sherman's reliance on matters occurring after the sale to apply the limited control discount appears to the court to have contravened the appraisal standards limiting the facts to be considered. As a result, Sherman improperly decreased the value of the Company by $2,994,000.

Moreover, as Pia testified, when principals sell a company to an ESOP, the ESOP does not then get unfettered control over the Company. *See* Pia Decl. ¶ 24(VI)(C), ECF No. 650, PageID # 23261. The record does not establish that Saakvitne had an absolute right to approve or disapprove the compensation paid to Bowers and Kubota.

Sherman's erroneous treatment of subconsultant fees and his consideration of after-the-sale developments to calculate a "limited control" discount amounted to an undervaluation of $13,515,000 ($10,521,000 + $2,994,000). If this amount were added to Sherman's value of $26,900,000, the total would be $40,415,000. In short, Sherman does not credibly undermine LVA's valuation as of December 14, 2012.

### 3. Kenneth J. Pia.

The court qualified Pia, Bowers and Kubota's retained expert, to provide an independent valuation of the Company as of December 14, 2012, and to review LVA's valuation and fairness

39

opinions.  *See* Test. of Kenneth J. Pia, ECF No. 632, PageID # 21110.

Pia is a CPA with more than 30 years of experience.  He works for Marcum, LLP.  *See* Decl. of Kenneth J. Pia ¶¶ 4-5, ECF No. 650, PageID # 23228-29.

Pia opined that the fair market value of the Company on December 14, 2012, was $43.20 million, or $43.20 per share.  *See* Decl. of Kenneth J. Pia ¶ 10, ECF No. 650, PageID # 23238.

Pia opined that Kniesel's conclusions of the fair market value range "were within a reasonable range."  *See* Decl. of Kenneth J. Pia ¶ 16, ECF No. 650, PageID # 23240.

As already noted earlier in these findings of fact, Pia was helpful to the court in evaluating Sherman's opinion.  As to Pia's additional opinion that the Company was worth $43.20 million, this court, while understanding that that opinion is offered by the defense as validation of LVA's valuation, sees no need to determine whether the Company was in fact worth $43.20 million as of December 14, 2012.  The court finds that the $40 million sale price did not exceed fair market value.  The court is not in need of further validation of the actual sale price of $40 million.

### 4.  **Ian C. Rusk**.

The court qualified Ian C. Rusk as a defense expert to provide opinions with respect to the fair market value of 100

40

percent of the shares of the Company as of December 14, 2012. Test. of Ian C. Rusk, ECF No. 631, PageID # 21060; Decl. of Ian C. Rusk ¶ 1, ECF No. 622, PageID # 20146.

Rusk is a professional business appraiser. *See* Rusk Decl. ¶ 4, ECF No. 622, PageID # 20147.

Rusk testified that the fair market value of a nonmarketable controlling interest in the Company as of December 14, 2012, was $43,050,000 or $43.05 per share. *See* Rusk Decl. ¶ 11, ECF No. 622, PageID # 20154. Rusk reasoned that the fair market value of the Company on a controlling interest basis was $44,600,000, but that there was a potential for dilution of the Company's stock. He therefore deducted 3.5 percent, or $1,550,000, leading to a value of $43,050,000. *See* Rusk Decl. ¶¶ 16-17, ECF No. 622, PageID #s 20155-56.

As with Pia's valuation opinion, Rusk's valuation opinion would be important only if the Government had mounted a credible challenge to the actual sale price. The court does, however, find Rusk's identification of certain aspects of the Company's finances helpful. In particular, the court credits Rusk for his discussion about the Company's EBITDA and about the upward trend the Company was experiencing in 2012.

### M.   The Sale Price Did Not Exceed the Fair Market Value of the Company as of December 14, 2012.

Having reviewed the evidence going to the value of the Company as of December 14, 2012, the court here summarizes that evidence and finds that the sale price of $40,000,000 did not exceed the fair market value of the Company as of December 14, 2012.

In the first place, the URS nonbinding preliminary indication of interest is not relevant to (and certainly does not establish) the fair market value of the Company.  No agreement was ever reached between the Company and URS.

GMK valued the Company at approximately $39.7 million. This figure appears to have been based on limited data, and GMK ultimately withdrew from its role as an appraiser for the Company.  These circumstances make this court hesitant to rely on the GMK valuation in determining the value of the Company as of December 14, 2014.

LVA then stepped in to perform an analysis and, on November 21, 2012, preliminarily determined for the Board of Trustees of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust that the "ESOP Controlling Interest Value" was between $37,090,000 and $41,620,000.  *See* Joint Ex. 20.

LVA was subsequently retained by Saakvitne and gave him its determination that the Company had a value of $40,150,000 as of December 14, 2012.

Bowers and Kubota sold their shares in the Company to the ESOP for $40,000,000. The Government pointed to a number of circumstances that the Government viewed as suspicious. The Government raised concerns that Saakvitne had spent very little time working on the matter before agreeing on a price and on the terms of the sale of the Company shares to the ESOP. But Saakvitne actually negotiated significant benefits for the ESOP, and the amount of time Saakvitne billed for is by no means proof of carelessness or negligence on his part.

The Government also voiced concern about Saakvitne's reliance on LVA to provide an independent valuation, when LVA had already provided a preliminary determination of value before Saakvitne became the ESOP trustee. To complicate matters further, LVA had Kuba's limited valuation, which ended up being in the same ballpark as LVA's opinion. In aid of showing that Saakvitne's reliance on LVA was problematic, the Government presented the opinions of its expert, Sherman, who valued the Company at $26,900,000 as of December 14, 2012. Unfortunately for the Government, however, Sherman's opinion contained notable errors that may have amounted to an undervaluation of $13,515,000 ($10,521,000 relating to subconsultant fees + $2,994,000 relating to a "limited control" discount). If $13,515,000 is added to his value of $26,900,000, the total is $40,415,000, which is very close to the actual sale price.

