**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor, | No. 22-15378 |
| | D.C. No. 1:18-cv-00155-SOM-WRP |
| *Plaintiff-Appellee,* | |
| v. | |
| | OPINION |
| BRIAN J. BOWERS, an individual; DEXTER C. KUBOTA, an individual; BOWERS + KUBOTA CONSULTING, INC., a corporation; BOWERS + KUBOTA CONSULTING, INC. EMPLOYEE STOCK OWNERSHIP PLAN, | |
| *Defendants-Appellants.* | |

Appeal from the United States District Court
for the District of Hawaii
Susan O. Mollway, District Judge, Presiding

Argued and Submitted February 15, 2023
Honolulu, Hawaii

Filed October 25, 2023

Before:  Carlos T. Bea, Daniel P. Collins, and Kenneth K. Lee, Circuit Judges.

Opinion by Judge Lee;
Partial Concurrence and Partial Dissent by Judge Collins

---

## SUMMARY[*]

---

### Equal Access to Justice Act

The panel affirmed the district court's denial of attorneys' fees and nontaxable costs under the Equal Access to Justice Act ("EAJA"), and remanded the district court's award of taxable costs.

The U.S. Department of Labor brought the underlying lawsuit under the Employee Retirement Income Security Act, alleging that Appellants Brian Bowers and Dexter Kubota sold their company to an employee stock ownership plan (ESOP) at an allegedly inflated value. The government's case hinged on a single valuation expert, who opined that the plan overpaid for that company. The district court rejected the opinion, and the government lost a bench trial. The district court denied Appellants' request for attorneys' fees and nontaxable costs under EAJA, finding that the government's litigation position was "substantially justified" and that it did not act in bad faith,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in concluding that the government's position at trial was substantially justified, and in denying attorneys' fees and nontaxable costs under EAJA. The panel noted that the government could not rely on red flags alone, such as the "suspicious" circumstances of the ESOP transaction, to defend its litigation position as "substantially justified." The government, however, did not know heading to trial that the district court would reject the expert's entire opinion as unreliable. The panel further held that it was constrained by the deferential standard of review, and it could not say that the district court abused its discretion in finding that the government's position was substantially justified at the time of trial. Given the panel's holding that the government's position was substantially justified, the district court did not clearly err in finding that the government did not litigate in bad faith.

The panel held that the district court abused its discretion in reducing the award of taxable costs because it relied on a clearly erroneous finding of fact in reducing the magistrate judge's recommended award of taxable costs.

Judge Collins concurred with the majority's decision to vacate the district court's order reducing the award of taxable costs, and dissented from the majority's decision to affirm the denial of EAJA attorneys' fees. He would reverse the district court's determination that the government's position in this case was substantially justified, and would remand for the district court to consider the government's remaining argument that none of the Appellants satisfied the "net worth" requirements of EAJA.

# COUNSEL

David R. Johanson, I (argued), Hawkins Parnell & Young LLP, Napa, California; Douglas A. Rubel, Hawkins Parnell & Young LLP, Cary, North Carolina; William M. Harstad, Carlsmith Ball LLP, Honolulu, Hawaii; Scott I. Batterman, Clay Chapman Iwamura Pulice & Nervell, Honolulu, Hawaii; for Defendants-Appellants.

Christine D. Han (argued), Attorney, Office of the Solicitor; Sarah M. Karchunas, Attorney, Plan Benefits Security Division; Jeffrey M. Hahn, Counsel for Appellate and Special Litigation; G. William Scott, Associate Solicitor for Plan Benefits Security; Seema Nanda, Solicitor of Labor; United States Department of Labor, Washington, D.C.; Jing Acosta and Elisabeth Nolte, Trial Attorneys, United States Department of Labor, Chicago, Illinois; for Plaintiff-Appellee.

Richard J. Pearl, Faegre Drinker Biddle & Reath LLP, Chicago, Illinois; Mark D. Taticchi, Faegre Drinker Biddle & Reath LLP, Philadelphia, Pennsylvania; for Amicus Curiae The ESOP Association.

# OPINION

LEE, Circuit Judge:

Congress enacted the Equal Access to Justice Act (EAJA) to curb abusive and costly lawsuits involving the federal government. 28 U.S.C. § 2412. The EAJA thus allows a prevailing party to seek attorneys' fees and costs from a federal agency if the agency's litigation position was not "substantially justified."

The U.S. Department of Labor's Employee Retirement Income Security Act (ERISA) lawsuit here was time-consuming and expensive for Appellants Brian Bowers and Dexter Kubota, who sold their company, Bowers + Kubota Consulting, Inc. ("B+K"), to an employee stock ownership plan (ESOP) at an allegedly inflated value. The government's case was also shoddy: It ultimately hinged on a single valuation expert, who opined that the plan overpaid for the company. The expert's errors led the district court to reject his opinion, and the government lost after a five-day bench trial. The district court, however, determined that the government's litigation position was "substantially justified" and denied Bowers and Kubota's request for attorneys' fees and costs.