43

Taking into account all of the evidence presented, this court finds that the Company was not sold for more than fair market value.

### N.    The Limitations Defense.

Bowers and Kubota raised an affirmative defense premised on the statute of limitations.  Given this court's valuation ruling and this court's ultimate conclusion (detailed in the conclusions of law) that they breached no fiduciary duty, they no longer need to rely on that defense.  This court nevertheless includes here its factual findings relating to that defense, and, in the accompanying conclusions of law, discusses that limitations issue.  Bowers and Kubota made two arguments relevant to their limitations defense.

First, they argued that the Government was on notice of their December 2012 sale to the ESOP from the time Form 5500 was electronically filed in October 2013.  According to Bowers and Kubota, the three-year limitations period began to run in October 2013, but this lawsuit was not filed until April 27, 2018.

Second, Bowers and Kubota argue that, because the claims against them are grounded in what the Government has asserted was a breach of fiduciary duty by Saakvitne, the Government should have acted more promptly once it knew or should have known about alleged deficiencies in Saakvitne's actions in

his capacity as the trustee of other ESOPs being reviewed by the Government.

With respect to both arguments, this court makes the following findings.

>    **1.    It was Not Until December 2014 that Any Government Official Read the Form 5500 That Was Submitted Electronically in October 2013.**

Form 5500 is an Annual Return/Report of Employee Benefit Plan, required to be filed with the Internal Revenue Service. Form 5500 for the ESOP in issue in this case was filed around October 15, 2013.

The supplemental attachments to that Form 5500 explained the transaction:

> Closing on December 14, 2012, the Plan purchased all of the issued and outstanding shares (Shares) of common stock of the Company and financed the purchase with two loans (ESOP Loans) from the Sellers that are evidenced by two executed Promissory Notes, and pledged the Shares to the Sellers to secure payment of the Notes. The Company common stock is held in a trust (Trust) established under the Plan. The loans are to be repaid over a period of twenty five years by Company contributions and/or distributed dividends and/or earnings to the Plan. As the Plan makes each payment of principal, an appropriate percentage of stock will be allocated to eligible employees' accounts in accordance with applicable regulations under the Code. Shares vest fully upon allocation. The loans are collateralized by the unallocated shares of common stock and are guaranteed by the Company. The lenders have no rights against shares of common stock once they are allocated under the ESOP. Accordingly, the financial statements of the

Plan as of December 31, 2012, and for the
year ended December 31, 2012, present
separately the assets and liabilities and
changes therein pertaining to:

◦ The accounts of employees with vested
rights in allocated common stock (Allocated)
and

◦ Common stock not yet allocated to employees
(Unallocated).

Joint Ex. 62 at Page 17 of 32.

Apparently, the Form 5500 was also submitted to the
Department of Labor via EFAST2.  According to Marianne Gibbs, the
ERISA Filing Acceptance Program Manager for the Office of the
Chief Information Officer in the Department of Labor, EFAST2
collects information for the Government and discloses that
information to the public and the Government.  *See* Test. of
Marianne Gibbs, ECF No. 632, PageID # 21216; Decl. of Marianne
Gibbs ¶ 1, ECF No. 644, PageID #s 23140-01.  Gibbs testified that
the Government electronically receives a million filings per year
via EFAST2 and does not have employees assigned to regularly read
those filings.  *Id.*, PageID #s 21217-18, 21231.

Nothing in the record establishes that anyone in the
Government actually read the Form 5500 when it was submitted in
2013.  Instead, the record establishes that Michael Wen, Senior
Investigator for the United States Department of Labor, Employee
Benefits Security Administration, first read the relevant Form
5500 in December 2014.  Decl. of Michael Wen ¶ 1, ECF No. 637,

46

PageID #s 21345; Depo. Desig. of Michael Wen, ECF No. 643-4,

PageID #s 21934-35; Decl. of Crisanta Johnson ¶ 53, ECF No. 623,

PageID #s 20185; *See* Depo. Desig. of Robert Prunty, ECF No. 643-

2, PageID #s 21712-13.  The legal import of this fact is

addressed in the conclusions of law.

> **2.    No Government Official Involved with Looking at Saakvitne's Performance as a Trustee for other ESOPs Was Actually Prompted By Anything About those other ESOPs to Examine Saakvitne's Performance as a Trustee for the ESOP in Issue in This Case.**

In December 2014, Michael Wen of the Department of

Labor was told by his supervisor to "find some ESOP cases in

Hawaii."  Depo. Desig. of Michael Wen, ECF No. 643-4, PageID

# 21934.  Wen then used the Government's ERISA data system to

identify leveraged ESOPs with an asset value over either $1

million or $5 million.  The ERISA data system identified the

Company's ESOP.  *Id.*

Wen's supervisor was Miguel Paredes.  *See* Depo. Desig.

of Miguel Paredes, ECF No. 643-5, PageID #s 22189, 22192-93.

Paredes testified that the Government began investigating

Saakvitne in 2014 and was concerned about his actions.  *Id.*,

PageID #s 22195, 22264.

Having identified the Company's ESOP, Wen turned to

Dorian Hanzich, then a senior investigator for the Department of

Labor and now a financial analyst for it, who then reviewed the

GMK and LVA valuation reports, as well as the Company's financial statements, determining while performing preliminary diagnostics for the Department of Labor that the sale price must have been predetermined and that the ESOP had paid significantly more than fair market value. *See* Depo. Desig. of Dorian Hanzich, ECF No. 643-1, PageID #s 21469-70, 21483, 21500-01, 21513.