We hold that the district court did not abuse its discretion in denying attorneys' fees. In hindsight, the Department of Labor's case had many flaws. But the district court did not err in concluding that the government was "substantially justified" in its litigation position when it went to trial. The government's expert, despite his errors, arguably had a reasonable basis—at least at the time of trial—in questioning whether the company's profits could surge by millions of dollars in just months.

We, however, remand on the award of costs because the district court based its denial of costs in part on a clearly erroneous factual finding.

## BACKGROUND

## I. The Secretary of Labor Brings an Unsuccessful ERISA Action Against Bowers, Kubota, and B+K.

To understand the district court's decision under the EAJA, we must first take a brief look at the merits of the Department of Labor's ERISA lawsuit. For the most part, we need not delve into the minutiae of the case. But it is useful to understand the basic nature of the ESOP transaction, why the government sued, and—most importantly—why the government lost.

### A. Bowers and Kubota sell B+K Consulting to an ESOP.

Bowers and Kubota owned all the stock in B+K, a construction management, architecture, and engineering design firm based in Hawaii. In 2008, Bowers and Kubota began exploring options for selling the company. After some haggling with a potential third-party acquirer, Bowers and Kubota decided to sell B+K to an ESOP. As suggested by its name, an ESOP is an employee benefit plan that gives employees an ownership stake in their company. 26 U.S.C. §§ 401(a), 4975(e)(7). An ESOP has a trustee who owes fiduciary responsibility to the plan's participants and beneficiaries. 29 U.S.C. §§ 1104, 1106(a)(1)(A), 1108(e), 1102(18).

In the fall of 2012, B+K retained Libra Valuation Advisors (LVA) to prepare a fair market valuation for the company. On December 3, 2012, B+K appointed a trustee to the ESOP.

From there, the deal moved quickly.  On December 7, LVA changed its engagement letter to state that it was working for the ESOP trustee rather than B+K. Negotiations over the sale began on December 10.  On December 11, LVA valued B+K at between $37,090,000 and $41,620,000.  And by the end of that day, the ESOP trustee agreed that the ESOP would buy B+K from Bowers and Kubota for $40 million.  Shortly after the agreement, LVA submitted its final report, which concluded that B+K's fair market value was $40,150,000.  With LVA's advice that the $40 million price was fair, the deal closed on December 14—the ESOP trustee having billed only 30.1 hours of work.

## B. The Department of Labor Sues Bowers, Kubota, and B+K Under ERISA.

Two years after the B+K sale, the transaction came under government scrutiny when a drop in the company's share price aroused the Department of Labor's suspicion that B+K was sold to the ESOP for more than its fair market value. The government conducted a multiyear investigation, culminating in a complaint filed against Appellants.  The complaint alleged that Bowers and Kubota breached their fiduciary duties and engaged in self-dealing by inducing the ESOP to pay above the fair market value for the shares of B+K in violation of ERISA, 29 U.S.C. §§ 1001 et seq.

After surviving a motion to dismiss and a summary judgment motion, the government's case proceeded to trial. The government emphasized the circumstances of the ESOP transaction, questioning LVA's independence as well as the ESOP trustee's diligence.  But when the dust settled on the government's case, the only question that mattered was whether B+K was sold for more than its fair market value.

To support that the ESOP overpaid for B+K, the government depended on its valuation expert, Steven Sherman. Sherman opined that LVA significantly overvalued B+K by basing its findings on an unsupportable projection of the company's 2012 Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA). LVA provided a 2012 EBITDA estimate of $9.2 million. In contrast, Sherman—arguing that LVA's estimate far exceeded B+K's past performance and the earnings achieved by industry peers—estimated $4.8 million.

To reconcile this gaping difference, Sherman flagged that LVA's forecast projected lower subconsultant expenses than B+K historically averaged, which Sherman argued would have inflated LVA's EBITDA estimate and ultimately its valuation. Sherman concluded that by adjusting these fees to align with historical averages, one could produce a 2012 EBITDA that better matched B+K's past performance. As it would turn out, however, Sherman was wrong because these subconsultant fees were not expenses on B+K's profit and loss statement but costs passed through to the company's clients. On top of his EBITDA adjustments, Sherman further reduced LVA's valuation by applying a "limited control" discount, which he argued would account for his observation that Bowers and Kubota controlled B+K after the sale, even though the ESOP had complete ownership of the company. Sherman concluded that B+K had a fair market value of $26.9 million at the time of the ESOP transaction.

After a five-day bench trial, Appellants prevailed. The district court rejected Sherman's expert report as unreliable, finding that several errors—his revised EBITDA estimate, his treatment of subconsultant fees, and his limited-control discount analysis—caused him to "significantly and

unreasonably undervalue[]" B+K. Sherman erred in deducting subconsultant fees because he mistakenly treated them as B+K expenses, not as pass-through costs. His limited-control discount analysis was erroneous because it relied on post-sale facts that should not have been incorporated into the pre-sale valuation. And he faltered in his EBITDA estimate by glossing over B+K's upward-trending earnings and its backlog of contracts. The district court added that these issues might have been avoided if Sherman or the government's attorneys had interviewed B+K management about the company's finances.