Robert Prunty of the Department of Labor spoke with Saakvitne in mid-2014 about another investigation the Department of Labor was conducting involving the Hot Dog on a Stick ESOP, which Saakvitne was the trustee of. *See* Depo. Desig. of Robert Prunty, ECF No. 643-2, PageID #s 21680-81, 21686. Prunty did not speak to Wen about the Company's ESOP before December 2014, and it was not until early 2017 that Prunty began investigating the Company's ESOP. *Id.*, PageID # 21686, 21694. According to Prunty, the EFAST2 system was not set up in a way that would have allowed a Government investigator to use Form 5500 filings to identify multiple ESOPs a particular person was involved with. *Id.*, PageID # 21715. Prunty testified that neither Wen nor Hanzich had worked on the Hot Dog on a Stick investigation. Depo. Desig. of Robert Prunty, ECF No. 643-3, PageID # 21891. In other words, the mere existence of the Hot Dog on a Stick investigation did not lead anyone to look at Saakvitne's work with the Company's ESOP.

48

The court received evidence regarding the issue of whether an earlier investigation involving Saakvitne might have alerted the Department of Labor to look at Saakvitne's other work, such as with the ESOP in issue here.  Jerome Raguero of the Department of Labor (and its Rule 30(b)(6) representative for deposition purposes) testified that, when the Department of Labor investigates an ESOP, it does not generally ask about other ESOPs a person might be involved with, but that there was no policy prohibiting such questions.  *See* Depo. Desig. of Jerome Raguero, ECF No. 643-7, PageID #s 22442, 22488, 22491.  Raguero also testified that the Department of Labor does not have policies with respect to flagging ESOP transactions from the Form 5500s.  *Id.*, PageID # 22519.  Paul Zielinski of the Department of Labor first heard of Saakvitne through the Hot Dog on a Stick investigation.  *See* Depo. Desig. of Paul Zielinski*,* ECF No. 643-8, PageID #s 22612, 22643.  Zielinski said investigators could ask witnesses about their involvement with other ESOPs.  *Id.*, PageID # 22647.

In fact, the Department of Labor's Ty Fukumoto said that an investigator "would definitely ask" about other clients that a service provider might be working with.  *See* Depo. Desig. of Ty Fukumoto, ECF No. 643-9, PageID #s 22849, 22766.  He testified that the Department of Labor used Form 5500s to help it decide which ESOPs it should investigate.  *Id.*, PageID # 22791.

49

Fukumoto became aware of Saakvitne in the mid-2000s, when Saakvitne was working with abandoned 401(k) plans. *Id.*, PageID #s 22820-21. He said that it was "very possible that in talking to Mr. Saakvitne or gathering information . . . additional investigations were opened as a result." *Id.,* PageID # 22849.

On or about June 15, 2016, Wen prepared a Major Case Submission relating to the ESOP at issue in this case. *See* Wen Depo. Desig., ECF No. 643-4, PageID # 22038. Wen explained that the case was "opened . . . due to a more than $30 million decrease in the company stock valuation after the ESOP purchased 100 percent of the common stock in 2012." *Id.*, PageID # 22041. Of course, as noted above, the decrease in valuation flowed from the debt incurred when the ESOP purchased the Company's stock and the Company guaranteed the ESOP's payment of the purchase price.

The court takes judicial notice of a matter that does not appear to be in dispute, which is that, in October 2017, the Government, the Company, and Bowers and Kubota in their individual capacities, agreed to toll the statute of limitations under ERISA effective October 16, 2017, to April 30, 2018. *See* ECF No. 367-2, PageID #s 7607-12 (copy of tolling agreement marked as Defense Ex. 241 but not offered into evidence).

The legal import of the facts set forth above concerning Department of Labor investigations is addressed in this court's conclusions of law.

III.      CONCLUSIONS OF LAW.

A.   Jurisdiction.

The Company's ESOP is an employee benefit plan as defined by ERISA.  *See* 29 U.S.C. § 1002(3) ("The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.").  The ESOP is governed by the applicable provisions of subchapter I of ERISA, 29 U.S.C. §§ 1001 to 1191d.  *See* 29 U.S.C. § 1003(a)(1) ("this subchapter shall apply to any employee benefit plan if it is established or maintained--
(1) by any employer engaged in commerce or in any industry or activity affecting commerce").

This Court has jurisdiction over this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (5) ("A civil action may be brought . . . (2) by the Secretary . . . for appropriate relief under section 1109 of this title . . . ; [or] (5) . . . (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter.").

51

### B. The Alleged Failure of Bowers and Kubota To Discharge Fiduciary Duties with the Proper Care, Skill, Prudence, and Diligence in Violation of 29 U.S.C. § 1104(a)(1)(A), (B), and (D) (Complaint ¶ 37).

Paragraph 37 of the Complaint asserts violations of 29 U.S.C. § 1104(a)(1)(A), (B), and (D).  Those provisions state:

**(a) Prudent man standard of care**

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and–

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and]

. . . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

In relevant part, ERISA defines a fiduciary as follows:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting

52

> management or disposition of its assets,
> (ii) he renders investment advice for a fee
> or other compensation, direct or indirect,
> with respect to any moneys or other property
> of such plan, or has any authority or
> responsibility to do so, or (iii) he has any
> discretionary authority or discretionary
> responsibility in the administration of such
> plan. . . .

29 U.S.C. § 1002(21)(A).

"ERISA 'defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan.'" *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)). The Ninth Circuit "construe[s] ERISA fiduciary status 'liberally, consistent with ERISA's policies and objectives.'" *Id.* (quoting *Ariz. State Carpenters Pension Tr. Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997)); *see also LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015) ("we have repeatedly stated that ERISA is remedial legislation that should be construed liberally to protect participants in employee benefits plans." (alteration signals, quotation marks, and citation omitted)); *Batchelor v. Oak Hill Med. Grp.*, 870 F.2d 1446, 1449 (9th Cir. 1989) ("ERISA is remedial legislation which should be liberally construed in favor of protecting participants in employee benefit plans."). In short, ERISA's aim is to protect employees in connection with plans like ESOPs.