Without a reliable expert to show that B+K was sold for more than its fair market value, the government's case crumbled.

## II. The District Court Grants in Part and Denies in Part Appellants' Bill of Costs and Motion for Attorneys' Fees and Nontaxable Costs.

After the trial, Appellants filed a bill of costs, seeking reimbursement from the government for the taxable costs incurred in the case. 28 U.S.C. § 2412(a)(1). A magistrate judge recommended taxable costs of $72,962.95. The district court adopted this recommendation in part, modifying it to $41,810.46 based on its finding that certain depositions taken by Appellants "were unnecessary and unreasonably increased the cost of this litigation."

Appellants also sought attorneys' fees and nontaxable costs under the EAJA. The magistrate judge recommended denying the request, finding that the government's position was substantially justified and that it did not act in bad faith. The magistrate judge concluded that the government reasonably relied on Sherman's expert opinion, despite its flaws, when proceeding to trial. The district court adopted

the magistrate judge's findings and conclusions. Appellants then timely appealed.

## ANALYSIS

Congress enacted the EAJA to "eliminate financial disincentives for those who would defend against unjustified governmental action and thereby to deter the unreasonable exercise of Government authority." *Ardestani v. INS*, 502 U.S. 129, 138 (1991). The EAJA partially waives the United States' sovereign immunity and allows prevailing parties to seek attorneys' fees and nontaxable costs if (a) the government's position was not "substantially justified" or (b) the government acted in bad faith. 28 U.S.C. § 2412(b), (d)(1)(A), (d)(2)(A). The EAJA also empowers a court to award taxable costs. 28 U.S.C. § 2412(a). We affirm the district court's denial of fees, but we remand its award of costs.

## I. The District Court Did Not Abuse Its Discretion in Finding the Government's Position "Substantially Justified" and Denying Attorneys' Fees and Nontaxable Costs under 28 U.S.C. § 2412(d).

Under the EAJA, a prevailing party can seek attorneys' fees unless the government's litigation position was "substantially justified." *See Comm'r, INS v. Jean*, 496 U.S. 154, 159, 165 (1990). For the government's position to be substantially justified, it "must have a 'reasonable basis both in law and fact.'" *Meier v. Colvin*, 727 F.3d 867, 870 (9th Cir. 2013) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Of course, the government's position need not be correct, but it must be "justified to a degree that could satisfy a reasonable person." *Underwood*, 487 U.S. at 565–66 & n.2.

Courts thus must avoid placing "too much weight on the government's ultimate loss" in hindsight, and instead assess "the reasonableness of the government's position *at the time of the litigation.*" *Gonzales v. Free Speech Coal.*, 408 F.3d 613, 620 (9th Cir. 2005). In deciding whether the government's position was substantially justified after we already know the outcome, "it is not enough to repeat the analysis of the merits decision, and add adjectives." *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1175 (D.C. Cir. 2005) (Roberts, J.). The central issue, then, is whether the government's position *at trial* was reasonable, despite its ultimate failure to prove that position.

We review the district court's fee determination under the EAJA for an abuse of discretion. *Underwood*, 487 U.S. at 559–60. "A district court abuses its discretion when . . . its application of the correct legal rule is illogical, implausible or without support in inferences that may be drawn from the facts in the record," *Meier*, 727 F.3d at 869–70 (citing *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc)), such that we are left with a "definite and firm conviction" that the district court's conclusion was a mistake, *Hinkson*, 585 F.3d at 1262.

## A. The Government Cannot Rely on Red Flags Alone to Defend its Litigation Position as "Substantially Justified."

To start, the government makes much hay about the "suspicious" circumstances of the ESOP transaction. It points out, among other things, that the plan used the same valuation advisor (LVA) that B+K had previously hired; that the ESOP trustee billed only 30 hours; and that the deal was completed at breakneck speed and landed on the same price that Bowers and Kubota had wanted when they started the

process.    Hearkening back to the adage "where there is smoke, there must be fire," the government implies that its litigation position was "substantially justified."

While these red flags can justify the *investigation*, they alone cannot be the basis for proceeding to trial.    The government's case here depended on its claim that the ESOP improperly relied on LVA's opinion and paid well above the fair market value of the company.  Put another way, the red flags were a red herring if the plan ultimately paid fair market value for the company.  That means the government must have provided some evidence that the ESOP sale price was inflated.  And here, the government relied only on its expert's valuation opinion.  We thus must review whether the district court abused its discretion in finding that the government reasonably relied on its expert's valuation opinion, despite its flaws, as the parties proceeded to trial.

## B.  The District Court Did Not Abuse Its Discretion in Finding that the Government was Substantially Justified in Relying on Sherman's Opinion at Trial.