Members of an employer's board of directors have ERISA fiduciary obligations to the extent they have responsibility over the ESOP and over the management or disposition of its assets. *See Couturier*, 572 F.3d at 1076 ("We have accordingly recognized that where members of an employer's board of directors have responsibility for the appointment and removal of ERISA trustees, those directors are themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection and retention."). The Department of Labor has provided guidance for fiduciaries who sit on a board of directors:

> Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the [ERISA, 29 U.S.C. § 1002(21)(a)]. For example, the board of directors may be responsible for the selection and retention of plan fiduciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting management of such plan" and are, therefore, fiduciaries with respect to the plan. However, their responsibility, and, consequently, their liability, is limited to the selection and retention of fiduciaries (apart from co-fiduciary liability arising under circumstances described in section 405(a) of the Act[, 29 U.S.C. § 1105(a)]).

29 C.F.R. § 2509.75-8(D-4).

ERISA seeks to ensure that fiduciaries who fund an ESOP acquire employer securities for "adequate consideration."  29 U.S.C. § 1108(e)(1).  Courts therefore recognize that "an ERISA

54

plan and ERISA fiduciary responsibilities thereunder, can exist even where a formal employee benefit plan ha[s] not been adopted." *Solis v. Webb*, 931 F. Supp. 2d 936, 945 (N.D. Cal. 2012). "A person's actions, not the official designation of his role, determines whether he enjoys fiduciary status, regardless of what his agreed-upon contractual responsibilities may be." *CSA 401(K) Plan v. Pension Pros., Inc.*, 195 F.3d 1135, 1138 (9ᵗʰ Cir. 1999) (quotation marks and citation omitted).

In analyzing the Government's assertions about breaches of fiduciary duty, this court keeps firmly in mind the Government's burden. A plaintiff has the burden of proving the breach of a fiduciary duty under 29 U.S.C. § 1104 or § 1105.[6]

---

[6] Because this court concludes that the Government fails to meet its burden of establishing a breach of fiduciary duty, this court does not go on to address whether alleged losses were or were not caused by the breach. The subject of who bears the burden of establishing causation has divided courts, but within the Ninth Circuit that burden appears to rest with plaintiffs. *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9ᵗʰ Cir. 2004) (citing with approval a Sixth Circuit case for the proposition that a "fiduciary's failure to investigate an investment decision alone is not sufficient to show that the decision was not reasonable. . . . [A] plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan." (citation omitted)). *See also Pledger v. Reliance Tr. Co.*, 2019 WL 10886802, at *28 (N.D. Ga. Mar. 28, 2019). By contrast, the Eighth Circuit has stated that, "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty." *Martin v. Feilen*, 965 F.2d 660, 671 (8ᵗʰ Cir. 1992). *See also Chao v. Tr. Fund Advisors*, 2004 WL 444029, at *6 (D.D.C. Jan. 20, 2004).

*See Roth v. Sawyer-Cleator Lumber Co.,* 16 F.3d 915, 917 (8th Cir. 1994) (stating that "ERISA plaintiffs bear the burden of proving a breach of fiduciary duty"); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1122 (D. Colo. 2020), *aff'd,* 1 F.4th 769 (10th Cir. 2021); *see also Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 700 (W.D. Mo. 2019) ("a plaintiff bears the burden of showing the defendant breached its fiduciary duties, which results in a prima facie case of loss to the plan"); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 793 (D. Minn. 2018)("ERISA plaintiffs bear the burden of proving a breach of fiduciary duty.").

In June 2012, after the discussions with URS fell apart, Bowers and Kubota decided to consider a sale to an ESOP. *See* Bowers Test., ECF No. 628, PageID #s 20358-59; Amd. Bowers Decl. ¶ 24, ECF No. 640, PageID # 21379; Def. Ex. 50 (June 19, 2012, email from Bowers to Kuba and Kubota, stating, "Gary: We may be moving in the ESOP direction."). June 2012 is therefore the earliest that Bowers and Kubota could be said to have been fiduciaries with respect to the Company's ESOP. Before then, they exercised no discretionary authority, management, or control with respect to an ESOP. This court concludes that Bowers and Kubota were fiduciaries as defined by ERISA from the time they exercised discretionary authority to form the Company's ESOP.

56

Bowers and Kubota generally ceased being fiduciaries for the ESOP on December 3, 2012, when Bowers and Kubota in their capacities as directors of the Company signed a Resolution of Board Directors by Unanimous Written Consent Without a Meeting that adopted the ESOP and appointed Saakvitne as the independent fiduciary and the sole ESOP trustee, retroactively effective as of January 1, 2012. *See* Joint Ex. 28.  The Government fails to meet its burden of proving the breach of any fiduciary duty.

This court addresses each of the fiduciary duty allegations in Paragraph 37 of the Complaint, taking them in order except that Paragraph 37(c) is considered last given the nature of the fiduciary duty cited in that paragraph.

### 1.   **Paragraph 37(a) of the Complaint.**

In Paragraph 37(a) of the Complaint, the Government asserts that Bowers and Kubota breached their fiduciary duty to the ESOP by sending LVA inflated revenue projections for 2012.

Essential to establishing this breach is establishing that the revenue projections were in fact inflated.  The Government does not meet its burden of doing that.

The Government's expert, Sherman, criticized LVA's analysis because it relied, in part, on an allegedly inflated projected EBITDA of $9,235,000, which Sherman said exceeded historical numbers. *See* Joint Ex. 47, Ex. 5 at DOL 000255; Sherman Test., ECF No. 631, PageID #s 20923, 20953.  He said that

57

a more appropriate EBITDA would have been $4,849,000, which would have resulted in a much lower value. The court rejects Sherman's "corrected" EBITDA of $4,849,000 because, as this court found earlier in this order, Sherman failed to take relevant circumstances into account.

While the Government says that the LVA valuation is also flawed because it used the 2012 projected EBITDA of $9.24 million in its discounted cash flow analysis, *see* Government's Proposed Finding of Fact ¶ 92, ECF No. 655, PageID # 23561, LVA does not appear to have done that. *See* Joint Ex. 47 at DOL 000238-39 (noting that "[t]he analysis for the DCF Method is based on . . . projected income statements after an adjustment has been made . . . to include income taxes at a 40 percent rate"). *Id.* at DOL 000238.