The government's valuation expert, Steven Sherman, asserted that the $40 million valuation offered by LVA, B+K's advisor, was inflated because it had relied on a dubious $9.2 million projection for the company's 2012 EBITDA.   In 2011, the company's EBITDA was only $2.6 million.  Sherman cast doubt on LVA's projection of a sudden spike in EBITDA, given the company's historical performance and the results of comparable companies in the industry.  Sherman concluded that $4.8 million would have been a more accurate projection for the 2012 EBITDA, and he downgraded the company's value accordingly.

Sherman  believed  that  B+K's  subconsultant  fees possibly  contributed  to  the  inflated  2012  EBITDA

projection.  So he deducted those expenses in preparing his valuation of the company.  But Sherman was wrong.  He conceded at trial that he had mistakenly considered the fees as company expenses when in fact they were passed through to B+K's clients.  Put another way, the subconsultant fees could not have affected the 2012 EBITDA projection.

The government either knew or should have known about this error before trial because Appellants' experts pointed out this mistake during discovery.  Indeed, this error also would have been apparent had Sherman interviewed B+K management in accordance with the Uniform Standards of Professional Appraisal Practice.  The government thus was not substantially justified in relying on this aspect of its expert's analysis.

But this error, as plain as it was, did not necessarily undermine Sherman's big-picture EBITDA analysis—and the government's position—as the parties headed to trial.  Sherman's main objection to LVA's valuation of the company was that "the profitability of this company, which had historically been two to five or $6 million EBITDA, was not going to turn on a dime and go to nine or $10 million."  He was stumped by how LVA could justify such a massive surge in expected profitability in such a short time in a competitive environment.  One reason for this overestimate—he thought—could have been LVA's understated forecast of B+K's subcontract expenses; other candidates might have been LVA's failure to adjust for additional wages.  Whatever the cause, Sherman stood firm in his conviction that B+K was not as profitable as LVA predicted.  As he testified at trial, "the adjustment to subcontract expenses was more illustrative than anything

else. . . . I looked at the historical EBITDA . . . [a]nd there was a radical change."[1]

Ultimately, the district court rejected Sherman's EBITDA analysis and his entire opinion. It found that Sherman overlooked that B+K's earnings trended upwards and that the company had a backlog of contracts.[2] The court also noted that Sherman should have known that his projection was too low because B+K had notched a 2012 EBITDA of $7.047 million by the time that he produced his opinion.

But the government did not know heading to trial that the district court would reject Sherman's entire opinion, even if it knew or should have known that Sherman had erred in assessing the subconsultant fees. The government could have rationally believed that LVA's valuation analysis was faulty, given that LVA predicted that profitability would balloon in a matter of a few months with no compelling explanation why. Indeed, the actual EBITDA in 2012 turned

---

[1] Sherman's application of a limited-control discount was also problematic because it was based on post-transaction circumstances. But this error does not necessarily suggest that the government's position was unreasonable. For one thing, the discount constituted only a small part of Sherman's overall analysis. What's more, the EAJA does not require the government's position to be faultless to be substantially justified under 28 U.S.C. § 2412(d). *See Underwood*, 487 U.S. at 565 (stating that "substantially justified" does not mean "'justified to a high degree,' but rather . . . justified to a degree that could satisfy a reasonable person").

[2] Sherman had plausible responses to the district court's critiques of his opinion. For example, Sherman recognized that the company had strong revenue growth—indeed, his opinion incorporated B+K's revenue projections—but he contended that the company's profits remained far short of LVA's projections.

out to be $7 million, far lower than LVA's estimate of $9 or $10 million (although much higher than Sherman predicted). And the fact that the district court denied Appellants' motion in limine to exclude Sherman as an expert witness suggests that the government did not know the court would later reject Sherman's opinion as unreliable.

In short, the government's litigation position at the time of trial was weak on evidence but perhaps not without a reasonable basis. We recognize that this is a close call. We also note that the EAJA is not a toothless tool when combatting governmental overreach: the statute entitles parties to seek fees from the government when its case is based on incorrect legal positions or dubious evidence and expert testimony. Indeed, had the district court awarded fees here, it might not have been an abuse of discretion to do so. But we are constrained by that same deferential standard of review. And we cannot say that the district court abused its discretion in finding that the government's position was substantially justified at the time of trial.[3]

---

[3] The dissent suggests that we are establishing a laxer standard for the government to prevail in an EAJA case. Not so. Our decision is largely based on our deferential standard of review and the unique facts of the case. At the time of trial, the government appeared to have substantial evidence for its case because its expert pinpointed the anomaly of Appellants' estimate that EBITDA would double in a short period of time (it turned out that both the government and Appellants were substantially off in their EBITDA projections). In the end, the government's case completely crumbled, but we cannot say that the district court abused its discretion in finding the government's position to be substantially justified at the time of trial.

## II. The District Court Did Not Abuse Its Discretion in Denying Attorneys' Fees and Nontaxable Costs under 28 U.S.C. § 2412(b) Because the Government Did Not Act in Bad Faith.