This court concludes that the Government fails to prove by a preponderance of the evidence that Bowers or Kubota breached a fiduciary duty relating to the revenue predictions for 2012 that they provided to LVA.

## 2.   Paragraph 37(b) of the Complaint.

In Paragraph 37(b) of the Complaint, the Government asserts that Bowers and Kubota sent LVA inflated revenue projections for 2013 to 2017. Once again, the Government does not establish that by a preponderance of the evidence.

As noted in this court's findings of fact, Bowers, in

November 2012, sent LVA revenue growth projections for 2014 through 2017 using a 5 percent growth rate.  *See* Bowers Test., ECF No. 628, PageID # 20402; Def. Ex. 89, Bates No. Pia 010048 or LIBRA-DOL INV 004759.  After 2012, the actual growth rate of the company ranged between 10 and 14 percent, meaning that Bowers actually understated the growth rate in November 2012.  *See* Bowers Test., ECF No. 628, PageID # 20403.  In short, the Government fails to show by a preponderance of the evidence that Bowers and Kubota breached any fiduciary duty relating to their revenue predictions for 2013 to 2017.

### 3. Paragraphs 37(d) and (e) of the Complaint.

In Paragraphs 37(d) and (e) of the Complaint, the Government asserts that Bowers and Kubota breached their fiduciary duty to the ESOP by relying on LVA's preliminary and fairness opinion.  Again, the record does not establish that alleged breach.

To start with, Bowers and Kubota could not have breached a duty in relying on LVA's preliminary or fairness opinion unless that opinion suffered from material errors or misstatements.  The Government has not shown material errors or misstatements.  To the contrary, this court has found that the Company was not sold for more than fair market value, and the sale price was nearly identical to LVA's valuation as of December 14, 2012.

In addition, as of December 7, 2012, LVA was working for "Nicholas L. Saakvitne, Trustee of the Proposed Bowers + Kubota Employee Stock Ownership Plan and Trust." *See* Joint Ex. 30. Saakvitne had the exclusive right to hire an appraiser, and it was he who relied on LVA's fairness opinion in negotiating and executing the sale and sale documents. To the extent the Government is seeking to blame Bowers and Kubota for Saakvitne's reliance on LVA's opinion, such blame is not actionable unless the opinion was materially flawed, which this court has found not to have been the case.

Nor has the Government shown how any reliance on the valuations damaged the Company's ESOP.

Accordingly, this court concludes that the Government fails to meet its burden of establishing a breach of fiduciary duty relating to reliance on LVA's preliminary and fairness opinions, as alleged in Paragraphs 37(d) and (e) of the Complaint.

### 4.    Paragraph 37(f) of the Complaint.

In Paragraph 37(f) of the Complaint, the Government asserts that Bowers and Kubota breached a fiduciary duty by causing the ESOP to purchase the Company's stock for more than fair market value. This court has found that, in paying $40,000,000 for 100 percent of the Company's stock on December 14, 2012, the ESOP did not pay more than fair market value. This

finding is fatal to the claim in Paragraph 37(f) of the Complaint.

### 5.    Paragraph 37(c) of the Complaint.

Paragraph 37(c) of the Complaint asserts that Bowers and Kubota breached their limited fiduciary duty to monitor Saakvitne after he was appointed as the ESOP's trustee and fiduciary.  The Government does not prove this assertion by a preponderance of the evidence.

The Department of Labor's published guidance discusses the fiduciary duty to monitor a trustee, which in this case Bowers and Kubota had even after Saakvitne's appointment because they exercised discretionary authority with respect to monitoring Saakvitne:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.  No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

29 C.F.R. § 2509.75-8(FR-17).  This guidance is consistent with the Plan, which states:

> The Company shall have all powers necessary to enable it to administer the Plan and the Trust Agreement in accordance with their provisions, including without limitation the

> following: . . . (9) reviewing the
> performance of the Trustee with respect to
> the Trustee's administrative duties,
> responsibilities and obligations under the
> Plan and Trust Agreement.

Joint Ex. 38 § 17.03.

This court has already ruled in this case that the power to appoint and remove a trustee gives rise to a duty to monitor the trustee's performance. *See* ECF No. 47, PageID # 472 (citing *Webb*, 931 F. Supp. 2d at 953; *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1090 (D. Nev. 2011)). As noted by the Northern District of California in *In re Calpine Corporation ERISA Litigation*, 2005 WL 1431506, at *3 (N.D. Cal. Mar. 31, 2005), the duty arising from § 2509.75-8(FR-17) is "limited."

Bowers and Kubota did not breach their limited fiduciary duty to monitor Saakvitne to ensure that he was acting in the best interests of the ESOP. In its proposed Conclusions of Law, the Government claims:

> Defendants breached their fiduciary duty to
> monitor Saakvitne because they knew of
> Saakvitne's misconduct, having set up the
> entire transaction to facilitate it, and
> failed to take remedial steps. Specifically,
> Defendants set up the entire transaction
> before appointing Saakvitne at the last
> minute, leaving him insufficient time to do
> anything but rubber stamp the prebaked
> transaction set out for him by Defendants.
> Defendants then watched as the pieces of
> their plan fell into place, doing nothing
> despite their knowledge the $40 million price
> was in excess of fair market value.

ECF No. 655 ¶ 38, PageID # 23590. The record does not support

62

the Government's statement.