Appellants also appeal the district court's denial of attorneys' fees under 28 U.S.C. § 2412(b).  Section 2412(b) allows a court to award attorneys' fees where the government acted in bad faith.  *Rodriguez v. United States*, 542 F.3d 704, 709 (9th Cir. 2008) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)).  Here, the district court found that the government did not act in bad faith.  We review that finding for clear error.  *Ibrahim v. DHS*, 912 F.3d 1147, 1166 (9th Cir. 2019) (citing *Cazares v. Barber*, 959 F.2d 753, 754 (9th Cir. 1992)).

"Mere recklessness does not alone constitute bad faith; rather, an award of attorney's fees is justified when reckless conduct is 'combined with an additional factor such as frivolousness, harassment, or an improper purpose.'" *Rodriguez*, 542 F.3d at 709 (quoting *Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001)).  Naturally, this is a higher burden than § 2412(d)'s requirement that the government's case be "substantially justified."  *See Underwood*, 487 U.S. at 566 ("To be 'substantially justified' means, of course, more than merely undeserving of sanctions for frivolousness.").  Given our holding that the government was substantially justified in its position, the district court did not clearly err in finding that the government did not litigate in bad faith.

## III. The District Court Abused Its Discretion in Reducing the Award of Taxable Costs.

Finally, we hold that the district court incorrectly reduced the magistrate judge's recommended award of

taxable cost by relying on a clearly erroneous finding of fact. *Hinkson*, 585 F.3d at 1263; 28 U.S.C. § 2412(a)(1).

The parties agree that the district court mistakenly believed that several depositions occurred after it had denied Appellants' motion for summary judgment and that the depositions therefore "unreasonably increased the cost" of litigation. In reality, the depositions were taken before that judgment. Because the district court's reduction of costs was mainly based on that clear error, it abused its discretion. We thus remand the issue of costs so that the district court may reconsider its decision on the corrected record.

## CONCLUSION

The EAJA deters the government from using its vast resources and power to pursue abusive litigation against its citizens. Appellants soundly defeated the government's flawed case against them. But whether the district court abused its discretion in denying attorneys' fees is a different question. And under that deferential standard, we do not have the "definite and firm conviction" that the district court erred in finding that the government's position was substantially justified. *Hinkson*, 585 F.3d at 1263. We **AFFIRM** the district court's denial of attorneys' fees and nontaxable costs, and we **REMAND** the district court's award of taxable costs.

18                           SU V. BOWERS

COLLINS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's decision to vacate the district court's order reducing the cost award, and I therefore concur in Part III of the court's opinion.  However, I dissent from the majority's decision to affirm the denial of attorney's fees in this case.

As a general rule, if a civil case brought by the Government is unsupported by substantial evidence, then the Government's litigating position is not "substantially justified" for purposes of determining the defendants' eligibility for attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A).  Here, the majority does not dispute that the Government's case against Defendants-Appellants was unsupported by substantial evidence, yet the majority nonetheless upholds the district court's denial of attorney's fees.  The majority does so on the ground that the Government reasonably failed to recognize, in advance of trial, just how weak its case was. *See* Opin. at 14–15.  But this replaces the statutory standard for when attorney's fees may be denied (*viz.*, when "the position of the United States was substantially justified") with a standard that is much more forgiving to the Government (*viz.*, whether the United States *reasonably believed* that its position was substantially justified).  Because the majority's novel standard is inconsistent with the statute and precedent and leads to the wrong outcome in this case, I respectfully dissent.

## I

The relevant provision of the EAJA states that, "[e]xcept as otherwise specifically provided by statute, a court *shall*

award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort) . . . brought by or against the United States in any court having jurisdiction of that action, *unless* the court finds that the position of the United States was *substantially justified* or that special circumstances make an award unjust."    28 U.S.C. § 2412(d)(1)(A) (emphasis added).  Under the EAJA, the default rule is that attorney's fees will be awarded if the Government loses the case, unless the Government carries its burden to show that its position in the litigation was substantially justified or that, for other special reasons, an award of fees would be unjust.  Here, the district court denied Defendants' motion for attorney's fees under § 2412(d) solely on the ground that the Government's position *was* substantially justified, and so the central question before us is whether the district court correctly so held.

In *Pierce v. Underwood*, 487 U.S. 552 (1988), the Supreme Court construed the phrase "substantially justified" in the EAJA by drawing upon the settled understanding of the familiar, and similarly phrased, "substantial evidence" standard that is applied in the administrative context.  *Id*. at 564.  Because that standard requires that an agency position be supported with "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" the Court held that the EAJA standard likewise required that the Government's position be "justified to a degree that could satisfy a reasonable person."  *Id*. at 564–65 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  That means, in other words, that the Government's position must have a "reasonable basis both in law and fact." *Id*. at 565 (citation omitted).  We review "the position of the United States" for substantial justification "as a whole,"

rather than by breaking the case down into "atomized line-items." *Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1168–69 & n.16 (9th Cir. 2019) (en banc) (citations omitted).