On November 21, 2012, Hansen sent Saakvitne an email in which Hansen told Saakvitne that Hansen was leaving town on December 19, 2021 and that the sale would have to close by that date. *See* Govt. Ex. 58; Hansen Decl. ¶ 29, ECF No. 646, PageID # 23158. While that date did not give Saakvitne a lot of time to conduct due diligence, there was actually no requirement that the deal close in December 2012. *See* Kubota Test., ECF No. 628, PageID # 20494; Hansen Decl. ¶ 31, ECF No. 646, PageID # 23159. At most, there were tax advantages for Bowers, Kubota, the Company, and ESOP participants if the sale concluded by the end of 2012. *See* Amd. Kubota Decl. ¶ 55, ECF No. 639, PageID # 21368. That suggests that Saakvitne may have decided that the tax benefits to the ESOP outweighed the burden of finalizing the sale by the end of 2012.

While the Government argues that Saakvitne was forced by the time constraint to hire LVA, the record demonstrates that he had unfettered discretion to hire any independent appraiser, and that he was not required to hire LVA. *See* Gregory Kniesel Test, ECF No. 630, PageID # 20751; Bowers Test., ECF No. 628, PageID # 20419-20; Kubota Test., ECF No. 628, PageID # 20487. Saakvitne may have decided that LVA was a well-respected appraisal company that had already started an appraisal and that, given the tax benefits to the ESOP and its participants, it was

better to hire LVA than to delay the sale.  If this court is to find any deficiency, it had to be proven by the Government.  It was not.

Nor does the record support the Government's suggestion that Bowers, Kubota, and Saakvitne conspired to arrange for a $40 million sale price.  Bowers and Kubota had told Hansen that they were hoping to sell the Company for $40,000,000.  *See* Joint Ex. 58; Govt. Ex. 66.  Hansen then tried to organize the process, asking Marcus Piquet to look into a $40,000,000 loan.  *See* Depo. Desig. of Marcus Piquet, ECF No. 591-1, PageID # 19579.  While Hansen's email to Saakvitne of November 21, 2012, mentions the possibility of selling the Company for $40 million, *see* Govt. Ex. 58, that merely gave Saakvitne insight into the price Bowers and Kubota wanted to sell their shares for.  Saakvitne's negotiation, *see* Joint Ex. 32, ended up saving the ESOP millions of dollars. *See* Bowers Test., ECF No. 628, PageID # 20433; Gregory K. Brown Test., ECF No. 631, PageID # 21049.  In the end, the ESOP did not pay more than the fair market value for the Company, and the Government does not identify damage to the ESOP.

As this court acknowledged earlier, the Government's concerns are understandable.  The Government was looking at a high sale price that had been shared ahead of time with the ESOP trustee.  But knowing what a seller wants does not make a buyer complicit in wrongdoing.  The Government was also faced with an

appraiser who had initially been dealing with the sellers who were forming the ESOP, then transferred its services to the trustee, ultimately providing an appraisal in a fairly short time that was fairly close to the limited valuation set by GMK.  For his part, the trustee documented only about 30 hours of work.  That the Government had suspicions and opened an investigation appears entirely warranted.  But when the Government filed this lawsuit, it took on the burden of proving that its suspicions were reflected in fact.  What has happened in the trial of this case is that the Government failed to carry that burden, not for want of effort but for what appears to be a want of evidence.

The Government simply does not prove that Bowers or Kubota should have better monitored Saakvitne to ensure that he was acting in the best interests of the ESOP and to prevent the ESOP from being damaged.

### C.  Bowers and Kubota Are Not Liable for Breaches of Fiduciary Responsibilities by Other Fiduciaries under 29 U.S.C. § 1105(a)(1)-(3) (Complaint ¶¶ 40-43).

Paragraphs 40 to 43 of the Complaint assert violations of 29 U.S.C. §§ 1105(a)(1) to (3), which provide:

> a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing

65

such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

Paragraphs 40 to 43 of the Complaint assert that Bowers and Kubota are liable for breaches of fiduciary duties by others. Specifically, the Government asserts that 1) Bowers and Kubota are liable for each other's provision of faulty financial data to LVA; 2) Bowers and Kubota are liable for each other's failure to monitor Saakvitne; and 3) Bowers and Kubota are liable for behavior by another fiduciary (such as Saakvitne) who caused the ESOP to pay more than fair market value to purchase the Company. *See* ECF No. 1, PageID #s 17-18.

1.      **Bowers and Kubota Are Not Liable for Each Other's Provision of Allegedly Inaccurate Financial Data to LVA in 2012.**

In Joint Exhibit 48, the Company estimated its EBITDA for 2012 as $9,284,000. In LVA's valuation of the Company as of December 14, 2012, it relied on this EBITDA. *See* Joint Ex. 47 at DOL 000235 and DOL 255. The Government's expert, Sherman, characterizing this estimated EBITDA for 2012 as being way off the mark, calculated "an adjusted EBITDA projection for 2012 of

66

$4.9 million, more in line with the Company's historical financial performance." *See* Sherman Decl ¶ 187, ECF No. 635, PageID # 21323; Sherman Test., ECF No. 631, PageID # 20923. Sherman was too quick to dismiss Bowers and Kubota's projections as unsupported by historical results.

Joint Exhibit 48 illustrates the projected revenue for 2012 as about only $3 million more than the projected revenue for 2011 ($22,005,000 vs. $24,964,000). Bowers and Kubota knew the Company had contracts due to be paid in 2012 (which Sherman appears not to have taken into account because he did not know about them). Bowers and Kubota generally knew what their expenses would be. The Government does not establish that their projection was unreasonably inflated. *See* Decl. of Ian C. Rusk ¶¶ 22-24, ECF No. 622, PageID #s 20159-60.

Joint Exhibit 49 is LVA's valuation of the Company as of December 31, 2012. It lists the actual EBITDA for the Company in 2012 as $7,050,000 (rounded to the nearest $10,000). *See* Joint Ex. 49 at DOL 000120; Joint Ex. 49, Ex 5, DOL 000138 (listing the 2012 EBITDA as $7,047,000). This actual amount was not calculated until the summer of 2013; it therefore does not prove that Bowers and Kubota are liable for having projected inflated 2012 profits.