As we have recognized, *Pierce*'s explicit analogy between the substantial evidence standard and the EAJA's "substantially justified" standard means that, except perhaps in a "decidedly unusual case," a judicial determination that the Government's case on the merits was "unsupported by substantial evidence" will ordinarily mean that the Government's position was not "substantially justified" and that fees should be awarded. *Thangaraja v. Gonzales*, 428 F.3d 870, 874 (9th Cir. 2005) (quoting *Al-Harbi v. INS*, 284 F.3d 1080, 1085 (9th Cir. 2002)); *see also Meier v. Colvin*, 727 F.3d 867, 872 (9th Cir. 2013).

Under these standards, this is an easy case. As I explain in the next two sections, (1) the Government's case against Defendants was not supported by substantial evidence; and (2) there is nothing about this matter that would make it the sort of "decidedly unusual case" in which the Government's position can be said to have been "substantially justified" *despite* the lack of substantial evidence.

## II

The Government brought this suit against, *inter alia*, Defendants-Appellants Brian Bowers and Dexter Kubota, the founders of a design firm called Bowers + Kubota Consulting ("B+K"), alleging multiple violations of the Employment Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. As the majority notes, *see* Opin. at 7, the Government's central theory was that Bowers and Kubota had committed multiple violations of ERISA in selling B+K to an Employee Stock Ownership

Plan ("ESOP") for an allegedly inflated value of $40 million.[1]    This theory, however, was unsupported by substantial evidence.

## A

A review of the Government's claims in this matter confirms that the Government's case rested dispositively on the central premise that Bowers and Kubota had inflated the value of B+K when selling it to an ESOP in December 2012.

First, the Government alleged that Bowers and Kubota— who were allegedly "fiduciaries" of the ESOP within the meaning of ERISA, *see* 29 U.S.C. § 1002(21)(A)(i)—had engaged in a transaction prohibited by § 406(a)(1)(A) of ERISA, 29 U.S.C. § 1106(a)(1)(A).  That section prohibits ESOP fiduciaries from causing the ESOP to engage in the "sale or exchange, or leasing, of any property between the plan and a party in interest."  29 U.S.C. § 1106(a)(1)(A). However, ERISA carves out certain transactions from that prohibition, including an "acquisition, sale, or lease [that] is for adequate consideration." *Id*. § 1108(e)(1).  For purposes of that provision, "adequate consideration" means (as relevant here) "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." *Id*. § 1002(18)(B).  To establish the applicability of this exception, it was Bowers and Kubota's burden to prove, as an affirmative defense to the Government's § 406(a)(1)(A) charge, that B+K's $40 million sale price was *not* inflated. *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *see also Perez v. Bruister*, 823 F.3d 250, 262 (5th Cir. 2016);

---

[1] An ESOP is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014).

*Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994).

Second, the Government alleged that Bowers and Kubota had engaged in a transaction prohibited by § 406(b)(1) and (b)(2) of ERISA, 29 U.S.C. § 1106(b)(1), (2). Those subsections prohibit fiduciaries from "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. § 1106(b)(1), and from "act[ing] in any transaction involving the plan on behalf of a party (or represent[ing] a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries," *id.* § 1106(b)(2). The district court construed these allegations—*i.e.*, that Bowers and Kubota were acting in their "own interest," and acting on behalf of a party (themselves) "whose interests are adverse to the interests of the [ESOP]"—as requiring the *Government* to make a showing that the $40 million sale of B+K was "for more than fair market value." In other words, the district court concluded that Bowers and Kubota would not be acting in their "own interest," *id.* § 1106(b)(1), or in the service of interests "adverse to the interests of the [ESOP]," *id.* § 1106(b)(2), if they arranged the sale of B+K for a price that fairly reflected the ESOP's interests (*i.e.*, for a price reflecting fair market value). The Government has not challenged the district court's legal analysis of the elements of this claim.

Third, the Government alleged fiduciary imprudence and disloyalty by Bowers and Kubota, in violation of § 404(a)(1)(A), (B), and (D) of ERISA. This cause of action rested on allegations that Bowers and Kubota had failed in their duties as trustees by (1) "[c]ausing unreasonable, inflated revenue projections" for B+K to be forwarded to a firm (LVA) conducting an evaluation of the value of B+K;

(2) failing to adequately monitor the ESOP trustee (Saakvitne) to ensure that "he acted in the best interests of the [ESOP's] Participants and Beneficiaries"; (3) relying on a valuation of B+K, prepared by LVA, that "significantly overvalued the shares of [B+K]," without ensuring that reliance on LVA's valuation report "was reasonably justified under the circumstances"; (4) relying on another LVA-created "Fairness Opinion," which "indicated that the fair market value of the Company as of that date was $40,150,000," without "making certain that reliance on the Opinion was reasonably justified under the circumstances"; and (5) "[c]ausing the ESOP to enter into the purchase of the Company's stock at a price in excess of fair market value which was not solely in the interest of the Plan's participants."