In November 2012, Bowers sent LVA revenue growth projections for 2014 through 2017. Those projections used a 5

67

percent growth rate based on historical averages.  *See* Bowers
Test., ECF No. 628, PageID # 20402; Def. Ex. 89, Bates No. Pia
010048 or LIBRA-DOL INV 004759.  After 2012, the actual growth
rate of the company ranged between 10 and 14 percent, meaning
that Bowers actually understated the growth rate in November
2012.  *See* Bowers Test., ECF No. 628, PageID # 20403.

The circumstances just summarized by this court
undercut the Government's assertion that either Bowers or Kubota
bears responsibility for the other's provision to LVA of inflated
financial projections.

### 2.    Bowers and Kubota Are Not Liable for Each Other's Failure To Monitor Saakvitne.

This court earlier ruled that the Government failed to
prove that Bowers or Kubota is liable for having failed to
monitor Saakvitne.  That ruling makes it impossible for each to
be liable for the failure of the other to monitor Saakvitne,
there having been no such failure.

### 3.    Bowers and Kubota Are Not Liable for Behavior by Any Other Fiduciary That Caused or Contributed to Payment by the ESOP of More than Fair Market Value for the Company.

Nor does the Government prove its contention that
Bowers or Kubota is liable for another fiduciary's actions
leading to payment by the ESOP of more than fair market value for
the Company.  This court has already found that the Government
failed to prove that the ESOP paid more than fair market value.

Payment of more than fair market value being a necessary predicate for this contention, the contention fails.

### D. Bowers and Kubota Did Not Engage in Prohibited Transactions in Violation of 29 U.S.C. § 1106.

The Government alleges that Bowers and Kubota engaged in transactions prohibited by ERISA in 29 U.S.C. § 1106.  Under 29 U.S.C. § 1108(e)(1), § 1106 is inapplicable when a sale to an ESOP involves "adequate consideration."  With respect to such claims, the Government has the burden of establishing the existence of a transaction that would be prohibited under § 1106.  If the Government makes that showing, the burden shifts to Defendants to demonstrate that they satisfied the "adequate consideration" exemption in 29 U.S.C. § 1108(e)(1). *See Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

As set forth below, the sale to the ESOP was for "adequate consideration."

### 1. Prohibited Transactions Between a Plan and a Party in Interest.

Paragraphs 45 to 47 of the Complaint assert violations of 29 U.S.C. § 1106(a)(1)(A), which provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . sale or exchange, or leasing, of any property between the plan and a party in interest."

Specifically, paragraphs 45 to 47 of the Complaint assert that Bowers and Kubota engaged in a prohibited transaction by causing or allowing the Company's ESOP to purchase the stock of the Company for more than fair market value.

Defendants meet their burden of demonstrating by a preponderance of the evidence that the Company's shares were worth at least what the Company's ESOP paid for it.  Accordingly, there was no improper prohibited transaction for purposes of 29 U.S.C. § 1106(a)(1)(A).

## 2.    **Prohibited Transactions with the ESOP.**

Paragraphs 49 to 50 of the Complaint assert violations of 29 U.S.C. §§ 1106(b)(1) and (2), which provide:

A fiduciary with respect to a plan shall not–

(1) deal with the assets of the plan in his own interest or for his own account,[or]

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

Specifically, paragraphs 49 and 50 of the Complaint assert that Bowers and Kubota improperly dealt with assets of the Company's ESOP by acting in their own interests.  As set forth in paragraphs 44 to 61 of the Government's proposed conclusions of law, these allegations are based on the alleged sale of the Company for more than fair market value.  *See* ECF No. 655, PageID

# 23595 to 23602.

This court has already determined by a preponderance of the evidence that the Company's ESOP did not pay more than fair market value for the Company.  In other words, Bowers and Kubota did not sell the Company to the ESOP in a manner detrimental to the ESOP and favorable to them.  Accordingly, this court concludes that Bowers and Kubota cannot be said to have violated § 1106, as they show that the sale was for "adequate consideration" for purposes of § 1108(e)(1).

> **E.    Bowers and Kubota Are Not Individually Liable Under 29 U.S.C. § 1132(a)(5) for Knowingly Participating in Prohibited Transactions.**

Paragraphs 52 and 53 of the Complaint assert that Bowers and Kubota are individually liable under 29 U.S.C. § 1132(a)(5) for having participated in transactions prohibited by ERISA.

Under 29 U.S.C. § 1132(a)(5), a civil action may be brought "by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter."

As already set forth above, because the Government fails to prove that Bowers and Kubota violated any provision of ERISA with respect to the sale of the Company to the ESOP, they have no liability under § 1132(a)(5).

71

**F.    The Government's Claims Are Not Barred by The Statute of Limitations.**

ERISA's statute of limitations states:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of–

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

Defendants have asserted as an affirmative defense the untimeliness of the Government's claims.  Although this affirmative defense is no longer essential given this court's conclusion that the Government has not shown that the ESOP paid more than fair market value for the Company's shares or that Defendants breached any fiduciary duty, this court proceeds to discuss the limitations defense because considerable time and effort was spent on it.  This court concludes that Defendants do not meet their burden with respect to their limitations defense.

The Supreme Court last year, in *Intel Corporation Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 776 (2020), discussed when a plaintiff can be said to have had "actual knowledge" of an ERISA breach or violation such that the three-year limitation period begins running.  "[P]otential, possible, virtual, conceivable, theoretical, hypothetical, or nominal" knowledge does not, without more, qualify as "actual knowledge."  *Id.*  Section 1113(2) "requires more than evidence of disclosure alone.  That all relevant information was disclosed to the plaintiff is no doubt relevant in judging whether he gained knowledge of that information. . . .  To meet § 1113(2)'s 'actual knowledge' requirement, however, the plaintiff must in fact have become aware of that information." *Id.* at 777.