Three of these five allegations—allegations (3), (4), and (5) above—rested explicitly on the Government's claim that B+K's overall value was overstated. Allegation (1) also rested indirectly on that valuation claim, because the allegedly inflated 2012 revenue projections would cause a loss to the ESOP only if they ultimately caused the company to be sold for more than it was worth. Allegation (2) also rested implicitly on the premise that the company was overvalued, because the Government's theory was that Bowers and Kubota's failure to monitor Saakvitne led to his agreement to buy B+K for an inflated price, in violation of his obligation to "act[] in the best interests of the [ESOP's] Participants and Beneficiaries."[2]

---

[2] The Government also alleged that Bowers and Kubota were liable as co-fiduciaries, that they engaged in knowing participation in trustee Saakvitne's fiduciary breaches, and that they orchestrated improper indemnification agreements with the ESOP. The first two claims were

Accordingly, Bowers and Kubota's liability in this case ultimately hinged dispositively on whether they had inflated the value of B+K when selling it to an ESOP in December 2012. Although the party with the burden of proof on that issue shifted depending upon the claim, a finding that B+K was worth more than $40 million would doom the Government's entire case.

**B**

As the district court found, the evidence of *both* sides at trial showed that B+K was worth more than $40 million at the time it was sold to the ESOP. Although the Government sought to prove otherwise, its valuation methodology contained several obvious errors that, once corrected, confirmed that the company's value exceeded $40 million.

Specifically, the Government at trial relied exclusively upon a valuation expert named Sherman, who testified that at the time of sale, B+K was in fact worth just $26.9 million, and that Bowers and Kubota's competing valuation report was flawed. However, as the district court concluded, Sherman made three significant errors that caused him to "significantly *and unreasonably* undervalue[] the Company" (emphasis added).

First, Sherman erroneously treated some $10.5 million in "subconsultant fees"—which the company had in fact passed on to clients—as if they were company expenses that had to be "deducted in determining the value of the

entirely derivative of the Government's other claims. The third claim was not, strictly speaking, an operative substantive claim: the district court held that, properly construed, the Government's indemnification claim sought no finding of liability against Bowers and Kubota on the merits, but sought merely to hold certain indemnification agreements void in the event that liability was found on another ground.

Company."  As the district court concluded, "[t]his was a notable error" that caused Sherman's valuation of B+K to be "correspondingly too low."

Second, Sherman erroneously applied a nearly $3 million discount to the company's value based on circumstances occurring *after* the company's sale.  This was a clear violation of the applicable appraisal standards.

Correcting just these two obvious errors in Sherman's analysis leads to a valuation of more than $40 million.  That is, had Sherman correctly omitted the $10.5 million in subconsultant fees and the erroneous $3 million discount, his calculated value of the company—applying his own methodology—would have been $40.4 million.

Third, Sherman erroneously relied on the sale price floated in a nonbinding indication of interest from a third-party company, URS.  URS had earlier raised the possibility of purchasing B+K for $15 million, "plus or minus 'cash and debt on the Company's balance sheet.'"  The Government claimed in its Proposed Post-Trial Findings of Fact and Conclusions of Law that "Sherman appropriately considered URS's indication of interest as an objective, market-based indicator of the value at which a willing seller would purchase B+K."  This aspect of Sherman's analysis was also seriously wrong.  As the district court observed, B+K had approximately $14 million in "cash and working capital" on hand—meaning that Sherman, and by extension the Government, had "ignore[d] the actual 'cash and debt on the Company's balance sheet' that the URS indication of interest expressly acknowledged should be considered."  Moreover, the URS indication of interest was, in essence, an initial low-ball negotiation position on the part of URS; it was not an actual estimate of the company's fair-market value.

Accordingly, the URS indication of interest on which Sherman relied had "little relevance to the actual value of the Company."

In light of these errors, the district court found that Sherman "significantly and unreasonably undervalued the Company." "Not only does this render his ultimate valuation unreliable," the district court concluded, "it also undermines the usefulness of his critique of LVA's valuation" (*i.e.*, the competing valuation relied upon by Bowers and Kubota).

Without substantial evidence on the Government's part that B+K was worth anything less than $40 million, and faced with competing valuation evidence substantiating a value of over $40 million, Bowers and Kubota prevailed on the central issue at trial—*viz.*, "that the Company's shares were worth *at least* what the Company's ESOP paid for it" (emphasis added).[3]

Accordingly, it is established, for purposes of this appeal, that the Government's case on the merits was unsupported by substantial evidence. That brings this case within the general rule that there is no "substantial justification under the EAJA" where the Government's position was unsupported by "reasonable, substantial and

---

[3] Moreover, even with respect to the subsidiary issue of whether the 2012 revenue projections were inflated, *see supra* at 22–23, the district court held that the Government's claims were simply unsupported. As the district court stated, Sherman inexplicably failed to take into account several relevant considerations in estimating his proposed "corrected" projections, thereby rendering his estimates "unreliable."

probative evidence in the record." *Thangaraja*, 428 F.3d at 874; *see Al-Harbi*, 284 F.3d at 1085.[4]

## III

The only question, then, is whether this is the "decidedly unusual case" in which the Government's position might be said to be substantially justified despite a wholesale lack of evidentiary support. *Al-Harbi v. INS*, 284 F.3d at 1085. It manifestly is not.