In *Sulyma*, the Court noted that actual knowledge could be proven in the usual way, such as through testimony and inferences from circumstantial evidence.  *Id.* at 779.  The Court also noted that its decision did "not preclude defendants from contending that evidence of 'willful blindness' supports a finding of 'actual knowledge.'"  *Id.* (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

In *Global-Tech*, the Court saw "willful blindness" as occurring when a person subjectively believed there was a high probability that a fact existed but deliberately avoided learning about that existence.  563 U.S. at 769.  *Sulyma* recognizes that

willful blindness can support a finding of actual knowledge.  140 S. Ct. at 779.

This court has taken judicial notice of the agreement by the Government, the Company, and Bowers and Kubota in their individual capacities to toll the statute of limitations under ERISA from October 16, 2017, to April 30, 2018.  *See* ECF No. 367-2, PageID #s 7607-12 (copy of tolling agreement was Defense Ex. 241 but was not introduced into evidence).  The present Complaint was filed on April 27, 2018.  See Joint Ex. # 1; *see also* ECF No. 1.

## 1.    Actual Knowledge.

Bowers and Kubota argue that § 1113(2) bars the Government's claims because the Government had actual knowledge of the facts underlying those claims more than three years before this lawsuit was filed, even taking into account the parties' tolling agreement.  Bowers and Kubota point to Form 5500 (the Annual Return/Report of Employee Benefit Plan), filed with the Internal Revenue Service and submitted to the Department of Labor via EFAST2 on October 15, 2013.  *See* ECF No. 654, PageID #s 23517-18.

For the claims in this case to be timely, the Government cannot have had actual knowledge of the facts underlying them more than three years before October 2017, when the tolling agreement took effect.  Thus, if actual knowledge

74

flowed from a filing in October 2013, then the claims in this lawsuit are time-barred.  However, this court is not persuaded that the mere filing of the Form 5500 in 2013 provided the Government with actual notice.  As the Supreme Court held in *Sulyma*, "§ 1113(2) requires more than evidence of disclosure alone."  140 S. Ct. at 777.

        According to Marianne Gibbs, the ERISA Filing Acceptance Program Manager for the Office of the Chief Information Officer in the Department of Labor, the Government electronically receives a million filings per year via EFAST2 and does not have people reading those filings.  *See* Test. of Marianne Gibbs, ECF No. 632, PageID #s 21217-18, 21231. Moreover, the record establishes that Michael Wen, Senior Investigator for the United States Department of Labor, Employee Benefits Security Administration, first read the Form 5500 for the ESOP in December 2014, which falls within the three-year period before the tolling agreement took effect in October 2017. Decl. of Michael Wen ¶ 1, ECF No. 637, PageID #s 21345; Depo. Desig. of Michael Wen, ECF No. 643-4, PageID #s 21934-35; Decl. of Crisanta Johnson ¶ 53, ECF No. 623, PageID #s 20185; *See* Depo. Desig. of Robert Prunty, ECF No. 643-2, PageID #s 21712-13.  The tolling agreement bars claims that the Government had actual knowledge of on or before October 16, 2014.  The filing of Form 5500 in 2013 did not provide actual knowledge as that concept has

been explained in *Sulyma*.  Instead, Form 5500 was only a disclosure that was not actually reviewed by anyone in the Government until December 2014.  Given the nature of the information on the form and the volume of such forms filed, it is understandable that it was pulled up and actually reviewed more than a year after it was filed.

### 2.  Willful Blindness.

Bowers and Kubota argue that the Government cannot deny having had actual knowledge simply by ignoring facts staring the Government in the face.  It is, of course, true that if the Government is willfully blind, actual knowledge will be attributed to the Government.  Bowers and Kubota base their willful blindness argument on what they say was the Government's ignoring of Saakvitne's conduct with respect to other ESOPs.  *See* ECF No. 654, PageID #s 23518-19.  On this matter, the burden is on Bowers and Kubota to prove their point.  They do not meet their burden.

This court does have before it evidence that, in mid-2014, Robert Prunty of the Department of Labor spoke with Saakvitne concerning the investigation into the Hot Dog on a Stick ESOP.  *See* Depo. Desig. of Robert Prunty, ECF No. 643-2, PageID # 21686.  Prunty testified that a Government investigator interested in a particular person could conceivably use the EFAST2 system to look up Form 5500s in aid of gathering

information about that person's work.  *Id.*, PageID # 21715.
While other Government employees testified that, when
investigating ESOPs, they did not generally ask about other ESOPs
a person might be involved in, they also conceded that there was
no policy prohibiting such questions.  *See* Depo. Desig. of Jerome
Raguero, ECF No. 643-7, PageID #s 22442, 22488, 22491; Depo.
Desig. of Paul Zielinski*,* ECF No. 643-8, PageID # 22647.  *See
also* Depo. Desig. of Ty Fukumoto, ECF No. 643-9, PageID # 22649.
The problem facing this court is that the ability of Government
investigators to ask about other ESOPS Saakvitne was involved
with does not necessarily make the investigators willfully blind
when they do not do that.

Willful blindness requires more than a failure to do
everything possible.  The willfully blind person must have
believed there was a high probability or wrongdoing and must have
deliberately avoided learning about that.  *Global-Tech*, 563 U.S.
at 769.  At best, Bowers and Kubota have demonstrated that
Government employees did not, but could have, inquired into other
ESOPs Saakvitne was involved in when those employees spoke with
Saakvitne in 2014.  With the burden on Bowers and Kubota, this
alone does not demonstrate willful blindness.

77

**IV.        CONCLUSION.**

Based on the above findings and conclusions, this court rules that the remaining Defendants (i.e., Defendants other than Saakvitne and his law firm) did not violate any provision of ERISA with respect to the sale of the Company to the Company's ESOP.  Accordingly, the Clerk of Court is directed to enter judgment in favor of the remaining Defendants and against the Government and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 17, 2021.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*Walsh v. Heritage, et al.*, Civ. No. 18-00155 SOM-WRP; POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF REMAINING DEFENDANTS