We found *Al-Harbi* to be such an "unusual" case, but our rationale for doing so has no applicability here. In *Al-Harbi*, we "upheld the government's central positions in th[e] appeal," but we nonetheless granted relief to the alien based solely on an *additional* issue that had been "articulated only relatively briefly in Al–Harbi's presentation to this court." 284 F.3d at 1085. "Under these unique circumstances," we held, "the government's litigation position as a whole [was] substantially justified, albeit not ultimately adequate to sustain the agency's decision." *Id*. Nothing comparable is presented in this case. Here, in contrast to *Al-Harbi*, the Government lost on the central issue that was the focus of the entire case, and it lost precisely because its position on that loadbearing issue was wholly unsupported. There is no sense, as in *Al-Harbi*, that it could be said that, despite its substantial-evidence-based loss on the dispositive issues, the Government's position could still be thought to be substantially justified as an overall matter.

---

[4] Contrary to what the Government contends, this conclusion does not rest on or lead to the view that, whenever the Government loses a case on the merits, its position is not substantially justified under the EAJA. Here, the Government did not merely lose the case; it suffered a wholesale failure of proof on the central issue in the litigation that rendered its position, as an objective matter, wholly unsupported.

The majority does not directly dispute that the Government's case was not supported by substantial evidence, but it nonetheless holds that the Government's litigating position was substantially justified. According to the majority, when the Government proceeded to trial, it "did not know the court would later reject" its expert's valuation. *See* Opin. at 14–15. Until the district court did so, the majority asserts, the Government could reasonably have relied on that valuation "at the time of trial." *See* Opin. at 15. This approach is contrary to the statute and the caselaw construing it.

The district court's merits decision here rested upon, and was driven by, objective—indeed, incontestable—flaws in the Government's expert's valuation of B+K. Given these objective errors—which were inherent in the Government's case even before the district court pointed them out—the majority is wrong in saying that the Government's litigating position was somehow reasonable *up to the point that the district court rejected it*. The district court's merits decision simply recognized and enumerated the patent substantive deficiencies that were built into the Government's case all along.

The majority suggests that, even though there was no evidentiary support for the Government's central claim about the valuation of B+K, the Government's position was still substantially justified because, in light of the allegedly inflated 2012 earnings estimates, the Government "*could have rationally believed* that LVA's valuation analysis was faulty" as well. *See* Opin. at 14 (emphasis added). As an initial matter, this effort to isolate one assertedly valid sliver of the Government's case provides no basis for concluding that the Government's position was substantially justified. In applying that standard, we do not break down the

Government's case into "atomized line-items" of this sort. *Ibrahim*, 912 F.3d at 1168–69 & n.16 (citations omitted). Rather, we ask whether the Government's case was "justified *in substance* or *in the main*," *Pierce*, 487 U.S. at 565 (emphasis added), and for the reasons that I have explained, it obviously was not. Moreover, the majority's effort to salvage some sliver of this shoddy case also fails on its own terms. As noted earlier, the district court held that the Government had failed to present "reliable" evidence to support its critique of these earnings estimates, because its expert's analysis simply overlooked multiple relevant factors. *See supra* note 3. The district court also faulted the Government for failing to establish its broader claim that these earnings estimates ultimately caused the company to be sold for more than it was worth. In short, the Government's flawed reliance on these earnings estimates only further confirms that its case was objectively and seriously flawed.

More importantly, the majority's rationale effectively replaces the statutory standard for denying attorney's fees— *viz*., whether the Government's position *was* "substantially justified," 28 U.S.C. § 2412(d)(1)(A)—with the much looser standard of whether the Government "could have rationally believed" that its position was substantially justified. According to the majority, even though the Government's case was *not* supported by substantial evidence, it was still "substantially justified" because "the government's litigation position at the time of trial was weak on evidence but *perhaps* not without a *reasonable* basis." Opin. at 15 (emphasis added). This is a gross dilution of the EAJA's standard, which does not allow the Government to defeat a fee request based on speculative guesses about whether the case was "perhaps" supported by substantial evidence. The

statute, as construed by the Supreme Court, requires that the Government's case *objectively* rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce*, 487 U.S. at 564–65 (citation omitted). That standard was not met here, and there are no special circumstances that would suggest that this is the "decidedly unusual case" in which the Government's position is substantially justified despite being unsupported by substantial evidence. *Al-Harbi v. INS*, 284 F.3d at 1085.

*          *          *

Accordingly, I would reverse the district court's determination that the Government's position in this case was substantially justified, and I would remand for the district court to consider the Government's remaining argument that none of the Appellants here satisfied the "net worth" requirements of the EAJA. *See* 28 U.S.C. § 2412(d)(2)(B) (limiting the eligibility of individuals and entities to claim attorney's fees under EAJA to those whose "net worth" is under specified amounts).

I respectfully dissent.